```
 1                    UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF GEORGIA
 2                        GAINESVILLE DIVISION

 3

 4
    UNITED STATES OF AMERICA    ) DOCKET NO. 2:17-CR-05-RWS-JCF
 5                              )
                                ) GAINESVILLE, GEORGIA
 6                              ) AUGUST 15, 2017
             V.                 )
 7                              )
    WILLIAM CHRISTOPHER GIBBS,  )
 8                              )
             DEFENDANT.         )
 9

10

                    TRANSCRIPT OF SUPPRESSION HEARING
11                BEFORE THE HONORABLE J. CLAY FULLER
                     UNITED STATES MAGISTRATE JUDGE
12

13  APPEARANCES OF COUNSEL:

14  FOR THE GOVERNMENT:              RYAN K. BUCHANAN
                                     OFFICE OF THE U.S. ATTORNEY
15
    FOR THE DEFENDANT:               NATASHA PERDEW SILAS
16                                   FEDERAL DEFENDER PROGRAM

17

18  COURT REPORTER:                  ANDY ASHLEY
                                     1949 U. S. COURTHOUSE
19                                   75 TED TURNER DRIVE
                                     ATLANTA, GEORGIA  30303-3361
20                                   (404) 215-1478

21

22  PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
    PRODUCED BY COMPUTER.
23

24

25
```

1              P R O C E E D I N G S

2    (GAINESVILLE, HALL COUNTY, GEORGIA; AUGUST 15, 2017

3    IN OPEN COURT.)

4              THE COURT:  ALL RIGHT.  COURT CALLS 2:17-CR-5, UNITED

5    STATES VERSUS WILLIAM CHRISTOPHER GIBBS.  I'D ASK COUNSEL TO

6    STATE YOUR APPEARANCES FOR THE RECORD.

7              MR. BUCHANAN:  GOOD MORNING, YOUR HONOR.  RYAN

8    BUCHANAN FOR THE UNITED STATES.  I'M JOINED AT COUNSEL TABLE BY

9    KIMBERLY SPELL FOWLER, SPECIAL AGENT WITH THE FBI.

10             THE COURT:  GOOD MORNING.

11             MS. PERDEW SILAS:  GOOD MORNING, JUDGE.  FOR WILLIAM

12   CHRISTOPHER GIBBS, I AM NATASHA PERDEW SILAS.

13             THE COURT:  GOOD MORNING, MS. PERDEW SILAS AND MR.

14   GIBBS.

15             ALL RIGHT.  WE'RE HERE ON A COUPLE OF DEFENDANT'S

16   MOTIONS.  THE GOVERNMENT HAS GOT SOME WORK TO DO TO DEVELOP A

17   RECORD.  SO I'LL TURN IT OVER TO MR. BUCHANAN.

18             MR. BUCHANAN:  YOUR HONOR, THE DEFENDANT HAS FILED

19   MOTIONS TO SUPPRESS ESSENTIALLY THREE THINGS.  FIRST, THERE IS

20   A STATEMENT THAT'S A RECORDED INTERVIEW POST-MIRANDA STATEMENT

21   GIVEN BY MR. GIBBS.  SO I HAVE SPECIAL AGENT CHRIS BOWER TO

22   TESTIFY ABOUT THAT.

23             SECOND, THEY'VE MOVED TO SUPPRESS EVIDENCE DEVELOPED

24   AT A TRAFFIC STOP THAT OCCURRED APPROXIMATELY TWO WEEKS BEFORE

25   THE DEFENDANT WAS ARRESTED.  THAT TRAFFIC STOP WAS EXECUTED BY

1    FANNIN COUNTY SHERIFF'S OFFICE DEPUTY JOHN KINSER, AND HE'LL

2    TESTIFY ABOUT THE TRAFFIC STOP, SECOND.

3              THIRD, YOUR HONOR, THE DEFENDANT HAS MOVED TO

4    SUPPRESS STATEMENTS THAT HE MADE TO THE MEDICAL FACILITY PRIOR

5    TO HIS ARREST.  I BELIEVE THAT'S A LEGAL ISSUE, SOMETHING WE

6    CAN HANDLE ON THE PAPERS.

7              I TALKED WITH MS. SILAS THIS MORNING ABOUT A CFR, AND

8    THAT CFR IS 45 CFR 164.512 LITTLE (J)(1)(I), AND THAT CFR

9    ALLOWS A FACILITY COVERED BY HIPAA TO DISCLOSE TO A LAW

10   ENFORCEMENT OFFICIAL REASONABLY ABLE TO PREVENT OR LESSEN A

11   SERIOUS AND IMMINENT THREAT TO THE HEALTH OR SAFETY OF AN

12   INDIVIDUAL OR TO THE PUBLIC.

13             IT'S THE UNITED STATES' POSITION, YOUR HONOR, THAT

14   THAT PROVISION ALLOWS THE STATEMENT BY THE HEALTHCARE PROVIDER

15   TO LAW ENFORCEMENT REGARDING THE BELIEF THAT MR. GIBBS HAD

16   RICIN ON HIS PERSON OR MAYBE IN HIS POSSESSION WHEN HE CAME TO

17   THE HOSPITAL.  SO WE BELIEVE THAT'S A LEGAL MATTER, AND

18   SOMETHING WE WILL HANDLE ON THE PAPERS, AND WE DON'T NEED

19   TESTIMONY ON.

20             SO I'VE GOT TWO WITNESSES, SPECIAL AGENT BOWER FROM

21   THE FBI, AND DEPUTY SHERIFF KINSER FROM FANNIN COUNTY.  WITH

22   THAT, YOUR HONOR, THE UNITED STATES WILL CALL SPECIAL AGENT

23   CHRISTOPHER BOWER FROM THE FBI.

24             THE COURT:  OKAY.  MS. PERDEW SILAS IS STANDING.  IT

25   LOOKS LIKE SHE MAY WANT TO SAY SOMETHING ABOUT WHETHER WE NEED

1  PROOF ON THE LAST ISSUE.  COULD YOU PLEASE COME UP TO THE

2  LECTERN SO WE CAN PICK UP YOUR VOICE?  THANK YOU.

3          MS. PERDEW SILAS:  I MIGHT WANT TO CLARIFY IN MY

4  MOTION I SOUGHT TO SUPPRESS ANY AND ALL STATEMENTS OF MR.

5  GIBBS, AND THAT HE WAS TAKEN INTO CUSTODY ON FEBRUARY 2ND.

6          THE GOVERNMENT ALSO GAVE ME WHAT PURPORTS TO BE A

7  SURVEILLANCE VIDEO, AND THE VIDEO JUST SHOWS A PARKING LOT.

8  WELL, I REALIZED THAT I BELIEVE THAT THE GOVERNMENT'S PURPOSE

9  IN GIVING THE VIDEO IS STATEMENTS THAT WERE MADE BY MR. GIBBS

10  THAT WERE RECORDED BY A BODY CAM THAT WAS WORN BY A DEPUTY WHO

11  WAS ON SITE AT THE HOSPITAL.

12          AND SO IT SEEMS LIKE, AND WE CAN DEVELOP THIS THROUGH

13  THE SPECIAL AGENT PERHAPS, THAT THE MOMENT THAT HE ACTUALLY

14  WENT INTO CUSTODY MAY HAVE BEEN AS EARLY AS HIS BASICALLY

15  DISCHARGE FROM THE HOSPITAL WHICH WOULD HAVE BEEN AT THE TIME

16  OF THOSE OTHER STATEMENTS.

17          MY MOTION DID SAY ANY AND ALL STATEMENTS.  I DID NOT

18  SPECIFY ABOUT THE HOSPITAL BECAUSE I ONLY RECENTLY REALIZED THE

19  GOVERNMENT'S PURPOSE IN THE HOSPITAL SURVEILLANCE VIDEO SEEMS

20  TO BE THE STATEMENTS THAT ARE RECORDED ON THAT BODY CAM, AND I

21  WOULD CONTEND THAT HE WAS IN CUSTODY AT THAT TIME.  IT APPEARS

22  THAT HE WAS FROM THE PERSPECTIVE OF FROM THE MOMENT THAT HE'S

23  DONE AT THE HOSPITAL HE NEVER SEEMINGLY IS FREE TO GO UNTIL --

24  WELL NEVER.

25          THE COURT:  OKAY.  THANK YOU.  I APPRECIATE THE ROAD

1  MAP, AND WE'LL ALLOW MR. BUCHANAN TO CALL HIS FIRST WITNESS.

2          MR. BUCHANAN:  YOUR HONOR, THE UNITED STATES CALLS

3  SPECIAL AGENT CHRISTOPHER BOWER.

4          THE CLERK:  PLEASE RAISE YOUR RIGHT HAND TO TAKE THE

5  OATH.

6                  CHRISTOPHER JOHN BOWER,

7  HAVING BEEN DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

8          THE CLERK:  IF YOU WILL HAVE A SEAT, PLEASE, AND

9  STATE YOUR FULL NAME FOR THE RECORD AND SPELL YOUR LAST NAME

10 ALSO.

11         THE WITNESS:  CHRISTOPHER JOHN BOWER, B O W E R.

12                  DIRECT EXAMINATION

13 BY MR. BUCHANAN:

14 Q.   SPECIAL AGENT BOWER, HOW ARE YOU EMPLOYED?

15 A.   I'M CURRENTLY EMPLOYED WITH THE FEDERAL BUREAU OF

16 INVESTIGATION.

17 Q.   AND HOW LONG HAVE YOU BEEN WITH THE FBI?

18 A.   OVER SEVEN YEARS.

19 Q.   AND WHAT TYPES OF CASES DO YOU WORK ON?

20 A.   A WIDE VARIETY OF CASES.  I WORK IN A RESIDENT AGENCY, SO

21 I'M NOT ON A SPECIFIC SQUAD.  I WORK WHITE COLLAR CRIME, DRUGS,

22 GANGS, KIDNAPPINGS, BANK ROBBERIES, DOMESTIC TERRORISM,

23 INTERNATIONAL TERRORISM, A WIDE VARIETY OF VIOLATIONS.

24 Q.   YOU MENTIONED THAT YOU WORK FOR A RESIDENT AGENCY.  PLEASE

25 TELL JUDGE FULLER WHAT THAT MEANS?

1  A.   THE DIVISION HEADQUARTERS IS IN ATLANTA, GEORGIA.  WE HAVE

2  SATELLITE OFFICES AROUND THE STATE CALLED RESIDENT AGENCIES.  I

3  WORK OUT OF THE DALTON RESIDENT AGENCY.

4  Q.   AND SO IF YOU WORK UP IN DALTON, DO YOU SORT OF

5  CONCENTRATE YOUR CASE LOAD ON THE CASES THAT DEVELOP AND ARISE

6  OUT OF NORTH GEORGIA?

7  A.   THAT'S CORRECT.

8  Q.   AND DOES THAT INCLUDE FANNIN COUNTY?

9  A.   YES, SIR.

10  Q.   AND BLUE RIDGE, GEORGIA IS IN FANNIN COUNTY; IS THAT

11  RIGHT?

12  A.   YES, SIR, IT IS.

13  Q.   AND WERE YOU WORKING FEBRUARY 2ND AND 3RD OF 2017?

14  A.   YES, I DID.

15  Q.   AND DO YOU REMEMBER SPECIFICALLY WHAT YOU WERE CALLED TO

16  DO?

17  A.   I RECEIVED A CALL FROM MY SUPERVISOR ABOUT A POSSIBLE WMD

18  THREAT IN FANNIN COUNTY.  I WAS SEVERAL HOURS AWAY NEAR MY

19  RESIDENCE, SO IT TOOK ME A COUPLE OF HOURS TO GET OUT TO FANNIN

20  COUNTY.  I DIDN'T ARRIVE OUT THERE UNTIL PROBABLY AFTER NINE OR

21  TEN P.M.

22  Q.   AND WHAT'S A WMD?

23  A.   A WMD IS A WEAPON OF MASS DESTRUCTION.  THAT'S THE TERM

24  FOR IT THAT THE FBI USES WMD.

25  Q.   WHAT TYPE OF INFORMATION DID YOU HAVE ABOUT THIS POSSIBLE

1  WMD WHEN YOU LEFT HOME DRIVING TO FANNIN COUNTY?

2  A.    THE ONLY INFORMATION I RECEIVED INITIALLY WAS THAT THERE

3  WAS A REPORT THAT THERE WAS POTENTIAL RICIN, A RICIN INCIDENT

4  IN FANNIN COUNTY, AND THAT'S ALL I REALLY HAD TO GO ON BEFORE I

5  GOT IN THE CAR AND STARTED HEADING THAT WAY.

6  Q.    AND DID YOU EVENTUALLY ARRIVE IN FANNIN COUNTY?

7  A.    I DID.

8  Q.    AND WHERE SPECIFICALLY DID YOU GO?

9  A.    THE REGIONAL HOSPITAL THERE IN FANNIN COUNTY.

10  Q.    AND ONCE YOU GOT TO THE FANNIN COUNTY REGIONAL HOSPITAL,

11  WHAT DID YOU DO?

12  A.    WELL, THERE OBVIOUSLY WERE A NUMBER OF AGENCIES ON SITE

13  BEFORE I ARRIVED.  THERE WERE SOME OTHER FBI AGENTS HAD ARRIVED

14  BEFORE ME, AS WELL.  AT THE TIME THE FANNIN COUNTY SHERIFF'S

15  OFFICE HAD CONTROL OF THE SCENE AT THE HOSPITAL, AND THEY HAD

16  HAZMAT UNITS THAT WERE EXAMINING A VEHICLE WHEN I ARRIVED.

17  Q.    AND SO AFTER YOU GOT THERE, DID YOU LEARN WHO THE POSSIBLE

18  SUSPECT WAS IN THIS INVESTIGATION?

19  A.    INITIALLY, YES, I TALKED TO A FANNIN COUNTY SHERIFF'S

20  OFFICE MEMBER AND GOT APPRISED OF THE SITUATION, THAT THEY HAD

21  AN INDIVIDUAL WHO THOUGHT HE MAY HAVE BEEN CONTAMINATED WITH

22  RICIN, AND THAT THE VEHICLE THE INDIVIDUAL HAD DRIVEN WAS THE

23  ONE BEING EXAMINED IN THE PARKING LOT OF THE HOSPITAL.

24        WE WERE, THE FBI WAS STANDING BY TO AWAIT INITIAL

25  TESTING BY THE HAZMAT UNIT TO SEE WHAT WE POTENTIALLY WERE

1  DEALING WITH.

2  Q.    AND WHILE YOU WERE THERE, DID YOU ENCOUNTER MR. GIBBS?

3  A.    I FIRST SAW MR. GIBBS AFTER THE INITIAL ANALYSIS FROM THE

4  HAZMAT UNIT WAS ANNOUNCED OR RELAYED TO US.

5  Q.    OKAY.  AND WHAT DID THEY RELAY TO YOU?

6  A.    MY RECOLLECTION IS THAT THEY HAD A POSITIVE TEST FOR THE

7  RICIN ANTIBODY IN THE SUBSTANCE THAT WAS FOUND IN THE VEHICLE

8  DRIVEN BY MR. GIBBS.

9  Q.    AND ULTIMATELY THAT EVENING WAS MR. GIBBS ARRESTED?

10  A.    HE WAS.

11  Q.    AND DO YOU SEE MR. GIBBS IN COURT TODAY?

12  A.    I DO.

13  Q.    PLEASE IDENTIFY HIM BY AN ARTICLE OF CLOTHING THAT HE'S

14  WEARING?

15  A.    HE'S SITTING WITH THE YELLOW JUMPSUIT ON.

16          MR. BUCHANAN:  YOUR HONOR, WE'D LIKE THE RECORD TO

17  REFLECT THAT THIS WITNESS HAS IDENTIFIED THE DEFENDANT.

18  BY MR. BUCHANAN:

19  Q.    AFTER MR. GIBBS -- HE WAS ARRESTED AT THE HOSPITAL; IS

20  THAT CORRECT?

21  A.    HE WAS TAKEN INTO CUSTODY BY FANNIN COUNTY AT THE

22  HOSPITAL, YES, SIR.

23  Q.    AND THEN WHERE WAS HE TAKEN NEXT?

24  A.    HE WAS TAKEN TO THE SHERIFF'S -- WELL, HE WAS TAKEN TO THE

25  SHERIFF'S OFFICE FROM THE HOSPITAL.

1  Q.   AND WHEN HE WAS TAKEN FROM THE HOSPITAL TO THE SHERIFF'S

2  OFFICE, WERE YOU IN THAT PROCESSION OF CARS THAT TRAVELED FROM

3  THE HOSPITAL TO THE SHERIFF'S OFFICE?

4  A.   YES, MY VEHICLE FOLLOWED THE PATROL CAR THAT TOOK HIM BACK

5  TO THE SHERIFF'S OFFICE.

6  Q.   AND ROUGHLY HOW LONG DID IT TAKE YOU TO GET FROM THE

7  HOSPITAL TO THE SHERIFF'S OFFICE?

8  A.   IT'S FIVE OR SIX MILES AWAY, SO IT'S MAYBE A TEN-MINUTE

9  RIDE.

10  Q.   AND AFTER YOU DROVE FROM THE REGIONAL HOSPITAL TO THE

11  SHERIFF'S OFFICE, WAS MR. GIBBS PROCESSED BY THE SHERIFF'S

12  OFFICE?

13  A.   BRIEFLY, YES, SIR.

14  Q.   AND APPROXIMATELY HOW LONG DID THAT TAKE?

15  A.   FROM THE TIME WE ARRIVED AT THE SHERIFF'S OFFICE, PROBABLY

16  LESS THAN 10 TO 15 MINUTES WE WERE SITTING DOWN TO TALK TO HIM.

17  Q.   SO YOU MENTIONED THAT YOU SAT DOWN AND TALKED WITH HIM,

18  DID YOU CONDUCT AN INTERVIEW?

19  A.   YES, I DID.

20  Q.   AND DO YOU REMEMBER ROUGHLY WHAT TIME THAT INTERVIEW

21  STARTED?

22  A.   IT STARTED A FEW MINUTES AFTER ONE A.M. ON THE 3RD OF

23  FEBRUARY.

24  Q.   AND WHO WAS PRESENT IN THAT INTERVIEW ROOM WITH YOU?

25  A.   MR. GIBBS WAS THERE AND SPECIAL AGENT BENNIE JOHNSON OF

1   THE FBI WHO'S THE CASE AGENT FOR THIS CASE WAS ALSO PRESENT.

2   Q.    WAS ANYBODY ELSE THERE?

3   A.    NOT DURING THE INTERVIEW.

4   Q.    SPECIAL AGENT BOWER, AT THE OUTSET OF THAT INTERVIEW, DID

5   YOU, DID YOU AND SPECIAL AGENT JOHNSON ADVISE MR. GIBBS OF HIS

6   MIRANDA RIGHTS?

7   A.    WE DID.

8   Q.    AND DO YOU REMEMBER HOW YOU DID SO?

9   A.    SPECIAL AGENT JOHNSON TOOK THE FD-395, WHICH IS THE WAIVER

10  OF RIGHTS FORM, HE EXPLAINED IT TO MR. GIBBS.  HE HAD MR. GIBBS

11  READ IT TO MAKE SURE HE UNDERSTOOD IT, AND THEN HE HAD MR.

12  GIBBS INITIAL IT THAT HE UNDERSTOOD HIS RIGHTS, AND THEN MR.

13  GIBBS SIGNED THE WAIVER OF RIGHTS AND AGREED TO TALK TO US.

14  Q.    OKAY.  I'M GOING TO SHOW YOU WHAT'S BEEN MARKED AS

15  GOVERNMENT'S EXHIBIT 1.  PLEASE TELL THE COURT WHAT THAT

16  DOCUMENT IS?

17  A.    IT'S AN FD-395, FEDERAL BUREAU OF INVESTIGATION ADVICE OF

18  RIGHTS FORM.

19  Q.    AND IS THAT THE FORM THAT SPECIAL AGENT JOHNSON PRESENTED

20  TO MR. GIBBS PRIOR TO THAT INTERVIEW?

21  A.    YES, SIR.

22  Q.    AND YOU WERE PRESENT IN THAT ROOM, RIGHT?

23  A.    I WAS PRESENT, YES, SIR.

24  Q.    AND THE PLACES THAT ARE MARKED BESIDE EACH INDIVIDUAL

25  RIGHT, DID MR. GIBBS PUT THOSE MARKS IN THOSE PLACES?

1  A.   YES, SIR.

2  Q.   AND SPECIAL AGENT JOHNSON SIGNED IT?

3  A.   YES, SIR, HE DID.

4  Q.   AND DID YOU SIGN AT THE BOTTOM AS A WITNESS?

5  A.   I DID, SIR.

6          MR. BUCHANAN:  YOUR HONOR, WE MOVE FOR THE ADMISSION

7  OF GOVERNMENT'S EXHIBIT 1 INTO EVIDENCE.

8          MS. PERDEW SILAS:  NO OBJECTION.

9          THE COURT:  GOVERNMENT'S EXHIBIT 1 IS ADMITTED.

10  BY MR. BUCHANAN:

11  Q.   YOU MENTIONED, SPECIAL AGENT BOWER, THAT YOU AND SPECIAL

12  AGENT JOHNSON AND MR. GIBBS WERE THE ONLY PEOPLE IN THE ROOM;

13  IS THAT CORRECT?

14  A.   YES, SIR.

15  Q.   AT THE OUTSET OF THAT INTERVIEW, DID YOU AND SPECIAL AGENT

16  JOHNSON IDENTIFY YOURSELVES?

17  A.   WE DID.

18  Q.   AND WHAT DID YOU TELL MR. GIBBS ABOUT WHO YOU WERE?

19  A.   WE ADVISED HIM WE WERE SPECIAL AGENTS WITH THE FBI.

20  Q.   AND AT THE TIME OF THAT INTERVIEW, HOW WERE YOU AND

21  SPECIAL AGENT JOHNSON DRESSED?

22  A.   I WAS WEARING CARGO PANTS AND A BUTTON-DOWN SHIRT.

23  SPECIAL AGENT JOHNSON WAS IN CIVILIAN ATTIRE SIMILAR.  I THINK

24  HE HAD A PULLOVER ON.

25  Q.   LET ME BACK UP JUST A BIT.  AT THE CONCLUSION OF SPECIAL

1   AGENT JOHNSON READING AND EVERYONE SIGNING THE FORM IN

2   GOVERNMENT'S EXHIBIT 1, DID MR. GIBBS AGREE TO SPEAK WITH YOU

3   WITHOUT THE PRESENCE OF A LAWYER?

4   A.   YES, SIR.

5   Q.   AND NOW WHEN YOU TALKED WITH MR. GIBBS, WERE YOUR FIREARMS

6   VISIBLE?

7   A.   NO.

8   Q.   WAS MR. GIBBS IN HANDCUFFS?

9   A.   HE HAD ON ALMOST LIKE FLEX CUFFS THAT THE SHERIFF'S OFFICE

10  HAD PUT ON.

11  Q.   IS THAT THEIR POLICY FOR INTERVIEWING SUBJECTS?

12  A.   AS FAR AS I KNOW, SIR.

13  Q.   WAS HE WEARING ANYTHING ON HIS LEGS?

14  A.   NOT TO MY KNOWLEDGE.

15  Q.   HOW BIG IS THIS ROOM WHERE THE INTERVIEW TOOK PLACE?

16  A.   IT'S NOT A LARGE ROOM.  IT'S PROBABLY 10 FEET WIDE AND 6

17  OR 7 FEET DEEP.  IT'S NOT VERY BIG.

18  Q.   ENOUGH ROOM FOR THREE PEOPLE?

19  A.   YES, SIR.

20  Q.   AT ANY POINT DURING THIS INTERVIEW OR PRIOR TO, WAS ANY

21  PHYSICAL FORCE EXERTED UPON MR. GIBBS?

22  A.   NO, SIR.

23  Q.   WERE ANY WEAPONS USED ON MR. GIBBS?

24  A.   NO, SIR.

25  Q.   DID YOU OR ANYONE ELSE AFFILIATED WITH THIS INVESTIGATION

1  MAKE ANY THREATS TO MR. GIBBS?

2  A.   NO, SIR.

3  Q.   WAS MR. GIBBS SUBJECTED TO ANY DURESS?

4  A.   NOT TO MY KNOWLEDGE, SIR.

5  Q.   DID HE APPEAR TO BE UNDER DURESS WHILE HE TALKED TO YOU?

6  A.   NO, SIR.

7  Q.   WHAT WAS THE TONE OF THE CONVERSATION DURING THE

8  INTERVIEW?

9  A.   IT WAS FINE.  MR. GIBBS WAS VERY FORTHCOMING WITH

10  INFORMATION.  HE SEEMED AGITATED A LITTLE BIT BECAUSE HE, YOU

11  KNOW, OBVIOUSLY HE WAS NOT HAPPY ABOUT THE SITUATION HE WAS IN,

12  BUT HE WAS VERY FORTHCOMING IN SPEAKING TO US.

13  Q.   NOT HAPPY ABOUT BEING ARRESTED?

14  A.   YES, SIR.

15  Q.   IS THAT TYPICAL IN YOUR EXPERIENCE?

16  A.   YES, SIR.

17  Q.   DID YOU OR SPECIAL AGENT JOHNSON RAISE YOUR VOICE OR YELL

18  AT MR. GIBBS?

19  A.   NO, SIR.

20  Q.   DID MR. GIBBS EXPRESS TO YOU OR SPECIAL AGENT JOHNSON ANY

21  FEELINGS OF DURESS?

22  A.   NO, SIR.

23  Q.   DID YOU OR SPECIAL AGENT JOHNSON MAKE MR. GIBBS ANY

24  PROMISES?

25  A.   NO, SIR.

1  Q.    DID MR. GIBBS APPEAR TO BE UNDER THE INFLUENCE OF ALCOHOL?

2  A.    NO, SIR.

3  Q.    DID HE SMELL OF ALCOHOL?

4  A.    NO, SIR.

5  Q.    DID HE APPEAR TO BE UNDER THE INFLUENCE OF ANY OTHER DRUGS

6  OR NARCOTICS?

7  A.    NO, SIR.

8  Q.    WAS HIS SPEECH SLURRED?

9  A.    NO, SIR.

10  Q.    DID MR. GIBBS APPEAR COHERENT?

11  A.    YES, SIR.

12  Q.    THE ANSWERS THAT MR. GIBBS GAVE TO YOU AND SPECIAL AGENT

13  JOHNSON, WERE THOSE ANSWERS RESPONSIVE TO THE QUESTIONS THAT

14  YOU ASKED?

15  A.    YES, SIR, VERY MUCH SO.

16  Q.    DID MR. GIBBS APPEAR SLEEPY?

17  A.    I MEAN IT WAS ONE A.M., BUT HE DIDN'T APPEAR OVERLY

18  SLEEPY.

19  Q.    DID MR. GIBBS SIT UPRIGHT DURING THE ENTIRE INTERVIEW?

20  A.    FOR THE MOST PART, YES, SIR.

21  Q.    DID HE APPEAR CONFUSED ABOUT WHAT WAS GOING ON?

22  A.    NO, SIR.

23  Q.    AT ANY POINT DURING THAT INTERVIEW, DID MR. GIBBS INVOKE

24  HIS RIGHT TO REMAIN SILENT?

25  A.    HE DID NOT.

1   Q.   DID HE INVOKE HIS RIGHT TO AN ATTORNEY?

2   A.   HE DID NOT.

3   Q.   DID HE EVER MENTION WANTING AN ATTORNEY?

4   A.   NO, SIR.

5   Q.   DID HE ASK YOU OR SPECIAL AGENT JOHNSON ANY QUESTIONS

6   ABOUT AN ATTORNEY?

7   A.   NO, SIR.

8   Q.   WAS MR. GIBBS PROVIDED FOOD AND DRINK DURING THE

9   INTERVIEW?

10  A.   YES, SIR.

11  Q.   DO YOU REMEMBER WHAT HE WAS PROVIDED?

12  A.   WE BROUGHT SOME FOOD FROM MCDONALD'S OVER.  OBVIOUSLY IT

13  WAS ONE A.M. AND HE HAD BEEN AT THE HOSPITAL TO MY KNOWLEDGE

14  SINCE EARLY AFTERNOON, SO WE GOT HIM SOME FOOD FIGURING HE

15  HADN'T HAD DINNER.

16  Q.   DID HE EAT IT?

17  A.   HE DID EVENTUALLY, YES, SIR.

18  Q.   SPECIAL AGENT BOWER, DO YOU KNOW APPROXIMATELY HOW LONG

19  THE INTERVIEW LASTED?

20  A.   ABOUT AN HOUR AND 15 TO AN HOUR AND 20 MINUTES.

21  Q.   DOES THE FANNIN COUNTY SHERIFF'S OFFICE, THAT ROOM THAT

22  YOU WERE IN, DOES IT HAVE RECORDING CAPABILITY?

23  A.   YES, SIR.

24  Q.   AND WAS THE INTERVIEW RECORDED?

25  A.   YES, SIR.

1  Q.   I'VE HANDED YOU WHAT I HAVE MARKED AS GOVERNMENT'S EXHIBIT

2  2.  DO YOU KNOW WHAT THAT ITEM IS?

3  A.   YES, SIR.

4  Q.   AND WHAT IS IT?

5  A.   IT'S A DISK I'VE MARKED WILLIAM C. GIBBS INTERVIEW,

6  02-03-17.  IT'S A RECORDING OF THE INTERVIEW WE CONDUCTED.

7  Q.   AND DOES IT HAVE ANY MARKINGS ON IT THAT YOU ARE FAMILIAR

8  WITH?

9  A.   YES, SIR, I'VE SIGNED THIS DISK.

10  Q.   AND DID YOU SIGN IT AFTER YOU HAD A CHANCE TO LOOK AT IT?

11  A.   YES, SIR.

12  Q.   AND DOES THAT RECORDING IN GOVERNMENT'S EXHIBIT 2, DOES IT

13  FAIRLY AND ACCURATELY DEPICT THE INTERVIEW OF MR. GIBBS THAT

14  YOU CONDUCTED WITH SPECIAL AGENT JOHNSON?

15  A.   YES, SIR.

16          MR. BUCHANAN:  YOUR HONOR, WE MOVE FOR THE ADMISSION

17  OF GOVERNMENT'S EXHIBIT 2 INTO EVIDENCE.

18          MS. PERDEW SILAS:  NO OBJECTION.

19          THE COURT:  GOVERNMENT'S EXHIBIT 2 IS ADMITTED.

20          MR. BUCHANAN:  NO FURTHER QUESTIONS, YOUR HONOR.

21          THE COURT:  THANK YOU.

22                    CROSS-EXAMINATION

23  BY MS. PERDEW SILAS:

24  Q.   GOOD MORNING.

25  A.   GOOD MORNING, MA'AM.

1  Q.   AGENT BOWER, YOU SAID THAT WHEN YOU RESPONDED TO THE

2  INCIDENT, YOU GOT THERE AROUND NINE P.M.?

3  A.   IT WAS AFTER NINE, I'M SURE, BUT I DON'T KNOW IF --

4  Q.   IT WAS NIGHTTIME?

5  A.   YES, MA'AM, IT WAS NIGHTTIME.

6  Q.   OKAY.  AND AT THE TIME THAT YOU GOT TO THE HOSPITAL, MR.

7  GIBBS WAS THERE?

8  A.   YES, CORRECT, YES, MA'AM.

9  Q.   AND IT WOULD BE YOUR UNDERSTANDING THAT HE HAD BEEN THERE

10 FOR SOME PERIOD OF TIME, RIGHT?

11 A.   THAT WAS MY UNDERSTANDING, YES, MA'AM.

12 Q.   WHERE EXACTLY WAS HE WHEN YOU GOT THERE?

13 A.   I DON'T REALLY KNOW.  I DIDN'T SEE HIM UNTIL SEVERAL HOURS

14 AFTER I HAD ALREADY BEEN THERE.  SO I DON'T KNOW WHERE HE WAS

15 INITIALLY WHEN I GOT THERE.

16 Q.   NOW WHEN YOU GOT THERE, YOU SAID THAT THERE WERE SEVERAL

17 AGENCIES THAT WERE THERE?

18 A.   YES, MA'AM.

19 Q.   AND, OF COURSE, YOU'RE WITH THE FBI?

20 A.   YES, MA'AM.

21 Q.   AND YOU ALREADY MENTIONED THAT THE FANNIN COUNTY SHERIFF'S

22 DEPARTMENT WAS THERE?

23 A.   YES, MA'AM.

24 Q.   AND THERE WERE SOME OTHER AGENCIES?

25 A.   YES, MA'AM.

1   Q.    AND THOSE WERE?

2   A.    I BELIEVE CHEROKEE COUNTY HAS A HAZMAT UNIT THAT WAS

3   THERE.

4   Q.    OKAY.

5   A.    THERE WAS A UNIT FROM THE NATIONAL GUARD FOR CST THERE,

6   WHICH IS A HAZMAT UNIT, AS WELL, AND TO MY KNOWLEDGE THAT WAS

7   THE AGENCIES THAT I KNEW THAT WERE THERE AT THE TIME.

8   Q.    THE HAZMAT UNIT, THERE WERE A NUMBER OF PEOPLE THAT

9   RESPONDED, NOT JUST ONE PERSON, RIGHT?

10  A.    CORRECT.

11  Q.    TEN?

12  A.    I COULDN'T GUESS HOW MANY WERE THERE.  I MEAN THEY HAD

13  SEVERAL VEHICLES.  THERE WERE SEVERAL PEOPLE THERE.

14  Q.    AND THEY WERE WEARING HAZMAT OUTFITS?

15  A.    AT ONE POINT IN TIME, YES, MA'AM.

16  Q.    IS THAT LIKE WHITE STUFF THAT YOU COVER UP WITH?

17  A.    YES, MA'AM, SURE.

18  Q.    WAS IT YOUR UNDERSTANDING THAT MR. GIBBS WAS INSIDE THE

19  HOSPITAL OR OUTSIDE THE HOSPITAL AT THE TIME THAT YOU ARRIVED?

20  A.    I DON'T KNOW WHERE HE WAS AT THE TIME I ARRIVED.

21  Q.    WHEN YOU FIRST SAW HIM, HE WAS IN A POLICE CAR, RIGHT?

22  A.    THEY TOOK HIM OUT OF A POLICE CAR, YES, MA'AM.

23  Q.    SO WHEN YOU FIRST SAW HIM, HE WAS EMERGING FROM A POLICE

24  CAR, RIGHT?

25  A.    YES, MA'AM.

19

1   Q.   OKAY.  AND ABOUT WHAT TIME WAS THAT?

2   A.   I'M NOT SURE.

3   Q.   WAS IT SHORTLY BEFORE HE WAS TRANSPORTED TO THE FANNIN

4   COUNTY SHERIFF'S DEPARTMENT?

5   A.   THAT WOULD BE AN ACCURATE STATEMENT, YES, MA'AM.

6   Q.   OKAY.  AND YOU SAID THAT YOUR INTERVIEW STARTED A FEW

7   MINUTES AFTER ONE A.M.?

8   A.   YES, MA'AM.

9   Q.   AND THAT WOULD BE FEBRUARY 3RD, RIGHT?

10  A.   YES, MA'AM.

11  Q.   DO YOU REMEMBER IF FEBRUARY 2ND, THAT WAS A WORKDAY,

12  RIGHT?

13  A.   YES, MA'AM.

14  Q.   A THURSDAY?

15  A.   I DON'T REMEMBER WHAT DAY OF THE WEEK IT WAS BUT --

16  Q.   IF I SHOWED YOU A CALENDAR FROM FEBRUARY OF 2017, WOULD

17  THAT HELP TO REFRESH YOUR RECOLLECTION?

18  A.   YES, MA'AM.

19  Q.   I'D LIKE TO SHOW YOU WHAT I HAVE NOT MARKED BECAUSE I'M

20  SHOWING IT TO YOU FOR PURPOSES OF MEMORY REFRESHMENT, BUT I CAN

21  MARK IT IF THE COURT PREFERS.

22       WHAT DAY OF THE WEEK WAS FEBRUARY 2ND?

23  A.   IT WAS THURSDAY.

24  Q.   ALL RIGHT.  AND THEN YOUR INTERVIEW BEGAN ON FEBRUARY 3RD,

25  RIGHT --

1   A.   YES, MA'AM.

2   Q.   -- IN THE WEE HOURS OF THE MORNING SPECIFICALLY AROUND

3   ONE?

4   A.   YES, MA'AM.

5   Q.   OKAY.  NOW, AT THE TIME YOU RESPONDED, YOU WERE GIVEN SOME

6   INFORMATION THAT A PERSON HAD ARRIVED AT THE HOSPITAL TALKING

7   ABOUT EXPOSURE TO RICIN OR CASTOR BEANS OR SOME SUCH, RIGHT?

8   A.   THAT'S CORRECT, YES, MA'AM.

9   Q.   OKAY.  YOU WERE TOLD, WEREN'T YOU, THAT THE PERSON ARRIVED

10  AT THE HOSPITAL AROUND FOUR P.M.; IS THAT RIGHT?

11  A.   I WAS TOLD THAT AT SOME POINT.  I DON'T KNOW IF IT'S WHEN

12  I GOT THE INITIAL CALL OR NOT.  OBVIOUSLY I GOT MORE

13  INFORMATION WHEN I GOT TO THE HOSPITAL.

14  Q.   AND IT'S YOUR UNDERSTANDING THAT THE PERSON BASED ON

15  EITHER INFORMATION YOU GOT BEFOREHAND OR AFTER OR NOW, BUT THE

16  PERSON GOT THERE AROUND FOUR P.M., RIGHT?

17  A.   THAT'S MY UNDERSTANDING, YES, MA'AM.

18  Q.   OKAY.  NOW, DURING THE INTERVIEW WHICH WAS RECORDED, YOU

19  TALKED TO MR. GIBBS ABOUT SOME OF THE TIMELINE OF WHAT HAD

20  HAPPENED TO HIM, RIGHT?

21  A.   YES, MA'AM.

22  Q.   AND FAIR TO SAY BY THE TIME YOU BEGAN INTERVIEWING HIM, HE

23  HAD ALREADY HAD A PRETTY LONG DAY, RIGHT?

24  A.   YES, MA'AM.

25  Q.   OKAY.  AND LET'S TALK ABOUT THAT SPECIFICALLY.  HE TOLD

1   YOU THAT HE HAD GONE TO WORK AT THE CHICKEN PLANT THE NIGHT

2   BEFORE HE CAME INTO THE HOSPITAL, RIGHT?

3   A.   YES, MA'AM.

4   Q.   IN FACT, HE SAID THAT HE HAD GONE TO WORK TO BEGIN A SHIFT

5   THAT STARTED AT 9:45 P.M., RIGHT?

6   A.   YES, MA'AM.

7   Q.   AND THAT HE GOT OFF AT 8 A.M. ON THAT THURSDAY?

8   A.   YES, MA'AM.

9   Q.   FEBRUARY 2ND?

10   A.   YES, MA'AM.

11   Q.   SO, IN OTHER WORDS, HE WENT IN TO WORK ON WEDNESDAY NIGHT

12   AT 9:45 P.M., RIGHT?

13   A.   THAT'S WHAT HE SAID, YES, MA'AM.

14   Q.   ACCORDING TO HIM?

15   A.   YES, MA'AM.

16   Q.   AND HE GOT OFF AT 8 A.M. THURSDAY MORNING, RIGHT?

17   A.   YES, MA'AM.

18   Q.   AND THEN YOU'RE TALKING TO HIM STARTING AT ONE A.M. ON

19   FRIDAY MORNING, RIGHT?

20   A.   CORRECT.

21   Q.   NOW, YOU ALSO WENT THROUGH WITH HIM SOME OF THE EVENTS

22   THAT HAPPENED AFTER HE GOT OFF WORK AT 8 A.M., RIGHT?

23   A.   CORRECT.

24   Q.   FOR INSTANCE, HE TOLD YOU THAT HE HAD GONE TO HIS CAR

25   AROUND NOON TO CLEAN IT OUT; IS THAT RIGHT?

1  A.   AS I RECALL, YES, MA'AM.

2  Q.   OKAY.  AND, OF COURSE, YOU DID AN INTERVIEW SUMMARY AFTER

3  YOUR INTERVIEW, AND, OF COURSE, IT'S RECORDED THERE, AND WE

4  HAVE IT ON GOVERNMENT'S EXHIBIT NUMBER 2, BUT YOU WOULD AGREE

5  WITH ME THAT HE INDICATED THAT HE WAS DOING SOMETHING WITH HIS

6  CAR ABOUT 12 NOON ON THURSDAY FEBRUARY 2ND, RIGHT?

7  A.   YES, MA'AM.

8  Q.   OKAY.  AND THAT THAT IS THE TIME WHERE THE EVENT HAPPENED

9  THAT CAUSED HIM A GREAT DEAL OF CONCERN?

10  A.   YES, MA'AM.

11  Q.   IN OTHER WORDS, HE SAID HE HAD TOUCHED SOMETHING, AND HE

12  WAS CONCERNED THAT HE HAD EXPOSED HIMSELF TO A DEADLY TOXIN,

13  RIGHT?

14  A.   YES, MA'AM.

15  Q.   AND THEN SEVERAL HOURS LATER IS WHEN HE GOES TO THE

16  HOSPITAL ACCORDING TO HIM, RIGHT?

17  A.   CORRECT.

18  Q.   AND THAT, OF COURSE, IS CORROBORATED BY THE HOSPITAL, YOU

19  KNOW, HAVING CONFIRMED THAT HE ARRIVED AROUND FOUR P.M.?

20  A.   AS FAR AS I KNOW.  I DON'T KNOW WHAT THE HOSPITAL STATED,

21  BUT YES, MA'AM.

22  Q.   OKAY.  BUT EARLIER YOU SAID THAT WAS YOUR UNDERSTANDING HE

23  ARRIVED AROUND FOUR P.M., WHATEVER TIME IT WAS?

24  A.   YES, MA'AM.  I JUST CAN'T SAY WHAT THE HOSPITAL IS

25  CLAIMING.  I DON'T KNOW WHAT THE HOSPITAL SAYS THE EXACT TIME

1  HE WALKED IN.

2  Q.    AND I WON'T ASK YOU THAT.

3        NOW, BASED ON YOUR RE-CREATION OF EVENTS WITH HIM

4  DURING YOUR INTERVIEW, HE DID NOT INDICATE THAT AT ANY POINT

5  AFTER AT LEAST 9:45 WHEN HE SHOWED UP TO WORK ON WEDNESDAY

6  NIGHT, ANY TIME THERE HE HAD GONE TO SLEEP, RIGHT, UP UNTIL AT

7  LEAST WHEN HE WENT TO THE HOSPITAL?

8  A.    WE DID NOT DISCUSS SLEEP, NO, MA'AM.

9  Q.    WELL BUT YOU DID DISCUSS THE EVENTS?

10  A.    YES, MA'AM.

11  Q.    AND YOU TALKED ABOUT WHERE HE WENT AND WHO HE PICKED UP

12  AND DRINKING BEER, AND NOWHERE IN THAT CONVERSATION WAS THERE

13  AN INDICATION THAT HE HAD BEEN TO SLEEP?

14  A.    NO, MA'AM.

15  Q.    OKAY.  NOW, WHEN HE WAS TALKING WITH YOU, I THINK YOU CAME

16  INTO THE ROOM WITH SOME FOOD?  YOU JUST TALKED ABOUT THAT.  YOU

17  CAME IN WITH FOOD?

18  A.    YES, MA'AM.

19  Q.    YOU FIGURED HE HADN'T EATEN?

20  A.    YES, MA'AM.

21  Q.    AND WHEN HE TALKED TO YOU ABOUT WHAT ALL HE HAD DONE, HE

22  DIDN'T SAY ANYTHING ABOUT EATING, RIGHT?

23  A.    NOT TO MY KNOWLEDGE.

24  Q.    OKAY.  AND SO DID ANYONE AT THE HOSPITAL TELL YOU HE HAD

25  EATEN BEFORE YOUR INTERVIEW?

1  A.    NO, MA'AM, I DIDN'T TALK TO ANYONE AT THE HOSPITAL ABOUT

2  THAT.

3  Q.    DID ANYONE AS PART OF THE INVESTIGATION OR ANYBODY TALK TO

4  YOU ABOUT WHAT WAS GOING ON, SAY HEY, MR. GIBBS ATE AT SUCH AND

5  SUCH TIME?

6  A.    NO, MA'AM.

7  Q.    OKAY.  AND THAT'S WHY YOU BROUGHT FOOD BECAUSE YOU FIGURED

8  HE HADN'T EATEN?

9  A.    YES, MA'AM.

10  Q.    NOW, WHEN YOU PRESENTED HIM WITH THE FOOD, HE DID NOT TAKE

11  IT RIGHT AWAY; FAIR TO SAY?

12  A.    FAIR TO SAY.

13  Q.    IN FACT, HE INDICATED THAT HE THOUGHT THAT IT COULD BE

14  POISON?

15  A.    HE MAY HAVE SAID THAT, YES, MA'AM.

16  Q.    WELL, THERE WAS SOME REASON WHY HE WAS RELUCTANT TO TAKE

17  THE FOOD THAT HE VOCALIZED TO YOU, RIGHT?

18  A.    UH-HUH (AFFIRMATIVE).

19  Q.    YOU CAN'T REMEMBER THAT EXACTLY, RIGHT?

20  A.    I'M NOT SURE I UNDERSTAND YOUR QUESTION.

21  Q.    I'M ASKING YOU CAN YOU REMEMBER EXACTLY WHAT HE SAID ABOUT

22  WHY HE WAS RELUCTANT TO TAKE THE FOOD THAT YOU BROUGHT HIM FROM

23  MCDONALD'S BECAUSE YOU WERE CONCERNED HE HADN'T EATEN SO YOU

24  BROUGHT IT?

25  A.    YES, AND I DON'T REMEMBER EXACTLY WHAT HE SAID, NO.

1  Q.   RIGHT, SO YOU DON'T REMEMBER IT, OKAY, BUT IT COULD HAVE

2  BEEN THAT IT WAS POISONED, THAT HE THOUGHT IT MIGHT BE

3  POISONED, RIGHT?

4  A.   SURE.

5  Q.   NOW, DURING THE TIME THAT HE SAT WITH YOU, HE WAS CLEARING

6  HIS THROAT A GREAT DEAL; WOULD YOU AGREE WITH ME?

7  A.   I WOULD AGREE WITH YOU.

8  Q.   AND WITH RESPECT TO GOVERNMENT'S EXHIBIT 2, WHICH IS A

9  VIDEOTAPE OF THE INTERVIEW, HAVE YOU REVIEWED THAT AT ANY TIME,

10  OR ARE YOU JUST GOING BASED ON YOUR MEMORY OF THE INTERVIEW

11  ITSELF?

12  A.   I'VE REVIEWED IT.

13  Q.   OKAY.  WHEN WAS THE MOST RECENT TIME THAT YOU REVIEWED IT?

14  A.   IN TOTALITY IT'S BEEN A FEW WEEKS.

15  Q.   OKAY.  BUT FAIR TO SAY THAT ON THE VIDEO RECORDING THERE

16  ARE SOME SOUNDS COMING FROM MR. GIBBS, AND THEY'RE SORT OF

17  GUTTURAL SOUNDS, RIGHT?

18  A.   YES, MA'AM.

19  Q.   OR WHAT WORD WOULD YOU USE TO DESCRIBE THEM?

20  A.   KIND OF COUGHING OR HACKING, I GUESS.

21  Q.   RIGHT, AND AT ONE POINT IN THE INTERVIEW, HE EVEN SAYS I

22  CANNOT BREATHE; DO YOU REMEMBER THAT?

23  A.   I DON'T REMEMBER THAT.

24  Q.   HE TALKS ABOUT THE SYMPTOMS OF RICIN POISONING DURING YOUR

25  INTERVIEW, RIGHT?

1  A.   HE TALKED ABOUT EFFECTS THAT RICIN COULD HAVE ON A

2  PERSON.  WE DID TALK ABOUT THAT DURING THE INTERVIEW, YES.

3  Q.   AND HE SAID HE WAS CONCERNED THAT ME MIGHT DIE?

4  A.   HE DID SAY THAT.

5  Q.   MORE THAN ONCE?

6  A.   I DON'T KNOW HOW MANY TIMES HE SAID IT.  I DO REMEMBER HIM

7  SAYING THAT.

8  Q.   OKAY.  NOW, HE ALSO WAS ASKING YOU QUESTIONS ABOUT WHAT

9  HIS CHARGES WERE, RIGHT?

10  A.   THAT'S CORRECT.

11  Q.   AND I DON'T THINK YOU TOLD HIM; IS THAT RIGHT?

12  A.   AT THE TIME I DID NOT WANT TO SPECULATE BECAUSE I DIDN'T

13  KNOW WHAT CHARGES FANNIN COUNTY HAD, SPECIFICALLY WHAT THEY HAD

14  CHARGED HIM WITH, AND I WASN'T GOING TO GIVE HIM BAD

15  INFORMATION ON THAT.

16  Q.   OKAY.  ONE OF THE THINGS THAT YOU SAID TO HIM WAS THAT

17  PART OF THE REASON YOU WERE TALKING TO HIM WAS TO MAKE SURE NO

18  ONE ELSE HAD BEEN EXPOSED TO A DEADLY TOXIN, RIGHT?

19  A.   THAT'S CORRECT.

20  Q.   AND YOU ENCOURAGED HIM TO SPEAK TO YOU BECAUSE YOU WANTED

21  TO MAKE SURE THAT NO ONE ELSE HAD BEEN EXPOSED TO A DEADLY

22  TOXIN?

23  A.   THAT IS CORRECT.

24  Q.   YOU ALSO TOLD HIM THAT PART OF THE INTERVIEW WOULD HELP TO

25  DETERMINE WHETHER OR NOT HE WOULD BE FACING CHARGES, RIGHT?

1  A.    I DON'T KNOW IF I SPECIFICALLY STATED THAT OR NOT.

2  Q.    AT ONE POINT IN THE INTERVIEW, HE TALKS ABOUT THE FACT

3  THAT HE WAS TOTALLY FREAKING OUT WHEN HE TOUCHED THE BOTTLE

4  AROUND NOON OF THAT THURSDAY, RIGHT?

5  A.    YES, MA'AM.

6  Q.    HE ALSO ASKED IF YOU GUYS KNEW WHAT SYMPTOMS WERE RELATING

7  TO RICIN POISONING, RIGHT?

8  A.    HE MAY HAVE ASKED US THAT, YES, MA'AM.

9  Q.    OKAY.  NOW, DURING THIS INTERVIEW WHICH YOU SAID LASTED

10  MORE THAN AN HOUR, RIGHT?

11  A.    YES, MA'AM.

12  Q.    HE TALKED ABOUT NEEDING MEDICAL CARE; DO YOU RECALL THAT?

13  A.    I REMEMBER HIM TALKING ABOUT THE MEDICAL CARE HE HAD

14  RECEIVED AT THE HOSPITAL, YES, MA'AM.

15  Q.    OKAY.  AND THAT HE DIDN'T GET AN IV DRIP?

16  A.    I DON'T SPECIFICALLY REMEMBER THE IV DRIP PART, BUT I

17  REMEMBER TALKING ABOUT HIS UNHAPPINESS WITH THE MEDICAL CARE

18  THAT HE HAD.

19  Q.    OKAY.  NOW, YOU ALSO LEARNED DURING THE INTERVIEW THAT MR.

20  GIBBS HAS AN EDUCATION LEVEL THAT IS BELOW HIGH SCHOOL

21  GRADUATION, RIGHT?

22  A.    YES, MA'AM.

23  Q.    HE TALKED ABOUT HE DID NOT HAVE A G.E.D.?

24  A.    YES, MA'AM.

25  Q.    OKAY.  WHEN HE WAS TAKEN OUT OF THE ROOM, WHO TOOK HIM OUT

1   OF THE ROOM; WAS IT YOU OR SOMEBODY FROM FANNIN COUNTY?

2   A.   AT THE CONCLUSION OF THE INTERVIEW?

3   Q.   AT THE CONCLUSION OF THE INTERVIEW, WHO TOOK HIM OUT OF

4   THE ROOM?

5   A.   FANNIN COUNTY SHERIFFS, YES, MA'AM.

6   Q.   OKAY.  DO YOU KNOW WHERE HE WENT FROM THERE?

7   A.   I DO NOT.

8   Q.   BEFORE HE CAME INTO THE ROOM WITH YOU GUYS, YOU MENTIONED

9   HE HAD BEEN PROCESSED.  WHERE WAS THAT DONE?

10  A.   I DON'T KNOW.  HE WAS UNLOADED FROM THE CAR AT THE

11  PRISONER EXCHANGE POINT FOR THE SHERIFF'S OFFICE, AND THEY TOOK

12  HIM INSIDE, AND WE SAW HIM ABOUT TEN MINUTES LATER.  SO I'M NOT

13  SURE WHERE HE WAS PROCESSED.

14  Q.   OKAY.  DO YOU HAVE ANY REASON TO BELIEVE THAT AFTER MR.

15  GIBBS ARRIVED -- WELL STRIKE THAT FOR A MOMENT.

16          YOUR INVOLVEMENT IN THE CASE IS MORE THAN JUST DOING

17  THE MR. GIBBS INTERVIEW, ISN'T IT?

18  A.   YES, MA'AM.

19  Q.   FOR INSTANCE, YOU INTERVIEWED SOME OF THE PEOPLE AT THE

20  HOSPITAL?

21  A.   I DID NOT INTERVIEW THEM AT THE HOSPITAL.

22  Q.   THE ER DIRECTOR, AGENT CHRISTOPHER BOWER, YOU DID NOT DO

23  THAT INTERVIEW?

24  A.   THE NAME OF THE ER DIRECTOR IS?

25  Q.   WHOEVER IT WAS THAT CALLED 911, THE PERSON WHO DECIDED TO

1  DO THAT?  LET ME WITHDRAW THAT.

2          THE QUESTION REALLY IS DID YOU DO OTHER INTERVIEWS?

3  A.   I DID.

4  Q.   MORE THAN TWO INTERVIEWS IN THE CASE?

5  A.   YES, MA'AM.

6  Q.   OKAY.  DO YOU HAVE ANY REASON TO BELIEVE OR THAT YOU CAN

7  TELL THE COURT OR ME OR WHOEVER THAT MR. GIBBS HAD BEEN FREE TO

8  LEAVE AFTER HE CAME INTO THE HOSPITAL?  IS THERE SOMETHING THAT

9  I DON'T KNOW ABOUT THAT AT SOME POINT HE WAS AT LIBERTY AFTER

10 HE ARRIVED AT THE HOSPITAL?

11 A.   I DON'T KNOW THE ANSWER TO THAT.  I DON'T KNOW WHO THE

12 RESPONDING OFFICERS WERE FROM FANNIN COUNTY INITIALLY, AND WHO

13 TALKED TO HIM, AND WHAT HIS STATUS WAS AT THE TIME.

14          I ONLY KNOW WHAT I KNOW FROM WHEN I ARRIVED ON THE

15 SCENE AT THE HOSPITAL.

16 Q.   AND FAIR TO SAY AT THAT TIME HE WAS IN CUSTODY BECAUSE HE

17 WAS BEING BROUGHT OUT OF A POLICE CAR, RIGHT?

18 A.   YES, MA'AM.

19 Q.   WAS IT THE BACK SEAT OF THE POLICE CAR?

20 A.   YES, MA'AM.

21 Q.   AND HE WAS CUFFED AT THAT TIME, RIGHT?

22 A.   I DON'T RECALL IF HE WAS CUFFED OR NOT TO BE HONEST WITH

23 YOU.

24 Q.   WHEN HE'S BROUGHT INTO THE INTERVIEW ROOM, HE'S GOT SOME

25 FLEXI CUFFS WITH A VERY LONG STEM ON THEM, RIGHT?

1    A.    THAT'S CORRECT, YES, MA'AM.

2    Q.    OKAY.  WHEN HE EMERGED FROM THE POLICE CAR, IT WASN'T THAT

3    YOU SAW HIM OPEN THE DOOR AND GET OUT.  SOMEONE WENT AND GOT

4    HIM OUT OF THE POLICE CAR; IS THAT FAIR TO SAY?

5    A.    THAT'S CORRECT.

6    Q.    DID IT LOOK LIKE TO YOU -- YOU'RE AN EXPERIENCED AGENT.

7    DID IT LOOK LIKE TO YOU HE WAS IN CUSTODY AT THAT TIME?

8    A.    YES, I MEAN --

9              MS. PERDEW SILAS:  OKAY.  MAY I HAVE A MOMENT,

10   JUDGE?

11             THE COURT:  YES, YOU MAY.

12             (PAUSE IN THE PROCEEDINGS.)

13             MS. PERDEW SILAS:  THAT'S ALL I HAVE FOR THIS

14   WITNESS, JUDGE.

15             THE COURT:  THANK YOU.

16                        REDIRECT EXAMINATION

17   BY MR. BUCHANAN:

18   Q.    SPECIAL AGENT BOWER, DO YOU KNOW WHETHER OR NOT ANYONE

19   QUESTIONED MR. GIBBS, ANY LAW ENFORCEMENT OFFICERS QUESTIONED

20   MR. GIBBS PRIOR TO YOUR INTERVIEW?

21   A.    YES.

22   Q.    DID THEY, OR DID THEY NOT?

23   A.    YES.

24   Q.    THEY DID, OR THEY DID NOT?

25   A.    TO MY KNOWLEDGE FANNIN COUNTY TALKED TO HIM BEFORE I EVER

1  TALKED TO HIM, YES.

2  Q.    OKAY.  AND DO YOU KNOW WHERE FANNIN COUNTY TALKED TO HIM?

3  A.    AT THE HOSPITAL.

4  Q.    OKAY.  AND THAT WAS BEFORE HE WAS BROUGHT TO THE SHERIFF'S

5  OFFICE?

6  A.    YES, THAT'S CORRECT.

7  Q.    WAS THERE ANY TALK -- WITH RESPECT TO MR. GIBBS

8  TALKING WITH FANNIN COUNTY AT THE HOSPITAL, ARE YOU AWARE

9  WHETHER OR NOT HE INVOKED HIS RIGHT TO REMAIN SILENT DURING ANY

10  OF THAT?

11  A.    NOT TO MY KNOWLEDGE.

12  Q.    AND WHAT WAS THE POINT OF FANNIN COUNTY TALKING WITH HIM

13  AT THE HOSPITAL?

14          MS. PERDEW SILAS:  OBJECTION FOR BASIS OF KNOWLEDGE.

15  I MEAN I DON'T THINK WE HAVE A FOUNDATION THAT HE -- I DON'T

16  KNOW.

17          MR. BUCHANAN:  I'LL ASK HIM WHETHER OR NOT HE KNOWS.

18          THE COURT:  ASK HIM WHETHER HE KNOWS.

19  BY MR. BUCHANAN:

20  Q.    DO YOU KNOW WHY FANNIN COUNTY WANTED OR DID TALK WITH MR.

21  GIBBS WHILE HE WAS AT THE HOSPITAL?

22  A.    YES.

23  Q.    AND WHY WAS THAT?

24  A.    WHEN THE FANNIN COUNTY SHERIFF'S OFFICE WAS CONTACTED

25  ABOUT MR. GIBBS COMING TO THE HOSPITAL WITH POSSIBLE EXPOSURE

1  TO RICIN, THEY OBVIOUSLY RESPONDED TO THE SCENE TO FIND OUT

2  WHAT WAS GOING ON, AND IN RESPONDING TO THE SCENE, THEY TALKED

3  TO MR. GIBBS ABOUT WHY HE FELT HE WAS CONTAMINATED WITH RICIN.

4  Q.   BASED ON YOUR TRAINING AND EXPERIENCE AS A LAW ENFORCEMENT

5  OFFICER, WHAT WOULD HAVE BEEN THE CONCERNS WITH A PERSON

6  SHOWING UP HAVING BEEN EXPOSED TO RICIN?

7  A.   WELL, THERE'S NUMEROUS CONCERNS.  ONE IS FOR THE PERSON IN

8  CUSTODY --

9       MS. PERDEW SILAS:  I'M GOING TO OBJECT TO THIS LINE

10  HERE BECAUSE I THINK ANYBODY CAN SORT OF SPECULATE AS TO WHAT

11  WOULD BE THE CONCERNS, BUT IF THE GOVERNMENT IS GOING TO TRY TO

12  ESTABLISH THROUGH THIS WITNESS THE JUSTIFICATION FOR THE

13  QUESTIONS POSED BY A SEPARATE LAW ENFORCEMENT AGENCY, THEN

14  THEY'VE GOT TO CONNECT THIS WITNESS' STATE OF MIND TO THAT

15  PERSON'S STATE OF MIND, AND SO ASKING WHAT WOULD HAVE BEEN THE

16  CONCERN AND ASKING HIM TO SPECULATE AS TO WHAT THIS OTHER

17  PERSON WAS THINKING WHEN HE ASKED QUESTIONS OF MR. GIBBS, I

18  DON'T THINK IS ACTUALLY RELEVANT.

19       THE COURT:  I UNDERSTAND YOUR POINT.  I THINK IT'S

20  NOT EXACTLY WHAT HE'S ASKING.  I'LL LET HIM DEVELOP THE

21  TESTIMONY, BUT YOUR OBJECTION WOULD BE VALID OR WORTHY OF

22  CONSIDERATION IN THE WRITTEN PAPERS IF THEY ATTEMPT TO RELY ON

23  THIS TO JUSTIFY ACTIONS OF ANOTHER LAW ENFORCEMENT AGENCY.

24       SO YOUR POWDER IS DRY FOR WHEN WE BRIEF IT UP IF YOU

25  NEED IT.

1  BY MR. BUCHANAN:

2  Q.    WHAT WOULD BE SOME OF THOSE CONCERNS?

3  A.    THE INDIVIDUAL WHO STATED THEY WERE EXPOSED TO RICIN THEIR

4  HEALTH, THE HEALTH AND SAFETY OF ANYONE ELSE WHO MIGHT HAVE

5  BEEN EXPOSED, WHERE THE RICIN CAME FROM, WHY THEY THOUGHT THEY

6  WERE EXPOSED TO RICIN.  THERE'S NUMEROUS CONCERNS AS A LAW

7  ENFORCEMENT AGENCY WHEN SOMEONE SAYS THEY MAY HAVE BEEN EXPOSED

8  TO A BIOTOXIN.

9  Q.    AND WHEN YOU INTERVIEWED MR. GIBBS LATER AT THE FANNIN

10  COUNTY SHERIFF'S OFFICE, HE SPECIFICALLY TALKED WITH YOU ABOUT

11  WHY HE WENT TO THE HOSPITAL, RIGHT?

12  A.    THAT'S CORRECT.

13  Q.    AND WHAT DID HE TELL YOU WAS THE BASIS FOR HIS TRIP TO THE

14  HOSPITAL THAT EVENING?

15  A.    HE FELT HE HAD BEEN EXPOSED TO A TOXIC SUBSTANCE THAT

16  COULD HARM HIM, SO HE WENT TO THE HOSPITAL.

17  Q.    AND DID HE TELL YOU WHAT THAT SUBSTANCE WAS?

18  A.    HE DID.

19  Q.    AND WHAT DID HE TELL YOU IT WAS?

20  A.    HE BELIEVED THAT THERE WERE -- THAT THERE WAS A RICIN

21  TOXIN IN THE -- IN A BOTTLE THAT HE HAD IN HIS VEHICLE THAT HE

22  HAD PUT CASTOR BEANS AND ACETONE IN, AND THAT HE HAD EXPOSED

23  HIMSELF TO THAT WHEN HE WAS CLEANING OUT HIS CAR, AND HE FELT

24  THAT HIS HEALTH WAS IN JEOPARDY AS A RESULT OF THAT EXPOSURE,

25  SO HE WENT TO THE HOSPITAL.

1  Q.    AND WHEN HE WENT TO THE HOSPITAL, HE WAS CHECKED OUT BY

2  THE MEDICAL STAFF, RIGHT?

3  A.    YES, SIR, TO MY KNOWLEDGE.

4  Q.    AND SO YOUR INTERVIEW OF MR. GIBBS OCCURRED AFTER HE WAS

5  CHECKED OUT BY THE DOCTORS?

6  A.    THAT'S CORRECT.

7  Q.    AND SINCE THE DOCTORS DID LET HIM GO, WERE YOU AWARE OF

8  ANY PRESSING MEDICAL CONCERNS FOR MR. GIBBS AT THE TIME OF THE

9  INTERVIEW?

10  A.    NO, SIR.

11  Q.    DID MR. GIBBS EXPRESS ANY ISSUES ABOUT BEING FATIGUED?

12  A.    NOT TO MY KNOWLEDGE, SIR.

13  Q.    DID HE TALK ABOUT BEING SLEEPY?

14  A.    NO, SIR.

15  Q.    DID HE SAY THAT HE HAD NOT BEEN TO SLEEP IN A DAY OR SO?

16  A.    NOT THAT I RECALL, SIR.

17  Q.    DID HE MENTION THAT HE WANTED TO STOP THE INTERVIEW

18  BECAUSE HE WAS SO TIRED?

19  A.    NO, SIR.

20  Q.    IN FACT, WHAT PROMPTED THE END OF THE INTERVIEW?

21  A.    WE WERE FINISHED WITH OUR QUESTIONS.

22  Q.    AND YOU SAID IT TOOK ABOUT AN HOUR AND 15 MINUTES?

23  A.    ROUGHLY, YES, SIR.

24        MR. BUCHANAN:  NOTHING FURTHER, YOUR HONOR.

25        THE COURT:  THANK YOU.

```
 1            MS. PERDEW SILAS:  MAY I, JUDGE?

 2            THE COURT:  YES, YOU MAY

 3                     RECROSS-EXAMINATION

 4  BY MS. PERDEW SILAS:

 5  Q.   YOU WERE THE ONE WHO RETRIEVED THE AUDIO RECORDING FROM

 6  FANNIN COUNTY SPEAKING TO MR. GIBBS, RIGHT?

 7  A.   YES, MA'AM.

 8  Q.   AND YOU GOT THAT ON FEBRUARY 8TH OF 2017 FROM DEPUTY

 9  JUSTIN CARTER?

10  A.   THAT'S CORRECT.

11  Q.   AND THE RECORDING THAT YOU GOT, IT SAYS ENCAPSULATES THE

12  CONVERSATION, RIGHT?

13  A.   I DON'T UNDERSTAND YOUR QUESTION.

14  Q.   LET ME SHOW YOU WHAT I HAVE MARKED AS DEFENDANT'S EXHIBIT

15  NUMBER 1 WHICH PURPORTS TO BE A MEMORANDUM OR REPORT THAT YOU

16  PREPARED, IS IT?

17  A.   THAT'S CORRECT.

18  Q.   AND IT TALKS ABOUT OBTAINING THIS VIDEOTAPE THAT

19  REPRESENTED THE CONVERSATION BETWEEN MR. GIBBS AND THIS DEPUTY

20  JUSTIN CARD FROM FANNIN COUNTY.

21  A.   THAT'S CORRECT.

22  Q.   AND THAT YOU WERE THE ONE WHO DID THAT; YOU GOT THE TAPE

23  FROM DEPUTY CARD?

24  A.   I DID.

25  Q.   AND YOU LOOKED AT IT, RIGHT?  DID YOU EVER LOOK AT THAT
```

1    TAPE?

2    A.    I LISTENED TO IT.  I DON'T THINK THERE'S MUCH VIDEO TO IT.

3    Q.    OKAY.  YOU LISTENED TO IT; YOU REVIEWED IT, RIGHT?

4    A.    YES.

5    Q.    AND DEPUTY CARD, DID HE TELL YOU HE REVIEWED IT --

6    A.    I DON'T REMEMBER --

7    Q.    -- OR HE JUST GAVE IT TO YOU?

8    A.    I DON'T RECALL IF HE REVIEWED IT OR NOT.

9    Q.    OKAY.  YOU SEE WHERE YOU USED THE WORDS "ENCAPSULATE THE

10   CONVERSATION?" IT'S A SHORT MEMO THAT YOU DID?

11   A.    THAT'S CORRECT.

12   Q.    OKAY.  AND SO THAT'S WHAT YOU SAID ABOUT THIS TAPE, IT

13   ENCAPSULATES THE CONVERSATION, RIGHT?

14   A.    THAT'S CORRECT.

15   Q.    OKAY.  NOW, WHEN YOU GOT THE TAPE, I IMAGINE THAT YOU GAVE

16   IT TO SOMEBODY SO THAT IT COULD BE TURNED OVER AS DISCOVERY?

17   A.    THAT'S CORRECT.

18   Q.    AND DO YOU KNOW IF IT WAS TITLED HOSPITAL SURVEILLANCE?

19   A.    I DON'T REMEMBER WHAT IT'S TITLED.  IT'S POSSIBLE, YES,

20   MA'AM.

21          MS. PERDEW SILAS:  I WOULD LIKE TO SUBMIT, I THINK,

22   BY STIPULATION THAT DEFENDANT'S EXHIBIT NUMBER 2 IS A COPY OF

23   THAT TAPE.  I WOULD LIKE IT TO BE IN THE RECORD SO THAT WE

24   CAN -- AND I BELIEVE, SINCE WE'RE STIPULATING, I BELIEVE

25   THAT THIS IS THE TAPE THAT WAS COPIED ON THE BODY CAM THAT

1   THIS WITNESS JUST TALKED ABOUT.  SO I SUBMIT DEFENDANT'S

2   EXHIBIT 2.

3           THE COURT:  ANY OBJECTION?

4           MR. BUCHANAN:  NO OBJECTION.

5           MS. PERDEW SILAS:  I'M LEERY OF PUTTING A BLUE

6   STICKER ON IT BECAUSE I DON'T WANT IT TO GET CAUGHT IN THE

7   COURT'S DISK DRIVE.

8           THE COURT:  FAIR ENOUGH.  MAYBE WE CAN STICK IT IN AN

9   ENVELOPE.  DEFENDANT'S EXHIBIT 2 IS ADMITTED.

10          MS. PERDEW SILAS:  GREAT.

11  BY MS. PERDEW SILAS:

12  Q.   NOW, DID YOU TALK TO THE DEPUTY ABOUT WHETHER OR NOT HE

13  MIRANDIZED MR. GIBBS PRIOR TO HIS QUESTIONING OF MR. GIBBS

14  THERE ON FEBRUARY 2ND?

15  A.   NOT THAT I RECALL.

16  Q.   DID YOU TALK TO HIM ABOUT HIS RATIONALE FOR QUESTIONING

17  MR. GIBBS AT THE TIME THAT HE DID?

18  A.   NOT THAT I RECALL.

19  Q.   AT THE TIME HE QUESTIONED MR. GIBBS, MR. GIBBS HAD ALREADY

20  BEEN EXAMINED, RIGHT?

21  A.   BY?

22  Q.   BY SOME MEDICAL PERSONNEL THERE.

23  A.   TO MY KNOWLEDGE, YES, MA'AM.

24  Q.   BECAUSE ON THE TAPE IT TALKS ABOUT WHEN WE GET YOU OUT OF

25  HERE, WE CAN HAVE A CIGARETTE, ET CETERA, RIGHT; DO YOU

1  REMEMBER THAT PART?

2  A.  WELL, I HAVEN'T LISTENED TO THAT IN A WHILE, SO I CAN'T

3  RECALL WHAT THEY SAID, BUT --

4  Q.  OKAY.  CAN YOU RECALL THAT MR. GIBBS SAYS ON THERE THAT HE

5  DOESN'T HAVE HIS OWN CLOTHES AT THE TIME THAT THEY'RE HAVING

6  THIS CONVERSATION?

7  A.  LIKE I SAID, IT'S BEEN PROBABLY SINCE FEBRUARY SINCE I'VE

8  LISTENED TO THIS, SO I CAN'T RECALL.

9  Q.  WHEN YOU INTERVIEWED HIM, HE HAD ON BLUE PANTS AND

10 BOTTOMS, RIGHT?

11 A.  YES, MA'AM.

12 Q.  I DON'T KNOW IF THOSE ARE INMATE UNIFORM ISSUE, OR IF

13 THEY'RE MEDICAL CLOTHING, DO YOU?

14 A.  MY UNDERSTANDING THAT THAT WAS MEDICAL CLOTHING.

15 Q.  BECAUSE HIS CLOTHES WERE CONFISCATED FOR WHATEVER REASON,

16 RIGHT?

17 A.  THAT'S CORRECT.

18 Q.  HE DIDN'T HAVE HIS CLOTHES.  HE HAD ON THIS MEDICAL

19 OUTFIT?

20 A.  THAT'S CORRECT.

21          MS. PERDEW SILAS:  OKAY.  THAT'S ALL I HAVE FOR THIS

22 WITNESS.

23          THE COURT:  OKAY.  THANK YOU.

24          MR. BUCHANAN:  CAN I ASK ONE QUESTION?

25          THE COURT:  YES, YOU MAY.

1            FURTHER DIRECTION EXAMINATION

2  BY MR. BUCHANAN:

3  Q.   SPECIAL AGENT BOWER, YOU TESTIFIED EARLIER THAT THERE WERE

4  PEOPLE ON THE SCENE WHO WERE WORKING TO DECONTAMINATE OR MAKE

5  SAFE THE AREA?

6  A.   THAT'S CORRECT.

7  Q.   BASED ON YOUR TRAINING AND EXPERIENCE IN WORKING WITH

8  WEAPONS OF MASS DESTRUCTION, THESE SUBSTANCES, WOULD THAT HAVE

9  INCLUDED THE POTENTIAL EXPOSED PERSON'S CLOTHING?

10 A.   YES, SIR, ABSOLUTELY.

11          MR. BUCHANAN:  NOTHING ELSE, YOUR HONOR.

12          THE COURT:  ANYTHING FURTHER?

13          MS. PERDEW SILAS:  NO, JUDGE.

14          THE COURT:  OKAY.  THANKS, SPECIAL AGENT BOWER, YOU

15 MAY BE EXCUSED.

16          WELL, MS. PERDEW SILAS, YOU DID NOT MOVE DEFENDANT'S

17 EXHIBIT 1 INTO EVIDENCE.

18          MS. PERDEW SILAS:  IT WAS USED TO REFRESH HIS

19 RECOLLECTION.

20          THE COURT:  YEAH, I MEAN IT'S UP TO YOU IF YOU WANT

21 TO ASK OR NOT.  I KNOW -- YOU'RE LOOKING LIKE YOU'RE TRYING TO

22 GIVE IT TO HER.  SO IF YOU'RE NOT PUTTING IT IN, LET'S DON'T

23 GIVE IT TO HER, OKAY.

24          MS. PERDEW SILAS:  YES, JUDGE.

25          MR. BUCHANAN:  YOUR HONOR, A FEW WEEKS PRIOR TO MR.

40

1  GIBBS' ARREST, HE WAS THE SUBJECT OF A TRAFFIC STOP.  THAT

2  TRAFFIC STOP IS NOT RELATED TO HIS ARREST, BUT IF THIS MATTER

3  WENT TO TRIAL, THE UNITED STATES WOULD SEEK TO INTRODUCE

4  EVIDENCE FROM THAT TRAFFIC STOP UNDER 404(B), AND SO WE'VE GOT

5  THE OFFICER WHO CONDUCTED THAT TRAFFIC STOP.  I JUST WANT TO

6  LET THE COURT KNOW THAT THERE IS A BIT OF A BREAK BETWEEN THE

7  TWO.

8          THE COURT:  THANK YOU.

9          MR. BUCHANAN:  WITH THAT, YOUR HONOR, THE UNITED

10 STATES CALLS FANNIN COUNTY DEPUTY SHERIFF'S OFFICER JOHN

11 KINSER.

12          THE CLERK:  PLEASE RAISE YOUR RIGHT HAND TO TAKE THE

13 OATH.

14               JOHN CHRISTOPHER DAVID KINSER,

15 HAVING BEEN DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

16          THE CLERK:  IF YOU WILL HAVE A SEAT, PLEASE, AND

17 STATE YOUR FULL NAME FOR THE RECORD AND SPELL YOUR LAST NAME

18 ALSO.

19          THE WITNESS:  JOHN CHRISTOPHER DAVID KINSER,

20 K I N S E R.

21               DIRECT EXAMINATION

22 BY MR. BUCHANAN:

23 Q.   SIR, HOW ARE YOU EMPLOYED?

24 A.   HOW AM I EMPLOYED?

25 Q.   YES.

1  A.    DEPUTY SHERIFF FANNIN COUNTY SHERIFF'S OFFICE.

2  Q.    AND HOW LONG HAVE YOU BEEN A DEPUTY SHERIFF WITH THE

3  FANNIN COUNTY SHERIFF'S OFFICE?

4  A.    ABOUT A YEAR AND EIGHT MONTHS.

5  Q.    AND DOES YOUR WORK SORT OF TAKE YOU ALL OVER FANNIN

6  COUNTY?

7  A.    YES, SIR.

8  Q.    AND DOES THAT ALSO INCLUDE BLUE RIDGE, GEORGIA?

9  A.    YES, SIR.

10  Q.    AND WHAT ARE YOUR DUTIES WITH THE FANNIN COUNTY SHERIFF'S

11  OFFICE?

12  A.    I'M A DEPUTY SHERIFF.

13  Q.    AND WHAT DO YOU DO?

14  A.    I'M ON UNIFORM PATROL.

15  Q.    AND HOW LONG HAVE YOU BEEN ON PATROL?

16  A.    ABOUT A YEAR AND EIGHT MONTHS.

17  Q.    AND SO ON PATROL, WHAT ARE SOME OF THE THINGS THAT YOU DO?

18  A.    WE PATROL ALL OF FANNIN COUNTY.  WE ANSWER 911 CALLS, TAKE

19  A LOT OF REPORTS, WORK A LOT OF TRAFFIC.

20  Q.    SO YOU CONDUCT TRAFFIC STOPS?

21  A.    YES, SIR.

22  Q.    AND ARE YOU FAMILIAR WITH THE GEORGIA STATE TRAFFIC LAWS?

23  A.    YES, SIR.

24  Q.    WERE YOU WORKING ON JANUARY 14TH OF 2017?

25  A.    YES, SIR.

1  Q.   AND WHAT WERE YOU DOING THAT DAY?

2  A.   I WAS WORKING TRAFFIC DOWN IN MCCAYSVILLE, DOWN AROUND THE

3  AREA OF MCCAYSVILLE, GEORGIA.

4  Q.   MCCAYSVILLE IS THAT WITHIN FANNIN COUNTY?

5  A.   YES, SIR.

6  Q.   AND AT SOME POINT DURING THAT DAY, DID YOU CONDUCT A

7  TRAFFIC STOP OF A WHITE LINCOLN TOWN CAR?

8  A.   YES, SIR.

9  Q.   AND APPROXIMATELY WHAT TIME OF DAY WAS IT?

10  A.   I DON'T EXACTLY RECALL, BUT IF I HAD TO SAY APPROXIMATELY

11  AROUND TWO O'CLOCK.

12  Q.   TWO O'CLOCK P.M.?

13  A.   P.M., YEAH.

14  Q.   SO THE SUN WAS UP?

15  A.   YES.

16  Q.   IT WAS NOT HARD TO SEE THAT DAY?

17  A.   NO, IT WAS NOT.

18  Q.   WAS IT RAINING?

19  A.   NO, SIR.

20  Q.   AT THE TIME THAT YOU CONDUCTED THE TRAFFIC STOP WAS

21  THERE ANYTHING THAT SORT OF BLOCKED YOUR VIEW OF THE WHITE TOWN

22  CAR?

23  A.   NO, SIR.

24  Q.   AND WHEN YOU SAW THE TOWN CAR, WERE THERE ANY CARS BETWEEN

25  YOU AND THE TOWN CAR?

1  A.   NO, SIR.

2  Q.   SO YOU HAD A DIRECT LINE OF SIGHT ON IT?

3  A.   YES, SIR.

4  Q.   AND WHAT HAPPENED WHILE YOU WERE BEHIND THE LINCOLN TOWN

5  CAR?

6  A.   HE RAN THROUGH A STOP SIGN.

7  Q.   WAS THAT A VIOLATION OF THE GEORGIA TRAFFIC LAWS?

8  A.   YES, SIR.

9  Q.   AND AFTER THE LINCOLN TOWN CAR RAN THE STOP SIGN, DID YOU

10 CONDUCT A TRAFFIC STOP?

11 A.   YES, SIR.

12 Q.   NOW WHEN YOU CONDUCTED THAT STOP, WAS THE TOWN CAR IN SORT

13 OF AN ODD PLACE?

14 A.   YES, SIR.

15 Q.   AND PLEASE TELL JUDGE FULLER WHAT WAS ODD ABOUT WHERE IT

16 STOPPED?

17 A.   WHERE IT STOPPED IT CAUSED ME TO HAVE TO STOP BEHIND IT,

18 AND I WAS STILL ON THE ROADWAY, SO I ASKED HIM TO MOVE ON DOWN

19 INTO THE DRIVEWAY THAT HE WAS STOPPED IN.  THAT WAY I COULD GET

20 OUT OF THE ROADWAY.

21 Q.   AND WHEN YOU ASKED THE DRIVER TO MOVE -- FIRST OF ALL, DO

22 YOU RECALL WHO THE DRIVER OF THE LINCOLN TOWN CAR WAS?

23 A.   YES, SIR, CHRIS GIBBS.

24 Q.   AND DO YOU RECOGNIZE MR. GIBBS IN THE COURTROOM TODAY?

25 A.   YES, SIR.

1  Q.   PLEASE IDENTIFY HIM BY SOMETHING THAT HE'S WEARING?

2  A.   WEARING A YELLOW BUTTON-UP SHIRT.

3        MR. BUCHANAN:  YOUR HONOR, I'D LIKE THE RECORD TO

4  REFLECT THAT THIS WITNESS HAS IDENTIFIED THE DEFENDANT.

5  BY MR. BUCHANAN:

6  Q.   AFTER YOU ASKED MR. GIBBS TO MOVE UP A LITTLE BIT SO YOU

7  COULD GET OUT OF THE ROADWAY, WHAT HAPPENED?

8  A.   HE COMPLIED.

9  Q.   AND WHEN HE COMPLIED, HE BROUGHT HIS CAR TO A STOP?

10  A.   YES.

11  Q.   AND AFTER HIS CAR STOPPED, WHAT HAPPENED?

12  A.   THE PASSENGER TAO SERANO EXITED THE VEHICLE AND STARTED

13  MOVING HIS GROCERIES OUT OF THE CAR.

14  Q.   SO DID THE PASSENGER REMOVE AN ITEM FROM THE CAR?

15  A.   YES, SIR.

16  Q.   AND THE PASSENGER GOT OUT OF THE CAR?

17  A.   YES, SIR.

18  Q.   AND I KNOW YOU HADN'T BEEN IN LAW ENFORCEMENT LONG, BUT

19  DID THIS RAISE YOUR SUSPICION?

20  A.   ABSOLUTELY.

21  Q.   AND EVENTUALLY DID YOU GO UP AND TALK TO THE DRIVER?

22  A.   YES, SIR.

23  Q.   AND WHEN YOU WENT UP TO TALK TO THE DRIVER, DID YOU HAVE

24  YOUR GUN DRAWN?

25  A.   NO, SIR.

1  Q.   AND DID YOU ASK THE PASSENGER, DID YOU ASK HIM TO COME

2  BACK TO THE VEHICLE AFTER HE GOT OUT OF IT?

3  A.   YES, SIR.

4  Q.   WAS ANYBODY ELSE WITH YOU AT THE OUTSET OF THIS TRAFFIC

5  STOP?

6  A.   IN THE BEGINNING, NO.

7  Q.   OKAY.  EVENTUALLY SOMEONE ELSE SHOWED UP?

8  A.   YES, SIR.

9  Q.   AND WHO WAS THAT OTHER PERSON WHO SHOWED UP?

10  A.   IT WAS A MCCAYSVILLE OFFICER.  I CAN'T EXACTLY REMEMBER

11  HIS NAME, BUT THE TWO DEPUTY SHERIFFS THAT SHOWED UP AFTER HIM

12  WERE JACOB PLESS AND DUSTIN CARTER.

13  Q.   OKAY.  AND WE'LL GET TO THEIR ARRIVAL IN A SECOND.

14           SO INITIALLY WHEN YOU WENT TO TALK TO MR. GIBBS, IT

15  WAS JUST YOU, MR. GIBBS AND HIS PASSENGER?

16  A.   YES, SIR.

17  Q.   AND DID YOU ASK MR. GIBBS TO SEARCH HIS CAR?

18  A.   YES, SIR.

19  Q.   AND WHAT DID MR. GIBBS SAY?

20  A.   IN THE BEGINNING HE SAID YOU'RE GOING TO DO WHAT YOU'RE

21  GOING TO DO, AND THEN I ASKED HIM AGAIN, AND HE GAVE ME CONSENT

22  TO SEARCH THE CAR.

23  Q.   AND WHEN HE GAVE YOU CONSENT TO SEARCH THE CAR, WERE YOU

24  YELLING AT HIM?

25  A.   NO, SIR.

1  Q.    YOU MENTIONED THAT YOU DID NOT HAVE YOUR GUN DRAWN?

2  A.    NO, SIR.

3  Q.    WERE YOU TOUCHING MR. GIBBS?

4  A.    NO, SIR.

5  Q.    WERE YOU RESTRAINING MR. GIBBS?

6  A.    NO, SIR.

7  Q.    DID YOU MAKE ANY THREATS TO MR. GIBBS?

8  A.    NO, SIR.

9  Q.    ANY PROMISES TO MR. GIBBS?

10  A.    NO, SIR.

11  Q.    AND EVENTUALLY YOU DID SEARCH THE CAR; IS THAT RIGHT?

12  A.    YES, SIR.

13  Q.    NOW, WHEN YOU HAD THE CONVERSATION ABOUT WHEN YOU ASKED

14  MR. GIBBS FOR PERMISSION TO SEARCH THE CAR, WERE THERE ANY

15  OTHER LAW ENFORCEMENT OFFICERS PRESENT AT THAT TIME?

16  A.    NO, SIR.

17  Q.    BUT EVENTUALLY SOME OTHERS SHOWED UP?

18  A.    YES, SIR.

19  Q.    AND YOU SEARCHED MR. GIBBS' CAR?

20  A.    YES, SIR.

21  Q.    AND WHAT, IF ANYTHING, OF INTEREST DID YOU FIND?

22  A.    I FOUND WHAT HE IDENTIFIED AS BEING SOME VERY DANGEROUS

23  POISON SEEDS.

24  Q.    AND WHERE DID YOU FIND THEM?

25  A.    IN THE GLOVE COMPARTMENT OF THE VEHICLE.

1    Q.    AND WHEN YOU FOUND THEM, WHAT DID YOU DO WITH THEM?

2    A.    I SET THEM TO THE SIDE, FINISHED SEARCHING THE CAR, AND I

3    SPOKE TO A MORE SENIOR OFFICER JACOB PLESS TO SEE IF HE COULD

4    IDENTIFY WHAT THEY WERE, AND HE SAID HE HAD NEVER SEEN THEM

5    BEFORE.

6    Q.    DO YOU REMEMBER WHAT MR. GIBBS, APPROXIMATELY, NOT WORD

7    FOR WORD, BUT DO YOU REMEMBER BASICALLY WHAT HE TOLD YOU ABOUT

8    THOSE SEEDS?

9    A.    HE IDENTIFIED THEM AS WHITE ANGEL TRUMPET SEEDS OR

10    SOMETHING LIKE THAT, AND HE JUST TOLD ME THEY WERE VERY, VERY

11    DANGEROUS, VERY POISONOUS.

12    Q.    AND, SHERIFF'S DEPUTY KINSER, WAS THE TRAFFIC STOP

13    RECORDED?

14    A.    YES, SIR.

15    Q.    I HAVE HANDED YOU WHAT I HAVE MARKED AS GOVERNMENT'S

16    EXHIBIT 3.  DO YOU KNOW WHAT THAT ITEM IS?

17    A.    YES, SIR.

18    Q.    IS THAT -- WHAT IS IT?

19    A.    IT'S A VIDEO COPY OF THE TRAFFIC STOP.

20    Q.    WHERE WAS THAT VIDEO RECORDED FROM?

21    A.    FROM THE PATROL CAR.

22    Q.    FROM YOUR DASH CAM?

23    A.    YES, SIR.

24    Q.    AND YOU'VE HAD A CHANCE TO LOOK AT IT?

25    A.    YES, SIR.

1  Q.   AND IS THERE ANYTHING, ANY MARKINGS THAT YOU PUT ON THAT

2  DISK?

3  A.   I INITIALED IT WITH A BLUE MARKER.

4  Q.   THOSE ARE YOUR INITIALS?

5  A.   YES, SIR.

6  Q.   AND DID YOU DO SO AFTER YOU HAD A CHANCE TO TAKE A LOOK

7  AT IT?

8  A.   YES, SIR.

9  Q.   AND DID THAT RECORDING, DOES IT FAIRLY AND ACCURATELY

10  DEPICT THE TRAFFIC STOP?

11  A.   YES, SIR.

12         MR. BUCHANAN:  YOUR HONOR, WE'D MOVE FOR THE

13  ADMISSION OF GOVERNMENT'S EXHIBIT 3 INTO EVIDENCE.

14         MS. PERDEW SILAS:  NO OBJECTION.

15         THE COURT:  GOVERNMENT'S EXHIBIT 3 IS ADMITTED.

16  BY MR. BUCHANAN:

17  Q.   AND, SHERIFF'S DEPUTY KINSER, AFTER YOU FINISHED WITH THE

18  TRAFFIC STOP, DID YOU ARREST MR. GIBBS?

19  A.   NO, SIR.

20  Q.   DID YOU GIVE HIM A WARNING?

21  A.   YES, SIR, JUST A VERBAL WARNING.

22  Q.   AND DID YOU LET HIM GO ON?

23  A.   YES, SIR.

24         MR. BUCHANAN:  NOTHING FURTHER, YOUR HONOR.

25         THE COURT:  THANK YOU, SIR.

```
 1                    CROSS-EXAMINATION

 2  BY MS. PERDEW SILAS:

 3  Q.    IS IT OFFICER OR DEPUTY?

 4  A.    DEPUTY SHERIFF.

 5  Q.    OKAY.  DEPUTY, DID YOU DO A REPORT OF THIS INCIDENT?

 6  A.    NO, MA'AM.

 7  Q.    OKAY.  AT SOME POINT MAYBE A COUPLE WEEKS LATER, DID YOU

 8  TALK TO SOMEONE ABOUT THIS TRAFFIC STOP, THAT IS TO SAY, WE

 9  KNOW AT SOME POINT MR. GIBBS ENDED UP GOING TO THE HOSPITAL,

10  AND THAT POINT I THINK THE PARTIES WOULD AGREE WAS FEBRUARY

11  2ND, WERE YOU CONTACTED AT ALL ON THAT DAY IN REFERENCE TO WHAT

12  YOU HAD SEEN AND HEARD DURING THE TRAFFIC STOP?

13          IN OTHER WORDS, LET ME CONTINUE TO SEE IF I CAN GET

14  US ORIENTED TO THE SAME PLACE.  THERE'S A DEPUTY JUSTIN CARD

15  THAT WORKS, I GUESS, WITH FANNIN COUNTY, RIGHT?

16  A.    JUSTIN?

17  Q.    CARD DO YOU KNOW HIM?

18  A.    DUSTIN CARTER?

19  Q.    IT COULD BE.  I DON'T KNOW.

20  A.    OKAY.  THE NAME YOU'RE GIVING ME, NOBODY BY THAT NAME

21  WORKS THERE.

22  Q.    OKAY.  HOW ABOUT A DUSTIN CARTER?

23  A.    YEAH.

24  Q.    OKAY.  DID YOU TALK TO DUSTIN CARTER ABOUT THESE BEANS

25  FROM JANUARY 15TH?
```

1  A.   YES, MA'AM.

2  Q.   OKAY.  DO YOU KNOW IF YOU TALKED TO HIM ABOUT THAT AROUND

3  THE TIME OF FEBRUARY 2ND WHEN MR. GIBBS SHOWED UP AT THE

4  EMERGENCY ROOM SAYING HE HAD BEEN EXPOSED TO RICIN, OR I'M

5  SORRY, SAYING HE HAD BEEN EXPOSED TO SOMETHING HE WAS WORRIED

6  ABOUT?  DID YOU EVER TALK TO DUSTIN CARTER?

7  A.   YEAH, HE WAS MY FIELD TRAINING OFFICER.

8  Q.   DID HE SHOW UP ON SCENE FOR JANUARY 15TH?

9  A.   THE TRAFFIC STOP?

10  Q.   UH-HUH (AFFIRMATIVE).

11  A.   YES, MA'AM.

12  Q.   OKAY.  AND SO HE SAW THE BEANS THERE HIMSELF, I GUESS?

13  A.   THEY WERE SEEDS.

14  Q.   SO HE SAW THE SEEDS THERE HIMSELF, I GUESS, RIGHT?

15  A.   UH-HUH (AFFIRMATIVE).

16  Q.   OKAY.  NOW, THE SEEDS -- WELL, WHEN YOU WERE TALKING TO

17  MR. GIBBS, MR. GIBBS WAS CALM, RIGHT?

18  A.   YES, MA'AM.

19  Q.   BECAUSE LATER YOU SAY YOU ASKED HIM FOR PERMISSION TO

20  SEARCH, RIGHT?

21  A.   YES, MA'AM.

22  Q.   YOU SAY HE SAID YOU'RE GOING TO DO WHAT YOU'RE GOING TO

23  DO, RIGHT?

24  A.   YES, MA'AM.

25  Q.   DID YOU CORRECT HIM ABOUT THAT?  DID YOU SAY WELL, NO, I

1    WANT TO HAVE YOUR PERMISSION BEFORE I CAN DO THAT?

2    A.    I DON'T EXACTLY RECALL.

3    Q.    OKAY.  BUT YOUR CONVERSATION THERE WITH HIM IS RECORDED?

4    A.    YES, MA'AM.

5    Q.    OKAY.  AND SO WE HAVE THAT AS GOVERNMENT'S EXHIBIT, I

6    THINK, 3?

7    A.    YES, MA'AM.

8    Q.    ALL RIGHT.  WHEN YOU GOT THE SEEDS, WERE THEY IN A BAG?

9    A.    YES, MA'AM.

10   Q.    LIKE A ZIPLOC BAG?

11   A.    YEAH, LIKE A SMALL JEWELER'S BAGGIE.

12   Q.    OKAY.  AND DID YOU HANDLE THE BAG?

13   A.    UH-HUH (AFFIRMATIVE).

14   Q.    AND WHEN YOU GOT DONE HANDLING THE BAG THAT CONTAINED THE

15   SEEDS, WHAT DID YOU DO WITH IT?

16   A.    I RETURNED IT TO MR. GIBBS.

17   Q.    OKAY.  NOW, EARLIER YOU CALLED HIM CHRIS GIBBS.  ARE YOU

18   FAMILIAR WITH HIM FROM BEFORE THE TRAFFIC STOP?

19   A.    YES, MA'AM.

20   Q.    HOW ARE YOU FAMILIAR WITH HIM?

21   A.    HE WAS A FREQUENT INMATE WHEN I WAS A SERGEANT AT THE

22   FANNIN COUNTY JAIL.

23   Q.    OKAY.  DID YOU VIEW HIM AS A TROUBLEMAKER?

24   A.    YES, MA'AM.

25   Q.    HOW COME?

1  A.   HE, HE WAS ALWAYS INSUBORDINATE WHEN HE WAS AN INMATE.

2  Q.   OKAY.  WERE YOU ALREADY FAMILIAR WITH HIS TOWN CAR BEFORE

3  YOU SAW IT THAT DAY?

4  A.   NO, MA'AM.

5  Q.   OKAY.  NOW, THE BODY CAM THAT HAS BEEN SUBMITTED AS

6  GOVERNMENT'S EXHIBIT 3, THERE ARE SOME SECONDS BEFORE MR. GIBBS

7  AND THE TOWN CAR PULL OVER; HAVE YOU REVIEWED THAT?

8           MR. BUCHANAN:  YOUR HONOR, I'D OBJECT.  THAT

9  MISCHARACTERIZES THE EVIDENCE.  I THINK HE SAID IT WAS A DASH

10  CAM, NOT A BODY CAM.

11           MS. PERDEW SILAS:  OKAY.  I ACCEPT THAT AS A FRIENDLY

12  AMENDMENT.

13  BY MS. PERDEW SILAS:

14  Q.   ON YOUR DASH CAM THERE ARE SOME SECONDS BEFORE THE STOP

15  OCCURS, RIGHT?

16  A.   YES, MA'AM.

17  Q.   SO FOR A WHILE YOU'RE BEHIND THIS WHITE TOWN CAR, RIGHT?

18  A.   YES, MA'AM.

19  Q.   AND THEN THERE'S A STOP?

20  A.   YES, MA'AM.

21  Q.   THE REASON YOU STOPPED HIM WAS WHAT?

22  A.   BECAUSE HE FAILED TO STOP AT A STOP SIGN.

23  Q.   OKAY.  AND THAT IS SHOWN, IS IT, ON THAT DASH CAM?

24  A.   YES, MA'AM.

25  Q.   OKAY.  DO YOU KNOW EXACTLY WHAT POINT THE RUNNING OF THAT

1  STOP SIGN IS SHOWN?

2  A.   AS FAR AS LIKE THE TIMESTAMP?

3  Q.   UH-HUH (AFFIRMATIVE).

4  A.   NO, MA'AM.

5           MS. PERDEW SILAS:  JUDGE, IN LIGHT OF OUR TECHNICAL

6  LIMITATIONS HERE, I'M GOING TO ASK THAT I BE ABLE TO SHOW, AND

7  IT PROBABLY WOULD BE EASIER IF HE STEPPED DOWN AND CAME AROUND,

8  BECAUSE I JUST WANT TO KNOW THE TIMESTAMP OF WHERE HE'S TALKING

9  ABOUT THAT HE'S -- THE STOP SIGN RUNNING TAKES PLACE.

10          THE COURT:  ANY OBJECTION FROM THE GOVERNMENT FOR HER

11 SHOWING HIM THE VIDEO --

12          MR. BUCHANAN:  NO, YOUR HONOR.

13          THE COURT:  -- TO ESTABLISH THE TIMESTAMP OF THE

14 ALLEGED STOP SIGN OFFENSE?

15          MS. PERDEW SILAS:  OKAY.  AND I DON'T HAVE TO DO IT

16 AT THIS MOMENT BECAUSE I ALMOST THINK IT WOULD BE NICE TO JUST

17 TAKE A BREAK, AND WE PROBABLY CAN STIPULATE BECAUSE I MAY BE --

18          THE COURT:  MY HOPE IS IF YOU ALL LOOKED AT THE VIDEO

19 THAT YOU'D BE ABLE TO IDENTIFY THE EVENT THAT HE'S DESCRIBING

20 IF IT'S ON THERE.  SO WE'LL GIVE YOU ALL AN OPPORTUNITY TO DO

21 THAT ONCE HE FINISHES TESTIFYING, AND IF YOU NEED TO CALL HIM

22 BACK, WE'LL DO IT.  THANK YOU.

23          MS. PERDEW SILAS:  OKAY.  GREAT.

24 BY MS. PERDEW SILAS:

25 Q.   WHEN YOU -- DID SOMEONE SHOW YOU THE SEEDS, OR DID YOU SAY

1  HEY, THERE'S SOME SEEDS; HOW DID THAT HAPPEN?

2  A.   I FOUND THEM WHILE SEARCHING THE VEHICLE IN THE GLOVE

3  COMPARTMENT.

4  Q.   OKAY.  YOU HADN'T ASKED MR. GIBBS BEFOREHAND HEY, DO YOU

5  HAVE SOME SEEDS IN YOUR CAR, RIGHT?

6  A.   HUH-UH (NEGATIVE).

7  Q.   BECAUSE YOU DIDN'T KNOW TO BE THINKING THAT, RIGHT?

8  A.   RIGHT.

9  Q.   AND SO WHEN YOU FOUND THEM, THEY WERE WHERE?

10  A.   IN THE GLOVE COMPARTMENT.

11  Q.   IN THE GLOVE COMPARTMENT.

12  A.   YES, MA'AM.

13  Q.   MR. GIBBS WHERE WAS HE WHEN YOU FOUND THEM?

14  A.   HE WAS STANDING OUTSIDE THE VEHICLE.

15  Q.   HE COULD SEE YOU SEARCHING HIS CAR?

16  A.   YES, MA'AM.

17  Q.   OKAY.  DID HE MAKE ANY EXCLAMATIONS WHEN YOU FOUND THESE

18  SEEDS?

19  A.   NO.

20  Q.   AND YOU ASKED HIM ABOUT THEM AND WHAT THEY WERE, RIGHT?

21  A.   YES, MA'AM.

22  Q.   AND HE TOLD YOU, HE MADE SOME STATEMENTS ABOUT THAT?

23  A.   YES, MA'AM.

24  Q.   OKAY.  I IMAGINE THAT HE WAS NOT MIRANDIZED AT ANY TIME AT

25  THIS POINT, RIGHT?

1  A.    CORRECT.

2  Q.    AND HE'S THE SUBJECT OF A TRAFFIC STOP AT THIS POINT,

3  RIGHT?

4  A.    YES, MA'AM.

5  Q.    THE TRAFFIC STOP FOR RUNNING THE STOP SIGN, THERE WOULD

6  NOT HAVE BEEN EVIDENCE OF THAT INSIDE OF MR. GIBBS' CAR?

7  A.    CORRECT.

8  Q.    HE JUST EITHER RAN IT OR HE DIDN'T, RIGHT?

9  A.    RIGHT.

10  Q.    AND DID YOU TELL HIM WHAT YOU WERE GOING TO BE WANTING TO

11  SEARCH HIS CAR FOR?

12  A.    NO, MA'AM.

13  Q.    YOU JUST SAID I THINK I'D LIKE TO SEARCH YOUR CAR OR WORDS

14  TO THAT AFFECT?

15  A.    I ASKED HIM, I SAID CAN I SEARCH YOUR VEHICLE.

16  Q.    CAN I SEARCH YOUR VEHICLE?

17  A.    YES, MA'AM.

18  Q.    OKAY.  BESIDES THOSE SEEDS, YOU FOUND A WEAPON?

19  A.    YEAH, AN AIR RIFLE.

20  Q.    OKAY.  BUT THAT'S NOT -- IS THAT A REAL GUN?  I DON'T

21  KNOW.

22  A.    IT'S NOT A FIREARM.  AN AIR RIFLE IS PROPELLED BY

23  COMPRESSED AIR.

24         MS. PERDEW SILAS:  OKAY.  ALL RIGHT.  THAT'S ALL I

25  HAVE OTHER THAN TO GET HIM TO IDENTIFY THE SPOT ON THE VIDEO.

```
1              THE COURT:  OKAY.  THANK YOU.

2              MR. BUCHANAN:  MAY I, YOUR HONOR?

3              THE COURT:  YES, YOU MAY.

4                     REDIRECT EXAMINATION

5   BY MR. BUCHANAN:

6   Q.   DEPUTY SHERIFF KINSER, WHERE WAS THAT AIR RIFLE?

7   A.   IT WAS IN THE BACK SEAT OF THE CAR.

8   Q.   COULD YOU SEE IT WHEN YOU APPROACHED THE DRIVER'S DOOR?

9   A.   YES, SIR.

10  Q.   AND I BELIEVE YOU TESTIFIED THAT WHEN THE CAR STOPPED, THE

11  PASSENGER THREW SOMETHING OUT OF THE CAR?

12  A.   YES, SIR.

13  Q.   DID THAT FACTOR INTO YOUR DECISION TO ASK FOR CONSENT TO

14  SEARCH?

15  A.   YES, SIR.

16             MS. PERDEW SILAS:  OBJECTION FOR LEADING, JUDGE.

17  THIS IS JUST LEADING, BUT IT'S DONE A LITTLE MORE CRAFTIER, BUT

18  IT'S DEFINITELY LEADING.

19             THE COURT:  SUSTAIN THE OBJECTION.

20  BY MR. BUCHANAN:

21  Q.   WHAT DID YOU DO AFTER YOU SAW THE PASSENGER SET SOMETHING

22  OUT OF THE CAR?

23  A.   THAT'S WHEN MY SUSPICION WAS RAISED THAT THERE MAY BE

24  SOMETHING, SOME KIND OF CONTRABAND INSIDE THE CAR.

25  Q.   AND DID THE PASSENGER -- YOU SAID WHEN THE CAR STOPPED
```

1  AFTER YOU ASKED MR. GIBBS TO MOVE UP, THE PASSENGER GOT OUT OF

2  THE VEHICLE?

3  A.   YES, SIR.

4  Q.   AND WHAT, IF ANYTHING, DID YOU DO WITH THAT INFORMATION?

5  WHAT DID YOU DO IN RESPONSE TO THE PASSENGER GETTING OUT OF THE

6  VEHICLE?

7  A.   I TOLD HIM TO GO BACK TO THE CAR.

8  Q.   DID THAT RAISE ANY SUSPICIONS?

9  A.   ME TELLING HIM TO GO BACK TO THE CAR?

10  Q.   NO, THE PASSENGER EXITING THE VEHICLE.

11  A.   OH, YES, YEAH, IT'S --

12          MR. BUCHANAN:  NOTHING FURTHER, YOUR HONOR.

13          MS. PERDEW SILAS:  THERE'S NOTHING UNTIL AFTER WE DO

14  THIS.

15          THE COURT:  OKAY.  DEPUTY KINSER, YOU MAY STEP DOWN.

16  WE'RE GOING TO LET YOU ALL TAKE A LOOK AT THE VIDEO TO LOOK FOR

17  THIS TIME, AND WE UP HERE WILL HANG TIGHT FOR A MINUTE AND GIVE

18  YOU ALL A MINUTE TO DO THAT.

19          (PAUSE IN THE PROCEEDINGS.)

20              FURTHER CROSS-EXAMINATION

21  BY MS. PERDEW SILAS:

22  Q.   DID YOU REVIEW GOVERNMENT'S EXHIBIT 3 WITH ME?

23  A.   YES, MA'AM.

24  Q.   OKAY.  WHAT WAS THE TIMESTAMP FOR WHEN THE STOP SIGN WAS?

25  A.   34 SECONDS.

1  Q.   OKAY.  IS IT FAIR TO SAY THAT THAT STOP SIGN IS RIGHT

2  THERE LIKE MAYBE TEN FEET FROM THIS DRIVEWAY WHERE MR. GIBBS

3  ENDED UP PULLING IN?

4  A.   YES, MA'AM.

5  Q.   OKAY.  COULD YOU TELL FROM REVIEWING THAT VIDEO -- OR

6  ACTUALLY LET ME ASK THIS, DID YOU AT SOME POINT PUT ON YOUR

7  BLUE LIGHTS?

8  A.   AFTER HE RAN THE STOP SIGN.

9  Q.   AFTER HE RAN THE STOP SIGN, BUT BEFORE HE CAME TO A STOP?

10  A.   YES, MA'AM.

11  Q.   OKAY.  AND YOU CAN TELL THAT FROM LOOKING AT THE VIDEO, OR

12  THAT'S JUST YOUR MEMORY?

13  A.   THAT'S MY MEMORY.

14          MS. PERDEW SILAS:  OKAY.  THAT'S ALL I HAVE, JUDGE.

15          THE COURT:  THANK YOU.

16          MR. BUCHANAN:  NOTHING ELSE, YOUR HONOR.

17          THE COURT:  THANK YOU, DEPUTY KINSER.  YOU MAY BE

18  EXCUSED.

19          MR. BUCHANAN:  THAT'S ALL OF THE UNITED STATES'

20  WITNESSES, YOUR HONOR.

21          THE COURT:  OKAY.

22          MS. PERDEW SILAS:  OKAY.  I DO FEEL LIKE THE RECORD

23  IS IN A STATE OF NOT BEING CLEAR IN LIKE MAYBE IT WAS DUSTIN

24  CARTER AND MAYBE AGENT BOWER WROTE DOWN JUSTIN CARD.  I DON'T

25  KNOW.  IT LOOKS LIKE THE GOVERNMENT IS ELECTING NOT TO CALL

1  THIS INDIVIDUAL, WHETHER IT BE DUSTIN OR JUSTIN, AND, YOU KNOW,

2  BE THAT AS IT MAY, I DO THINK IT'S IMPORTANT THAT WE KNOW IF

3  IT'S THE SAME PERSON.  IT SOUNDS LIKE IT PROBABLY IS.

4          AND IF AGENT BOWER IS LURKING ABOUT SOMEWHERE, MAYBE

5  WE CAN JUST FIND THAT OUT BEFORE WE CLOSE THE RECORD, AND I

6  ARGUE SIMPLY FROM THE INTERVIEW THAT THIS STATEMENT IS

7  INADMISSIBLE, THIS TAPE THAT I PUT IN AS DEFENDANT'S EXHIBIT

8  2.  CAN I JUST LOOK AND SEE IF HE'S OUT THERE?

9          MR. BUCHANAN:  I DON'T THINK HE'S GONE.  I THINK HE'S

10 STILL OUTSIDE.

11          THE COURT:  YEAH, I MEAN I THINK THE POINT YOU'RE

12 TRYING TO MAKE IS WHO IS IT.

13          MS. PERDEW SILAS:  WHO IS IT, YES, JUDGE.

14          THE COURT:  AND BASED ON WHAT WE'RE HEARING FROM

15 DEPUTY KINSER, THERE'S SOME REASON TO THINK THERE MIGHT BE A

16 MISTAKE.  I'M FINE WITH YOU ALL RUNNING THAT DOWN IF HE'S STILL

17 OUT THERE.

18          MS. PERDEW SILAS:  OKAY.  LET ME JUST GO AND SEE.

19          (PAUSE IN THE PROCEEDINGS.)

20          MS. PERDEW SILAS:  I HAVE TO GIVE BACK GOVERNMENT'S

21 EXHIBIT 3.

22          I GUESS I WILL CALL AGENT BOWER FOR A SECOND.

23          THE CLERK:  YOU ARE STILL UNDER OATH.

24              CHRISTOPHER JOHN BOWER,

25 HAVING BEEN PREVIOUSLY DULY SWORN, WAS EXAMINED AND TESTIFIED

1  AS FOLLOWS:

2                    FURTHER CROSS-EXAMINATION

3  BY MS. PERDEW SILAS:

4  Q.   AGENT, HAVE YOU EVER MET THIS DEPUTY KINSER HERE BEFORE?

5  A.   YES.

6  Q.   AND DEPUTY KINSER TESTIFIED THAT THERE'S A DUSTIN CARTER

7  AT FANNIN COUNTY THAT WAS WITH HIM WHEN HE SAW THE SEEDS, BUT

8  THAT THERE IS NOT A JUSTIN CARD -- CARTER.  SO COULD IT HAVE

9  BEEN DUSTIN CARTER INSTEAD OF JUSTIN CARDER?

10              LET ME GIVE YOU BACK DEFENDANT'S 1 WHICH WAS SHOWN TO

11  YOU FOR IDENTIFICATION PURPOSES, AND YOU HAVE THAT PERSON IN

12  THERE AS JUSTIN CARDER WITH A "D," BUT IT PROBABLY WAS DUSTIN

13  CARTER, RIGHT?

14  A.   I DON'T KNOW.

15  Q.   YOU DON'T KNOW?

16  A.   I DON'T KNOW IF THERE'S A MIXUP IN THE NAME OR NOT.  I

17  CAN'T SAY.  I MEAN I KNOW DEPUTY KINSER WOULD KNOW WHO WORKS AT

18  FANNIN COUNTY.  THERE MAY BE AN ERROR ON MY PART, BUT I CAN'T

19  SAY A HUNDRED PERCENT SURE UNLESS I DOUBLE-CHECK MYSELF.

20              MS. PERDEW SILAS:  OKAY.  ALL RIGHT.  WELL THAT'S

21  GOOD ENOUGH.  IT SOUNDS TO ME LIKE IT'S THE SAME PERSON, BUT

22  YOU CAN ONLY SAY WHAT YOU CAN SAY.

23  A.   YES, MA'AM.

24              MS. PERDEW SILAS:  THAT'S ALL I HAVE FOR AGENT BOWER.

25              THE COURT:  OKAY.  THANK YOU.  MR. BUCHANAN, DO YOU

1  HAVE ANYTHING?

2        MR. BUCHANAN:  NO, YOUR HONOR.

3        THE COURT:  THANK YOU, SPECIAL AGENT BOWER.  YOU MAY

4  BE EXCUSED AGAIN.

5        MS. PERDEW SILAS:  YOU KNOW THERE ARE SOME GAPS IN

6  THE RECORD THAT I'M A LITTLE BIT CONCERNED ABOUT, AND IT MAY BE

7  THAT WE CAN STIPULATE.

8        I THINK THAT WE NEED TO HAVE THE INFORMATION OF

9  WHETHER OR NOT MR. GIBBS WAS IN CONDITIONS THAT ARE

10  COMMENSURATE TO CUSTODY FROM SOMEWHERE AROUND FOUR TO AROUND

11  NINE.  I HAVE ENOUGH IN THE RECORD TO ARGUE THAT HE WAS IN

12  CUSTODY AT LEAST AS OF NINE.  WE KNOW THAT HE WAS STILL THERE

13  AT THE HOSPITAL, AND YOU WILL BE ABLE TO DETERMINE FROM

14  LISTENING TO THE -- WELL, IT'S A VIDEOTAPE, BUT THERE'S ONLY

15  AUDIO THAT HE WAS STILL THERE, BUT I'M CONCERNED ABOUT THE GAP

16  IN THE RECORD AS TO WHERE HE WAS AT PRIOR TO THAT.

17        SO I WOULD LIKE THE OPPORTUNITY TO CONSULT WITH THE

18  GOVERNMENT AND/OR POSSIBLY CALL SOMEBODY TO ESTABLISH HIS

19  WHEREABOUTS.  I THINK HE WAS SITTING IN THE BACK OF A POLICE

20  CAR FOR MOST OF THAT TIME, AND THAT I WOULD BE ABLE TO ARGUE

21  THAT HE WAS IN CUSTODY ALL THAT TIME PERIOD, BUT THE MORE

22  GERMANE ISSUE IS WHETHER HE WAS IN CUSTODY AT THE TIME OF THE

23  STATEMENTS THAT WE'RE TAKEN BY DUSTIN CARTER.

24        THE COURT:  OKAY.  I'VE NOT HAD THE BENEFIT OF

25  ANYTHING FROM THAT STATEMENT.  IT SOUNDS LIKE HE WAS SOMEWHERE

1   AT THE HOSPITAL, RIGHT?

2            MS. PERDEW SILAS:  YES, JUDGE, AND IT SOUNDS LIKE HE

3   WAS MAKING A TRANSITION FROM BEING INSIDE THE HOSPITAL TO --

4   BUT I DON'T THINK HE WAS FREE TO LEAVE.  SO I WOULD ASK TO BE

5   ABLE TO CALL DEPUTY CARTER.

6            WE DO HAVE, I MEAN WE DO HAVE THE BENEFIT OF HAVING

7   THE ACTUAL EXCHANGE BETWEEN HIM AND MR. GIBBS ON TAPE, BUT

8   SINCE I BELIEVE I'LL BE ARGUING WITH RESPECT TO CUSTODY STATUS,

9   I WOULD LIKE LEAVE TO BRING HIM IN ON A DIFFERENT DAY.

10           I WAS PERFECTLY FINE WITH BEING HAPPY WITH THE

11  GOVERNMENT NOT PUTTING ON A FULL RECORD AND I CAN ARGUE FROM

12  THAT, BUT ON REFLECTION --

13           THE COURT:  I MEAN I'M NOT TELLING YOU NO, AND I'M

14  NOT TELLING YOU YES RIGHT YET EITHER BECAUSE MR. BUCHANAN STOOD

15  UP BECAUSE HE'S GOING TO HAVE SOMETHING TO ADD HERE.

16           LET ME JUST -- YOU KNOW HOW THESE THINGS GO.  WE'VE

17  GOT TO WAIT ON THE TRANSCRIPT, AND THEN YOU'VE GOT SOME TIME TO

18  BRIEF IT UP.  MY INCLINATION IS THIS IS A TWO-FOLD ISSUE.

19  NUMBER ONE IS WHO IS THIS, AND IS IT JUST ONE PERSON, AND I

20  THINK THAT'S SOMETHING MR. BUCHANAN CAN PROBABLY RUN DOWN BY

21  THE CLOSE OF BUSINESS TODAY.

22           YOU ALL CAN PROBABLY TELL EITHER FROM BEING UP HERE

23  OR JUST WATCHING HOW WE'VE LET THIS THING FLOW TODAY IS I

24  TYPICALLY ALLOW YOU ALL SOME LATITUDE TO BRING WHATEVER YOU

25  THINK YOU NEED TO GET YOUR HANDS ON IN HERE FOR ME TO MAKE

1  THESE DECISIONS.

2        HAVING SAID THAT, THIS PARTICULAR HEARING HAS BEEN

3  KIND OF A BEAR TO GET SCHEDULED, YOU KNOW, ALL THIS WENT DOWN

4  THE FRIDAY BEFORE THE SUPER BOWL, AND WE'RE READY FOR THE

5  SECOND PRESEASON GAME.  SO WHAT I'M TELLING YOU IS IF WE'RE

6  GOING DO ANYTHING ELSE, AND I'M NOT DECIDING THAT RIGHT NOW

7  BECAUSE I'M NOT SURE YOU'RE REALLY ASKING ME QUITE YET UNTIL

8  YOU HEAR IT'S JUST ONE GUY OR IF THERE'S TWO DIFFERENT FELLOWS

9  OVER THERE, BUT IF YOU'RE GOING TO ASK FOR THAT, TALK TO THE

10  GOVERNMENT AND SEE IF THEY'LL AGREE TO IT, AND THEN COME AT ME

11  WITH LIKE A LASER LIKE EFFICIENCY OF WE'RE GOING TO GET OVER

12  HERE FOR THIS ONE WITNESS AND WE'RE GOING TO SQUEEZE IT IN,

13  WE'RE GOING TO COME OVER HERE AND GET THIS DONE.  WE'RE NOT

14  GOING TO HOLD UP THE BRIEFING PROCESS MUCH.

15        MS. PERDEW SILAS:  OKAY.  YES.

16        THE COURT:  BECAUSE IF WE'RE GOING TO HAVE A LITTLE

17  BITTY SHORT TRANSCRIPT THAT WE DEVELOP IN THE NEXT WEEK OR TWO,

18  YOU KNOW, CANDIDLY, AND I DON'T WANT TO PRESUME THE

19  AVAILABILITY TOO MUCH OF SOME OF THE FANNIN COUNTY LAW

20  ENFORCEMENT FOLKS, BUT MY THOUGHT IS COMPARED TO SOME PEOPLE

21  THEY WOULD BE EASIER TO GET HERE THAN OTHERS THAT WE MIGHT HAVE

22  A HARD TIME TRACKING.

23        MS. PERDEW SILAS:  YES, JUDGE.

24        THE COURT:  THE WAY I'M LEAVING IT, I THINK, I'M

25  GOING TO LET MR. BUCHANAN TALK, I'M JUST TELLING YOU HOW IT

1  STRIKES ME IS AT THIS PRECISE SECOND YOU HAVEN'T YET ASKED TO

2  TALK TO THIS GUY BECAUSE YOU DON'T KNOW RIGHT NOW IF IT'S ONE

3  GUY OR TWO, RIGHT?

4         MS. PERDEW SILAS:  BUT I DO WANT TO TALK TO HIM.  I

5  THINK IT'S PROBABLY ONE.

6         THE COURT:  I TEND TO THINK THAT'S PROBABLY RIGHT,

7  TOO, BUT WE DON'T KNOW.

8         MS. PERDEW SILAS:  I EITHER WANT TO TALK TO HIM OR

9  THEM.

10        THE COURT:  RIGHT.

11        MS. PERDEW SILAS:  YEAH, I DO WANT TO TALK TO HIM.

12        THE COURT:  RIGHT.  OKAY.  YOU DEFINITELY WANT TO DO

13  IT.

14        OKAY.  MR. BUCHANAN, MAYBE YOU CAN TELL ME IF YOU

15  THINK THIS IS NOT APPROPRIATE AND CONVINCE ME THAT MY

16  INCLINATION IS WRONG.

17        MR. BUCHANAN:  YOUR HONOR, IT MAY TAKE A LITTLE BIT

18  OF FACTUAL DEVELOPMENT, BUT JUST LOOKING AT DEFENDANT'S EXHIBIT

19  1, IT NOTES THAT THAT RECORDING WAS MADE WHILE IT SAYS TIME OF

20  THE RECORDING MR. GIBBS WAS SEEKING MEDICAL TREATMENT AT THE

21  FANNIN COUNTY SHERIFF'S OFFICE.

22        AS I POINTED OUT EARLY, THE DEFENDANT HAS FILED A

23  MOTION TO SUPPRESS EVIDENCE RESULTING FROM AN UNLAWFUL HIPAA

24  DISCLOSURE.  SO IT SOUNDS LIKE TO ME THAT ANY STATEMENT THAT HE

25  MADE WHETHER OR NOT FANNIN COUNTY OFFICER CARTER OR CARDER WAS

1  PRESENT WOULD BE WHILE HE WAS SEEKING MEDICAL ATTENTION, AND

2  THAT INFORMATION WAS THEN RELAYED BACK TO LAW ENFORCEMENT, AND

3  THAT'S WHAT I MENTIONED TO THE COURT AT THE OUTSET.  THAT'S

4  COVERED BY A CFR, SO I DON'T BELIEVE -- WE'RE FINE WITH -- I

5  ENJOY COMING UP HERE.  SO I'M FINE TO COME UP HERE FOR ANOTHER

6  HEARING, BUT I BELIEVE THAT MY ARGUMENT WILL BE, EVEN AFTER WE

7  FIGURE OUT EXACTLY WHO IT IS AND WHAT WAS SAID, THAT THAT

8  INFORMATION IS NOT SUPPRESSIBLE BECAUSE THAT INFORMATION AND

9  THE DISCOURSE ABOUT THE MEDICAL TREATMENT IS NOT SUPPRESSIBLE

10 AND SUBJECT --

11         THE COURT:  AND I THINK FROM MS. PERDEW SILAS'

12 PERSPECTIVE THERE'S TWO ISSUES.  THERE'S THAT, AND THEN THERE'S

13 THE ISSUE OF WHETHER SHE CAN ARGUE HE WAS IN CUSTODY FROM

14 THE -- WITHIN MOMENTS FROM WHEN HE ROLLED INTO THE FACILITY.

15         MR. BUCHANAN:  OKAY.

16         THE COURT:  SO THAT'S WHY I'M INCLINED TO LET HER DO

17 IT, BUT LET ME BE CLEAR.  I'M INCLINED TO LET HER DO IT PRETTY

18 QUICK.  WE GOT WHAT APPEARS TO BE SOME GOOD NEWS.  WE HAD A

19 CASE WE WERE GOING TO TRY AT THE END OF THIS MONTH THAT WAS

20 GOING TO TAKE UP A WHOLE WEEK THAT I KNOW WE MAY HAVE SCHEDULED

21 THIS AROUND, AND THAT APPARENTLY HAS SETTLED.

22         SO, YOU KNOW, TO INVOKE THE FOOTBALL CALENDAR AGAIN,

23 IF WE'RE GOING TO DO THIS THING, I WANT TO DO IT BEFORE THE

24 REGULAR SEASON KICKS OFF, YOU KNOW, LET'S GET IT DONE THIS

25 MONTH, FIGURE OUT WHO WE GOT, AND YOU ALL GET WITH MS. KLIMENKO

1  AND GET ON BACK UP HERE SO THAT WE CAN OUR TRANSCRIPTS DONE IN

2  A REASONABLE AMOUNT OF TIME.

3          MR. BUCHANAN:  YES, YOUR HONOR.

4          THE COURT:  AND SINCE IT LOOKS LIKE WE'RE GOING TO

5  VISIT SOME MORE ON THIS THING PROBABLY, UNLESS YOU ALL

6  STIPULATE TO SOMETHING, ORDINARILY I'D WAIT AND TELL YOU ALL

7  WHAT I THINK ABOUT A BRIEFING SCHEDULE, BUT I THINK IT MIGHT BE

8  PRUDENT TO GO AHEAD AND DO IT JUST IN CASE IN THE COURSE OF THE

9  RIDE HOME FROM THE COURTHOUSE WHERE YOU ALWAYS GET YOUR BEST

10  IDEAS YOU ALL FIGURE OUT MAYBE WE DON'T NEED TO DO THIS.

11          IF MY MEMORY IS CORRECT, I THINK MS. PERDEW SILAS IS

12  ONE OF THOSE WHO LIKES THE OPPORTUNITY TO AMEND UP EVEN WHEN

13  IT'S THE GOVERNMENT'S BURDEN.  AM I REMEMBERING THAT RIGHT THAT

14  YOU'D LIKE THE FIRST CRACK AT AN AMENDED BRIEF SO YOU CAN HAVE

15  THE LAST WORD?

16          MS. PERDEW SILAS:  YES, JUDGE.

17          THE COURT:  OKAY.  I WOULD BE INCLINED ONCE THE

18  TRANSCRIPTS ARE DONE TO GIVE YOU 21 DAYS FROM THAT TIME TO GET

19  YOUR BRIEF FILED, GIVE THE GOVERNMENT 21 DAYS TO RESPOND AND A

20  14 DAY PERIOD TO REPLY.

21          AND I'LL -- I WAS WHINING A LITTLE BIT ABOUT HOW LONG

22  IT TOOK US TO GET THIS SCHEDULED, BUT I WILL TELL YOU ALL IF

23  YOU RUN INTO SOME SIGNIFICANT HARDSHIPS OR CONFLICTS DURING

24  THAT BRIEFING SCHEDULE TIME, HOLLER AT US AND GET ANOTHER WEEK

25  OR SOMETHING SQUEEZED IN THERE IF YOU NEED IT.

1          DOES EVERYBODY UNDERSTAND THE BRIEFING SCHEDULE?

2          MR. BUCHANAN:  YES, YOUR HONOR.

3          MS. PERDEW SILAS:  YES, JUDGE.

4          THE COURT:  ALL RIGHT.  AND I WOULD ENCOURAGE YOU,

5  MR. BUCHANAN, IF YOU CAN, TO TRY TO RUN DOWN WHO IS IT OR WHO

6  ARE THEY IN THE NEXT -- TODAY OR TOMORROW IF YOU CAN GET THAT

7  DONE, AND THEN WE CAN START LOOKING AT WHEN WE CAN GET BACK UP

8  HERE, AND I APPRECIATE YOUR KIND WORDS SAYING YOU LIKE TO COME

9  UP HERE.

10          ANYTHING FURTHER FROM THE GOVERNMENT?

11          MR. BUCHANAN:  I HOPE TO HAVE THAT DONE BEFORE WE

12  LEAVE, SO WE'LL RELAY THAT INFORMATION TO MS. SILAS AS SOON AS

13  I GET IT.

14          THE COURT:  MS. PERDEW SILAS, HAVE YOU GOT ANYTHING

15  ELSE FOR ME?

16          MS. PERDEW SILAS:  NO, JUDGE.

17          THE COURT:  OKAY.  THANK YOU, ALL.

18          (PROCEEDINGS CONCLUDED.)

19

20

21

22

23

24

25

1                                INDEX

2

3    CHRISTOPHER JOHN BOWER
     DIRECT EXAMINATION
4    BY MR. BUCHANAN: ......................................... 5
     CROSS-EXAMINATION
5    BY MS. PERDEW SILAS: .................................... 16
     REDIRECT EXAMINATION
6    BY MR. BUCHANAN: ........................................ 30
     RECROSS-EXAMINATION
7    BY MS. PERDEW SILAS:..................................... 35
     FURTHER DIRECTION EXAMINATION
8    BY MR. BUCHANAN:........................................ 39
     FURTHER CROSS-EXAMINATION
9    BY MS. PERDEW SILAS:..................................... 60

10   JOHN CHRISTOPHER DAVID KINSER
     DIRECT EXAMINATION
11   BY MR. BUCHANAN:........................................ 40
     CROSS-EXAMINATION
12   BY MS. PERDEW SILAS: .................................... 49
     REDIRECT EXAMINATION
13   BY MR. BUCHANAN: ........................................ 56
     FURTHER CROSS-EXAMINATION
14   BY MS. PERDEW SILAS:..................................... 57

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2                    C-E-R-T-I-F-I-C-A-T-E

 3

 4   UNITED STATES OF AMERICA

 5   NORTHERN DISTRICT OF GEORGIA

 6

 7            I, ANDRE G. ASHLEY, DO HEREBY CERTIFY THAT I AM A

 8   U.S. DISTRICT REPORTER FOR THE NORTHERN DISTRICT OF GEORGIA,

 9   THAT I REPORTED THE FOREGOING AND THE SAME IS A TRUE AND

10   ACCURATE TRANSCRIPTION OF MY MACHINE SHORTHAND NOTES AS TAKEN

11   AFORESAID.

12            IN TESTIMONY WHEREOF I HAVE HEREUNTO SET MY HAND ON

13   THIS 25TH DAY OF AUGUST, 2017.

14

15

16

17

18
                            S/ ANDRE G. ASHLEY
19                          ANDRE G. ASHLEY
                            OFFICIAL COURT REPORTER
20                          NORTHERN DISTRICT OF GEORGIA

21

22

23

24

25
```