```
 1                      UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF GEORGIA
 2                         GAINESVILLE DIVISION

 3

 4
    UNITED STATES OF AMERICA     ) DOCKET NO. 2:17-CR-05-RWS-JCF
 5                               )
                                 ) GAINESVILLE, GEORGIA
 6                               ) SEPTEMBER 1, 2017
             V.                  )
 7                               )
    WILLIAM CHRISTOPHER GIBBS,   )
 8                               )
             DEFENDANT.          )
 9

10
                             VOLUME 2
11             TRANSCRIPT OF SUPPRESSION HEARING
             BEFORE THE HONORABLE J. CLAY FULLER
12              UNITED STATES MAGISTRATE JUDGE

13
    APPEARANCES OF COUNSEL:
14
    FOR THE GOVERNMENT:            RYAN K. BUCHANAN
15                                 OFFICE OF THE U.S. ATTORNEY

16  FOR THE DEFENDANT:             NATASHA PERDEW SILAS
                                   FEDERAL DEFENDER PROGRAM
17

18
    COURT REPORTER:                ANDY ASHLEY
19                                 1949 U. S. COURTHOUSE
                                   75 TED TURNER DRIVE
20                                 ATLANTA, GEORGIA  30303-3361
                                   (404) 215-1478
21

22
    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
23  PRODUCED BY COMPUTER.

24

25
```

1            P R O C E E D I N G S

2   (GAINESVILLE, HALL COUNTY, GEORGIA; SEPTEMBER 1, 2017

3   IN OPEN COURT.)

4            THE COURT:  WE'RE HERE ON 2:17-CR-5.  COUNSEL, PLEASE

5   STATE YOUR APPEARANCES FOR THE RECORD.

6            MR. BUCHANAN:  GOOD MORNING, YOUR HONOR, RYAN

7   BUCHANAN.  I'M JOINED AT COUNSEL TABLE BY SPECIAL

8   AGENTS KIMBERLY SPELL-FOWLER AND BENNI JONSSON FROM THE

9   FBI.

10           THE COURT:  GOOD MORNING, FOLKS.

11           MS. PERDEW SILAS:  GOOD MORNING, JUDGE.  FOR WILLIAM

12  CHRISTOPHER GIBBS, I AM NATASHA PERDEW SILAS.

13           THE COURT:  GOOD MORNING, AND GOOD MORNING, MR.

14  GIBBS.  WELL, I DON'T THINK WE'D BE SITTING HERE IF YOU ALL

15  HADN'T SOLVED THE MYSTERY.  I ASKED MS. KLIMENKO A MINUTE AGO

16  HAVE WE GOT ONE WITNESS OR TWO BECAUSE I KNOW THE NAMES DIDN'T

17  QUITE LINE UP.  SO MY GUESS IS YOU ALL FOUND THE PERSON THAT

18  WAS REFERENCED IN THE REPORTS.

19           MR. BUCHANAN:  WE HAVE TWO PEOPLE, ONE WITNESS, YOUR

20  HONOR.

21           THE COURT:  FAIR ENOUGH.

22           MR. BUCHANAN:  THE UNITED STATES WOULD CALL JUSTIN

23  TURNER.

24           THE CLERK:  PLEASE RAISE YOUR RIGHT HAND TO TAKE THE

25  OATH.

```
 1                     JUSTIN TURNER,

 2  HAVING BEEN DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

 3            THE CLERK:  IF YOU WILL HAVE A SEAT, PLEASE, AND

 4  STATE YOUR FULL NAME FOR THE RECORD AND SPELL YOUR LAST NAME

 5  ALSO.

 6            THE WITNESS:  JUSTIN TURNER, T U R N E R.

 7                     DIRECT EXAMINATION

 8  BY MR. BUCHANAN:

 9  Q.   HOW ARE YOU EMPLOYED?

10  A.   WITH THE FANNIN COUNTY SHERIFF'S OFFICE.

11  Q.   AND WHAT'S YOUR POSITION?

12  A.   I'M THE COMMANDER OF THE CRIMINAL INVESTIGATIONS DIVISION.

13  Q.   AND HOW LONG HAVE YOU BEEN WITH FANNIN COUNTY?

14  A.   SINCE NOVEMBER OF 1997, TWO YEAR BREAK IN SERVICE FOR

15  MILITARY, BUT BASICALLY SINCE 97.

16  Q.   AND HOW LONG HAVE YOU HAD YOUR CURRENT POSITION?

17  A.   I'VE BEEN COMMANDING THE CRIMINAL INVESTIGATIONS DIVISION

18  AS A SERGEANT, LIEUTENANT OR CAPTAIN SINCE 2009.

19  Q.   SO YOU'RE A SERGEANT NOW?

20  A.   A CAPTAIN.

21  Q.   CAPTAIN.  AND AS THE CAPTAIN OF THAT UNIT, WHAT TYPES OF

22  THINGS DO YOU DO?

23  A.   I OVERSEE THE DAILY OPERATIONS OF THE CRIMINAL

24  INVESTIGATIONS DIVISION INCLUDING PROPERTY AND EVIDENCE.

25  Q.   AND IN YOUR ROLE AS A CAPTAIN, DO YOU LEAVE YOUR DESK AND
```

1    GO OUT AND CONDUCT INVESTIGATIONS?

2    A.    I DO.   I ALSO DO INVESTIGATIONS.

3    Q.    AND DO YOU CONDUCT INTERVIEWS AS A PART OF YOUR DUTIES?

4    A.    I DO.

5    Q.    INTERVIEW THOSE SUSPECTED OF CRIME AND WITNESSES, TOO?

6    A.    YES, SIR.

7    Q.    AND WERE YOU WORKING ON FEBRUARY 2ND OF 2017?

8    A.    YES, SIR.

9    Q.    AND AT SOME POINT THAT DAY DID YOU RESPOND TO THE HOSPITAL

10   THERE IN FANNIN COUNTY?

11   A.    I DID, FANNIN REGIONAL.

12   Q.    AND WHY DID YOU GO TO THE HOSPITAL THAT DAY?

13   A.    DISPATCH HAD A CALL FOR SERVICE AT THE HOSPITAL.

14   Q.    AND DO YOU REMEMBER SOME OF THE SPECIFICS OF WHAT YOU

15   LEARNED BEFORE YOU WENT TO THE HOSPITAL?

16   A.    I DO.

17   Q.    AND WHAT DID THEY -- WHY DID THEY TELL YOU TO GO TO THE

18   HOSPITAL?

19   A.    THAT A SUBJECT HAD TRIED TO MAKE RICIN.

20   Q.    AND SO WHEN YOU WENT THERE, DID YOU LEARN WHO THIS SUBJECT

21   WAS WHO HAD SUPPOSEDLY TRIED TO MAKE SOME RICIN?

22   A.    I DID.

23   Q.    AND DID YOU LOCATE HIM?

24   A.    YES, SIR.

25   Q.    AND HOW DID YOU FIND HIM?

1  A.   HE WAS IN THE HOSPITAL.  I WALKED IN AND ASKED FOR HIM.

2  Q.   OKAY.  AND DID SOMEONE POINT YOU TO A PERSON?

3  A.   THEY POINTED ME TO THE ROOM OR GAVE ME THE ROOM NUMBER.

4  Q.   OKAY.  AND WHEN YOU WENT THERE, DO YOU SEE THE INDIVIDUAL

5  THAT YOU ENCOUNTERED IN THE COURTROOM?

6  A.   I DO.

7  Q.   AND WHAT'S HE WEARING TODAY?

8  A.   HE'S IN THE YELLOW THERE.

9       MR. BUCHANAN:  YOUR HONOR, I'D LIKE THE RECORD TO

10  REFLECT THE WITNESS HAS IDENTIFIED THE DEFENDANT.

11  BY MR. BUCHANAN:

12  Q.   WHEN YOU WENT INTO THAT HOSPITAL ROOM AND THE DEFENDANT

13  WAS THERE, WHO ELSE WAS IN THE ROOM?

14  A.   DEPUTY DUSTIN CARDER.

15  Q.   DEPUTY CARDER, YOURSELF AND MR. GIBBS?

16  A.   YES, SIR.

17  Q.   AND WAS ANYONE ELSE IN THE ROOM?

18  A.   NOT THAT I RECALL.

19  Q.   WHEN YOU GOT INTO THE ROOM WAS MR. GIBBS BEING GUARDED BY

20  ANY LAW ENFORCEMENT OFFICERS?

21  A.   NO, SIR.

22  Q.   WAS MR. GIBBS HANDCUFFED?

23  A.   NO, SIR.

24  Q.   HAD YOU BEEN TOLD THAT MR. GIBBS HAD BEEN ARRESTED?

25  A.   NO, SIR.

1  Q.    WHEN YOU WALKED IN DID YOU ARREST MR. GIBBS?

2  A.    NO, SIR.

3  Q.    DID YOU ASK HIM SOME QUESTIONS?

4  A.    YES, SIR.

5  Q.    AND PLEASE TELL JUDGE FULLER WHY YOU ASKED QUESTIONS?

6  A.    I WAS TRYING TO SEE WHAT TYPE OF ALARM MAY OR MAY NOT

7  EXIST.  I WAS CALLED TO THE HOSPITAL BECAUSE OF A SUBSTANCE

8  THAT I DIDN'T KNOW A LOT ABOUT.

9  Q.    AND DO YOU REMEMBER SOME OF THE SPECIFIC THINGS THAT YOU

10  ASKED MR. GIBBS?

11  A.    I REMEMBER ASKING HIM ABOUT HIS WELL-BEING, WHERE HE WAS

12  AT DURING THE TREATMENT PROCESS, EXACTLY WHAT HE HAD DONE AS

13  FAR AS THIS PROCESS WITH CASTOR BEANS, AND WHERE SOME OF THOSE

14  ELEMENTS OF THAT MAY BE AT AS FAR AS IN HIS CAR OR SOMEWHERE

15  ELSE.

16  Q.    AND DID YOU ASK HIM THESE QUESTIONS -- WHY DID YOU ASK HIM

17  THESE QUESTIONS?

18  A.    I HAD ALREADY HEARD THAT THE SUBSTANCE WAS GOING TO BE IN

19  MR. GIBBS' VEHICLE, AND THE VEHICLE WAS PARKED RIGHT OUTSIDE OF

20  THE EMERGENCY DEPARTMENT MAIN ENTRANCE.

21  Q.    DID THAT CAUSE YOU ANY CONCERN?

22  A.    YES, SIR, IT DID.

23  Q.    AND SO YOU ASKED -- DID YOU ASK MR. GIBBS WHERE IN HIS

24  VEHICLE THE SUBSTANCE MIGHT BE?

25  A.    I REMEMBER ASKING HIM IF IT WAS IN THE VEHICLE, AND WHAT

1  TYPE OF QUANTITY THAT IT WAS.

2  Q.    AND YOU MENTIONED THAT YOU WERE CONCERNED ABOUT THIS.   WHY

3  WERE YOU CONCERNED?

4  A.    IT WAS A SUBSTANCE THAT I -- IT WAS AN ALLEGED SUBSTANCE

5  THAT I DIDN'T KNOW ANYTHING ABOUT, OR WHAT I SHOULD OR SHOULD

6  NOT DO.  SO I KNEW THAT I HAD TO ASK SOME QUESTIONS AS FAR AS A

7  FIRE RESPONSE OR EMA, I'D HAVE TO ANSWER SOME QUESTIONS TO

8  THEM, AND ALSO JUST THE GENERAL, LIKE I SAY, WE WERE AT THE

9  HOSPITAL, AND THAT'S WHERE AMBULANCES COME IN AND OUT.  WE WERE

10  AT THE EMERGENCY DEPARTMENT.  SO I FIGURED THAT I NEEDED TO

11  KNOW A LOT OF THINGS REAL QUICK JUST TO SEE IF THE ALARM NEEDED

12  TO GO UP OR COME DOWN AT THAT TIME AS FAR AS OUR CONCERN.

13  Q.    YOU MEAN ALARM FOR PUBLIC SAFETY?

14  A.    YES.

15  Q.    AND ROUGHLY HOW LONG DID YOU TALK WITH MR. GIBBS?

16  A.    PROBABLY SEVEN OR EIGHT MINUTES.

17  Q.    AND AT THE CONCLUSION OF THAT CONVERSATION, DID YOU ARREST

18  HIM?

19  A.    NO, SIR.

20  Q.    DID YOU PUT HIM IN HANDCUFFS?

21  A.    NO, SIR.

22  Q.    DID YOU TELL MR. GIBBS NOT TO LEAVE THE ROOM?

23  A.    NO, SIR.

24  Q.    AND SO YOU FINISHED TALKING WITH HIM, AND WHAT DID YOU DO?

25  A.    I WENT OUTSIDE.  I LEFT HIM.

1  Q.    AND DID DEPUTY CARDER, DID HE LEAVE HIM, TOO?

2  A.    YES, HE LEFT ALSO.

3  Q.    SO THE TWO OF YOU WALKED OUT OF THE ROOM, AND WHO WAS LEFT

4  IN THE ROOM WITH MR. GIBBS?

5  A.    NO ONE.

6  Q.    AND THEN YOU LEFT THE ROOM, BUT DID YOU LEAVE THE

7  HOSPITAL?

8  A.    I DID NOT LEAVE THE HOSPITAL.  I LEFT THE BUILDING, BUT I

9  WENT TO THE PARKING LOT.

10  Q.    OKAY.  WHAT DID YOU DO WHEN YOU WENT OUT TO THE PARKING

11  LOT?

12  A.    I STARTED ASSURING THAT VEHICLES WERE BEING MOVED AWAY

13  FROM MR. GIBBS' VEHICLE.

14  Q.    AND WHY DID YOU DO THIS?

15  A.    TO ISOLATE THE VEHICLE WITH THE UNKNOWN SUBSTANCE AWAY

16  FROM EVERYBODY ELSE JUST FOR PUBLIC SAFETY.

17  Q.    DID YOU MOVE MR. GIBBS' VEHICLE?

18  A.    NO, SIR.

19  Q.    BUT YOU MOVED THOSE THAT WERE PARKED AROUND IT?

20  A.    YES, SIR.

21  Q.    AND AT SOME POINT DID YOU SEE MR. GIBBS AGAIN?

22  A.    I DID.

23  Q.    ROUGHLY HOW MUCH TIME HAD PAST SINCE YOU LEFT HIM IN THE

24  HOSPITAL ROOM?

25  A.    A GUESS TEN, FIFTEEN MINUTES TOPS.

1  Q.   OKAY.  AND HOW DID YOU SEE HIM AGAIN; DID HE WALK OUT OF

2  THE HOSPITAL?

3  A.   HE WALKED OUT OF THE HOSPITAL.

4  Q.   WAS HE ACCOMPANIED BY LAW ENFORCEMENT OFFICERS WHEN HE

5  WALKED OUT?

6  A.   NO, SIR.

7  Q.   WHEN HE WALKED OUT, DID HE APPROACH YOU?

8  A.   HE DID.

9  Q.   AND WHAT HAPPENED WHEN HE APPROACHED YOU?

10  A.   WE BEGAN A CONVERSATION.

11  Q.   NOW, DID YOU GIVE HIM A CIGARETTE, OR DID HE ASK FOR A

12  CIGARETTE?

13  A.   IT SEEMS LIKE I DID GIVE HIM A CIGARETTE BECAUSE I TOLD

14  HIM I WAS GOING OUT TO SMOKE.

15  Q.   AND SO WHEN MR. GIBBS CAME BACK OUT AND YOU MAY OR MAY NOT

16  HAVE GIVEN HIM A CIGARETTE, ONCE HE CAME BACK OUT DID YOU

17  ARREST HIM?

18  A.   NO, SIR.

19  Q.   DID YOU PUT HIM IN CUSTODY?

20  A.   NO, SIR.

21  Q.   DID YOU TELL HIM NOT TO LEAVE?

22  A.   NO, SIR.

23  Q.   BUT YOU DID TALK WITH HIM ABOUT HIS CAR; IS THAT CORRECT?

24  A.   I DID SPEAK WITH HIM ABOUT THE CAR.

25  Q.   AND WHAT WAS THE CONCERN WITH THE CAR?

1   A.   I DIDN'T KNOW WHAT WOULD HAVE TO BE DONE TO MAKE SURE THAT

2   CAR WAS SAFE, SO I TOLD HIM THAT HIS CAR COULDN'T LEAVE UNTIL I

3   KNEW FURTHER.

4   Q.   AND AT THAT POINT HAD ANY SORT OF PUBLIC SAFETY OR HAZMAT

5   PERSONNEL ARRIVED?

6   A.   THEY HAD NOT ARRIVED.   THOSE NOTIFICATIONS WERE MADE, BUT

7   I DIDN'T HAVE ANYBODY ON SCENE AT THE TIME AS FAR AS HAZMAT.

8   Q.   AND DID HAZMAT EVENTUALLY SHOW UP?

9   A.   YES, SIR.

10  Q.   AND WHEN HAZMAT SHOWED UP, DID MR. GIBBS GIVE CONSENT FOR

11  THE SEARCH OF HIS CAR?

12  A.   YES, SIR.

13  Q.   AND AFTER THAT CONSENT AND AFTER THE SEARCH OF THE CAR

14  STARTED, WHERE WAS MR. GIBBS?

15  A.   HE WAS IN THE PARKING LOT.   WE HAD OPENED THE CAR.

16  ACTUALLY WE HAD OPENED ONE OF THE DEPUTIES' CARS BEFORE SHIFT

17  CHANGE, AND I DON'T REMEMBER EXACTLY WHICH DEPUTY IT WAS.   WE

18  HAD OPENED THE CAR BECAUSE IT WAS FEBRUARY, IT WAS STILL COLD,

19  SO HE COULD SIT INSIDE SOME SHELTER IF HE WANTED TO.

20  Q.   DO YOU REMEMBER WHAT TYPE OF CLOTHES HE WAS WEARING WHEN

21  HE CAME OUT OF THE HOSPITAL?

22  A.   I REMEMBER THE JACKET WITH PATCHES, BUT I DON'T REMEMBER

23  SPECIFICALLY THE CLOTHING HE HAD ON, BUT I DON'T THINK HE HAD A

24  LONG SLEEVE, BUT I DON'T REMEMBER IF IT WAS SHORT OR LONG.

25  Q.   MIGHT HE HAVE BEEN CHILLY STANDING OUTSIDE AT THAT TIME?

1  A.   I WAS CHILLY OUTSIDE.

2  Q.   AND SO DID YOU TELL HIM HE HAD TO SIT IN THE CAR?

3  A.   NO, SIR.

4  Q.   BEFORE HE GOT IN THE CAR, DID ANYBODY PAT HIM DOWN AND

5  TAKE HIS PERSONAL EFFECTS?

6  A.   NO, SIR.

7  Q.   WAS MR. GIBBS ALLOWED TO USE HIS CELLPHONE WHILE HE WAS IN

8  THE CAR?

9  A.   HE HAD HIS CELLPHONE THE ENTIRE TIME.

10  Q.   AND WHILE HE WAS IN THE CAR WAS HE FREE TO GET IN AND OUT

11  OF THE CAR?

12  A.   HE WAS.

13  Q.   AND DID YOU SEE HIM GET IN AND OUT OF THE CAR?

14  A.   I DID.

15  Q.   NOW AT SOME POINT AFTER THE HAZMAT AND OTHER PEOPLE

16  ARRIVED, WAS THERE A CONCLUSION REACHED THAT MR. GIBBS DID, IN

17  FACT, HAVE SOME RICIN?

18  A.   YES, VERY MUCH LATER ON.

19  Q.   AND AFTER THAT HAPPENED, WAS HE THEN PLACED INTO CUSTODY

20  AND TAKEN TO THE FANNIN COUNTY SHERIFF'S OFFICE?

21  A.   HE WAS.  WE WERE ADVISED HE HAD TO BE WASHED DOWN.  HE HAD

22  TO BE WASHED DOWN BY THE HAZMAT CREW, AND THEN I HAD ONE OF MY

23  SERGEANTS FROM UNIFORM PATROL TRANSPORT HIM TO OUR COUNTY

24  FACILITY.

25  Q.   I JUST WANT TO MAKE SURE I UNDERSTAND THIS TIMING

1    CORRECTLY.  SOMEONE DETERMINED THAT THERE WAS RICIN; IS THAT

2    RIGHT?

3    A.    YES, SIR.

4    Q.    AND THEN THEY DETERMINED THAT MR. GIBBS HAD TO BE SHOWERED

5    OR DECONTAMINATED?

6    A.    YES, SIR.

7    Q.    AND SO THAT HAPPENED AT THE HOSPITAL?

8    A.    YES.

9    Q.    AND AFTER THAT DECONTAMINATION SHOWER, HE WAS TAKEN TO

10    FANNIN COUNTY?

11    A.    YES.

12              MR. BUCHANAN:  NOTHING ELSE, YOUR HONOR.

13              THE COURT:  THANK YOU, SIR.

14                       CROSS-EXAMINATION

15    BY MS. PERDEW SILAS:

16    Q.    GOOD MORNING.

17    A.    GOOD MORNING, MA'AM.

18    Q.    AND IS IT CORRECT TO CALL YOU OFFICER TURNER, OR I

19    MISSED -- YOU KNOW, I'M JUST NOT FAMILIAR WITH ALL THESE

20    RANKINGS AND THINGS.

21    A.    YES, MA'AM, I AM A CAPTAIN, BUT I ANSWER TO OFFICER ALSO.

22    Q.    OKAY.  GOOD ENOUGH.

23              SO LET ME GET THE SORT OF ORDER OF EVENTS RIGHT.  IT

24    SOUNDS LIKE FROM YOUR TESTIMONY THAT WHEN YOU ARRIVED AT THE

25    HOSPITAL, MR. GIBBS WAS ALREADY THERE?

1  A.    YES, MA'AM.

2  Q.    AND WERE THERE OTHER LAW ENFORCEMENT THERE BY THE TIME

3  THAT YOU ARRIVED?

4  A.    YES, MA'AM.

5  Q.    OKAY.  HOW MANY OTHER FOLKS WERE THERE?

6  A.    I WAS THERE.  DEPUTY CARDER WAS THERE.

7  Q.    OKAY.  AND YOU GUYS, OF COURSE, ARE NOT THE SAME PERSON,

8  YOU AND DEPUTY CARDER?

9  A.    NOPE, THAT'S TWO OF US.

10  Q.    YES, AND YOU GUYS -- WAS DEPUTY CARDER AT ALL INVOLVED IN

11  YOUR MAKING OF THE RECORDING?

12  A.    DEPUTY CARDER WAS MY RECORDER.  THEY HAVE THE RECORDERS IN

13  THEIR CAR, AND I SHOWED UP -- IT WAS ALMOST QUITTING TIME AT

14  THE OFFICE.  SO WHEN I SHOWED UP, DEPUTY CARDER WAS THERE, AND

15  I TOLD HIM JUST TO COME WITH ME AND TURN HIS RECORDER ON.

16  Q.    OKAY.  AND BY THAT DO YOU MEAN HIS BODY RECORDER OR HIS --

17  OR MAYBE IT'S THE SAME THING?

18  A.    SO THE RECORDING SYSTEMS AT THE TIME WERE AUDIO ONLY.

19  THEY ACCOMPANIED THE IN-CAR VIDEO.  IT WASN'T A TRUE BODY-WORN

20  CAMERA AND RECORDER, BUT IT HAD THE AUDIO CAPABILITIES WHILE

21  THE CAMERA IS JUST LOOKING AT THE HOSPITAL PARKING LOT.

22  Q.    OKAY.  AND SO THE AUDIO, DEPUTY CARDER WAS YOUR RECORDER

23  AS YOU WERE SAYING?

24  A.    YES, MA'AM.

25  Q.    NOW DEPUTY CARDER WAS HE DRESSED IN OFFICER TYPE UNIFORM?

1  A.    YES, MA'AM, HE'S IN UNIFORM PATROL.  HE WOULD HAVE HAD HIS

2  UNIFORM PATROL MARKED UNIFORM ON.

3  Q.    OKAY.  AND WHAT ABOUT YOU, HOW WERE YOU DRESSED?

4  A.    I PROBABLY HAD ON GREEN PANTS AND A BELT AND A BADGE AND A

5  SHERIFF'S OFFICE POLO WITH A COAT, WITH A BLACK COAT.

6  Q.    ALL RIGHT.  SO WHAT YOU'VE JUST DESCRIBED IS THE HOSPITAL,

7  THE PEOPLE AT THE HOSPITAL, AND THEN FROM A LAW ENFORCEMENT

8  STANDPOINT JUST THE TWO OF YOU?

9  A.    THE TWO OF US AS FAR AS WHAT'S GOING ON WITH MR. GIBBS.

10  Q.    OKAY.  NOW, WAS THERE ALSO A FIRETRUCK OR ANYTHING LIKE

11  THAT?

12  A.    AT THAT TIME, NO FIRETRUCKS.

13  Q.    OKAY.  NOW BEFORE YOU ARRIVED AT THE HOSPITAL, YOU DID

14  HAVE A CONVERSATION WITH SOME OTHER LAW ENFORCEMENT PEOPLE,

15  RIGHT?

16  A.    YES.

17  Q.    AND ONE OF THOSE PERSONS ADVISED YOU TO TRY TO KEEP MR.

18  GIBBS AND HIS CAR AT THE SCENE SO THAT HE COULD BE INTERVIEWED

19  BY OTHER LAW ENFORCEMENT?

20  A.    NO, MA'AM.

21  Q.    OKAY.  ARE YOU FAMILIAR WITH A DARREL MITCHELL?

22  A.    NO, MA'AM.

23  Q.    OKAY.  LET'S SEE WHO WROTE THIS REPORT.

24  A.    I MET A LOT OF FOLKS THAT NIGHT, BUT THE NAME IS NOT

25  FAMILIAR TO ME RIGHT NOW.

1   Q.    HOW ABOUT A CHIEF MITCHELL?

2   A.    CHIEF MITCHELL?

3   Q.    YES.

4   A.    WHAT AGENCY?

5   Q.    FANNIN COUNTY.

6   A.    NO, MA'AM, WE DON'T HAVE --

7   Q.    AND I THINK PERHAPS FIRE, FANNIN COUNTY FIRE.

8   A.    NO, MA'AM, I'M ALSO A VOLUNTEER FIREMAN.  WE DON'T HAVE

9   ANYBODY BY THAT NAME THAT I'M FAMILIAR WITH.

10  Q.    OKAY.  SO IT'S YOUR TESTIMONY THAT NOBODY FROM EITHER LAW

11  ENFORCEMENT OR FIRE SERVICES, NO OFFICIAL PERSON SAID THAT THEY

12  ADVISED YOU OR -- THAT'S A BAD QUESTION.

13         NOBODY ADVISED YOU THAT YOU SHOULD TRY TO KEEP THE

14  CAR AND MR. GIBBS AT THE SCENE SO THAT THEY COULD DO FURTHER

15  THINGS?

16  A.    OKAY.  THAT'S ON DOWN THE ROAD.  THAT'S A PRETTY GOOD

17  WHILE IN TIME BEYOND OUR INITIAL EFFORT AT WHICH TIME CHEROKEE

18  COUNTY FIRE, BECAUSE I THOUGHT I WOULD JUST TOW THE CAR OUT OF

19  THERE, AND CHEROKEE FIRE EVER WHO THEIR PERSON ON THE CELLPHONE

20  WAS SAID DO NOT MOVE THAT VEHICLE, MOVE THE OTHER VEHICLES.

21  THAT WAS THEIR SUGGESTION TO ME, YES.

22  Q.    OKAY.  SO CHEROKEE COUNTY GOT INVOLVED AS OPPOSED TO

23  FANNIN COUNTY?

24  A.    YES, MA'AM, THAT WAS SOMETIME INTO IT.

25  Q.    OKAY.  AND THE HOSPITAL IS IN FANNIN COUNTY?

1  A.   YES, MA'AM.

2  Q.   OKAY.  ALL RIGHT.  SO WHEN YOU FIRST ARRIVED THERE, YOU

3  WERE NOT TOLD BY ANYBODY THAT YOU NEED TO KEEP MR. GIBBS THERE;

4  THAT'S WHAT YOU'RE SAYING?

5  A.   THAT'S WHAT I'M SAYING NO ONE TOLD ME WHEN I FIRST ARRIVED

6  TO DO ANYTHING OTHER THAN I HAD A CALL, AND IT WAS ON ME.

7  Q.   OKAY.  IT WAS YOUR INTENTION, THOUGH, TO KEEP MR. GIBBS

8  AROUND UNTIL YOU COULD GET TO THE BOTTOM OF WHATEVER ALARM WAS

9  GOING ON, RIGHT?

10  A.   ONLY, ONLY DURING THE INITIAL EFFORT.  MY FIRST FOCUS WAS

11  I NEED TO SPEAK TO MR. GIBBS.  AFTER I SPOKE TO MR. GIBBS AND

12  HE CAME OUT OF THE EMERGENCY DEPARTMENT, MY EFFORT WENT FROM

13  MR. GIBBS TO MR. GIBBS' VEHICLE.

14  Q.   OKAY.  NOW, DO YOU REMEMBER ABOUT WHAT TIME YOU WERE USING

15  DEPUTY CARDER AS A RECORDER?

16  A.   APPROXIMATELY 4:30 IN THE AFTERNOON, 4:30, 4:40.

17  Q.   OKAY.  AND DO YOU KNOW HOW LONG MR. GIBBS HAD BEEN AT THE

18  HOSPITAL BY THAT TIME?

19  A.   DO I KNOW EXACTLY HOW LONG HE HAD BEEN THERE?

20  Q.   NO, I BET YOU'RE NOT GOING TO KNOW EXACTLY.  IF YOU DO

21  I'LL TAKE IT, BUT ABOUT HOW LONG?

22  A.   45, 50 MINUTES.

23  Q.   OKAY.  AND DID YOU SPEAK WITH ANYONE AT THE HOSPITAL

24  BEFORE TALKING WITH MR. GIBBS, YOU DID, RIGHT?

25  A.   YES, MA'AM.

1  Q.    OKAY.  AND WHAT DID YOU -- WHAT WAS THE SUBSTANCE OF THAT

2  CONVERSATION?

3  A.    AS I WALKED INTO THE EMERGENCY DEPARTMENT ITSELF INTO THE

4  SECURE AREA WHERE THEY HAVE THE PATIENTS, THEY ADVISED ME WHERE

5  MR. GIBBS WAS AT, AND THAT HE HAD BEEN TRYING TO SEPARATE SOME

6  CASTOR BEANS, HE HAD GOT SOME SUBSTANCE ON HIM, AND HE CAME TO

7  THE HOSPITAL TO REPORT IT, HE WAS IN FEAR FOR HIS SAFETY, AND

8  THAT SOME OF THAT SUBSTANCE WAS IN THE VEHICLE WHICH WAS

9  SUPPOSED TO BE IN THEIR PARKING LOT.

10  Q.    OKAY.  AND THEN, OF COURSE, THEY GAVE YOU THE ROOM NUMBER?

11  A.    THEY EITHER GIVE ME THE ROOM NUMBER OR SHOWN IT TO ME.

12  THEY ONLY HAVE A VERY FEW ROOMS THERE.  SO THEY DIRECTED ME TO

13  THAT ROOM ONE WAY OR THE OTHER.

14  Q.    BY THE TIME YOU GOT THERE, THEY WERE DONE WITH THEIR

15  PHYSICAL EXAMINATION OF MR. GIBBS; ISN'T THAT RIGHT?

16  A.    I'M NOT 100 PERCENT SURE WHERE THEY WERE AT AS FAR AS THAT

17  EXAMINATION GOES.  I WAS UNDER THE IMPRESSION THAT THEY HAD

18  BEGAN AN EXAMINATION OF MR. GIBBS.

19  Q.    OKAY.  WELL AFTER YOU TALKED WITH MR. GIBBS, THERE WAS NO

20  OTHER PHYSICAL EXAMINATION OR TREATMENT THAT TOOK PLACE BEFORE

21  HE WALKED OUT, RIGHT?

22  A.    OKAY.  I WASN'T IN THE ROOM, SO I DON'T KNOW IF THEY

23  ACTUALLY CAME IN AND DID SOMETHING OR NOT.  I DO NOT KNOW.

24  Q.    OKAY.  NOW, HAVE YOU LISTENED TO THE RECORDING THAT WAS

25  MADE USING DEPUTY CARDER WHEN YOU ALL WERE TALKING TO MR.

1  GIBBS?

2  A.  YES, MA'AM.

3  Q.  OKAY.  AND I IMAGINE THAT RECORDING IS THE SAME ONE THAT

4  WAS GIVEN TO THE GOVERNMENT, THE FEDS SO TO SPEAK, RIGHT?

5  A.  THAT WOULD BE SPECULATION.  I HAVE HEARD A RECORDING AND

6  SEEN IT.

7  Q.  OKAY.  I WOULD LIKE TO SHOW YOU WHAT I'M GOING TO MARK IN

8  SOME KIND OF WAY.  I'D LIKE TO SHOW YOU WHAT I'M MARKING AS

9  DEFENDANT'S EXHIBIT 2-A.  THE RECORDING IS IN EVIDENCE AS

10  DEFENDANT'S EXHIBIT 2.  I'M GOING TO SHOW YOU 2-A AND ASK YOU

11  TO TAKE A LOOK AT THAT.

12  A.  YES, MA'AM.

13  Q.  THIS PURPORTS TO BE A TRANSCRIPT OF SORTS OF THE

14  RECORDING.  I CAN PLAY THE RECORDING, I SUPPOSE, AND MAYBE THAT

15  WOULD BE BEST, BUT LET ME SEE IF I CAN ASK YOU WITHOUT HAVING

16  TO PLAY IT, OKAY?

17  A.  YES, MA'AM.

18  Q.  ALL RIGHT.  DO YOU RECOGNIZE SOME OF THE DIALOGUE SHOWN

19  THERE --

20  A.  I DO.

21  Q.  -- AS BEING WHAT YOU ALL TALKED ABOUT THAT NIGHT?

22  A.  YES, MA'AM.

23       MS. PERDEW SILAS:  JUDGE, I'M GOING TO MOVE THE

24  ADMISSION OF 2-A, BUT I WANT TO BE CLEAR THAT I'M REALLY JUST

25  DOING IT AS AN AID TO THE COURT.  THE ACTUAL DISK IS GOING TO

1  CONTAIN WHAT ACTUALLY WAS SAID, AND I'M REALLY JUST TRYING TO

2  TAKE A SHORTCUT TO ASK THESE QUESTIONS.

3          SO I'M GOING TO ASK THAT 2-A BE GIVEN TO THE

4  FACTFINDER WHICH OF COURSE IS YOURSELF AS AN AID, AND I'D LIKE

5  TO USE IT AS AN AID DURING THIS CROSS-EXAMINATION.

6          THE COURT:  ANY OBJECTION?

7          MR. BUCHANAN:  NO OBJECTION TO USING IT AS AN AID.

8          THE COURT:  OKAY.  WE'LL ALLOW 2-A IN TO ASSIST MY

9  REVIEW AND TO STREAMLINE THE TESTIMONY TODAY.

10          MS. PERDEW SILAS:  THANK YOU.

11  BY MS. PERDEW SILAS:

12  Q.   IF YOU WOULD TURN OVER TO WHAT WOULD BE PAGE 2 WHICH IS

13  SORT OF THE START OF YOU ALL'S CONVERSATION?

14  A.   YES, MA'AM.

15  Q.   AND TOWARDS THE TOP THERE, MALE NUMBER 2 SAYS "WHAT ARE

16  THEY GOING TO DO WITH YOU HERE, BROTHER," AND THAT WAS YOU,

17  RIGHT?

18  A.   YES, MA'AM.

19  Q.   AND THEN THERE IS AN "I DON'T KNOW" FROM MR. GIBBS, RIGHT?

20  A.   YES, MA'AM.

21  Q.   AND A SAY "WHAT," RIGHT?

22  A.   YES, MA'AM.

23  Q.   AND THEN THIS NEXT SENTENCE SAYS "I ASKED THEM WHY NOT

24  RELEASE ME," RIGHT?

25  A.   YES, MA'AM.

1  Q.    AND, OF COURSE, YOU WERE THERE DURING THIS CONVERSATION,

2  AND YOU WOULD AGREE WITH ME IT SOUNDS LIKE MR. GIBBS WAS READY

3  TO GO, RIGHT?

4  A.    HE TOLD ME THAT THEY WERE GOING TO DISCHARGE HIM, YES,

5  MA'AM.

6  Q.    OKAY.  AND THAT HE PROMPTED THEM FOR WANTING TO BE

7  DISCHARGED, RIGHT?

8  A.    I KNEW THAT HE WAS GOING TO BE DISCHARGED, YES, MA'AM.

9  Q.    RIGHT, RIGHT, RIGHT, BUT I'M TALKING ABOUT MR. GIBBS IS

10  PROMPTING THEM TO BE DISCHARGED, HE'S READY TO GO, RIGHT?

11  A.    I DON'T KNOW IF HE PROMPTED THEM, OR IF THEY WERE JUST

12  DONE WITH HIM.

13  Q.    BUT HE'S SAYING THAT HE DID, RIGHT?

14  A.    HE'S SAYING THAT HE BELIEVES HE'S GETTING READY TO GO.

15  Q.    YEAH.  NOW, YOU TALKED TO HIM ABOUT THE FACT THAT YOU

16  NEEDED TO DO SOMETHING WITH HIS CAR, RIGHT?

17  A.    YES, MA'AM.

18  Q.    AND, OF COURSE, THE FANNIN COUNTY HOSPITAL, IS IT THE

19  FANNIN COUNTY HOSPITAL?

20  A.    IT'S FANNIN REGIONAL HOSPITAL, YES, MA'AM.

21  Q.    THE FANNIN REGIONAL HOSPITAL IS OUT THERE ON A ROAD THAT

22  DOESN'T HAVE ANY PUBLIC TRANSPORT, I GUESS, RIGHT, OUT THERE,

23  DOES IT?

24  A.    WHAT DO YOU MEAN PUBLIC TRANSPORT?

25  Q.    YOU CAN'T TAKE THE SUBWAY HOME FROM THE FANNIN REGIONAL

1   HOSPITAL, I IMAGINE?

2   A.   NO, MA'AM.

3   Q.   RIGHT.  OKAY.  AND YOU KNEW THAT HE DROVE HIS CAR OVER

4   THERE, RIGHT?

5   A.   YES, MA'AM.

6   Q.   OKAY.  AND HE WOULD HAVE NEEDED HIS CAR TO GET HOME UNLESS

7   YOU WERE GOING TO TAKE HIM, RIGHT?

8   A.   I MEAN THERE'S STILL OTHER WAYS TO GET HOME.

9   Q.   BUT YOU TOLD HIM THAT YOU WERE GOING TO NEED HIS CAR, AND

10  THEN MOST OF THE WAY DOWN THIS PAGE, IT SAYS MR. GIBBS SAID "I

11  GOT TO HAVE MY CAR." DO YOU SEE THAT PART?  I MARKED IT ON

12  MINE.  I CAN COME HELP YOU IF NEEDED.

13  A.   YES, MA'AM, "I GOT TO HAVE MY CAR."

14  Q.   "I GOT TO HAVE MY CAR," RIGHT?

15  A.   YES, MA'AM.

16  Q.   NOW, YOU WOULD AGREE WITH ME, AND I'M NOT GOING TO GO

17  THROUGH THIS LINE BY LINE, BUT YOU WOULD AGREE WITH ME THAT YOU

18  LEFT MR. GIBBS WITH THE IMPRESSION THAT HE WASN'T GOING TO HAVE

19  HIS CAR, YOU WERE GOING TO HAVE HIS CAR, RIGHT?

20  A.   YES, MA'AM.

21  Q.   AND SO NOW LET'S FAST FORWARD A LITTLE BIT HERE BECAUSE I

22  NEED TO ASK YOU SOMETHING ELSE.

23          DEPUTY CARDER HAD HIS SIDEARM, RIGHT?

24  A.   YES, MA'AM.

25  Q.   AND YOU HAD YOURS YOU JUST DESCRIBED, RIGHT?

1  A.   YES, MA'AM.

2  Q.   OKAY.  AND YOU WERE PUTTING IT TO HIM IN SUCH A WAY THAT

3  MAKES IT CLEAR THAT YOU'RE GOING TO NEED TO DO SOMETHING WITH

4  THE CAR BECAUSE OF YOUR SAFETY CONCERNS, RIGHT?

5  A.   YES, MA'AM.

6  Q.   OKAY.  NOT AS AN OPTION DOESN'T SOUND LIKE IT THERE, DOES

7  IT?

8  A.   THAT'S WHY I GAVE HIM ADVANCE NOTICE, YES, MA'AM.

9  Q.   RIGHT, RIGHT, BUT NOT AS AN OPTION BECAUSE YOU WERE GOING

10  TO SEE ABOUT THE CAR, RIGHT?

11  A.   YES, MA'AM.

12  Q.   OKAY.  NOW, IT SOUNDS LIKE FROM YOUR TESTIMONY THAT YOU

13  WOULD SAY THAT YOU DO NOT KNOW IF THE HOSPITAL STAFF WERE

14  HOLDING MR. GIBBS A LITTLE BIT LONGER BEFORE RELEASING HIM

15  BECAUSE THEY WANTED LAW ENFORCEMENT TO HAVE A CHANCE TO TALK TO

16  HIM?

17  A.   I DO NOT KNOW, MA'AM.

18  Q.   OKAY.  AND YOU DIDN'T TELL THEM THAT?

19  A.   NO, MA'AM, I DID NOT.

20  Q.   OKAY.  SO LET'S GO TO THE POINT WHERE YOU'RE TOLD BY

21  CHEROKEE COUNTY FIRE, WHOEVER TOLD YOU HOLD ONTO THE CAR, HOLD

22  ONTO THE SUBJECT.

23  A.   YES, MA'AM.

24  Q.   AND LET ME MAKE SURE I'M NOT PUTTING WORDS IN YOUR MOUTH.

25  THEY WANTED YOU TO HOLD ONTO THE CAR AND THE PERSON, RIGHT?

1  A.   THEY WANTED ME TO HOLD ONTO THE CAR AND THE PERSON, BUT I

2  DID NOT KNOW IF I COULD HOLD ONTO THE PERSON, BUT I KNEW I WAS

3  GOING TO HOLD ONTO THE CAR, AND THAT'S WHAT I EXPRESSED TO MR.

4  GIBBS.

5  Q.   OKAY.  NOW, WHEN HE CAME OUT, HE WAS DRESSED IN HOSPITAL

6  CLOTHES.  DID WE GET A CLEAR YES ON THAT FROM YOU?

7  A.   NO, MA'AM.

8  Q.   NO?  WAS HE NOT DRESSED IN HOSPITAL CLOTHES?

9  A.   I DON'T THINK SO BECAUSE HOSPITAL CLOTHES AT FANNIN

10 REGIONAL AND THEY ARE IS JUST A ROBE.  I CAN REMEMBER THAT.

11 Q.   OKAY.  HE WASN'T DRESSED IN SCRUBS?

12 A.   NO, MA'AM.

13 Q.   ALL RIGHT.  YOU SAY THAT YOU DID NOT ARREST HIM.  WOULD

14 YOU LOOK TOWARDS THE END OF THIS CONVERSATION HERE ON THIS

15 TRANSCRIPT.  AT THE END YOU SAY "SEE YOU IN A MINUTE, DUDE,

16 THANKS, THOMAS, I APPRECIATE IT, MAN," RIGHT?

17 A.   HOW MANY PAGES?  ARE YOU ON THE LAST PAGE?

18 Q.   WOULD YOU LOOK AT THAT LAST PAGE RIGHT ABOVE THE WORDS END

19 OF RECORDING AND SEE HOW YOU LEFT THAT?

20 A.   WHICH PART ARE YOU IN REFERENCE TO, MA'AM?

21 Q.   THESE LAST TWO LINES BEFORE END OF RECORDING, IT SAYS "SEE

22 YOU IN A MINUTE, DUDE, THANKS, THOMAS, I APPRECIATE IT, MAN, WE

23 WAS WORRIED?"

24 A.   YES, MA'AM.

25 Q.   IS THAT HOW YOU REMEMBER ENDING THE CONVERSATION THERE?

1  A.    I BELIEVE THAT'S PROBABLY ACCURATE, YES, MA'AM.  I DON'T

2  REMEMBER ANYTHING OTHER THAN THAT.

3  Q.    OKAY.  WHAT I'M GETTING AT HERE IS THAT'S THE END OF THAT

4  RECORDING.  DID YOU STOP HAVING ANY CONVERSATION WITH MR. GIBBS

5  AFTER THAT POINT, OR WAS THERE MORE CONVERSATION THAT WAS

6  UNRECORDED?

7  A.    ARE YOU TALKING ABOUT AT THAT PARTICULAR POINT IN TIME OR

8  LATER ON?

9  Q.    I'M TALKING ABOUT LATER THAN THAT; WAS THERE SOMETHING

10 LATER THAN THAT?

11 A.    THIS WAS ALL THE CONVERSATION INSIDE THE PHYSICAL BUILDING

12 AT THE EMERGENCY DEPARTMENT.

13 Q.    OKAY.  THERE WAS MORE?

14 A.    WE HAD MORE GENERAL CONVERSATION AFTER HE CAME OUT OF THE

15 HOSPITAL, YES, MA'AM.

16 Q.    OKAY.  NOW, YOU JUST TOLD MR. BUCHANAN THAT WHEN HE CAME

17 OUT OF THE HOSPITAL, I'M GATHERING THAT YOU'RE SAYING HE CAME

18 OUT OF HIS OWN FREE WILL, RIGHT?

19 A.    AS FAR AS I KNOW, YES, MA'AM, HE JUST WALKED OUT OF THE

20 HOSPITAL.

21 Q.    OKAY.  AND AT SOME POINT THAT NIGHT HE ENDS UP IN CUSTODY,

22 RIGHT, SOME POINT LATER HE DOES END UP IN CUSTODY?

23 A.    YES, MA'AM.

24 Q.    NOW IN BETWEEN THAT TIME I WANT TO TALK ABOUT HIS STATUS A

25 LITTLE BIT, OKAY?

1  A.   YES, MA'AM.

2  Q.   HE COMES OUT OF THE HOSPITAL.  HE STANDS THERE TALKING TO

3  YOU WITH A CIGARETTE, RIGHT?

4  A.   YES, MA'AM.

5  Q.   THEN HE GETS INTO A CAR, RIGHT?

6  A.   YES, MA'AM.

7  Q.   WHICH CAR IS THIS?

8  A.   ONE OF THE UNIFORM PATROL CARS.  I DON'T REMEMBER WHOSE IT

9  WAS.

10  Q.   A FANNIN COUNTY POLICE CAR, RIGHT?

11  A.   YES, MA'AM.

12  Q.   OKAY.  AND THEN HE STAYS IN THE FANNIN COUNTY POLICE CAR

13  FOR HOW LONG?

14  A.   I MEAN HE'S IN AND OUT, SO I DON'T KNOW HOW LONG HE'S

15  ACTUALLY IN THE CAR BECAUSE HE'S JUST -- HE'S IN AND OUT.

16  Q.   BECAUSE WE KNOW THAT SOMEWHERE AFTER MIDNIGHT THERE'S AN

17  INTERROGATION THAT TAKES PLACE, OKAY.  SO I'M TRYING TO FIGURE

18  OUT DOES HE STAY IN THAT POLICE CAR FROM THE TIME THAT HE

19  FINISHES THE CIGARETTE, IN AND OUT UNTIL HE ENDS UP DOWN THERE

20  IN THE INTERROGATION ROOM AT, I GUESS, THE FANNIN COUNTY POLICE

21  DEPARTMENT?

22  A.   NO, MA'AM, HE'S IN THE PARKING LOT AT FANNIN REGIONAL

23  HOSPITAL, AND BECAUSE IT'S COLD, THE DAYSHIFT WOULD HAVE BEEN

24  ON UNTIL 1800 OR UNTIL SIX P.M.  SO EVER WHICH DEPUTY WAS

25  THERE, I HAD HIM OPEN THEIR BACK DOOR, TURN THE HEATER ON.  I

1  MEAN HE WAS THERE WITH -- I MEAN HE WAS IN THE PARKING LOT.  HE

2  WAS UP AND DOWN AND IN AND OUT.

3          AFTER SHIFT CHANGE, ANOTHER DEPUTY WOULD HAVE SHOWED

4  UP, AND WE DID THE SAME THING IN THAT DEPUTY'S CAR, AND I THINK

5  THE LAST DEPUTY THAT I HAD OUT THERE WITH ME WAS SERGEANT

6  WYATT, AND SERGEANT WYATT HAD HIS DOOR OPEN, HIS HEATER ON, AND

7  WE WERE IN THE PARKING LOT, BUT HE COULD USE THE CAR ANY TIME

8  HE WANTED TO HE COULD SIT DOWN.

9  Q.  I GOT YOU.  WE KNOW AT SOME POINT, THOUGH, HE ENDS UP IN

10  CUSTODY, AND I'M TRYING TO FIGURE OUT WHEN THAT BECOMES THE

11  CASE.  SO I WANT TO REALLY -- AND JUST SO I CAN TELL YOU WHERE

12  I'M GOING BECAUSE YOU CAN -- WE CAN STREAMLINE OUR EXCHANGE

13  HERE.

14          WHEN DOES HE GO INTO CUSTODY, AND HOW DOES HIS STATUS

15  CHANGE THERE?  YOU WERE THERE THE WHOLE TIME, WERE YOU?

16  A.  YES, MA'AM, I WAS.

17  Q.  OKAY.

18  A.  AT SOME POINT LATER IN THE NIGHT AFTER HAZMAT AND AFTER

19  THE OTHER SPECIAL RESPONSE TEAMS THAT CAME, AFTER THE FEDERAL

20  BUREAU OF INVESTIGATION SHOWED UP, AFTER SOME TESTS, THEY

21  DETERMINED THAT MR. GIBBS NEEDED TO BE, NEEDED TO BE

22  DECONTAMINATED.

23          THEY DECONTAMINATED HIM, AND AT SOME POINT ONE OF THE

24  FOLKS FROM THE FEDERAL BUREAU OF INVESTIGATION SAID CAN WE GET

25  THIS GUY A RIDE UP TO THE COUNTY JAIL, AND THAT'S WHY I HAD

1  SERGEANT WYATT AND THAT'S WHAT SERGEANT WYATT IS FOR, HE HAS A

2  MARKED VEHICLE WITH A CAGE IN IT, AND I ASKED SERGEANT WYATT IF

3  HE WOULD TAKE HIM TO THE FANNIN COUNTY JAIL FOR US.

4  Q.   IS THAT THE ONLY OPTION FOR SOMEBODY WHO WANTS TO BE

5  DECONTAMINATED, THEY HAVE TO GO TO THE JAIL TO GET

6  DECONTAMINATED?

7  A.   NO, MA'AM, HE WAS DECONTAMINATED AT THE HOSPITAL.

8  Q.   OKAY.  GOT IT.  SO AFTER LEAVING THE HOSPITAL, HE'S TAKEN

9  TO THE JAIL?

10  A.   YES, MA'AM.

11  Q.   IT SEEMS LIKE HE WAS IN CUSTODY AT THAT POINT, RIGHT?

12  A.   IF I WERE IN THE BACK OF A CAR, I'D SAY I WAS IN CUSTODY

13  ON MY WAY TO THE JAIL, YES, MA'AM.

14  Q.   WELL, SURE.  OKAY.  SO WHEN DID THAT HAPPEN THEREABOUTS,

15  AND JUST TO BE CLEAR, I KNOW YOU'RE NOT STANDING THERE WITH A

16  CLOCK, OKAY?  DO YOU REMEMBER WHEREABOUTS IN TIME HE GOT

17  DECONTAMINATED?

18  A.   THIS IS RUNNING PROBABLY CLOSE TO MIDNIGHT.

19  Q.   AND WHERE YOU WERE SAYING HE HAD ON STREET CLOTHES, I'M

20  GUESSING THAT THE DECONTAMINATION EXPLAINS HIS SWITCH FROM

21  STREET CLOTHES TO WHAT WE SEE HIM ON THE VIDEO IN LATER WHICH

22  APPEARS TO BE EITHER SCRUBS OR A JAIL UNIFORM, WE DON'T KNOW

23  WHICH?  I DON'T ANYWAY.

24  A.   THAT WOULD BE LOGICAL, YES, MA'AM.

25  Q.   OKAY.  DO YOU KNOW WHAT HE CHANGED INTO; WAS IT SCRUBS OR

1  A JAIL UNIFORM?

2  A.   I DIDN'T DO THE DECONTAMINATION, MA'AM.

3  Q.   YOU DIDN'T SEE HIM ANY MORE?

4  A.   I DIDN'T DO THE DECONTAMINATION, AND I DON'T REMEMBER WHAT

5  THEY WALKED HIM THROUGH IN THE PARKING LOT.  I DON'T REMEMBER

6  WHAT HE HAD ON AT THAT TIME.

7  Q.   WHEN DID HE FIRST HAVE ON HANDCUFFS?

8  A.   IF I HAD BEEN ARRESTING HIM, I COULD TELL YOU FOR SURE.  I

9  WAS JUST WORKING THE BIG PIECES OF THE PUZZLE THAT NIGHT.  SO

10 PROBABLY SOMETIME AT THAT POINT AFTER DECONTAMINATION BECAUSE I

11 KNOW HE WAS HANDCUFFED GOING TO JAIL BECAUSE OUR POLICY SAYS

12 YOU WILL TRANSPORT PEOPLE TO JAIL IN HANDCUFFS, AND THAT'S THE

13 FIRST RECOLLECTION I HAVE OF HANDCUFFS.

14 Q.   OKAY.  DO YOU REMEMBER HIM BEING PROVIDED WITH FOOD THERE

15 IN THE PARKING LOT?

16 A.   I DON'T REMEMBER ANYTHING ABOUT FOOD.

17 Q.   WHAT ABOUT WATER?

18 A.   I DON'T RECALL.

19 Q.   DO YOU REMEMBER HIM SAYING ANYTHING ABOUT NOT HAVING HAD

20 SLEEP IN A GOODLY AMOUNT OF TIME?

21 A.   I DON'T RECALL ANYTHING ABOUT THAT, NO, MA'AM.

22 Q.   OKAY.  AFTER THE RECORDING IS DONE, OKAY, AND BEFORE HE

23 ENDS UP ON THE VIDEO BEING INTERROGATED AT WHEREVER HE WAS,

24 POLICE OFFICE OR JAIL, WHAT DO YOU REMEMBER THAT HE SAID IN

25 BETWEEN THERE?  DID YOU WRITE A REPORT ABOUT WHATEVER ELSE HE

1    MAY HAVE SAID?

2    A.    NO, MA'AM.

3    Q.    DO YOU REMEMBER WHAT HE MAY HAVE SAID ANY TIME BETWEEN THE

4    END OF THE RECORDING AND THE BEGINNING OF THE INTERROGATION?

5    A.    ARE YOU TALKING ABOUT AFTER THE RECORDING MYSELF AND

6    DEPUTY CARDER DID AND THE INTERROGATION?

7    Q.    YES, SIR.

8    A.    LIKE I SAY, IT WAS JUST GENERAL CONVERSATION.  THE ONLY

9    THING I REMEMBER HIM TALKING ABOUT IS SOME CHURCH OF -- CHURCH

10    OR SOMETHING IS ALL I REMEMBER HIM TALKING ABOUT.

11    Q.    OKAY.  SO GENERAL CONVERSATION TO ME MEANS NOT ABOUT

12    RICIN.  SO WERE YOU ALL TALKING ABOUT RICIN IN THE GENERAL

13    CONVERSATION OR NOT?

14    A.    THE ONLY THING I REMEMBER TALKING ABOUT IS CHURCH AND --

15    IS CHURCH, AND I BELIEVE HE WORKED AT THE CHICKEN PLANT, AND HE

16    SAID SOMETHING ABOUT WORK.  THAT'S THE ONLY THING I REMEMBER

17    SPEAKING WITH HIM ABOUT.

18          MS. PERDEW SILAS:  JUDGE, I NEED TO BRING UP AN ISSUE

19    WITH THE COURT AND WITH MR. BUCHANAN.

20          THE COURT:  OKAY.

21          MS. PERDEW SILAS:  WHICH IS THAT IN THE DISCOVERY I'M

22    PRETTY SURE THAT I GOT SOMETHING THAT LOOKED LIKE A SEARCH

23    WARRANT FOR THE CAR.  UNTIL THIS MORNING I DID NOT REALIZE

24    THAT WE WERE RELYING ON CONSENT FOR THE INITIAL SEARCH OF THE

25    CAR.

1        SO I WAS ABOUT TO SEE WHETHER YOU WANTED ME TO ASK

2   THOSE QUESTIONS OF THIS -- I GUESS IT MUST BE THE SAME PERSON

3   WHO DID IT, BUT I WAS ABOUT TO SWITCH GEARS, SO I WANTED TO

4   BRING THIS UP.

5           THE COURT:  ANY OBJECTION, MR. BUCHANAN?

6           MR. BUCHANAN:  THE CONSENT FORM FOR THE CAR WAS

7   PROVIDED IN DISCOVERY, SO THAT FORM WOULD HAVE BEEN THERE.  I

8   DON'T REMEMBER OFF THE TOP OF MY HEAD WHETHER OR NOT THIS

9   WITNESS WAS THE PERSON WHO WENT THROUGH THE CONSENT FORM WITH

10  MR. GIBBS.  SO I DON'T KNOW NECESSARILY WHETHER HE'D EVEN BE

11  ABLE TO TESTIFY TO THAT.  I HAVEN'T ASKED HIM, BUT I JUST DON'T

12  REMEMBER THE SIGNATURE ON THAT.

13          MS. PERDEW SILAS:  OKAY.  WELL, I APOLOGIZE FOR

14  MISSING THAT.  THAT'S OBVIOUSLY SOMETHING THAT HIS LAWYER

15  SHOULD BRING UP, THAT BEING ME.  CAN I ASK THIS WITNESS IF

16  HE'S THE RIGHT ONE, AND THEN FIGURE OUT WHAT YOU ALL WANT ME TO

17  DO?

18          THE COURT:  SURE.

19  BY MS. PERDEW SILAS:

20  Q.   ARE YOU THE RIGHT ONE, ARE YOU THE ONE THAT TALKED TO MR.

21  GIBBS ABOUT THE CONSENT FOR SEARCHING HIS CAR?

22  A.   I HAD THAT DONE.  I COMMANDED THAT DONE TO ONE OF MY

23  INVESTIGATORS.  I BELIEVE IT WAS INVESTIGATOR SCOTT GALLOWAY

24  WHO ACTUALLY FILLED THE FORM OUT AND WENT THROUGH THE CONSENT

25  FORM WITH HIM.

1  Q.   DID YOU HAVE ANY DISCUSSIONS WITH MR. GIBBS ABOUT THAT

2  BECAUSE, YOU KNOW, YOU TALKED TO HIM ABOUT HIS CAR A LITTLE BIT

3  ON THE RECORDED PART?

4  A.   YES, MA'AM.

5  Q.   IS THAT THE TOTALITY OF YOUR DISCUSSIONS ABOUT THE

6  CAR WITH HIM, OR WERE THERE MORE THAT YOU TALKED ABOUT WITH

7  HIM?

8  A.   LIKE I SAID EARLIER, I TOLD HIM THE CAR WAS GOING TO HAVE

9  TO STAY, THAT FOLKS WERE GOING TO LOOK AT THAT CAR AND FIGURE

10  THAT OUT.

11  Q.   BUT THAT'S ON THE RECORDING, RIGHT, OR IS THERE SOMETHING

12  OTHER THAN THE RECORDING?

13  A.   I THINK I MENTIONED THE CAR WHILE WE WERE IN THERE, AND

14  THEN WHEN HE FIRST CAME OUT OF THE HOSPITAL, I HAD TOLD HIM

15  THAT THE CAR COULDN'T LEAVE.

16  Q.   OKAY.  AND YOU SAY IT WOULD HAVE BEEN A SCOTT, DEPUTY

17  SCOTT --

18  A.   INVESTIGATOR SCOTT GALLOWAY.

19  Q.   INVESTIGATOR SCOTT GALLOWAY?

20  A.   YES, MA'AM.

21  Q.   OKAY.  THEN LET ME JUST ASK YOU A FEW OTHER QUESTIONS

22  WHICH IS WHEN THE HAZMAT PEOPLE GOT THERE, CAN YOU DESCRIBE

23  VISUALLY WHAT THAT SCENE WOULD HAVE LOOKED LIKE?

24        WELL, LET ME BACK UP A QUESTION.  MR. GIBBS WAS ON

25  SCENE IN THE CAR, OUT OF THE CAR, BUT THE CAR THAT HE WAS IN

1   WAS IN THE PARKING LOT, RIGHT?

2   A.   YES, MA'AM.

3   Q.   AND THE CAR THAT HE WAS IN WAS WITHIN VISUAL CONTACT WITH

4   MR. GIBBS' CAR, RIGHT, HE WOULD HAVE BEEN ABLE TO SEE WHAT WAS

5   GOING ON WITH HIS CAR?

6   A.   MR. GIBBS WOULD HAVE BEEN ABLE TO SEE, HEAR AND

7   COMMUNICATE DURING THAT TIME, YES, MA'AM.

8   Q.   OKAY.  AND HE WAS NEAR ENOUGH TO SEE HIS CAR, RIGHT?

9   A.   YES, MA'AM.

10  Q.   OKAY.  WHEN THE HAZMAT PEOPLE ARRIVED, WHAT DID THEY COME

11  IN, A HAZMAT VEHICLE OR SOMETHING?

12  A.   THEY CAME IN TWO VEHICLES, A LARGER LOOKING FIRE ENGINE,

13  AND THEN THEY ALSO HAD LIKE A SEMI-TRAILER SET UP.  SO IF YOU

14  PULL INTO FANNIN REGIONAL HOSPITAL, THE EMERGENCY DEPARTMENT IS

15  IN THE REAR, AND IT'S A SMALLER PARKING LOT WITH SOME ACCESS

16  FOR EMPLOYEE PARKING ON AROUND OXYGEN TANKS AND WHATNOT.

17         SO BASICALLY WHEN CHEROKEE HAZMAT PULLED IN, THEY

18  CAME INTO THE RECEIVING SIDE OF THE EMERGENCY DEPARTMENT WHERE

19  MR. GIBBS' VEHICLE WAS AT, AND THEN THEY PULLED STILL YET

20  FORWARD SEVERAL MORE YARDS, SO THEY WERE ON THE OTHER SIDE OF

21  THE VEHICLE, AND THE PARKING LOT I'M TALKING ABOUT IS MAYBE TWO

22  OF THESE COURTROOMS.  SO THIS IS NOT A REALLY BIG AREA LIKE A

23  METRO HOSPITAL.

24         SO THEY HAVE PULLED DOWN, AND THE REASON I HAVE THEM

25  PULLED DOWN IS BECAUSE AMBULANCES NEEDED TO COME IN AND CIRCLE

1   THROUGH FOR THE EMERGENCY DEPARTMENT.  SO EVERYTHING IS RIGHT

2   HERE KIND OF SET IN A STAGE FROM THE EMERGENCY DEPARTMENT FROM

3   THEIR ENTRANCE.  SO EVERYTHING IS PRETTY MUCH IN SIGHT AND

4   SOUND AND REAL CLOSE.

5   Q.   AND IT PROBABLY NEEDED TO BE OUT OF THE WAY OF

6   PATIENTS AND PATIENTS' FAMILY SO THEY WOULDN'T BE ALL ALARMED,

7   RIGHT?

8   A.   WE DID NOT WANT TO CAUSE AN ALARM TO THE FAMILIES, YES,

9   MA'AM.

10  Q.   OKAY.  BUT ALL THIS WAS VISIBLE TO MR. GIBBS, RIGHT?

11  A.   YES, MA'AM.

12  Q.   AND HOW MANY PEOPLE DO YOU THINK RESPONDED WITH THAT SET

13  UP, THE HAZMAT FOLKS?

14  A.   THERE WERE PROBABLY HALF DOZEN, SEVEN OF THEM THAT CAME

15  FROM CHEROKEE.

16  Q.   AND DID THEY DRESS OUT IN THE SPACE SUIT LOOKING THING

17  THAT HAZMAT PEOPLE WEAR?

18  A.   YES, MA'AM.

19  Q.   OKAY.  AND WHEN THEY GOT THERE, THEY APPROACHED MR. GIBBS'

20  CAR, DIDN'T THEY?

21  A.   AFTER SOME TIME, YES, MA'AM.

22  Q.   OKAY.  IN THE TIMELINE OF EVENTS IS THAT BEFORE OR AFTER

23  INVESTIGATOR SCOTT GALLOWAY HAD THAT CONVERSATION WITH MR.

24  GIBBS THAT WE TALKED ABOUT?

25  A.   THAT WOULD HAVE BEEN AFTER INVESTIGATOR GALLOWAY SPEAKING

1    WITH HIM AND THE CONSENT FORM.

2    Q.    OKAY.  AND -- OKAY.  SO INVESTIGATOR GALLOWAY HAD THAT

3    CONVERSATION.  AS PART OF THAT -- AND YOU WERE NOT IN EARSHOT

4    OF THAT, IS THAT RIGHT, YOU DON'T KNOW WHAT HE SAID?

5    A.    OF THE CONSENT?

6    Q.    YES.

7    A.    NO, MA'AM, I DIDN'T SPECIFICALLY DO THAT.

8    Q.    BUT YOU DID NOT HEAR WHAT THEY SAID, RIGHT?

9    A.    NO, MA'AM.

10             MS. PERDEW SILAS:  COULD I HAVE A MOMENT?

11             (PAUSE IN THE PROCEEDINGS.)

12   BY MS. PERDEW SILAS:

13   Q.    AND BEFORE, BEFORE INVESTIGATOR -- WELL, WHERE IN THAT

14   SEQUENCE OF EVENTS IS IT THAT THE CHEROKEE COUNTY FIRE GUY TOLD

15   YOU TO KEEP HOLD OF THE CAR AND MR. GIBBS IF YOU COULD?

16   A.    SO IF I SPOKE TO CHEROKEE FIRE, IT WOULD HAVE BEEN AFTER

17   OUR INITIAL CONVERSATION INSIDE THE HOSPITAL EMERGENCY

18   DEPARTMENT, AND SO I WOULD HAVE CAME OUT, AND SOMEWHERE BETWEEN

19   ME COMING OUT -- SOMEWHERE IN BETWEEN, SOMETIME BETWEEN THE

20   TIME I CAME OUT AND BEFORE CHEROKEE FIRE ACTUALLY CHECKED THE

21   CAR.

22   Q.    OKAY.  AND SO IF I'M HEARING YOU RIGHT, YOU CAN'T PLACE IN

23   SEQUENCE WHETHER YOU HAD THAT CALL WITH FIRE BEFORE OR AFTER

24   INVESTIGATOR GALLOWAY HAD HIS CONVERSATION WITH MR. GIBBS?

25   A.    OKAY.  SO, NO, MY CONVERSATION ABOUT THAT WOULD HAVE BEEN

1  BEFORE INVESTIGATOR GALLOWAY'S CONVERSATION WITH MR. GIBBS

2  ABOUT THE CONSENT FORM.  THAT WOULD HAVE DEFINITELY BEEN WAY

3  BEFORE THAT.

4  Q.   OKAY.  AND JUST TO BE KIND TO MYSELF LATER WHEN I'M TRYING

5  TO RECONSTRUCT THIS, WE'VE GOT YOU ARRIVING AT THE HOSPITAL.

6  WE'VE GOT THEN MR. GIBBS COMES OUT.  THEN THE CALL WITH

7  CHEROKEE FIRE, RIGHT?

8  A.   BY THE TIME MR. GIBBS HAS COME OUT, SOME OF THESE CALLS

9  HAVE PROBABLY BEEN MADE.  SOME OF THIS IS HAPPENING KIND OF --

10  THEY'RE OCCURRING PRETTY CLOSE TOGETHER BECAUSE I ALSO HAVE MY

11  SHERIFF MAKING PHONE CALLS FOR ME.

12  Q.   OKAY.  BUT THOSE CALLS WERE BEFORE INVESTIGATOR GALLOWAY

13  AND MR. GIBBS HAD THE TALK ABOUT HIS CAR?

14  A.   YES, MA'AM.

15  Q.   AND THEN HAZMAT ARRIVES AFTER THAT?

16  A.   HAZMAT WAS ALREADY ON SCENE WHEN THE CONSENT FORM WAS

17  DONE.

18  Q.   OKAY.

19  A.   BUT THEY WERE ON SCENE.

20  Q.   GOT IT.  WHO WAS THE PERSON WHO ARRESTED MR. GIBBS THEN;

21  IT WASN'T YOU, RIGHT?

22  A.   NO, MA'AM, IT WAS NOT ME.

23  Q.   WHO WAS IT?

24  A.   I KNOW WHO TRANSPORTED HIM TO THE JAIL.

25  Q.   OKAY.  WHO WAS THAT?

1  A.    THAT WAS SERGEANT MARK WYATT FROM OUR AGENCY.

2         MS. PERDEW SILAS:  OKAY.  THAT'S ALL I HAVE OF THIS

3  WITNESS.

4                      REDIRECT EXAMINATION

5  BY MR. BUCHANAN:

6  Q.    A COUPLE OF QUESTIONS, CAPTAIN.  WHAT COLOR ARE THE JAIL

7  CLOTHES IN FANNIN COUNTY?

8  A.    ORANGE.

9  Q.    NOW WAS MR. GIBBS WEARING ORANGE PRIOR TO LEAVING THE

10 HOSPITAL?

11 A.    SIR, I DON'T REMEMBER WHAT THEY PUT HIM IN.  I KNOW THEY

12 PUT HIM IN SOMETHING IF THEY DECONNED HIM, BUT I DON'T

13 REMEMBER.

14 Q.    YOU DON'T REMEMBER SEEING HIM IN ORANGE, DO YOU?

15 A.    I DON'T, AND THERE'S A CHANCE WE WOULD HAVE CALLED FOR

16 SOME CLOTHES TO BRING UP THERE, BUT I DON'T KNOW BECAUSE I

17 WASN'T PERSONALLY INVOLVED IN IT.

18 Q.    WAS THERE -- DID YOU HAVE A CONVERSATION WITH MR.

19 GIBBS ABOUT A CELLPHONE CHARGER WHILE HE WAS IN AND OUT OF THE

20 CAR?

21 A.    I BELIEVE I TRIED TO FIND A CHARGER FOR HIM.  THEY SAY I'M

22 A HOARDER, AND I LOOKED THROUGH MY CAR TO SEE IF I HAD

23 SOMETHING THAT WOULD FIT IT.

24 Q.    DID SOMEONE TELL YOU THAT HE WANTED A CELLPHONE CHARGER?

25 A.    I THINK HE HAD ASKED, OR I HEARD HIM ASKING ONE OF THE

1  DEPUTIES THERE.

2  Q.    YOU'VE PARTICIPATED IN MANY ARRESTS BEFORE, RIGHT?

3  A.    YES, SIR.

4  Q.    DO YOU TYPICALLY PROVIDE CELLPHONE CHARGERS TO PEOPLE IN

5  CUSTODY?

6  A.    I MAY NOT IN USUAL CIRCUMSTANCES, NO, SIR.

7  Q.    YOU ALSO TESTIFIED EARLIER THAT YOU LEFT MR. GIBBS IN THE

8  ROOM AT THE END OF THAT RECORDING, CORRECT?

9  A.    I DID.

10  Q.    IS IT TYPICAL WITH PEOPLE WHO ARE IN CUSTODY FOR YOU TO

11  LEAVE THEM IN A ROOM AND WALK AWAY FROM THEM?

12  A.    I DO NOT LEAVE PEOPLE THAT ARE IN CUSTODY.

13  Q.    YOU TESTIFIED THAT YOU BELIEVE YOU ARRIVED AT THE FANNIN

14  COUNTY HOSPITAL 45 MINUTES AFTER MR. GIBBS, IS THAT CORRECT, OR

15  ROUGHLY?

16  A.    I'M GUESSING A ROUGH GUESS PROBABLY ABOUT 45 MINUTES

17  LATER.

18  Q.    AND THEN YOU SAID THAT YOUR CONVERSATION WITH MR. GIBBS IN

19  THE ROOM WAS ROUGHLY SEVEN TO EIGHT MINUTES?

20  A.    YES, SIR.

21  Q.    AND THEN THERE WAS SOME TALK, AS MS. SILAS POINTED OUT,

22  ABOUT HIS DISCHARGE WHEN YOU TALKED WITH HIM IN THE ROOM,

23  RIGHT?

24  A.    YES.

25  Q.    AND THEN YOU LEFT THE ROOM, CORRECT?

107

1   A.   YES.

2   Q.   DEPUTY CARDER LEFT THE ROOM, CORRECT?

3   A.   HE DID.

4   Q.   AND APPROXIMATELY HOW MUCH LATER DID MR. GIBBS COME OUT OF

5   THE HOSPITAL?

6   A.   A FEW MINUTES.  I MEAN NO LONGER THAN TEN.

7   Q.   SO NOT LONG AFTER YOU HAD THE CONVERSATION WITH HIM ABOUT

8   HIM BEING DISCHARGED?

9   A.   NOT VERY LONG, SIR.

10   Q.   WHEN YOU AND DEPUTY CARDER WENT INTO THE HOSPITAL ROOM,

11   YOU HAD YOUR FIREARMS WITH YOU, RIGHT?

12   A.   WE DID.

13   Q.   DID YOU UNHOLSTER THOSE FIREARMS?

14   A.   NO, SIR.

15   Q.   DID YOU AT ANY POINT MAKE ANY THREATS TO MR. GIBBS?

16   A.   NO, SIR.

17   Q.   DID YOU IN THE HOSPITAL ROOM TELL MR. GIBBS THAT HE COULD

18   NOT LEAVE THE HOSPITAL?

19   A.   NO, SIR.

20   Q.   WHEN MR. GIBBS CAME OUT AND TALKED WITH YOU OUTSIDE THE

21   HOSPITAL, DID YOU TELL HIM THAT HE COULD NOT LEAVE THE

22   HOSPITAL?

23   A.   NO, SIR.

24   Q.   DID YOU OR ANY OTHER LAW ENFORCEMENT FOLKS TO YOUR

25   KNOWLEDGE TELL THE HOSPITAL TO SLOW DOWN ON DISCHARGING MR.

1  GIBBS?

2  A.    NO, SIR.

3  Q.    DID YOU HAVE ANY CONVERSATIONS WITH ANYONE AT THE HOSPITAL

4  ABOUT THE TIMING OF HIS DISCHARGE?

5  A.    I MEAN THEY MIGHT HAVE GIVE ME A STATUS AS FAR AS WE'RE

6  GOING TO DISCHARGE HIM OR WHATNOT, BUT I HAD NOTHING TO DO WITH

7  THAT.

8  Q.    THEY GAVE YOU A STATUS, BUT YOU DIDN'T SAY HEY, HEY, HEY,

9  SLOW IT DOWN A LITTLE BIT?

10  A.    NO, SIR.

11  Q.    AND AT THE POINT WHEN YOU TALKED WITH MR. GIBBS HE HAD NOT

12  BEEN DISCHARGED?

13  A.    CORRECT, SIR.

14  Q.    AND MS. SILAS ASKED YOU ABOUT WHETHER OR NOT THERE

15  WERE ANY OTHER LAW ENFORCEMENT OFFICERS, ANY OTHER PERSONNEL

16  FROM FANNIN COUNTY PRESENT AT THE HOSPITAL THAT DAY, WERE

17  THERE?

18  A.    I THINK I ANSWERED THAT, YOU KNOW, AS FAR AS THAT CASE AT

19  THAT TIME, IT WAS JUST MYSELF AND DEPUTY CARDER.  I BELIEVE ONE

20  OF THE DEPUTIES WAS CONDUCTING A DUI INVESTIGATION.  THEY HAD

21  SOMEBODY UP THERE THAT THEY WERE GETTING A BLOOD TEST ON OR

22  SOMETHING.

23  Q.    SO THAT OTHER, THAT THIRD DEPUTY HAD NOTHING TO DO WITH

24  MR. GIBBS?

25  A.    NOT AT THAT TIME, NO.

1  Q.   YOU MENTIONED THAT YOU ARE A VOLUNTEER FIREFIGHTER AT

2  FANNIN COUNTY?

3  A.   YES, SIR.

4  Q.   AND DOES FANNIN COUNTY HAVE A HAZMAT TEAM?

5  A.   NO, WE DON'T.

6  Q.   AND IF YOU HAD HAZMAT NEEDS IN FANNIN COUNTY, WHOM WOULD

7  YOU CALL?

8  A.   WE CALL ONE OF TWO PLACES, CHEROKEE COUNTY OR HALL

9  COUNTY.  CHEROKEE COUNTY USUALLY HAS A QUICKER RESPONSE BECAUSE

10 THEY HAVE A FOUR-LANE HIGHWAY TO COME UP TO BLUE RIDGE ON.

11 Q.   AND SO IS THAT WHY CHEROKEE WAS INVOLVED IN THIS

12 INVESTIGATION?

13 A.   YES, SIR, MUTUAL AID.

14 Q.   NOW, YOU MENTIONED THAT DEPUTY GALLOWAY, GALLOWAY --

15 A.   YES, SIR.

16 Q.   -- DID THE -- HAD A CONVERSATION WITH MR. GIBBS ABOUT

17 CONSENT?

18 A.   YES, SIR.

19 Q.   AND DEPUTY GALLOWAY WORKS AT FANNIN COUNTY?

20 A.   HE DOES.

21 Q.   AND DOES FANNIN COUNTY HAVE A WRITTEN FORM FOR CONSENT TO

22 SEARCH PROPERTY?

23 A.   YES, SIR.

24 Q.   AND DID DEPUTY GALLOWAY COMPLETE A WRITTEN FORM?

25 A.   YES, HE DID.

1  Q.    AND HAVE YOU HAD A CHANCE TO TAKE A LOOK AT IT?

2  A.    YES, SIR.

3  Q.    AND WAS THAT FORM SIGNED BY THE APPROPRIATE PEOPLE?

4  A.    YES, SIR.

5  Q.    AND NOW YOU MENTIONED ALSO ON CROSS-EXAMINATION THAT

6  MR. GIBBS WAS NEARBY WHILE HAZMAT LOOKED IN THE CAR; IS THAT

7  RIGHT?

8  A.    YES, SIR.

9  Q.    AND WHY WAS HE NEARBY?

10  A.    WELL, I HAD SO MUCH SPACE BACK THERE, AND HE WAS STILL

11  THERE.

12  Q.    AND WHILE HE WAS THERE WHILE THEY SEARCHED, DID HE EVER

13  SAY HEY, STOP SEARCHING?

14  A.    AS FAR AS THE CONSENT SEARCH?

15  Q.    YES.

16  A.    YES, SIR, I MEAN WE MAKE SURE THAT IT'S -- YOU COULD

17  SEE.  YOU COULD COMMUNICATE THAT DISTANCE WHEN WE DO A CONSENT,

18  YES.

19  Q.    AND THAT IS BECAUSE SOMEONE CAN WITHDRAW THEIR CONSENT IF

20  THEY WANT TO?

21  A.    YES, SIR.

22  Q.    AND DID MR. GIBBS DO THAT?

23  A.    NO, SIR.

24          MR. BUCHANAN:  ONE MOMENT, YOUR HONOR.

25          (PAUSE IN THE PROCEEDINGS.)

1          MR. BUCHANAN:  NOTHING ELSE, YOUR HONOR.

2          THE COURT:  THANK YOU, SIR.

3          MS. PERDEW SILAS:  NOTHING ELSE FOR ME, JUDGE.

4          THE COURT:  THANK YOU, CAPTAIN TURNER.  YOU MAY BE

5  EXCUSED.

6          MR. BUCHANAN:  NOTHING ELSE FROM THE UNITED STATES,

7  YOUR HONOR.

8          THE COURT:  THANK YOU, SIR.

9          MS. PERDEW SILAS:  LET ME JUST HAND YOU DEFENDANT'S

10  EXHIBIT 2-A.

11          THE COURT:  THANK YOU.

12          MS. PERDEW SILAS:  I WASN'T GOING TO CALL A WITNESS.

13          THE COURT:  I WASN'T SURE THAT YOU WERE, BUT WE WERE

14  TALKING A LITTLE EARLIER ABOUT THE BUSINESS WITH MR. GALLOWAY.

15  SO IF YOU WANT TO TALK TO ME ABOUT THAT, YOU CAN CONFER WITH

16  MR. BUCHANAN BEFORE YOU TALK TO ME ABOUT THAT, BUT WE NEED

17  TO --

18          MS. PERDEW SILAS:  WE NEED TO HAVE A CONFERENCE.

19          (PAUSE IN THE PROCEEDINGS.)

20          MS. PERDEW SILAS:  WELL, I APOLOGIZE FOR NOT SEEING

21  THAT, AND IT CERTAINLY WAS IN THE DISCOVERY BECAUSE WHILE WE

22  WERE TALKING, I PULLED IT UP BY DOING A SEARCH ON MY SEARCHABLE

23  DISCOVERY, AND SO I MISSED THAT.

24          I DO THINK IT'S SOMETHING THAT NEEDS TO BE

25  CHALLENGED, AND I CAN TELL YOU THAT IT'S PRETTY IMPORTANT.  I

1  GUESS I HAD THE IMPRESSION THAT THEY JUST CAME AND DID SEIZE
2  THE CAR, DID THEIR HAZMAT THING, AND THEN THERE WAS A SEARCH
3  WARRANT OR THAT A SEARCH WARRANT MIGHT HAVE PRECEDED THE
4  SEARCH, BUT I DO THINK IT'S IMPORTANT, AND I CAN TELL YOU WHY.
5          I MEAN IT MAY BE OBVIOUS WHY, BUT IT SOUNDS LIKE THAT
6  MR. GIBBS IS THERE NOT IN CUSTODY UNDER THE GOVERNMENT'S VIEW
7  OF THINGS.  THEY SEARCH THE CAR, FIND SOMETHING THAT LEADS TO
8  HIM BEING ARRESTED, AND THEY'RE SAYING THAT THAT SEARCH WAS
9  DONE PURSUANT TO CONSENT.
10          I DON'T KNOW IF THAT WILL BE THE GOVERNMENT'S ONLY
11  ARGUMENT ON THAT.  THE FORM IS NOT WHAT I WOULD CALL A CLASSIC
12  CONSENT-TO-SEARCH FORM THAT WE'RE USED TO OVER HERE.  IT'S
13  PRETTY CURSORY, AND IN MY VIEW FOLLOWS HIM BEING TOLD THEY'RE
14  GOING TO SEARCH THAT CAR BY INVESTIGATOR -- I'M SORRY, BY
15  CAPTAIN TURNER.
16          I IMAGINE THE GOVERNMENT WOULD WANT TO ARGUE THAT,
17  YOU KNOW, THAT'S SOMEHOW OVERCOME BY THIS OTHER CONVERSATION,
18  BUT I ACTUALLY THINK THAT MY RECORD ON THE CONSENT IS FAIRLY
19  FAVORABLE TO THE DEFENSE.  I DON'T THINK I NEED ANOTHER WITNESS
20  ON THAT, BUT, OF COURSE, THE GOVERNMENT, I THINK, IS FAIR TO
21  SAY THAT THEY DID NOT REALIZE THAT I WAS GOING IN THIS
22  DIRECTION SINCE I DID NOT REALIZE IT EITHER.
23          SO I DON'T NEED ANOTHER WITNESS, BUT I'M PERFECTLY
24  HAPPY TO COME BACK.  I RECOGNIZE THAT I'M ASKING FOR LEAVE TO
25  AMEND, YOU KNOW, AND IT WOULD BE AT THE COURT'S DISCRETION, BUT

1    I DO FEEL LIKE IT WOULD BE IMPORTANT FOR MR. GIBBS, AND I

2    APOLOGIZE FOR MISSING IT.

3            THE COURT:  UNDERSTOOD.  MR. BUCHANAN, DO YOU WANT TO

4    SHED ANY LIGHT ON CONSIDERATION OF THIS ISSUE FOR ME?

5            MR. BUCHANAN:  YES, YOUR HONOR, AND AS MS. SILAS

6    POINTED OUT, I CERTAINLY WOULD HAVE HAD DEPUTY GALLOWAY OR

7    ANYONE ELSE INVOLVED IN THIS CONSENT PRESENT TO TESTIFY HAD I

8    KNOWN THAT SHE WAS CHALLENGING THE SEARCH OF THE CAR.

9            THE FORM THAT SHE MENTIONS, JUST SO THE COURT IS

10   AWARE, IS SIGNED BY MR. GIBBS.  IT'S SIGNED BY DEPUTY

11   GALLOWAY.  IT GIVES THE CHEROKEE COUNTY HAZMAT TEAM THE

12   AUTHORITY TO SEARCH A 1997 LINCOLN TOWN CAR SIGNATURE SERIES AT

13   THE FANNIN REGIONAL HOSPITAL.  I BELIEVE IT'S PRETTY CLEAR.

14   IT'S SIGNED, AND IT'S ALSO WITNESSED.  IT HAS A TIME ON IT OF

15   8:23 P.M. AS TO WHEN THAT CONSENT WAS GIVEN.

16           SO CERTAINLY IT'S THE COURT'S PLEASURE.  WE WOULD

17   HAVE NOT -- I WOULD HAVE HAD THIS OFFICER HERE DOWN FROM FANNIN

18   COUNTY HAD I KNOWN THAT THIS WAS A SUBJECT OF THE MOTION TO

19   SUPPRESS.

20           AS THE COURT IS AWARE, AS WELL, THIS SEARCH WAS GIVEN

21   TO THE CHEROKEE COUNTY HAZMAT TEAM.  AFTER THAT SEARCH WAS

22   MADE, THE FOLLOWING DAY THE FBI PRESENTED A SEARCH WARRANT TO

23   YOUR HONOR FOR A MORE FULSOME SEARCH OF THE VEHICLE THAT WAS

24   CONDUCTED A DAY LATER.

25           SO, YOUR HONOR, I DON'T -- I UNDERSTAND MS. SILAS'

1  DESIRE TO MAKE THIS CHALLENGE.  TO ME THE TESTIMONY THIS

2  MORNING ESTABLISHED THAT MR. GIBBS GAVE CONSENT.  HE WAS WITHIN

3  EARSHOT, AND THAT CONSENT WAS REDUCED TO WRITING.  HE WAS IN

4  EARSHOT OR, YOU KNOW, HE COULD SEE THE SEARCH AS IT PROCEEDED,

5  AND HE DID NOT WITHDRAW THAT CONSENT, BUT IF THE COURT WISHES

6  US TO HAVE AGENT GALLOWAY TALK ABOUT THE CONVERSATION THAT LEAD

7  UP TO THE COMPLETION AND THE SIGNING OF THIS FORM, WE'RE HAPPY

8  TO DO SO.

9          THE COURT:  OKAY.  THANK YOU.  I THINK MY DECISION ON

10  THIS IS INFORMED A LITTLE BIT BY THE -- ODDLY ENOUGH BY THE

11  FACT THAT WE'VE HAD TO COME BACK FOR THIS HEARING.  BECAUSE I

12  TOOK A LOOK AT MS. SILAS' MOTIONS AND I DIDN'T SEE ANY MENTION

13  OF THIS, AND I THINK SHE'S OWNING UP THAT IT'S NOT IN THERE,

14  OKAY, BUT LAST TIME WHEN WE WERE TOGETHER, I THINK THE WAY I

15  DESCRIBED THE BRIEFING SCHEDULE LEFT SOME LATITUDE TO AMEND THE

16  MOTIONS UP TO CONFIRM TO WHATEVER HAS COME OUT.

17          HAVING SAID THAT, I KIND OF WANT TO HAVE A DESIRE TO

18  BE ACCOMMODATING.  I'VE SAID THIS BEFORE GET A FULL RECORD, YOU

19  KNOW, CANDIDLY YOU ALL ARE A PLEASURE TO DEAL WITH.  I DON'T

20  LIKE THAT IT'S TAKING THIS LONG, AND I DON'T LIKE THE SENSE

21  THAT IT'S, YOU KNOW, THE OLD ADAGE I USED TO USE IS FLIP OVER A

22  ROCK AND TWO SNAKES COME OUT OF IT, AND YOU GO CHASE THEM BOTH

23  DOWN.  SO I FEEL LIKE WE'VE BEEN DOING THAT A LITTLE THROUGH

24  THE COURSE OF THIS.  THAT'S CERTAINLY NOT TO SUGGEST THAT

25  CAPTAIN TURNER AND MR. CARDER ARE SNAKES.  THAT'S NOT WHAT I'M

1   GETTING AT, BUT, YOU KNOW, ISSUES CONTINUE TO ARISE.

2          I'M ALSO -- I THINK THAT YOU ALL'S RECENT EFFORTS TO

3   GET THIS HEARING SCHEDULED WITHIN A REALLY SHORT TIMEFRAME

4   AFTER THE LONG DELAYS THAT CHALLENGED US ON THE FRONT END OF

5   GETTING THIS SET DOWN GIVES ME SOME CONFIDENCE THAT YOU ALL CAN

6   RUN MR. GALLOWAY DOWN AND GET HIM DOWN HERE FAIRLY QUICKLY, AND

7   WE'LL RECONVENE ONCE AGAIN AND PUT A BOW ON THIS THING AND GET

8   YOU ALL'S BRIEFS IN.

9          I'M NOT IN A POSITION RIGHT NOW TO -- MY INCLINATION

10  IS THAT THE, YOU KNOW, TO STOP NOW AND NOT AFFORD THE DEFENSE

11  THE OPPORTUNITY TO HEAR FROM MR. GALLOWAY AND GIVE THE

12  GOVERNMENT THE OPPORTUNITY TO TALK ABOUT THE CIRCUMSTANCES

13  AROUND THAT FORM GIVES ME A MORE COMPLETE EVIDENTIARY RECORD ON

14  WHICH TO BASE A DECISION.

15         SO I HOPE YOU ALL ARE NOT TIRED OF BEING HERE BECAUSE

16  I JUST TOLD YOU I'M ALL RIGHT WITH YOU ALL BEING HERE.  I'M

17  CONSTRUING MY PRIOR ORDER THAT SAID THAT SHE CAN AMEND UP HER

18  MOTIONS.  THAT WILL BE -- YOU KNOW WHAT WE'RE TALKING ABOUT

19  HERE.

20         MS. PERDEW SILAS:  YES, JUDGE.

21         THE COURT:  IF YOU FEEL THE SAFER COURSE IS TO GET A

22  SEPARATE MOTION FILED ADDRESSING THIS ISSUE, I WOULDN'T IMAGINE

23  YOU ALL WOULD BRIEF IT IN A CONSOLIDATED MANNER, BUT IN MY

24  CURSORY REVIEW WHILE THE TESTIMONY WAS GOING ON OF WHAT YOU GOT

25  OUT THERE SO FAR, I DIDN'T SEE IT.

116

1          MS. PERDEW SILAS:  I CAN DO THAT BY TUESDAY AND --

2          THE COURT:  AND SEEING --

3          MS. PERDEW SILAS:  I MEAN I CAN DO IT TODAY IF

4   NEEDED --

5          THE COURT:  AND SEEING HOW I HAD ALREADY -- I'M

6   PRETTY SURE MY EXACT WORDS NOT IN THE MINUTE ENTRY BUT WHILE WE

7   WERE ALL SITTING HERE WAS TALKING ABOUT AMENDING UP YOUR

8   MOTION, I'M GOING TO GIVE YOU A LITTLE LATITUDE TO DO THAT.

9          MS. PERDEW SILAS:  THANK YOU.

10          THE COURT:  DOES EVERYBODY UNDERSTAND WHERE WE'RE

11   GOING WITH THIS?

12          MR. BUCHANAN:  YES, YOUR HONOR.

13          MS. PERDEW SILAS:  YES, JUDGE.

14          THE COURT:  ALL RIGHT.  WELL, WE'LL SAVE THE GOING

15   BACK OVER THE BRIEFING SCHEDULE FOR NEXT WEEK OR THE WEEK AFTER

16   OR WHENEVER YOU ALL CAN GET BACK UP HERE WITH AS MUCH SPEED AND

17   EFFICIENCY AS YOU POSSIBLY CAN MAKE THIS HAPPEN.  THANK YOU.

18          (PROCEEDINGS CONCLUDED.)

19

20

21

22

23

24

25

117

1                              INDEX

2

3   JUSTIN TURNER
    DIRECT EXAMINATION
4   BY MR. BUCHANAN: ......................................... 72
    CROSS-EXAMINATION
5   BY MS. PERDEW SILAS: ..................................... 81
    REDIRECT EXAMINATION
6   BY MR. BUCHANAN:......................................... 105

7

8

9

10

11

12

13                   REPORTER'S CERTIFICATION

14

15

16   I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

17   RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

18

19
                                S/ ANDY ASHLEY
20                              ANDRE G. ASHLEY
                                OFFICIAL COURT REPORTER
21                              UNITED DISTRICT COURT
                                NORTHERN DISTRICT OF GEORGIA
22

23   DATE: 9/15/17

24

25