1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF GEORGIA
2                        GAINESVILLE DIVISION

3


4
   UNITED STATES OF AMERICA      ) DOCKET NO. 2:17-CR-05-RWS-JCF
5                                )
                                 ) GAINESVILLE, GEORGIA
6                                ) SEPTEMBER 25, 2017
            V.                   )
7                                )
   WILLIAM CHRISTOPHER GIBBS,    )
8                                )
            DEFENDANT.           )
9


10
                           VOLUME 3
11            TRANSCRIPT OF SUPPRESSION HEARING
            BEFORE THE HONORABLE J. CLAY FULLER
12              UNITED STATES MAGISTRATE JUDGE

13
   APPEARANCES OF COUNSEL:
14
   FOR THE GOVERNMENT:              RYAN K. BUCHANAN
15                                  OFFICE OF THE U.S. ATTORNEY

16 FOR THE DEFENDANT:               NATASHA PERDEW SILAS
                                    FEDERAL DEFENDER PROGRAM
17


18
   COURT REPORTER:                  ANDY ASHLEY
19                                  1949 U. S. COURTHOUSE
                                    75 TED TURNER DRIVE
20                                  ATLANTA, GEORGIA  30303-3361
                                    (404) 215-1478
21


22
   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
23 PRODUCED BY COMPUTER.

24

25

1                    P R O C E E D I N G S

2   (GAINESVILLE, HALL COUNTY, GEORGIA; SEPTEMBER 25, 2017

3   IN OPEN COURT.)

4           THE COURT:  COURT CALLS 2:17-CR-5, UNITED STATES

5   VERSUS WILLIAM CHRISTOPHER GIBBS.  I'LL ASK COUNSEL TO STATE

6   YOUR APPEARANCES FOR THE RECORD.

7           MR. BUCHANAN:  GOOD AFTERNOON, YOUR HONOR.  RYAN

8   BUCHANAN FOR THE UNITED STATES.  I'M JOINED AT COUNSEL TABLE BY

9   FBI SPECIAL AGENTS KIMBERLY SPELL-FOWLER AND BENNI JONSSON.

10          THE COURT:  GOOD AFTERNOON.

11          MS. PERDEW SILAS:  GOOD AFTERNOON.  FOR CHRIS GIBBS,

12  I AM NATASHA PERDEW SILAS.

13          THE COURT:  GOOD AFTERNOON, MA'AM.  GOOD AFTERNOON,

14  MR. GIBBS.

15          ALL RIGHT.  I KNOW WE HAD ONE MORE LOOSE END.

16          MR. BUCHANAN:  YOUR HONOR, IT'S BEEN A WHILE SINCE

17  I'VE GIVEN YOU A ROAD MAP, SO I THINK IT'S TIME AGAIN.  WE HAVE

18  THREE QUICK WITNESSES TODAY.

19          SCOTT GALLOWAY IS THE FANNIN COUNTY DEPUTY SHERIFF

20  WHO INTERACTED WITH MR. GIBBS AND GOT THE CONSENT FORM.  I

21  BELIEVE HIS TESTIMONY WILL BE FAIRLY BRIEF, AND THEN I HAVE TWO

22  OFFICERS FROM HAZMAT TO GIVE THE COURT AND TO MAKE A RECORD

23  ABOUT THE EXIGENCY OF THE CIRCUMSTANCES THAT LED TO THE SEARCH

24  OF THE CAR.  THOSE WILL BE OUR THREE WITNESSES.  I DON'T

25  BELIEVE THEY WILL BE EXTREMELY LONG.

```
 1              THE COURT:  THANK YOU, SIR.
 2              MR. BUCHANAN:  WITH THAT, YOUR HONOR, THE UNITED
 3  STATES WILL CALL FANNIN DEPUTY SHERIFF'S OFFICER SCOTT
 4  GALLOWAY.
 5              THE CLERK:  PLEASE RAISE YOUR RIGHT HAND TO TAKE THE
 6  OATH.
 7                          SCOTT GALLOWAY,
 8  HAVING BEEN DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:
 9              THE CLERK:  IF YOU WILL HAVE A SEAT, PLEASE, AND
10  STATE YOUR FULL NAME FOR THE RECORD AND SPELL YOUR LAST NAME
11  ALSO.
12              THE WITNESS:  SCOTT GALLOWAY, G A L L O W A Y.
13              MR. BUCHANAN:  MAY I, YOUR HONOR?
14              THE COURT:  YES.
15                      DIRECT EXAMINATION
16  BY MR. BUCHANAN:
17  Q.   DEPUTY GALLOWAY, HOW ARE YOU EMPLOYED?
18  A.   SAY AGAIN, SIR?
19  Q.   HOW ARE YOU EMPLOYED?
20  A.   I'M AN INVESTIGATOR WITH THE FANNIN COUNTY SHERIFF'S
21  OFFICE, SIR.
22  Q.   AND HOW LONG HAVE YOU BEEN WITH THE FANNIN COUNTY
23  SHERIFF'S OFFICE?
24  A.   FIVE YEARS, SIR.
25  Q.   AND WHAT TYPE OF DUTIES DO YOU HAVE AT THE SHERIFF'S
```

1  OFFICE?

2  A.    WE INVESTIGATE CRIMES.  ME SPECIFICALLY I MAINLY

3  INVESTIGATE CHILD CRIMES.

4  Q.    IS THAT ABOUT IT?

5  A.    I DREW A BLANK ON THAT ONE.  I'M SORRY.  YES, SIR.

6  Q.    AND WHAT WAS YOUR POSITION BACK IN FEBRUARY OF THIS YEAR?

7  A.    INVESTIGATOR WITH THE SHERIFF'S OFFICE, SIR.

8  Q.    AND WERE YOU WORKING ON FEBRUARY 2ND OF 2017?

9  A.    YES, SIR.

10  Q.    AND ON FEBRUARY 2ND OF 2017 AT SOME POINT DURING YOUR WORK

11  DAY DID YOU RESPOND TO THE HOSPITAL?

12  A.    YES, SIR, I DID.

13  Q.    AND THAT'S THE FANNIN COUNTY GENERAL --

14  A.    IT'S ACTUALLY FANNIN REGIONAL HOSPITAL.

15  Q.    FANNIN REGIONAL HOSPITAL?

16  A.    YES, SIR.

17  Q.    YOU WENT TO THAT HOSPITAL ABOUT WHAT TIME OF DAY WAS IT?

18  A.    I BELIEVE IT WAS IN THE AFTERNOON.  IT WAS BETWEEN FOUR

19  AND FIVE P.M., SIR.

20  Q.    WHILE YOU WERE THERE -- TELL ME THIS.  WHY DID YOU GO TO

21  THE HOSPITAL?

22  A.    CAPTAIN TURNER HAD TOLD ME THAT THERE HAD BEEN A REPORT OF

23  A POSSIBLE, I GUESS, CONTAMINATION OF RICIN OF SOME SORT, AND

24  HE NEEDED A BACKUP OFFICER TO GO WITH HIM.

25  Q.    AND SO YOU WENT TO THE HOSPITAL AFTER YOU GOT THAT WORD?

1  A.    YES, SIR, I RODE WITH HIM.

2  Q.    AND WHILE YOU WERE THERE, DID YOU ENCOUNTER WILLIAM

3  CHRISTOPHER GIBBS?

4  A.    YES, SIR.

5  Q.    DO YOU SEE MR. GIBBS IN THE COURTROOM TODAY?

6  A.    YES, SIR.

7  Q.    WHAT'S HE WEARING?

8  A.    IT LOOKS LIKE A YELLOW JUMPSUIT.

9        MR. BUCHANAN:  I'D LIKE THE RECORD TO REFLECT THAT

10  INVESTIGATOR GALLOWAY HAS IDENTIFIED THE DEFENDANT.

11  BY MR. BUCHANAN:

12  Q.    AFTER YOU GOT TO THE HOSPITAL, WHAT DID YOU DO?

13  A.    I ACTUALLY MAINTAINED -- WE WERE TOLD THAT IT WAS A WHITE

14  VEHICLE I BELIEVE LIKE A LINCOLN TOWN CAR THAT WAS PARKED IN

15  THE PARKING LOT.  I STAYED THERE TO MAKE SURE NOBODY GOT NEAR

16  THE VEHICLE WHILE CAPTAIN TURNER WENT INSIDE THE HOSPITAL TO

17  FIND OUT WHAT WAS GOING ON.

18  Q.    AND WHY DID YOU WANT TO KEEP PEOPLE AWAY FROM THE WHITE

19  VEHICLE?

20  A.    PRIOR TO THIS I DIDN'T EVEN KNOW WHAT RICIN WAS, BUT

21  CAPTAIN TURNER TOLD ME THAT IT WAS A BAD POISON.  SO HE SAID

22  JUST MAKE SURE THAT NOBODY GETS NEAR THE CAR BECAUSE THEY COULD

23  BECOME CONTAMINATED.

24        AT THE TIME HE HAD SAID THE REPORT COME IN THAT

25  SOMEONE HAD MADE RICIN AND GOTTEN IT ON THEMSELVES SOMEHOW, AND

1  THEN WALKED IN THE HOSPITAL, AND HE TOLD ME THAT THEY WERE

2  AFRAID THAT IT MIGHT BE STILL IN THAT VEHICLE.

3  Q.    AND EVENTUALLY YOU MENTIONED A SECOND AGO THAT YOU DID

4  ENCOUNTER MR. GIBBS?

5  A.    YES, SIR.

6  Q.    WHERE DID YOU SEE HIM FIRST?

7  A.    THE FIRST TIME I SAW HIM WAS COMING OUT OF THE EMERGENCY

8  ROOM EXIT OF FANNIN REGIONAL HOSPITAL, SIR.

9  Q.    WHEN HE CAME OUT OF THE HOSPITAL WAS HE BY HIMSELF?

10  A.    NO, I BELIEVE THAT CAPTAIN TURNER WAS WITH HIM.

11  Q.    WHEN YOU SAW HIM COME OUT OF THE HOSPITAL WAS MR. GIBBS IN

12  HANDCUFFS?

13  A.    NO, SIR.

14  Q.    WAS HE IN SHACKLES OR ANYTHING LIKE THAT?

15  A.    NO RESTRAINTS, SIR.

16  Q.    AND EVENTUALLY DID YOU GO TALK WITH MR. GIBBS?

17  A.    YES, SIR.

18  Q.    AND WHY DID YOU DO THAT?

19  A.    HONESTLY JUST FOR SMALL TALK INITIALLY JUST, YOU KNOW.

20  Q.    AND EVENTUALLY DID YOU GO BACK AND TALK TO HIM ABOUT HIS

21  CAR?

22  A.    YES, SIR.

23  Q.    AND WHY DID YOU DO THAT?

24  A.    CAPTAIN TURNER REQUESTED THAT I ASK FOR CONSENT TO SEARCH

25  HIS VEHICLE TO FIND THE RICIN OR THE SUBSTANCE THAT WAS IN THE

1  CAR.

2  Q.    AND WHEN YOU WENT TO TALK WITH MR. GIBBS, WHO WENT WITH

3  YOU?

4  A.    DEPUTY MARTIN, DEPUTY ETHAN MARTIN.

5  Q.    AND WHY DID DEPUTY ETHAN MARTIN GO WITH YOU?

6  A.    HE WAS WEARING A MICROPHONE THAT RECORDS ON HIS IN-CAR

7  CAMERA.  SO NORMALLY WHEN WE REQUEST CONSENT WE LIKE TO HAVE IT

8  RECORDED.  SO THAT WAY IF SOMETHING COMES UP LATER ON, THEY

9  CAN'T SAY THAT WE NEVER GAVE THEM THE OPPORTUNITY TO RESCIND IT

10 OR DENY IT OR ANYTHING.

11 Q.    AND IS YOUR CONVERSATION WITH MR. GIBBS, WAS IT RECORDED?

12 A.    YES, SIR.

13 Q.    INVESTIGATOR GALLOWAY, I'M HANDING YOU WHAT I'VE MARKED AS

14 GOVERNMENT'S EXHIBIT 5.

15 A.    YES, SIR.

16 Q.    THE CONVERSATION THAT YOU HAD WITH MR. GIBBS, AFTER IT WAS

17 RECORDED WAS IT BURNED TO A CD?

18 A.    YES, SIR.

19 Q.    AND HAVE YOU LISTENED TO THAT CD TO SEE WHETHER OR NOT IT

20 CONTAINED THE CONVERSATION YOU HAD WITH MR. GIBBS?

21 A.    YES, SIR.

22 Q.    DOES THAT CD HAVE YOUR INITIALS ON IT?

23 A.    YES, SIR, IT DOES.

24 Q.    AND DID YOU PUT YOUR INITIALS ON THAT CD AFTER YOU HAD A

25 CHANCE TO LISTEN TO IT?

1  A.   YES, SIR.

2  Q.   AND DOES THAT RECORDING FAIRLY AND ACCURATELY DEPICT WHAT

3  HAPPENED, THE CONVERSATION THAT YOU HAD WITH MR. GIBBS?

4  A.   YES, SIR.

5           MR. BUCHANAN:  YOUR HONOR, WE'D MOVE FOR THE

6  ADMISSION OF GOVERNMENT'S EXHIBIT 5 INTO EVIDENCE.

7           MS. PERDEW SILAS:  NO OBJECTION.

8           THE COURT:  GOVERNMENT'S EXHIBIT 5 IS ADMITTED.

9  BY MR. BUCHANAN:

10  Q.   INVESTIGATOR GALLOWAY, AFTER YOU TALKED WITH MR. GIBBS,

11  DID YOU PRESENT HIM WITH A FANNIN COUNTY SHERIFF'S DEPARTMENT

12  WAIVER OF CONSTITUTIONAL RIGHTS TO A SEARCH WARRANT?

13  A.   YES, SIR.

14  Q.   AND HAS THAT DOCUMENT, IT HAS BEEN REDUCED TO WRITING;

15  IT'S A WRITTEN DOCUMENT?

16  A.   YES, SIR, YES, SIR.

17  Q.   AND DID YOU SIGN THAT DOCUMENT?

18  A.   YES, SIR.

19  Q.   AND DID MR. GIBBS SIGN THAT DOCUMENT?

20  A.   YES, SIR.

21  Q.   AND DID MR. GIBBS SIGN THAT DOCUMENT IN YOUR PRESENCE?

22  A.   YES, SIR.

23  Q.   AND DID ANYONE WITNESS THOSE SIGNATURES?

24  A.   YES, SIR.

25  Q.   AND WHO WITNESSED THEM?

1  A.   DEPUTY ETHAN MARTIN.

2  Q.   I'M HANDING YOU WHAT I'VE MARKED AS GOVERNMENT'S EXHIBIT

3  4.   WHAT IS THAT DOCUMENT, INVESTIGATOR GALLOWAY?

4  A.   IT'S A FANNIN COUNTY SHERIFF'S DEPARTMENT WAIVER OF

5  CONSTITUTIONAL RIGHTS TO A SEARCH WARRANT.

6  Q.   AND IS THAT A COPY OF THE DOCUMENT THAT YOU PRESENTED TO

7  MR. GIBBS ON FEBRUARY 2ND, 2017.

8  A.   YES, SIR.

9  Q.   IS YOUR SIGNATURE DOWN AT THE BOTTOM BESIDE THE NUMBERS

10  354?

11  A.   YES, SIR.

12  Q.   IS THAT YOUR BADGE NUMBER?

13  A.   YES, SIR.

14  Q.   AND 323 IS DEPUTY MARTIN'S?

15  A.   YES, SIR.

16  Q.   AND BESIDE THE "X" WITH A CIRCLE, IS THAT WHERE MR. GIBBS

17  SIGNED?

18  A.   YES, SIR.

19  Q.   I WANT TO TALK TO YOU A LITTLE BIT ABOUT SORT OF WHAT

20  HAPPENED BEFORE -- YOUR HONOR, WE'D MOVE FOR THE ADMISSION OF

21  GOVERNMENT'S EXHIBIT 4 INTO EVIDENCE?

22          MS. PERDEW SILAS:  NO OBJECTION.

23          THE COURT:  GOVERNMENT'S EXHIBIT 4 IS ADMITTED.

24  BY MR. BUCHANAN:

25  Q.   LET ME TALK TO YOU ABOUT THE MINUTES LEADING UP TO MR.

1  GIBBS SIGNING GOVERNMENT'S EXHIBIT 4.

2         WHEN YOU WALKED UP TO MR. GIBBS TO TALK WITH HIM, YOU

3  SAID DEPUTY MARTIN WAS WITH YOU.  WAS ANYONE ELSE WITH YOU?

4  A.   NO, SIR.

5  Q.   THERE WERE OTHER PEOPLE ON SCENE, THOUGH, THAT'S CORRECT?

6  A.   CORRECT.

7  Q.   BUT WERE THEY IN CLOSE PROXIMITY WHEN YOU TALKED TO MR.

8  GIBBS?

9  A.   NO, SIR.

10  Q.   NOW, HOW WERE YOU DRESSED ON THAT DAY?

11  A.   IN OUR NORMAL ATTIRE WHICH IS A BLACK POLO SHIRT, GREEN

12  CARGO PANTS, TAN BOOTS.

13  Q.   AND WAS YOUR FIREARM VISIBLE?

14  A.   YES, SIR, IT'S ON AN EXTERNAL HOLSTER.

15  Q.   DID YOU EVER REMOVE IT FROM THE HOLSTER?

16  A.   NO, SIR.

17  Q.   WAS MR. GIBBS IN HANDCUFFS WHEN YOU HAD THIS CONVERSATION

18  WITH HIM?

19  A.   NO, SIR.

20  Q.   WAS HE IN LEG SHACKLES?

21  A.   NO, SIR.

22  Q.   DID YOU OR DEPUTY MARTIN EXERT ANY FORCE ON MR. GIBBS?

23  A.   NO, SIR.

24  Q.   DID YOU USE ANY WEAPONS ON MR. GIBBS?

25  A.   NO, SIR.

1  Q.    DID YOU MAKE ANY THREATS?

2  A.    NO, SIR.

3  Q.    DID YOU SUBJECT MR. GIBBS TO ANY DURESS?

4  A.    NO, SIR.

5  Q.    DID HE MAKE ANY COMMENTS TO YOU THAT HE WAS FEELING UNDER

6  DURESS?

7  A.    NO, SIR.

8  Q.    DID YOU RAISE YOUR VOICE AT HIM?

9  A.    NO, SIR.

10  Q.    DID YOU MAKE MR. GIBBS ANY PROMISES?

11  A.    NO, SIR.

12  Q.    DID MR. GIBBS APPEAR TO BE UNDER THE INFLUENCE OF ANY

13  ALCOHOLIC OR NARCOTIC?

14  A.    NO, SIR.

15  Q.    WAS HIS SPEECH SLURRED?

16  A.    NO, SIR.

17  Q.    DID HE APPEAR COHERENT?

18  A.    YES, SIR.

19  Q.    DID MR. GIBBS APPEAR SLEEPY OR TIRED?

20  A.    NO, SIR.

21  Q.    AT ANY POINT DID MR. GIBBS TELL YOU THAT HE DID NOT WANT

22  TO SIGN THAT FORM?

23  A.    NO, SIR.

24  Q.    AT ANY POINT DID HE REFUSE TO SIGN THAT CONSENT FORM?

25  A.    NO, SIR.

```
 1          MR. BUCHANAN:  THAT'S ALL I HAVE, YOUR HONOR.

 2          THE COURT:  THANK YOU, MR. BUCHANAN.

 3                    CROSS-EXAMINATION

 4  BY MS. PERDEW SILAS:

 5  Q.   IS IT OFFICER GALLOWAY?

 6  A.   WHICHEVER, INVESTIGATOR OR OFFICER.

 7  Q.   INVESTIGATOR.  OKAY.  I HAD MISSED THE TITLE.  SORRY ABOUT

 8  THAT.

 9          WHEN YOU ARRIVED AT THE SCENE, YOU WEREN'T THE FIRST

10  ARRIVER, RIGHT?

11  A.   NO, MA'AM.

12  Q.   IS IT CAPTAIN TURNER?

13  A.   YES, MA'AM, THAT'S MY COMMANDER.

14  Q.   HE WAS THERE BEFORE YOU?

15  A.   NO, MA'AM, ACTUALLY A UNIFORM POLICE OFFICER WAS THERE

16  PRIOR TO BOTH OF US ARRIVING.  WE RODE, MYSELF AND CAPTAIN

17  TURNER RODE IN THE SAME VEHICLE.

18  Q.   OKAY.  AND YOU'RE AWARE THAT CAPTAIN TURNER HAD A

19  CONVERSATION WITH MR. GIBBS BEFORE YOU DID?

20  A.   I'M ASSUMING SO, YES, MA'AM, HE WENT IN THE HOSPITAL TO

21  TALK TO HIM.

22  Q.   OKAY.  AND SO YOU FIRST SAW MR. GIBBS AFTER HE WAS OUT OF

23  THE HOSPITAL; IS THAT RIGHT?

24  A.   YES, MA'AM.

25  Q.   OKAY.  NOW, IT WAS COLD?
```

1  A.   MODERATELY.

2  Q.   WELL, IT WAS JACKET WEATHER?

3  A.   I BELIEVE THAT TO BE, I GUESS, YOU KNOW, PREFERENTIAL.  A

4  LOT OF TIMES I'M COLD AND CAPTAIN TURNER IS NOT OR VICE VERSA.

5  I MEAN AT THE BEGINNING OF FEBRUARY NORMALLY IT'S KIND OF

6  CHILLY, YES, BUT NOT TO THE POINT WHERE YOU'RE SHIVERING OR

7  ANYTHING.

8  Q.   IT WAS DARK?

9  A.   INITIALLY, NO, MA'AM, IT WAS DAYLIGHT WHEN WE FIRST

10 ARRIVED.

11 Q.   OKAY.  AND THIS IS FEBRUARY?

12 A.   YES, MA'AM.

13 Q.   THIS CONVERSATION YOU HAD WITH MR. GIBBS, DID THIS HAPPEN

14 AROUND EIGHT SOMETHING?

15 A.   YES, MA'AM.

16 Q.   OKAY.  AND IT WAS DARK?  IT WAS FEBRUARY?

17 A.   AT THAT TIME, YES, MA'AM.

18 Q.   OKAY.  SO I GUESS WHAT YOU'RE TRYING TO EXPLAIN IS THAT

19 YOU GOT THERE WHEN IT WAS LIGHT?

20 A.   YES, MA'AM.

21 Q.   AND THEN IT BECAME DARK?

22 A.   YES, MA'AM.

23 Q.   BUT AT THE TIME YOU WERE TALKING TO MR. GIBBS IT WAS DARK?

24 A.   WELL, ACTUALLY THE FIRST TIME I SPOKE WITH MR. GIBBS IT

25 WAS JUST A SMALL TALK CONVERSATION, IT WAS STILL DAYLIGHT.

1  Q.   WHAT DID YOU ALL TALK ABOUT THE FIRST TIME YOU SPOKE WITH

2  MR. GIBBS?

3  A.   I ASKED HIM ABOUT THE PATCH ON THE BACK OF HIS JACKET.  HE

4  SAID IT WAS HIS CHURCH THAT HE BELONGED TO.

5  Q.   OKAY.  ANYTHING ELSE?

6  A.   I THINK WE TALKED ABOUT GARDENING AND THINGS OF THAT

7  NATURE.

8  Q.   ALL RIGHT.  NOW, LET'S TALK ABOUT THE CAR.  THE CAR WAS IN

9  A PARKING SPACE, RIGHT?

10  A.   YES, MA'AM.

11  Q.   AND WHEN I SAY THE CAR, I'M TALKING ABOUT MR. GIBBS' CAR,

12  THE WHITE TOWN CAR?

13  A.   YES, MA'AM.

14  Q.   AND WERE THERE PEOPLE AROUND THE CAR, THAT IS TO SAY

15  CIVILIANS AROUND THE CAR?

16  A.   WHEN?  I DON'T KNOW.  I MEAN PRIOR TO MY ARRIVAL, I DON'T

17  KNOW IF ANYBODY WAS THERE, BUT ONCE WE GOT THERE, NO, I MADE

18  SURE NOBODY WENT AROUND THE CAR.

19  Q.   OKAY.  WELL, LET ME TRY TO BE MORE PRECISE.  MR. GIBBS

20  CAME OUT OF THE HOSPITAL?

21  A.   UH-HUH (AFFIRMATIVE).

22  Q.   YOU TALKED TO HIM ABOUT GARDENING AND THE PATCHES ON HIS

23  JACKET?

24  A.   YES, MA'AM.

25  Q.   AND AT SOME POINT CAPTAIN TURNER INDICATED HE WANTED YOU

1  TO GET CONSENT TO SEARCH THE CAR?

2  A.   UH-HUH (AFFIRMATIVE).

3  Q.   AT THAT POINT WHEN HE WANTED YOU TO GET CONSENT TO SEARCH

4  THE CAR, WERE THERE CIVILIANS AROUND THE CAR?

5  A.   NO, MA'AM.

6  Q.   ALL RIGHT.  WERE THERE OTHER CARS AROUND THE CAR?

7  A.   HOW CLOSE WOULD YOU CONSIDER AROUND IT?

8  Q.   HOW CLOSE WERE ANY OTHER CARS THAT WERE THERE?

9  A.   30, 40 FEET, GIVE OR TAKE.

10  Q.   OKAY.  SO THERE WERE NO CARS DIRECTLY ADJACENT TO THE

11  WHITE TOWN CAR, RIGHT?

12  A.   CORRECT.

13  Q.   IN FACT, CARS HAD BEEN MOVED AWAY FROM IT; ISN'T THAT

14  RIGHT?

15  A.   YES, MA'AM.

16  Q.   OKAY.  THE AREA, HAD ACCESS TO THE AREA BEEN CONTROLLED;

17  IN OTHER WORDS, WAS IT BLOCKED OFF, OR WERE PEOPLE JUST ABLE TO

18  COME STROLLING UP IF THEY'D LIKE TO?

19  A.   NO, IT WAS CONTROLLED.

20  Q.   IT WAS CONTROLLED, RIGHT?

21  A.   YES, MA'AM.

22  Q.   THERE WERE NO OTHER PEOPLE AROUND OTHER THAN LAW

23  ENFORCEMENT, HAZMAT AND FIRE PERSONNEL WHO WERE THERE TO DEAL

24  WITH THE SITUATION, RIGHT?

25  A.   YES.

1  Q.   DID IT APPEAR TO YOU LIKE THERE WAS ANYONE THERE WHO WAS

2  ABOUT TO GO INSIDE THE CAR?

3  A.   NOT THAT I KNOW OF, NOT THAT I CAN REMEMBER.

4  Q.   INHALE ANYTHING FROM INSIDE THE CAR?

5  A.   NOT THAT I CAN REMEMBER, NO.

6  Q.   SWALLOW SOMETHING FROM INSIDE THE CAR?

7  A.   NO, MA'AM.

8  Q.   TOUCH SOMETHING INSIDE THE CAR?

9  A.   NO, MA'AM.

10  Q.   OR INJECT THEMSELVES WITH SOMETHING INSIDE THE CAR?

11  A.   NO, MA'AM.

12  Q.   ALL RIGHT.  NOW, THE CONVERSATION THAT YOU HAD WITH MR.

13  GIBBS ABOUT SEARCHING THE CAR, THAT'S ALL ON TAPE, SO I'M NOT

14  GOING TO ASK ABOUT THAT BECAUSE WE'VE GOT THAT.

15       LET ME ASK YOU ABOUT A COUPLE OF OTHER THINGS.  OUT

16  THERE IN FANNIN COUNTY IF YOU GUYS WANT TO DO A SEARCH, IS

17  THERE A PROCEDURE FOR YOU ALL TO CONTACT THE MAGISTRATE AFTER

18  HOURS?

19  A.   YES, MA'AM.

20  Q.   YOU ALL HAVE SOMEBODY'S NUMBER?

21  A.   I COULDN'T HEAR YOU.

22  Q.   YOU ALL HAVE SOMEBODY'S NUMBER?

23  A.   YES.

24  Q.   AND THAT SOMEBODY IS A MAGISTRATE?

25  A.   YES.

134

1  Q.   AND THEY DON'T MIND BEING WAKEN UP IF THEY HAVE TO BE,

2  RIGHT?

3  A.   CORRECT.

4  Q.   OKAY.  AND DID YOU CALL THE MAGISTRATE?

5  A.   I DIDN'T.

6  Q.   NOBODY ELSE CALLED THE MAGISTRATE THAT YOU'RE AWARE OF,

7  RIGHT?

8  A.   I DON'T KNOW WHAT EVERYBODY ELSE WAS DOING.  I WAS JUST

9  PAYING ATTENTION TO MY TASK.

10  Q.   OKAY.  A COUPLE OF OTHER QUESTIONS.  MR. GIBBS WAS HE BY

11  THE CAR AT THE POINT THAT CAPTAIN TURNER SAID FOR YOU TO TRY TO

12  GET CONSENT TO SEARCH?

13  A.   WHICH CAR?

14  Q.   THE WHITE TOWN CAR.

15  A.   YES, HE WAS -- I MEAN HE WAS 30, 40 FEET AWAY FROM IT, BUT

16  HE COULD PLAINLY SEE IT, YES, MA'AM.

17  Q.   OKAY.  SO WAS IT THAT HE WAS WALKING OVER TO THE CAR TO

18  GET READY TO LEAVE?

19  A.   NO, MA'AM, NOT THAT I KNOW OF.

20  Q.   OKAY.  AND THERE WAS NO NOBODY ELSE IN THE CAR?

21  A.   NO, MA'AM.

22       MS. PERDEW SILAS:  THAT'S ALL I HAVE.

23       THE COURT:  THANK YOU.

24       MR. BUCHANAN:  NOTHING ELSE, YOUR HONOR.

25       THE COURT:  ALL RIGHT.  THANK YOU, INVESTIGATOR

1  GALLOWAY.  YOU MAY BE EXCUSED.

2         MR. BUCHANAN:  YOUR HONOR, THE UNITED STATES CALLS

3  SERGEANT NICK DURHAM -- YOUR HONOR, THIS WITNESS IS CHIEF

4  DARREL MITCHELL.

5         THE CLERK:  PLEASE RAISE YOUR RIGHT HAND TO TAKE THE

6  OATH.

7                    DARREL MITCHELL,

8  HAVING BEEN DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

9         THE CLERK:  IF YOU WILL HAVE A SEAT, PLEASE, AND

10 STATE YOUR FULL NAME FOR THE RECORD AND SPELL YOUR LAST NAME

11 ALSO.

12        THE WITNESS:  DARREL MITCHELL, M I T H C H E L L.

13        MR. BUCHANAN:  MAY I, YOUR HONOR?

14        THE COURT:  YES, YOU MAY.

15                  DIRECT EXAMINATION

16 BY MR. BUCHANAN:

17 Q.   CHIEF MITCHELL, HOW ARE YOU EMPLOYED?

18 A.   I AM EMPLOYED BY CHEROKEE COUNTY FIRE DEPARTMENT AND

19 EMERGENCY SERVICES.

20 Q.   AND HOW LONG HAVE YOU BEEN EMPLOYED BY CHEROKEE COUNTY

21 FIRE?

22 A.   SEVENTEEN YEARS.

23 Q.   AND WHAT ARE YOUR DUTIES?

24 A.   I'M CURRENTLY OVER THE SPECIAL OPERATIONS DIVISION.

25 Q.   AND DOES CHEROKEE COUNTY FIRE HAVE A HAZMAT TEAM?

1   A.   YES, THEY DO.

2   Q.   AND DOES THAT HAZMAT TEAM COVER MORE THAN JUST CHEROKEE

3   COUNTY?

4   A.   YES, WE DO.

5   Q.   AND WHICH COUNTIES DOES THAT TEAM COVER?

6   A.   WE COVER ALL THE COUNTIES THAT DO NOT HAVE HAZMAT TEAMS

7   NORTH AND EAST AND WEST OF CHEROKEE COUNTY.

8   Q.   DOES THAT INCLUDE FANNIN COUNTY?

9   A.   YES, SIR, THAT WOULD.

10  Q.   FANNIN COUNTY DOES NOT HAVE A HAZMAT TEAM?

11  A.   NO, SIR, THEY DO NOT.

12  Q.   AND YOUR TEAM, THE HAZMAT TEAM AND CHEROKEE FIRE

13  GENERALLY, DO YOU HAVE THE AUTHORITY TO ARREST?

14  A.   NO, SIR, WE DO NOT.

15  Q.   IS CHEROKEE FIRE A LAW ENFORCEMENT ENTITY?

16  A.   NO, SIR, WE ARE NOT.

17  Q.   HAVE YOU PARTICIPATED IN TRAINING FOR HAZARDOUS SUBSTANCES

18  THAT THE HAZMAT TEAM IS SORT OF TRAINED TO DO?

19  A.   YES, SIR.

20  Q.   AND PLEASE TELL THE COURT WHAT TYPES OF TRAINING YOUR

21  HAZMAT TEAM IN CHEROKEE FIRE HAS RECEIVED WITH RESPECT TO

22  HAZARDOUS SUBSTANCES LIKE POISONS OR TOXINS?

23  A.   WE ARE A ALL HAZARDS RESPONSE TEAM WHICH COVERS ANYTHING

24  THAT IS LISTED AS A CHEMICAL, BIOLOGICAL OR TOXIC INDUSTRIAL

25  CHEMICAL AGENT.  WE TRAIN WITH ALL CHEMICAL AGENTS AND ALL

1  CHEMICALS MANMADE OR OTHERWISE.

2  Q.    AND DOES THAT TRAINING INCLUDE SORT OF HOW YOUR TEAM

3  RESPONDS TO CERTAIN TOXINS?

4  A.    OH, ABSOLUTELY.

5  Q.    AND DOES THAT RESPONSE INCLUDE WHAT THE TEAM MEMBERS

6  SHOULD WEAR WHILE THEY ARE ON SCENE?

7  A.    ABSOLUTELY.

8  Q.    AND WERE YOU WORKING ON FEBRUARY 2ND, 2017?

9  A.    YES, SIR.

10  Q.    AND WAS THE HAZMAT TEAM CALLED TO FANNIN REGIONAL

11  HOSPITAL?

12  A.    YES, SIR.

13  Q.    AND DID YOU GO OUT TO FANNIN REGIONAL HOSPITAL WITH THE

14  TEAM THAT DAY?

15  A.    I DID.

16  Q.    DO YOU REMEMBER APPROXIMATELY WHAT TIME OF DAY YOU WENT?

17  A.    I DO NOT.

18  Q.    BUT YOU DO KNOW THAT YOU WENT OUT THAT DAY?

19  A.    YES, SIR.

20  Q.    AND WHAT WAS THE REASON FOR YOU AND THE HAZMAT TEAM GOING

21  TO FANNIN REGIONAL THAT DAY?

22  A.    WE RECEIVED A CALL FROM THE FANNIN COUNTY SHERIFF'S

23  DEPARTMENT SAYING THEY HAD AN UNKNOWN SUBSTANCE THAT HAD BEEN

24  PRESENTED AT THE HOSPITAL, AND THEY REQUESTED OUR ASSISTANCE TO

25  COME IN AND HELP WITH THE UNKNOWN SUBSTANCE.

1   Q.    AND DID YOU EVER RECEIVE ANY INFORMATION ABOUT WHAT THEY

2   BELIEVED THAT SUBSTANCE TO BE?

3   A.    YES, SIR, I DID.

4   Q.    AND WHAT DID THEY BELIEVE IT TO BE?

5   A.    THEY INDICATORS INDICATED TO THEM THAT IT WAS POSSIBLY

6   RICIN.

7   Q.    AND THIS CALL TO THE HAZMAT TEAM, WHO WAS IT FROM?

8   A.    IT WAS FROM THE FANNIN COUNTY SHERIFF, SHERIFF'S

9   OFFICE.

10  Q.    AND IS YOUR HAZMAT TEAM TRAINED TO RESPOND TO INCIDENTS

11  INVOLVING SUBSTANCES LIKE RICIN?

12  A.    YES, SIR, WE ARE.

13  Q.    AND PLEASE TELL THE COURT A LITTLE BIT ABOUT HOW THE TEAM

14  RESPONDS, HOW YOU PROCESS A SCENE WHERE THERE'S SUSPECTED

15  TOXINS LIKE RICIN?

16  A.    ANY TOXIN OR ANY POISON OR SUSPECTED POISON, WE WOULD GO

17  IN.  WE WOULD HAVE A SET LEVEL PROTECTION.  OUR PROTECTION

18  RANGES FROM A CHEMICAL PROTECTIVE SUIT, BOOTS, GLOVES,

19  RESPIRATORY PROTECTION.

20          WE WOULD TRY TO FIND OUT AND LOCATE WHERE THE

21  POSSIBLE SUBSTANCE WAS.  IF THERE'S ANYBODY THAT HAS BEEN

22  CONTAMINATED, IF THERE'S ANY VICTIMS OR ANYBODY ELSE THAT HAD

23  BEEN CONTAMINATED IN THE AREA, WE WOULD LOOK AT THAT

24  INFORMATION, SEE IF WE HAVE ANY SIGNS OR SYMPTOMS, OR IF

25  THERE'S ANY NEED FOR ANY KIND OF PERSONAL DECONTAMINATION FOR

139

1  ANY INDIVIDUALS.  OUR MAIN CAUSE -- OUR MAIN OPERATION IS HUMAN

2  SAFETY AND LIFE SAFETY FIRST.

3  Q.   AND SO WHEN YOUR TEAM PROCESSES A SCENE, THEIR PRIMARY

4  GOAL IS NOT THE RETENTION OF EVIDENCE FOR CRIMINAL

5  PROSECUTION?

6  A.   THAT IS CORRECT.

7  Q.   AND DOES YOUR TEAM RESPOND TO SITUATIONS IN WHICH THERE IS

8  NO CRIMINAL PROSECUTION?

9  A.   YES, SIR.

10          MR. BUCHANAN:  NOTHING ELSE, YOUR HONOR.

11          MS. PERDEW SILAS:  I DON'T HAVE ANY QUESTIONS.

12          THE COURT:  ALL RIGHT.  THANK YOU, SIR.  YOU MAY BE

13  EXCUSED.

14          MR. BUCHANAN:  LAST WITNESS, YOUR HONOR, IS SERGEANT

15  NICK DURHAM.

16          THE CLERK:  PLEASE RAISE YOUR RIGHT HAND TO TAKE THE

17  OATH.

18                    NICHOLAS H. DURHAM,

19  HAVING BEEN DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

20          THE CLERK:  IF YOU WILL HAVE A SEAT, PLEASE, AND

21  STATE YOUR FULL NAME FOR THE RECORD AND SPELL YOUR LAST NAME

22  ALSO.

23          THE WITNESS:  NICHOLAS H. DURHAM, D U R H A M.

24          MR. BUCHANAN:  MAY I?

25          THE COURT:  YES, YOU MAY.

```
 1                    DIRECT EXAMINATION

 2   BY MR. BUCHANAN:

 3   Q.   SERGEANT DURHAM, HOW ARE YOU EMPLOYED?

 4   A.   HOW LONG?

 5   Q.   HOW ARE YOU EMPLOYED?

 6   A.   I'M A SERGEANT FOR CHEROKEE COUNTY FIRE AND EMERGENCY

 7   SERVICES.

 8   Q.   AND HOW LONG HAVE YOU BEEN WITH CHEROKEE FIRE?

 9   A.   THIS FEBRUARY WILL BE SIX YEARS.

10   Q.   AND ARE YOU ON THE HAZMAT TEAM?

11   A.   YES, SIR, I AM.

12   Q.   AND DOES THAT HAZMAT TEAM IN CHEROKEE COUNTY, DOES IT

13   RESPOND TO CALLS IN FANNIN COUNTY?

14   A.   YES, SIR, IT DOES.

15   Q.   WERE YOU WORKING ON FEBRUARY 2ND, 2017?

16   A.   YES, SIR.

17   Q.   AND DID YOU RESPOND TO A HAZMAT CALL AT THE FANNIN

18   REGIONAL MEDICAL CENTER?

19   A.   YES, SIR, I DID.

20   Q.   AND WHAT WAS THE NATURE OF THAT CALL TO THE HOSPITAL THAT

21   DAY?

22   A.   WE RESPONDED TO A RICIN ALERT WAS OUR INITIAL DISPATCH

23   THAT THERE WAS A PATIENT THAT WAS POSSIBLY CONTAMINATED WITH

24   RICIN AS WELL AS FOLKS IN THE ER ROOM AND POSSIBLE HOSPITAL.

25   Q.   AND DID THIS -- WHEN YOU LEARNED ABOUT THE POSSIBLE RICIN
```

1  CONTAMINATION, DID YOU LEARN ANY INFORMATION ABOUT A POTENTIAL

2  VEHICLE WHERE A SUBSTANCE MAY BE LOCATED?

3  A.    YES, SIR, WE WERE BRIEFED THAT THERE WAS A VEHICLE OUTSIDE

4  THAT HAD POSSIBLE CONTAMINATES OF RICIN IN IT.

5  Q.    DO YOU REMEMBER WHAT KIND OF VEHICLE THAT WAS?

6  A.    IT WAS A WHITE LINCOLN.

7  Q.    AND PLEASE TELL THE COURT SORT OF WHEN THE HAZMAT TEAM

8  RESPONDS, WHAT TYPE OF VEHICLE DO YOU GO IN?

9  A.    WE HAVE A SPECIALIZED HAZARDOUS MATERIALS RESPONSE

10  VEHICLE.  IT'S WHAT YOU WOULD CONSIDER AND SEE ON THE STREETS

11  LIKE AN 18-WHEELER IS THE BASIC GIST OF ITS SIZE AND

12  DIMENSIONS.

13  Q.    AND DID THAT VEHICLE RESPOND TO THE HOSPITAL ON FEBRUARY

14  2ND, 2017?

15  A.    YES, SIR, IT DID.

16  Q.    AND WHAT'S IN THAT VEHICLE?

17  A.    THERE'S ALL SORTS.  THERE'S PERSONAL PROTECTION

18  EQUIPMENT.  THERE'S MONITORING EQUIPMENT.  THERE'S CLEAN-UP

19  EQUIPMENT, SAMPLING EQUIPMENT, DECONTAMINATION EQUIPMENT,

20  RESPIRATORY PROTECTION EQUIPMENT.  I COULD GO ON AND ON AND

21  ON.  THERE'S TOO MUCH FOR ME TO REMEMBER WHAT'S ON THAT

22  APPARATUS.

23  Q.    SO ONCE YOU GOT TO THE HOSPITAL THAT DAY, WHAT DID YOU DO?

24  A.    WELL, WE INITIALLY ARRIVED AT THE HOSPITAL, AND WE STAGED

25  OUT FRONT OF THE HOSPITAL.  OUR INCIDENT COMMANDER WENT INTO

1  THE SCENE, WAS BRIEFED ON THE SITUATION.  WE WERE CLEARED TO GO

2  INTO THE SCENE.

3         WE PULLED OUR HAZARDOUS MATERIALS RIG TO THE BACK OF

4  THE HOSPITAL TO THE EMERGENCY ROOM, AND FROM THERE WE PARKED

5  THE VEHICLE.  WE WERE BRIEFED ON THE SCENE OF THE SITUATION.

6  Q.   WHO WAS YOUR INCIDENT COMMANDER THAT DAY?

7  A.   CHIEF MITCHELL WAS THE CHEROKEE COUNTY FIRE AND EMERGENCY

8  SERVICES INCIDENT COMMANDER.

9  Q.   AT SOME POINT WAS THERE A DECISION MADE TO SEARCH THAT

10 LINCOLN TOWN CAR THAT YOU TALKED ABOUT?

11 A.   YES, SIR, THERE WAS A DECISION MADE TO SEARCH THE LINCOLN

12 TOWN CAR.

13 Q.   AND HOW DID YOU LEARN OF THAT DECISION?

14 A.   WE WERE INSTRUCTED THAT IT WAS CLEAR TO SEARCH THE VEHICLE

15 DIRECTLY FROM CHIEF MITCHELL.

16 Q.   AND SO YOU WERE PART OF THE TEAM THAT SEARCHED THE

17 VEHICLE?

18 A.   I WAS THE PERSONNEL IN CHARGE FOR THE RECON TEAM FOR THIS

19 INCIDENT, YES.

20 Q.   WHEN YOU CALL IT THE RECON TEAM THAT MEANS DOING

21 RECONNAISSANCE ON THE POTENTIAL ITEM THAT CONTAINED THE POISON?

22 A.   YES, SIR, THE POTENTIAL ITEMS THAT WERE IN THE VEHICLE AND

23 THE VEHICLE ITSELF JUST DOING A BRIEF OVERVIEW OF THE VEHICLE

24 AND CLEARING TO MAKE SURE IT WAS SAFE TO GO FURTHER.

25 Q.   AND WHAT TYPES OF THINGS DID YOU DO AS YOU APPROACHED THE

1  VEHICLE?

2  A.    AS WE APPROACHED THE VEHICLE, WE WERE A TEAM OF THREE,

3  MYSELF BEING IN CHARGE.  I HAD ONE CREW MEMBER THAT WAS IN

4  CHARGE OF PHOTOGRAPHS, AND THEN I HAD ANOTHER CREW MEMBER THAT

5  WAS IN CHARGE OF AIR MONITORING FOR THE INCIDENT.

6           WE HAD A FIVE GAS MONITOR, RADIOLOGICAL MONITOR,

7  THERMAL IMAGER, TEMPERATURE METERS.  SO WE APPROACHED THE

8  VEHICLE, WE TOOK PICTURES AND MADE SURE THAT WE WEREN'T GETTING

9  ANY ELEVATIONS ON ANY OF OUR MONITOR READINGS AS WE MOVED

10  TOWARDS THE VEHICLE.

11  Q.    AND SO THAT THE VIEW OF THE TEAM MEMBER WHO'S TAKING THE

12  PICTURES, AND WHY WAS THE OTHER PERSON CONDUCTING TESTS AS YOU

13  APPROACHED THE VEHICLE?

14  A.    TO MAKE SURE IT WAS SAFE FOR US TO GET CLOSER AND DO A

15  FURTHER INSPECTION BECAUSE IT WAS A POISONOUS SUBSTANCE THAT WE

16  WERE POSSIBLY DEALING WITH.

17  Q.    DO YOU REMEMBER THE SUBSTANCE THAT YOU WERE POSSIBLY

18  DEALING WITH?

19  A.    RICIN WAS THE PRODUCT OF SUSPICION.

20  Q.    DO YOU KNOW WHETHER OR NOT BASED ON YOUR TRAINING AND

21  EXPERIENCE WHETHER OR NOT RICIN CAN BE FATAL?

22  A.    YES, SIR, IT'S A HIGHLY TOXIC AND FATAL SUBSTANCE.

23  Q.    AND WHAT WERE YOU WEARING, YOU AND YOUR TEAMMATES, AS YOU

24  APPROACHED THE TOWN CAR?

25  A.    WE WERE IN LEVEL B PROTECTION AS WELL AS FULL RESPIRATORY

1  PROTECTION.

2  Q.    WHAT DOES LEVEL B LOOK LIKE?

3  A.    LEVEL B PROTECTION IT'S A FULL BODY SPLASH RESISTANT

4  SUIT.  WE HAD RUBBER BOOTS, RUBBER GLOVES, RUBBER HOOD AS WELL

5  AS FULL FACE PROTECTION AND RESPIRATORY PROTECTION.

6  Q.    AND SO AS YOU APPROACHED THE VEHICLE, I THINK WE LEFT OFF

7  ONE TEAM MEMBER WAS TAKING PICTURES, ONE WAS CONDUCTING TESTS,

8  AND DID YOU MAKE IT ALL THE WAY TO THE VEHICLE?

9  A.    YES, SIR, WE DID MAKE IT ALL THE WAY TO THE VEHICLE.

10  Q.    AND AS YOU APPROACHED THE VEHICLE DURING YOUR BRIEFING,

11  DID YOU HAVE ANY IDEA OF WHAT TYPE OF CONTAINER THE SUBSTANCE

12  MIGHT HAVE BEEN IN?

13  A.    YES, SIR, WE WERE BRIEFED BY OUR INCIDENT COMMANDER THAT

14  THE ITEM OF SUSPICION WAS IN SOME TYPE OF BOTTLE IN THE

15  FLOORBOARD OF THE DRIVER'S SIDE THAT WAS POSSIBLY IN OR HALFWAY

16  IN A BAG.

17  Q.    AND WHILE YOU WERE LOOKING FOR THAT ITEM THAT YOU HAD BEEN

18  BRIEFED ABOUT, DID YOU FIND SOMETHING THAT FIT THAT

19  DESCRIPTION?

20  A.    YES, SIR, WE DID.

21  Q.    AND WHERE DID YOU FIND IT?

22  A.    DRIVER'S SIDE FRONT FLOORBOARD.

23  Q.    THERE WAS A BOTTLE YOU SAID?

24  A.    YES, SIR.

25  Q.    AND DID YOU FIND ANYTHING ELSE THAT MIGHT HAVE FIT THAT

1  DESCRIPTION AS YOU WERE SEARCHING FOR A CONTAINER OF POSSIBLE

2  RICIN?

3  A.    AS FAR AS ANOTHER BOTTLE, IS THAT WHAT YOU'RE REFERRING

4  TO?

5  Q.    YES.

6  A.    THAT WAS THE ONLY BOTTLE THAT I REMEMBER SEEING.

7  Q.    DID YOU FIND A GRINDER?

8  A.    YES, SIR, WE DID FIND OTHER ITEMS OF SUSPICION WHICH WAS A

9  GRINDER.  IT DID HAVE A RESIDUE OF SOME TYPE OF GROUND PARTS IN

10  IT.  WE DIDN'T DO ANY SAMPLING, BUT WE DID FIND A GRINDER.

11  Q.    AND THAT GRINDER HAD IT COME UP IN YOUR BRIEFING PRIOR TO

12  SEARCHING THE VEHICLE?

13  A.    IT WAS NOTED BY OUR INCIDENT COMMAND TO BE AWARE OF

14  ANYTHING THAT COULD BE USED IN THE PRODUCTION.

15  Q.    THE PRODUCTION OF WHAT?

16  A.    OF RICIN.

17  Q.    AND SO DID YOU FIND BOTH OF THOSE ITEMS WHILE YOU WERE

18  DOING YOUR RECONNAISSANCE OF THE VEHICLE?

19  A.    YES, SIR, WE DID.  WE FOUND A BOTTLE AS WELL AS THE

20  GRINDER INSIDE THE VEHICLE.

21  Q.    HOW LONG DID IT TAKE BETWEEN THE TIME WHEN YOU GOT TO THE

22  CAR TO WHEN YOU FOUND THOSE ITEMS?

23  A.    I DON'T RECALL THE TOTAL TIME.

24  Q.    MORE THAN AN HOUR OR A MATTER OF MINUTES?

25  A.    MATTER OF MINUTES, PROBABLY LESS THAN 20 MINUTES.

1          MR. BUCHANAN:  NOTHING FURTHER, YOUR HONOR.

2                    CROSS-EXAMINATION

3   BY MS. PERDEW SILAS:

4   Q.   SERGEANT DURHAM, WHEN YOU RESPOND TO A SCENE WHERE YOU

5   THINK THERE MIGHT BE A TOXIC SUBSTANCE, YOU HAVE TO BE CAREFUL

6   THAT YOU DON'T END UP GETTING THE SUBSTANCE OUT INTO THE

7   ATMOSPHERE; IS THAT RIGHT?

8   A.   YES, MA'AM, THAT'S CORRECT.

9   Q.   IS THERE A PROCEDURE THAT YOU WOULD DO IF YOU THOUGHT THAT

10  THERE WAS SOMETHING OF THE SUBSTANCE THAT WAS SEEPING OUT THE

11  CAR; IN OTHER WORDS, MIGHT YOU PUT THINGS AROUND THE CAR TO

12  KEEP IT FROM CONTAMINATING THE AREA; IS THERE SOMETHING LIKE

13  THAT?

14  A.   IF THERE WAS SUSPICION OR IF WE DID SEE SOMETHING LEAKING

15  OUT OF THE VEHICLE, THEN, YES, MA'AM, WE WOULD.

16  Q.   WHAT WOULD YOU DO IN THIS INSTANCE?

17  A.   IT DEPENDS ON WHAT THE -- WHAT IT WAS, IF IT WAS A LIQUID

18  VERSUS SOMETHING ELSE COMING OUT.  IT WOULD BE DIFFERENT FOR

19  EVERY SCENE.

20  Q.   I GUESS IN MY MIND I WAS THINKING YOU MIGHT WRAP THE CAR

21  UP OR SOMETHING IF YOU THOUGHT THAT THERE WAS THE POSSIBILITY

22  THAT THINGS WERE SEEPING OUTSIDE OF IT; IS THAT RIGHT?

23  A.   WE WOULD NOT WRAP THE CAR UP, NO, MA'AM.

24  Q.   WHAT WOULD YOU DO?

25  A.   IF SOMETHING WAS LEAKING OUTSIDE THE VEHICLE, IF IT WAS A

1  LIQUID PERHAPS, WE'D HAVE A CERTAIN PROCEDURE WHERE WE WOULD

2  STOP THE LIQUID FROM FURTHER, YOU KNOW, ENDANGERING THE

3  ENVIRONMENT OR ANYBODY AROUND IT.

4  Q.   NOW, DID YOU HAVE SOMETHING CALLED LIKE A GAS METER OR

5  SOMETHING ON?

6  A.   YES, MA'AM, WE DID.

7  Q.   CAN YOU TELL US ABOUT THAT?

8  A.   OUR METER IS A FIVE GAS METER.  IT MONITORS THE OXYGEN

9  LEVEL, MAKE SURE IT MAINTAINS AN OXYGEN LEVEL, A LOWER

10  EXPLOSIVE LIMIT LEVEL AS WELL AS A PID LEVEL, HYDROGEN

11  CYANIDE, AND THAT'S WHAT THAT PARTICULAR MONITOR IS THAT WE

12  BROUGHT IN.

13  Q.   OKAY.  AND OXYGEN DO YOU KNOW NOTATE THAT AS O2?

14  A.   YES, MA'AM.

15  Q.   OKAY.  IS 20.9 AN OXYGEN LEVEL READING?

16  A.   THAT'S WHAT OUR MONITOR IS STANDARD SET AT, YES, MA'AM.

17  Q.   OKAY.  AND DID YOU TAKE ANY OXYGEN READINGS BEFORE YOU

18  OPENED UP THAT CAR?

19  A.   YES, MA'AM.

20  Q.   AND WHAT WAS THE READING?

21  A.   20.9.

22  Q.   IS 20.9 A GOOD READING, OR SOMETHING THAT IS CAUSE FOR

23  CONCERN?

24  A.   THAT'S A GOOD READING.

25  Q.   OKAY.  DID YOU TAKE READINGS AROUND THE CAR THEN BEFORE

1  YOU OPENED -- AT SOME POINT YOU OPENED THE CAR, RIGHT?

2  A.   YES, MA'AM, WE DID.

3  Q.   OKAY.  AND WITH YOUR READINGS DID YOU DETERMINE THAT IT

4  WAS SAFE FOR YOU TO OPEN THE CAR?

5  A.   YES, MA'AM.

6  Q.   IF IT WASN'T SAFE FOR YOU TO OPEN THE CAR, YOU WOULDN'T

7  OPEN THAT CAR, RIGHT?

8  A.   THAT'S CORRECT.

9  Q.   OKAY.  SO BEFORE OPENING THE CAR, YOU WERE ABLE TO

10  DETERMINE THAT THE AREA AROUND THE CAR WAS IT SAFE?

11  A.   YES, MA'AM, THAT'S CORRECT.

12  Q.   OKAY.  ALL RIGHT.  NOW, I'D LIKE TO HAND YOU A COUPLE OF

13  PAGES THAT I GOT FROM THE GOVERNMENT.  I'M GOING TO MARK THIS

14  AS GOVERNMENT'S EXHIBIT NUMBER 4.

15          MAY I APPROACH, JUDGE?

16          THE COURT:  YES, YOU MAY.

17  BY MS. PERDEW SILAS:

18  Q.   I'D LIKE TO SHOW YOU WHAT HAS BEEN MARKED AS DEFENDANT'S

19  EXHIBIT 4 AND ASK YOU IF YOU RECOGNIZE THOSE TWO PAGES THERE?

20  A.   YES, MA'AM, I DO RECOGNIZE THEM.

21  Q.   OKAY.  YOUR LOOK WAS MAKING ME THINK WE WERE GOING IN THE

22  WRONG DIRECTION.  IS THAT YOUR HANDWRITING?

23  A.   NO, MA'AM, IT IS NOT.

24  Q.   OKAY.  I SEE YOUR NAME ON THAT FIRST PAGE, RIGHT?

25  A.   YES, MA'AM.

1  Q.    DO YOU KNOW WHO WROTE THAT?

2  A.    YES, MA'AM, I DO.

3  Q.    WHO WROTE THAT?

4  A.    CODY WILSON, HE'S A FIREFIGHTER.

5  Q.    AND THAT'S SOMEBODY ON YOUR TEAM?

6  A.    YES, MA'AM.

7  Q.    CAN YOU TELL ME WHAT IT WAS THAT OFFICER WILSON WAS

8  RECORDING THERE?

9  A.    THIS IS OUR PICTURE LOG ON THE FIRST PAGE.  SINCE I WAS

10 THE LEAD TEAM LEADER FOR THE RECON TEAM, AS PICTURES WERE TAKEN

11 HE'S DOCUMENTING WHAT THE PICTURE IS THAT WE'RE TAKING AS WELL

12 AS THE TIME.

13 Q.    OKAY.  SO ON THE SIDE WHEN IT SAYS 20 COLON SOMETHING THAT

14 IS MILITARY TIME, RIGHT?

15 A.    YES, MA'AM.

16 Q.    OKAY.  AND THEN ON THE SECOND PAGE, IT LOOKS LIKE THOSE

17 ARE OXYGEN READINGS?

18 A.    YES, MA'AM.

19 Q.    WHEN WERE THOSE READINGS TAKEN?

20 A.    THE TIME THAT THEY'RE TAKEN; IS THAT CORRECT?

21 Q.    ACTUALLY IS IT BEFORE OR AFTER YOU ALL OPENED UP THE CAR

22 THAT THESE READINGS WERE TAKEN?

23 A.    WELL, THE OXYGEN READING ON THE SECOND PAGE SAYS 20:39.

24 Q.    OKAY.  IS THAT BEFORE YOU ALL OPENED THE CAR UP OR

25 AFTERWARDS?

1    A.    THAT CORRELATES DIRECTLY WITH THE DOOR OPEN AT 20:39.

2    Q.    OKAY.  DO YOU GET ANYTHING OUT OF THOSE READINGS THAT

3    RELATE TO THE SAFENESS OR DANGER OF THE OXYGEN LEVEL?

4    A.    THE OXYGEN LEVEL IS SAFE FOR ALL THREE READINGS.

5    Q.    OKAY.  ALL RIGHT.  NOW, EARLIER YOU SAID THAT -- I THINK

6    YOU SAID LEVEL B SUITS THAT YOU ALL HAD ON?

7    A.    YES, MA'AM.

8    Q.    OKAY.  AND LEVEL B WHAT DOES THAT CORRESPOND TO?  IS THERE

9    AN A, B AND C, OR WHAT IS IT?

10   A.    THERE'S AN A, B, C AND D LEVEL.

11   Q.    OKAY.

12   A.    A BEING THE MOST PROTECTION.

13   Q.    OKAY.  AND THE B LEVEL THAT YOU RESPONDED TO, THAT WAS

14   BASED UPON THE TYPE OF CALL, I GUESS?

15   A.    YES, THAT'S CORRECT.

16   Q.    OKAY.  WHY DIDN'T YOU PUT ON THE A LEVEL; WHAT WOULD

17   DIFFERENTIATE THIS FROM A AND B?

18   A.    WE WEREN'T WORRIED ABOUT A VAPOR WHICH A LEVEL A IS VAPOR

19   TYPE SUIT.

20   Q.    WHY NOT?

21   A.    BECAUSE WE WERE -- IN OUR BRIEFING WE WERE BRIEFED THAT IT

22   WAS A LIQUID SUBSTANCE THAT HAD BEEN MADE CONTACT WITH.

23   Q.    OKAY.  ALSO YOU SAID THAT YOU HAD BEEN ALERTED TO LOOK FOR

24   ANYTHING THAT COULD BE USED IN THE PRODUCTION OF RICIN?

25   A.    YES, THAT'S CORRECT.

1   Q.   WHAT WERE YOU TOLD ABOUT THAT?  WERE YOU JUST TOLD TO LOOK

2   FOR THAT?  WERE YOU TOLD WHY?

3   A.   WE WERE JUST TOLD TO LOOK FOR ANYTHING THAT MAY BE USED IN

4   THE PRODUCTION OF RICIN.

5   Q.   OKAY.  NOW, ONCE YOU GUYS GOT IN THERE, DID YOU TAKE THE

6   ITEMS THAT YOU JUST DESCRIBED, DID YOU TAKE THE BOTTLE AND DO

7   SOMETHING WITH IT?

8   A.   NO, MA'AM, WE WERE STRICTLY THE RECONNAISSANCE TEAM.  WE

9   DID NOT TOUCH ANYTHING INSIDE THE VEHICLE.

10  Q.   OKAY.  SO YOU JUST FOUND IT?

11  A.   THAT'S CORRECT.

12  Q.   NOBODY REMOVED ANYTHING?

13  A.   NOBODY FROM CHEROKEE COUNTY FIRE AND EMERGENCY SERVICES

14  TOUCHED ANYTHING IN THE VEHICLE, THAT'S CORRECT.

15  Q.   AND THERE WERE NO CIVILIANS IN THE AREA WHEN YOU

16  WERE THERE WITH YOUR TEAM PREPARING TO GO DO RECONNAISSANCE,

17  RIGHT?

18  A.   WHEN YOU SAY IN THE AREA, CAN YOU BE A LITTLE MORE

19  SPECIFIC BECAUSE THERE WAS -- WE ARE AT A PUBLIC HOSPITAL.  SO

20  THERE WAS NOBODY IN THE HOT ZONE WHICH WE WOULD REFER TO AS THE

21  DIRECT SURROUNDING OF THE VEHICLE.  EVERYBODY AS FAR AS

22  BYSTANDERS, COMMAND STAFF, EVERYBODY ELSE THAT WAS IN THE

23  GENERAL AREA WAS ALL LOCATED IN A SAFE ZONE WHICH WE WOULD

24  DESIGNATE AS GREEN OR COLD.

25  Q.   OKAY.  NOBODY IN THE HOT ZONE.  EVERYBODY WAS IN THE GREEN

1    ZONE?

2    A.    CORRECT.

3                MS. PERDEW SILAS:  THANK YOU.

4                MR. BUCHANAN:  NOTHING ELSE, YOUR HONOR.

5                THE COURT:  THANK YOU, SIR.  DID YOU MOVE THE

6    ADMISSION OF THAT OR JUST USE IT?

7                MS. PERDEW SILAS:  I DIDN'T MOVE THE ADMISSION OF

8    IT.  I GUESS I WILL MOVE THE ADMISSION OF IT.

9                MR. BUCHANAN:  NO OBJECTION.

10               THE COURT:  DEFENDANT'S EXHIBIT 4 IS ADMITTED.

11               THANK YOU, SERGEANT DURHAM.  YOU MAY BE EXCUSED.

12               MR. BUCHANAN:  NOTHING ELSE, YOUR HONOR.

13               THE COURT:  THANK YOU, SIR.  I'LL NOTE THAT THE

14   TRANSCRIPTS OF THE PRIOR HEARINGS HAVE ALREADY BEEN PREPARED.

15   THE BRIEFING SCHEDULE WE HAD IN PLACE IS STILL IN PLACE WHERE

16   THE DEFENDANT WAS GOING TO AMEND UP WITHIN 21 DAYS OF THE FINAL

17   TRANSCRIPT LANDING, AND THEN 21 DAYS FOR THE GOVERNMENT TO

18   RESPOND AND 14 DAYS ON REPLY.  I'M ASSUMING ALL THAT'S BASED ON

19   THE IDEA THAT WE'RE DONE.

20               MS. PERDEW SILAS:  YES, I THINK WE ARE.  THERE WAS

21   ONLY ONE THING THAT IS OF CONCERN.  WHEN WE WERE AT OUR

22   PREVIOUS HEARING AND THE GOVERNMENT CALLED TURNER, THEY FOUND

23   LATER A REPORT THAT TURNER HAD.  OF COURSE I WOULD BE ENTITLED

24   TO THAT AFTER HE TESTIFIES.

25               I'VE BEEN GIVEN THE TURNER REPORT, AND I'M JUST GOING

153

1    TO LOOK AT THAT AND SEE IF THAT MIGHT BE SOMETHING I MIGHT WANT

2    TO STIPULATE IN WITH THE GOVERNMENT, BUT IT MIGHT NOT BE

3    ANYTHING, BUT THAT'S THE ONLY THING THAT I CAN THINK OF THAT WE

4    MIGHT NEED.

5            THE COURT:  OKAY.  IT SOUNDS LIKE WE'LL HAVE PLENTY

6    OF TIME TO RUN THAT LAST THING DOWN WITHOUT IMPACTING OUR

7    BRIEFING SCHEDULE.

8            MS. PERDEW SILAS:  YES, JUDGE.

9            THE COURT:  OKAY.  ANYTHING FURTHER FROM THE

10   GOVERNMENT?

11           MR. BUCHANAN:  NO, YOUR HONOR.

12           THE COURT:  MS. SILAS?

13           MS. PERDEW SILAS:  NO, JUDGE.

14           THE COURT:  THANKS, EVERYBODY.

15           (PROCEEDINGS CONCLUDED.)

16

17

18

19

20

21

22

23

24

25

154

```
 1                              INDEX

 2

 3   SCOTT GALLOWAY
     DIRECT EXAMINATION
 4   BY MR. BUCHANAN:........................................ 120
     CROSS-EXAMINATION
 5   BY MS. PERDEW SILAS: ................................... 129

 6   DARREL MITCHELL
     DIRECT EXAMINATION
 7   BY MR. BUCHANAN: ....................................... 135

 8   NICHOLAS H. DURHAM
     DIRECT EXAMINATION
 9   BY MR. BUCHANAN: ....................................... 140
     CROSS-EXAMINATION
10   BY MS. PERDEW SILAS: ................................... 146

11

12

13

14                     REPORTER'S CERTIFICATION

15

16

17   I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

18   RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

19

20
                             S/ ANDY ASHLEY
21                           ANDRE G. ASHLEY
                             OFFICIAL COURT REPORTER
22                           UNITED DISTRICT COURT
                             NORTHERN DISTRICT OF GEORGIA
23

24   DATE: 10/6/17

25
```