IN THE UNITED STATES DISTRICT COURT
FOR THE NOTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | |
|---|---|
| United States of America | Criminal Action Number |
| *versus* | 2:17-CR-005-RWS-JCF |
| William Christopher Gibbs | |

## Post-Hearing Brief in Support of Motions to Suppress Evidence

Comes now William Christopher Gibbs, by and through his undersigned counsel, and hereby submits this post-hearing brief in support of his motions to suppress evidence in the above-captioned case, Docket Entries 12 (Motion to Suppress Statements), 13 (Motion to Suppress Evidence from Traffic Stop), and 26 (Motion to Suppress Evidence from "Consent" Search of Car).

<u>Facts Established at the Evidentiary Hearings</u>

*Events leading up to Mr. Gibbs' Arrest, February 1-2, 2017*

As of the date of his arrest, Mr. William Christopher Gibbs worked the third shift at a local chicken plant.  See Document 27-5. On Wednesday, February 1, 2017, Mr. Gibbs reported for his shift at the plant at approximately 9:45pm.  Document 23-21. He worked until 8:00am the next morning, Thursday, February 2, 2017.  Doc. 23-21.  After work, Mr. Gibbs

Federal Defender Program, Inc., 1500 Centennial Tower, 101 Marietta Street, NW, Atlanta, Georgia 30303, 404-688-7530, Natasha_Silas@FD.org

went to his friend Stanley's house and had a few beers. Doc. 27-5. Then, another buddy, Bubba, called and said that he needed a ride from the gas station. Doc. 23-21. Mr. Gibbs was going to pick him up, but before he did so, Mr. Gibbs wanted to clean out his car. Doc. 23-21. The car cleaning took place around noon. Doc. 27-21. Doc. 27-26. Doc. 27-27. Doc. 23-21.

During the course of clearning out his car, Mr. Gibbs came across a bottle. Doc. 23-22; 23-27; Doc. 32-34 (Transcript 151). He touched the bottle and noticed that it was leaking. Doc. 27-20; Doc. 27-4. Mr. Gibbs became extremely concerned for his safety. Doc. 28-2. Later that afternoon, Mr. Gibbs showed up at the Fannin County Hospital emergency room requesting medical help.



Mr. Gibbs arrived at the hospital at approximately 4:00pm. Doc. 23-22. Shortly thereafter, the Fannin County Sheriff's Department received a call to respond to the hospital due to an individual possibly being exposed to ricin. Doc. 29-4 (Transcript page 73). The Fannin County Sheriff's Department dispatched at least three officers: Captain Turner, Dustin Carter, and Scott Galloway. In addition to the

2

Fannin County Sheriff's Department response, there were also responders from the Fire Department, the Cherokee County Haz Mat team, a National Guard unit, and agents from the Federal Bureau of Investigation. Doc. 23-18. Fannin County Sheriff's Captain Turner arrived sometime after Mr. Gibbs arrived at the hospital. Doc. 29-5 (Transcript page 74). Officer or Deputy Scott Galloway rode with Captain Turner. Doc. 32-4-5 (Transcript pages 121-122).

Captain Turner determined that he was going to speak with Mr. Gibbs. Captain directed Deputy Carder to accompany him to act as his recorder. Doc. 29-13 (T82). Captain Turner went to Mr. Gibbs' hospital room (accompanied by Deputer Carter) and began asking Mr. Gibbs questions. Doc. 29-16 (T85). Turner and Gibbs' exchange is recorded on Defendant's Exhibit 2 and there is a transcript of the exchange submitted as Defendant's Exhibit 2-A (found at Document 28) as an aid to the Court.

After Captain Turner's greeting, Turner asks Mr. Gibbs what the hospital is going to do with him. See Defendant's Exhibit 2A, doc. 28-2. Gibbs complains that he has asked the hospital to release him. Id. Captain Turner testified that he definintely left Mr. Gibbs with the impression that he (Turner) was going to need to deal with Gibbs' car. See Doc. 29-20-21 (T 89-90). Defendant's Exhibit 2A is murky around the area of the conversation

3

about the car, but counsel asks the Court to review that portion of the report and keep in mind Captain Turner's testimony recalling the conversation with Mr. Gibbs.  Mr. Gibbs clearly responds to something said by Captain Turner with, "I got to have my car."  See Doc. 29-21 (T90) and doc. 28-2.  When Mr. Gibbs came walking out of the hospital some time later, he received a cigarette from Captain Turner.  Doc. 23-37/38.  The two talked, but at no time was Mr. Gibbs every told that the search of his car was anything other than a certain eventuality.

Mr. Gibbs' car was parked in the hospital parking lot, but other cars were moved away from it.  Doc. 29-8 (T77).  The Haz Mat team from Cherokee County was contacted.  They arrived and set up a controlled access area.  There were two Hazmat vehicles.  One was an 18-wheeler.  Doc. 32-24 (T77).  The Cherokee County HazMat personnel were dressed in level B outfits.  Doc. 32-26 (T143).  The FBI was also on scene.

Mr. Gibbs was in a position to see all of this happening.  Doc. 23-54. He could see his car, but he did not have access to it or the ability to leave in it.  It was cold outside, and Mr. Gibbs was not dressed for it, so he was allowed to sit in a patrol car.  Doc. 29-10 (T79).  He did have his phone and was allowed to use someone's charger, but he was not free to take his car and go home.

4

This not having access to his car and sitting around in a patrol car went on for hours.  Doc. 23-17.  A hot zone and a green zone were established in relation to his car.  Doc. 32-34 (T51).  No other cars remained in the hot zone after officers moved them.    Id.

Captain Turner sent Scott Galloway over to Mr. Gibbs to get a consent to search form signed.  Galloway got the form signed.  The time marked was 8:23pm.

Still more hours passed.  Somewhere during this time period, Mr. Gibbs was told that he had to be decontaminated.  Doc. 29-12 (T81).  His clothes were confiscated and he was washed off somewhere at the hospital. Id.  He ended up in some type of garb that was not his own clothing.  It was not clear what he was wearing.  Doc. 29-27 (T96).

Mr. Gibbs' car was searched by the HazMat team.  Doc. 32-26 (T143). One of the team members was assigned the duty of taking photographs as the search proceeded.  Id.  Items of evidentiary value were found.  A search warrant was not obtained for this search.  Doc. 32-16 (T133).  However, the findings of the search were used to obtain a later search warrant.

5

Case 2:17-cr-00005-RWS-JCF     Document 36     Filed 12/02/17     Page 6 of 17


*Arrest and Post Arrest Statements, February 2-3, 2017*

Some time after midnight, Mr. Gibbs was finally transported to the Fannin County Jail.[1]  Doc. 23-19.  Mr. Gibbs was in custody.  Doc. 23-29.  FBI Special Agent John Christopher Bowers had responded to the hospital and then he drove a car in the procession of cars that transported Mr. Gibbs the 10-15 minute/five to six mile ride to the Fannin County Jail.  Doc. 23-9.  Mr. Gibbs was processed and then put into an interrogation room with Agent Bowers and Bennie Johnson, both armed, though not visibly.  Doc. 23-9.

Mr. Gibbs revealed that he had only a 9th or 10th grade education and that he did not have a G.E.D.  Doc. 23-27.

Agent Bowers testified that the interrogation began at 1:06am, Friday, February 3, 2017.  Doc. 23-9.  The interrogation was videotaped and it was submitted to the Court as Government Exhibit 2.  See Doc. 23-16.  The interrogation room was approximatley 10 feet wide by 6 or 7 feet,  doc. 23-12, "not a large room ... not very big."  Doc. 23-12.

Mr. Gibbs was in flex cuffs.  Doc. 23-12. He complained of being cold (doc. 27-1) and he was not at all happy about the situation that he was in.  Doc. 23-13.   There was no indication that Mr. Gibbs had had any sleep at all

---

[1] Agent Bowers said that he had traveled to the hospital after receiving a report of a ricin incident in Fannin County. It took Agent Bowers about two hours to get there.  Agent Bowers said that he had been at the hospital several hours before he even saw Mr. Gibbs.  Doc. 23-17.

Federal Defender Program, Inc., 1500 Centennial Tower, 101 Marietta Street, NW, Atlanta, Georgia 30303, 404-688-7530, Natasha_Silas@FD.org

by this time.  Doc. 23-22.  That would put him at a no sleep status from February 1, 2017 at 9:45pm through to February 3, 2017 at 1:06am.  That is at least 27 hours without sleep, if not more.

There was no indication that Mr. Gibbs had had anything at all to eat, or drink.  Doc. 23-23-24.  Agents purchased some McDonald's food for him, doc. 23-24, but Mr. Gibbs didn't touch the food for some time.  Doc. 23-24-25.  He eventually gave in to the hunger.  When he did, he commented that the fries were soggy and implied that this meant they were probably poisoned.  Doc. 23-24;  doc. 27-18.

Also, Mr. Gibbs expressed an acute concern for his health during the interrogation at at least one point commenting that he was going to die.  Doc. 27-18.  The video tape (Government's Exhibit 2) shows him repeatedly making guttural sounds or coughing.  See Doc. 23-25.  He asked/discussed with the agents the symptoms of ricin poison with apparent concern for whether he was experiencing the symptoms.  At one point he stated that he could not breathe.  Doc. 23-25.  He also said that he did not believe that he had gotten adequate medical care.  Doc. 23-27.

Mr. Gibbs was told that the agents were talking to him in part to determine whether anyone else had been exposed and in part in order to determine whether or not he would be facing charges.  Doc. 23-26.

Federal Defender Program, Inc., 1500 Centennial Tower, 101 Marietta Street, NW,
Atlanta, Georgia 30303, 404-688-7530, Natasha_Silas@FD.org

Having started at 1:06am, the interrogation lasted an hour and 15 to 20 minutes.  Doc. 23-15.  That would put the wrap up at well after 2am, February 3, 2017.

Incriminating statements were made which the Government appears poised to use at trial.

*January 14, 2017 Traffic Stop*

Just under three weeks prior to Mr. Gibbs' trip to the Fannin County Hospital, he was the subject of a traffic stop for running a stop sign.  On January 14, 2017, Deputy John Kinser initiated a blue light traffic stop after following Mr. Gibbs' white Lincoln Town Car at around 2:00pm in the afternoon.  Mr. Gibbs pulled the Town Car over.  A video copy of the traffic stop has been submitted as Government's Exhibit 3.  The Deputy stated that the stop sign being run is at time stamp 34 of the video.  Doc. 23-57.

Deputy Kinser said that he saw an air rifle in the back seat of Mr. Gibbs' car.  Doc. 23-55.  He also described there having been another passenger in the car.  (However, Deputy Kinser never said that he ever thought that the air rifle was a real gun.)

Deputy Kinser asked Mr. Gibbs if he could search his car.  Mr. Gibbs said, "You are going to do what you are going to do."  Doc. 23-45.  After this statement, according to Deputy Kinser, Mr. Gibbs consented to the search of

8

his car.  Beans were found in the glove compartment.  Mr. Gibbs then made statements that were the fruits of the search of the car and finding of the beans.  We seek suppression of the statements.

## ISSUES

In this post-hearing brief, we urge the Court to make the following conclusions:

1) The Government has not carried its burden of showing that the statements made by Mr. Gibbs at the hospital and later during post arrest interrogation were voluntary or in compliance with Miranda.

2) The Government has not carried its burden of demonstrating that the consent to search the white Lincoln Town car on January 14, 2017 was knowing and voluntary and not simply acquiescence to authority.

3) The Government has not carried its burden of showing that the search of the car on February 2, 2017 was made pursuant to a valid consent which was not simply acquiescence to a show of authority.

9

<u>ARGUMENT</u>

(1)   The Government has not carried its burden of showing that the statements made by Mr. Gibbs at the hospital and later during post arrest interrogation were voluntary and in compliance with Miranda.

The voluntariness of statements is determined based upon a totality of the circumstances test. *Arizona v. Fulminate*, 499 U.S. 279, 285-88 (1991). Determining whether a confession or incriminating statement is voluntary depends on whether, under all of the surrounding circumstances, the statement was the product of the accused's "free and rational" choice. *United States v. Keyvee Jones*, 32 F.3d at 1516 (11th Cir. 1994).  In evaluating the totality of the circumstances, the district court must assess whether law enforcement conduct was "causally related" to the confession. *Jones*, 32 F.3d at 1516–17. Several non-exhaustive factors help assess voluntariness, including "the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by the police." *Hubbard v. Haley*, 317 F.3d 1245, 1253 (11th Cir.2003). While the Eleventh Circuit has "enumerated a number of (non-exclusive) factors that may bear on the issue of voluntariness, the absence of official coercion is a sine qua non of effective consent." *United States v. Gonzalez*, 71 F.3d 819, 828 (11th Cir.1996)

10

(citations omitted).  A court's finding that a confession is voluntary "must appear from the record with unmistakable clarity." *Sims v. Georgia*, 385 U.S. 538,544 (1967).  The Government bears the burden of persuasion.

Based upon the totality of the circumstances, the statements made by Mr. Gibbs at the hospital to Captain Turner and later at the Fannin County Sheriff's Department were not voluntary.  First, Mr. Gibbs' movement was clearly impacted by the fact that his car was being detained for HOURS (4pm until after midnight).  No one indicated that Mr. Gibbs would have had a way to get home without his car.  He was also under the impression that the police activity was designed to assist in ensuring his safety as well as the safety of others.  He was sleep deprived, fearful for his health, and had gone without food.  We would add that Mr. Gibbs is a young man with a sub-high school education. Under these circumstances, it is hard to see how the Government can prevail in showing on this record with unmistakeable clarity that the statements were voluntary.

The statements made at the station house were after Mr. Gibbs had been taken into custody.  The Government has noted a Miranda waiver, but under the circumstances, Mr. Gibbs' waiver is questionable at best.  We know that he had been up and without sleep for more than 24 hours.  The Government did not offer any justification for why Mr. Gibbs was not allowed

11

to sleep prior to the interrogation.  Although food was offered, Mr. Gibbs was afraid to eat it prior to the start of the interrogation.  In such a weakened state, the Miranda waiver should not be found to be valid.  In fact, Mr. Gibbs was sleep deprived to the point that he expressed paranoid ideas about his food as it pertained to the agents.  Such a thought process could not be clear minded enough to produce a valid Miranda waiver.

    (2)    **The Consent to Search the Car Given in the Parking Lot was Not Valid Under the Totality of the Circumstances.**

In order to carry its burden of proving an exception to the warrant requirement, the Government must demonstrate that Mr. Gibbs' consent to search the car was a valid consent.  Specifically, the government must establish "the existence of consent and that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily." *United States v. Blake*, 888 F.2d 795, 798 (11th Cir.1989).  See also *Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968):  "When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by  showing no more than acquiescence to a claim of lawful authority."

Federal Defender Program, Inc., 1500 Centennial Tower, 101 Marietta Street, NW, Atlanta, Georgia 30303, 404-688-7530, Natasha_Silas@FD.org

Whether a suspect voluntarily gave consent to a search is a question of fact to be determined by the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 249-50 (1973); *United States v. Chemaly*, 741 F.2d 1346, 1352 (11th Cir.1984), vacated, 741 F.2d 1363, reinstated on reh'g, 764 F.2d 747 (11th Cir.1985) (en banc). "The government bears the burden of proving both the existence of consent and that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily." *United States v. Blake*, 888 F.2d 795, 798 (11th Cir. 1989), <u>citing</u> *United States v. Massell*, 823 F.2d 1503, 1507 (11th Cir.1987).

The determination as to whether a suspect's consent is voluntary is not susceptible to neat talismanic definitions; rather, the inquiry must be conducted on a case-by-case analysis. To assist the lower courts in making their determinations, this court has, on prior occasions, identified a non-exhaustive list of relevant factors to consider when making the assessment of whether consent to a warrantless search is voluntary: voluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence,

13

and, significantly, the defendant's belief that no incriminating evidence will be found.

*United States v. Blake*, 888 F.2d 795, 798–99 (11th Cir. 1989) (internal citations omitted).

The Government will bear the burden of attempting to convince this Court of the validity of the consent given by Mr. Gibbs after he had been told that the car would be searched. We would note that the Government's effort should be unsuccessful in light of the record. Mr. Gibbs's custody status is an issue for determination by the Court, but even if the Court finds that he was not in custody, it is clear that his movements had been restricted at least insofar that he was not being allowed access to transportation that he already had stated that he would need. He was given the impression that the car was going to be searched as a fete accompli. Furthermore, he had been up for hours and had been forced to stand by for hours while police mobilized in response to the incident. Under these circumstances, we urge the Court to find that the consent was not valid.

14

(3)    The Government has not carried its burden of showing that the search of the car on February 2, 2017 was made pursuant to a valid consent which was not simply acquiescence to a show of authority.

The analytical framework for this issue is the same as that presented above. It is the Government's burden to convince the Court of the validity of the consent obtained by Deputy Kinser. Deputy Kinser's testimony established that Mr. Gibbs was of the impression that the deputy was "going to do what he was going to do." That is the very definition of acquiescence to authority. With this being the record, the Government should have a difficult time convincing the Court that the consent was valid.

15

CONCLUSION

WHEREFORE, for the reasons outlined above, we pray that the Court will suppress the evidence seized from Mr. Gibbs' car without a warrant.

Respectfully submitted this 2nd day of December, 2017.


*V. Natasha Perdew Silas*
Georgia Bar Number 571970
Attorney for Mr. Gibbs


FEDERAL DEFENDER PROGRAM, INC.
1500 CENTENNIAL TOWER
101 MARIETTA STREET, NW
ATLANTA, GEORGIA 30303
404-688-7530
NATASHA_SILAS@FD.ORG

16

## CERTIFICATE OF ELECTRONIC FILING

This is to certify that I have this day electronically filed the foregoing pleading on the ECF system.  I expect that the system will perfect service upon the Government in the person of Ryan Buchanan, Esquire.

This 2nd day of December, 2017.


*V. Natasha Perdew Silas*

17