IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

UNITED STATES OF AMERICA,   :
                            :
v.                          :        CRIMINAL INDICTMENT NO.:
                            :        2:17-CR-00005-RWS-JCF
WILLIAM CHRISTOPHER GIBBS   :

## ORDER and REPORT AND RECOMMENDATION

This case is before the Court on Defendant's Motion To Suppress Statements (Doc. 12), Motion To Suppress Evidence Resulting From Warrantless Seizure (Doc. 13), Motion To Suppress Evidence Resulting From Unlawful HIPAA[1] Disclosures (Doc. 14), and Motion To Suppress Evidence (Doc. 26). For the reasons discussed below, it is **RECOMMENDED** that Defendant's motions be **DENIED**.

## Procedural History

An Indictment filed February 22, 2017 charges Defendant with possession of ricin without obtaining the registration required by section 351A(c) of the Public Service Act, in violation of 18 U.S.C. § 175b(c). (Doc. 1). Defendant filed a motion to suppress evidence and statements obtained during a traffic stop on January 14, 2017 (Doc. 13); a motion to suppress statements he made while he was

---

[1]   HIPAA stands for "Health Insurance Portability and Accountability Act." HIPAA and its implementing regulations "generally prohibit covered entities from using or disclosing 'protected health information.' " *Murphy v. Dulay*, 768 F.3d 1360, 1368-69 (11th Cir. 2014) (citing 45 C.F.R. § 164.508(a)(1)).

at a hospital and after he was arrested in February 2017 (Doc. 12); and a motion to suppress evidence disclosed in violation of HIPAA while he was seeking medical treatment in February 2017 (Doc. 14).

The Court conducted a hearing on Defendant's motions on August 15, 2017 (*see* Doc. 20), and the Court continued the hearing on September 1, 2017 (*see* Doc. 24). The Court granted Defendant leave to file a motion to suppress evidence seized from his car located in the parking lot of Fannin Regional Hospital on February 2, 2017 (*see* Doc. 24), and Defendant filed that motion on September 7, 2017 (Doc. 26). The Court held an evidentiary hearing on the motion on September 25, 2017. (*See* Doc. 31). The transcript for the August 15th hearing was filed on August 25, 2017 (Doc. 23); the transcript for the September 1st hearing was filed on September 20, 2017 (Doc. 29); and the transcript for the September 25th hearing was filed on October 11, 2017 (Doc. 32).[2] Defendant filed a post-hearing brief on December 2, 2017 (Doc. 36), the Government submitted a response on January 23, 2018 (Doc. 40), and Defendant filed a reply on February 11, 2018 (Doc. 43). With briefing now complete, the Court considers the merits of Defendant's motions.

---

[2] References to the transcripts will be designated as "Tr. __" since the pagination continues from transcript to transcript.

<u>**Discussion**</u>

I.     <u>**Motion To Suppress Under HIPAA (Doc. 14)**</u>

Defendant filed a "preliminary motion to suppress evidence unlawfully disclosed pursuant to HIP[A]A," and asserts that he "went to the emergency room on February [2], 2017 seeking medical attention" and as a result, "the authorities were notified of the possibility of criminal acts on the part of [Defendant]." (Doc. 14 at 1). As discussed below, the evidence at the hearing shows that emergency room personnel at Fannin Regional Hospital reported to law enforcement officers that Defendant had come to the emergency room and reported possible exposure to ricin, a potentially fatal toxin. Defendant indicated in his motion that he was "simply seeking discovery of what items were provided by medical professionals and further which exception to HIP[A]A[']s nondisclosure requirements were implicated" and asserted that "[a]fter receiving this information, we will wish to further perfect the motion to suppress." (*Id.* at 2). Defendant has not perfected his motion, he did not present any argument or factual support for this motion in his post-hearing brief, nor was evidence relevant to the motion developed during the hearings that would support Defendant's motion. It therefore appears that he has abandoned his HIPAA motion.

Furthermore, even if medical professionals provided information about Defendant in violation of HIPAA, he has not shown that HIPAA provides a

suppression remedy. *See, e.g.*, *United States v. Andrews*, No. 1:12CR100-1, 2014 U.S. Dist. LEXIS 56159, at *12-13 (N.D. W. Va. Apr. 23, 2014) (explaining that "the weight of authority suggests that suppression is not the appropriate remedy for evidence obtained in violation of HIPAA" (collecting cases)). Moreover, the undersigned notes that HIPAA's implementing regulations provide that medical disclosures are permitted in a number of circumstances potentially applicable here, including but not limited to: disclosures by emergency health care providers in response to a medical emergency to alert law enforcement about the commission of a crime, 45 C.F.R. § 164.512(f)(6), and disclosures "necessary to prevent or less a serious and imminent threat to the health or safety of a person or the public," 45 C.F.R. § 164.512(j)(1)(i)(A) & (B). Defendant has not shown that the challenged disclosures do not fall into one of the enumerated disclosures authorized under 45 C.F.R. § 164.512.

Accordingly, it is **RECOMMENDED** that Defendant's motion to suppress evidence resulting from unlawful HIPAA disclosures (Doc. 14) be **DENIED**.

## II. <u>Motion To Suppress Evidence Obtained During Traffic Stop (Doc. 13)</u>

Defendant moves to suppress evidence and statements obtained as a result of a January 14, 2017 traffic stop. (Doc. 13 at 1).

## A. <u>Facts</u>[3]

At approximately 2 p.m. on January 14, 2017, Fannin County Sheriff's Deputy John Christopher David Kinser conducted a traffic stop of a white Lincoln Town Car driven by Defendant for running a stop sign. (Tr. 41-44, 52; Gov't Ex. 3). After Deputy Kinser instructed Defendant to move the car up so that Kinser's vehicle was not in the road, Defendant moved a short distance and stopped as directed. (Tr. 44). Defendant's passenger exited the vehicle and started moving or throwing items out of the car and Defendant exited the vehicle, which raised Kinser's suspicions that there might be some kind of contraband in the car. (Tr. 44, 56; Gov't Ex. 3). Kinser told the passenger to go back to the car and then approached Defendant, weapon holstered, and asked him to come back to the rear of the vehicle. (Tr. 44-45, 57). Kinser was alone at that point, but a McCaysville Police Officer and two deputy sheriffs arrived on the scene later. (Tr. 45). Kinser was familiar with Defendant because he "was a frequent inmate" when Kinser was a Sergeant at the Fannin County Jail and viewed him as "a troublemaker" because he "was always insubordinate when he was an inmate." (Tr. 51-52).

Kinser asked Defendant if he could search his car, and Defendant responded, "You're going to do what you're going to do," so Kinser asked him again, and

---

[3] These facts are taken from the testimony of Fannin County Sheriff's Deputy John Christopher David Kinser at the August 15, 2017 hearing (Tr. 40-58). The stop was also recorded by Deputy Kinser's dashboard camera (Tr. 47-48), and a copy of that video was admitted during the hearing (Gov't Ex. 3).

Defendant gave him consent to search the car. (Tr. 45). When Kinser asked Defendant for consent to search the car, his voice was not raised, his weapon was not drawn, he did not touch or restrain Defendant, and he did not threaten Defendant or make any promises to him to obtain his consent. (Tr. 45-46). The other officers had not yet arrived at that point. (Tr. 46).

Deputy Kinser searched Defendant's car and found some seeds in a bag in the glove compartment, asked Defendant what they were, and he identified them as "white angel trumpet seeds" and were "very dangerous poison seeds." (Tr. 46-47, 51, 53-54). Kinser set them to the side and continued searching the car. (Tr. 47). Defendant stood outside the car watching as Kinser searched it. (Tr. 54). Kinser asked a senior officer, Jacob Pless, if he could identify the seeds, but Pless said he had never seen them before. (Tr. 47). Kinser returned the seeds to Defendant. (Tr. 51). After Kinser concluded the stop he gave Defendant a verbal warning and let him go. (Tr. 48).

**B.  <u>Analysis</u>**

Defendant contends that "[t]he Government has not carried its burden of demonstrating that the consent to search the white Lincoln Town car on January 14, 2017 was knowing and voluntary and not simply acquiescence to authority." (Doc. 36 at 9). The undersigned disagrees.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." U.S. Const. amend. IV. "The 'ultimate touchstone of the Fourth Amendment is reasonableness.' " *United States v. Walker*, 799 F.3d 1361, 1363 (11th Cir. 2015) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). Where a seizure is made without a warrant, as in this case, the burden is on the government to "demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable within the meaning of the fourth amendment." *United States v. Freire*, 710 F.2d 1515, 1519 (11th Cir. 1983).

To determine whether the search of Defendant's vehicle violated the Fourth Amendment, the Court must ascertain the legality of: (1) the initial stop; (2) Defendant's detention; and (3) the warrantless search of his vehicle pursuant to his consent. The Court must also determine the admissibility of Defendant's statements made during the traffic stop.

### 1. **The Traffic Stop**

"The temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." *United*

*States v. Allen*, 274 Fed. Appx. 811, 817 (11th Cir. 2008) (unpublished decision) (citing *Whren v. United States*, 517 U.S. 806, 809-10 (1996)). "Such an automobile stop is reasonable and constitutional, however, if it is based on either probable cause to believe that a traffic violation has occurred or reasonable suspicion that a crime has been or will be committed." *Allen*, 274 Fed. Appx. at 817-18 (citing *United States v. Chanthasouxat*, 342 F.3d 1271, 1275 (11th Cir. 2003)); *See also United States v. Purcell*, 236 F.3d 1274, 1276, n.5 (11th Cir. 2001) (stating that "[a] law enforcement officer may legally stop an automobile traveling on the highways if he has probable cause to believe that a traffic violation has occurred" and citing *Whren*, 517 U.S. at 810).

The Court finds that Deputy Kinser had probable cause to stop Defendant's vehicle based on his observation of Defendant running a stop sign, which is a violation of O.C.G.A. § 40-6-72(b).[4] *See, e.g.*, *United States v. Miller*, 326 Fed. Appx. 513, 516 (11th Cir. 2009) (unpublished decision) ("Here, the police testified that they observed Miller drive recklessly and ignore a stop sign. Thus, they had probable cause to stop the car."); *United States v. Garcia*, 284 Fed. Appx. 791, 793 (11th Cir. 2008) (unpublished decision) (the officer's observation of the defendant's failure to maintain his lane provided probable cause for the stop).

---

[4] The video of the traffic stop also shows that Defendant went through the intersection without stopping at the stop sign. (*See* Gov't Ex. 3).

Accordingly, the Court finds that the traffic stop did not violate the Fourth Amendment.

### 2. **Defendant's Detention**

Once Deputy Kinser had stopped Defendant's vehicle, he was authorized to detain Defendant to investigate the circumstances justifying his decision to stop and to continue the detention to investigate circumstances that give rise to articulable suspicion of other illegal activity. *See Garcia*, 284 Fed. Appx. at 794 (" 'An officer's actions during a traffic stop must be reasonably related in scope to the circumstances which justified the interference in the first place,' and the stop 'may not last any longer than necessary to process the traffic violation unless there is articulable suspicion of other illegal activity.' " (quoting *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001)). Here, Deputy Kinser had a reasonable and articulable suspicion that there was contraband in the vehicle based on his observation of the traffic violation, i.e., Defendant's failure to stop at the stop sign, the occupants exiting the vehicle upon stopping, and the passenger tossing items out of the car, actions which raised Kinser's suspicion that there was contraband in the car. (Tr. 44, 56). Kinser also knew that Defendant had a criminal history and had been a "frequent inmate" in the Fannin County Jail. (Tr. 51-52). Therefore, the undersigned finds that Kinser's request for consent to search the car and subsequent search did not impermissibly extend the traffic stop.

*See United States v. DeJesus*, 435 Fed. Appx. 895, 900 (11th Cir. 2011) (unpublished decision) ("[A] traffic stop may last longer than the purpose of the stop would ordinarily permit if an officer, based on specific facts and rational inferences drawn from those facts in light of his training and experience, has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring.").

### 3. <u>Consent To Search</u>

"[L]aw enforcement officers may search an individual's property without a warrant, as long as the individual voluntarily consents to the search." *United States v. Brumfield*, 352 Fed. Appx. 366, 367 (11th Cir. 2009) (unpublished decision) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219-22 (1973)). "Whether consent is voluntary is a fact question determined according to the totality of the circumstances," *Brumfield*, 352 Fed. Appx. at 367 (quotation omitted), and the government bears the burden of proving the existence and voluntariness of the consent. *United States v. Acosta*, 363 F.3d 1141, 1151 (11th Cir. 2004). The non-exclusive list of factors the court must consider in determining whether a consent was voluntary includes "[the] voluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and

intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found." *United States v. Chemaly*, 741 F.2d 1346, 1352 (11th Cir. 1984) (quoting *United States v. Phillips*, 664 F.2d 971, 1023-24 (5th Cir. Unit B 1981)); *see also United States v. Gonzalez*, 71 F.3d 819, 828 (11th Cir. 1996). In *Gonzalez*, the Eleventh Circuit explained that "the absence of official coercion is a *sine qua non* of effective consent, as it is axiomatic that 'where there is coercion, there cannot be consent.' " 71 F.3d at 828 (quoting *Bumper v. North Carolina*, 391 U.S. 543, 550 (1968)).

The Government has met its burden of demonstrating that Defendant voluntarily consented to the search of his vehicle. The evidence shows that when Deputy Kinser asked Defendant for his consent, Defendant was not restrained, and Kinser, who was the sole law enforcement officer on the scene at the time, did not raise his voice, threaten Defendant, or point his weapon at him, nor did he make any promises to Defendant to obtain his consent. (Tr. 45-46). Moreover, although Defendant initially responded to Kinser's request for consent by stating, "You're going to do what you're going to do" (Tr. 45), Kinser did not then begin searching his car. Instead, Kinser again asked for Defendant's consent (*id*.), thus indicating that the deputy did not intend to search the car without Defendant's consent, and Defendant gave it. Under the circumstances of this case, the Court finds that

Deputy Kinser did not coerce Defendant into consenting to the search of his vehicle and that his consent was voluntarily given.

Accordingly, the undersigned finds that the traffic stop, detention, and search of Defendant's car on January 14, 2017 did not violate the Fourth Amendment and Defendant's motion to suppress evidence obtained as a result of those actions based on the Fourth Amendment, including any statements he made, be **DENIED**.

### 4.    <u>Voluntariness Of Defendant's Statements</u>

The Court also considers whether Defendant's statements were obtained in violation of the Fifth Amendment and whether he freely and voluntarily gave statements to law enforcement officers. "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. Const. amend. V. In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that the Government "may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id*. at 444. Specifically, before a person in custody is interrogated, he must be advised that he has the right to remain silent; that anything he says can and will be used against him in court; that he has the right to consult with a lawyer and to have the lawyer with him during interrogation; and that if he cannot afford a

lawyer, a lawyer will be appointed to represent him. *Id*. at 467-73. "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id*. at 444.

It is well-settled, however, that "[p]re-custodial questioning does not require *Miranda* warnings." *United States v. Street*, 472 F.3d 1298, 1309 (11th Cir. 2006) (original formatting altered) (citing *United States v. Brown*, 441 F.3d 1330, 1347-49 (11th Cir. 2006)). "A defendant is in custody for the purposes of *Miranda* when there has been a 'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.' " *Street*, 472 F.3d at 1309 (original formatting altered) (quoting *Brown*, 441 F.3d at 1347). In *Street*, the Eleventh Circuit explained that the definition of "custody" for *Miranda* purposes is not the same as the definition of "seizure" for Fourth Amendment purposes:

> [A] seizure does not necessarily constitute custody for *Miranda* purposes. The standards are different. The Fourth Amendment seizure analysis uses the "free to leave" test: a person is "seized" when a reasonable person would not feel free to terminate the encounter with the police. By contrast, a person is in "custody" for *Miranda* purposes only when there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.

*Street*, 472 F.3d at 1309-10 (internal citations omitted) (quotation marks omitted); *see also United States v. Luna-Encinas*, 603 F.3d 876, 881 (11th Cir. 2010) ("We previously have explained, however, that although a reasonable person in the

defendant's position may feel constrained not to leave the scene of a police encounter at a particular moment -- and thus may be deemed to have been 'seized' by law enforcement -- he will not necessarily be considered in 'custody' for Fifth Amendment purposes." (citing *Street*, 472 F.3d at 1310)). The court in *Street* explained further that the test for whether a person is "in custody" is a "totality of the circumstances determination," and it is objective, as viewed from the perspective of "a reasonable innocent person." 472 F.3d at 1309. Thus, "the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant." *Id.* (quoting *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996)).

When applying this test, the court should consider several factors, "including whether 'the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled.' " *Id.* (quoting *United States v. Long*, 866 F.2d 402, 405 (11th Cir. 1989)); *see also United States v. Dix*, No. 3:12-cr-00007-TCB-RGV, 2013 U.S. Dist. LEXIS 22476, at *12 (N.D. Ga. Jan. 29, 2013) ("[F]actors relevant to this determination include, but are not limited to, the location of the interview, the existence of any physical restraints such as handcuffs or drawn weapons, whether the suspect asked to leave, the officers' demeanor, the degree of pressure applied to the suspect, and whether the officers brandished weapons, touched the suspect, or used language or

a tone that indicated that compliance with the officers could be compelled."), *adopted by* 2013 U.S. Dist. LEXIS 21902 (N.D. Ga. Feb. 19, 2013); *United States v. Johnson*, No. 2:12-cr-92-FtM-29DNF, 2013 U.S. Dist. LEXIS 108849, at *58 (M.D. Fla. Feb. 8, 2013) ("Some factors to consider include the location of the questioning, its duration, the types of statements made during the questioning, the presence of physical restraints, and the release of the suspect at the end of the questioning."), *adopted by* 2013 U.S. Dist. LEXIS 108850 (M.D. Fla. Aug. 2, 2013). "No one fact is determinative of the issue of whether the interview was custodial or not." *Id.* at *59.

"Unless restraint of an individual by law enforcement personnel is 'significant,' *Miranda* warnings are not required." *United States v. Montos*, 421 F.2d 215, 222-23 (5th Cir. 1970). Furthermore, it is the defendant's burden to establish that he was in custody for purposes of *Miranda*. *See United States v. Asher*, No. 1:09-CR-414-JOB/AJB, 2010 U.S. Dist. LEXIS 112783, at *22-23 (N.D. Ga. Feb. 25, 2010) ("[A] defendant bears the burden of establishing that he was in custody and that his statements were made in response to government questioning."), *adopted by* 2010 U.S. Dist. LEXIS 112823 (N.D. Ga. Oct. 21, 2010).

Regardless of whether *Miranda* warnings are required, "the court must still rule on the confession's voluntariness." *Jarrell v. Balcom*, 735 F.2d 1242, 1252

(11th Cir. 1984). A statement is not given voluntarily if it is "extracted by any sort of threats or violence, or obtained by any direct or implied promises, or by the exertion of any improper influence." *Harris v. Dugger*, 874 F.2d 756, 761 (11th Cir. 1989). "The determination of whether a confession is voluntary depends on whether, under all of the surrounding circumstances, the statement was the product of the accused's free and rational choice." *United States v. Jones*, 32 F.3d 1512, 1516 (11th Cir. 1994) (citations omitted); *see also Arizona v. Fulminante*, 499 U.S. 279, 285-88 (1991) (noting that voluntariness is determined by the totality of the circumstances). "The burden is on the prosecution to establish, by a preponderance of the evidence, that a challenged confession was voluntary." *United States v. Lall*, 607 F.3d 1277, 1285 (11th Cir. 2010) (citing *Lego v. Twomey*, 404 U.S. 477, 489 (1972)).

Turning to Defendant's statements made during the January 14, 2017 traffic stop, the Court finds that Defendant was not in custody during that stop and in particular when Deputy Kinser questioned him about the seeds found in the glove compartment. Kinser did not restrain Defendant, nor did he draw his weapon or threaten him. Although Defendant may not have been free to leave during the traffic stop, he was not subjected to a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest," *Street*, 472 F.3d at 1309, and therefore, *Miranda* warnings were not required. The Court also finds that any

statements Defendant made during that stop were made voluntarily. As discussed above, Kinser did not threaten Defendant, point his weapon at him, make any promises to him, or act in any way that deprived Defendant of a "free and rational choice" in responding to Kinser's questions. *Jones*, 32 F.3d 1516.

Accordingly, it is **RECOMMENDED** that Defendant's motion to suppress any statements he made to law enforcement officers during the traffic stop on January 14, 2017 (Doc. 13) be **DENIED**.

### III. Motions To Suppress Statements And Evidence Obtained On February 2 and 3, 2017 (Docs. 12, 26)

Defendant moves to suppress evidence obtained from his car during a warrantless search on February 2, 2017 while it was in the parking lot of Fannin County Regional Hospital (Doc. 26), and he also moves to suppress pre- and post-arrest statements he made to law enforcement officers on February 2 and 3, 2017 (Doc. 12).

### A. Facts[5]

---

[5] These facts are taken from the hearing testimony of Christopher John Bower, Special Agent with the FBI; Captain Justin Turner, Commander of the Criminal Investigations Division for the Fannin County Sheriff's Office; Scott Galloway, an Investigator with the Fannin County Sheriff's Office; Chief Darrell Mitchell, who is in charge of the Special Operations Division of the Cherokee County Fire Department; Nicholas H. Durham, a Sergeant with the Cherokee County Fire Department and member of the hazardous materials ("hazmat") team, as well as exhibits admitted during the hearing.

On February 2, 2017, Captain Justin Turner, Commander of the Criminal Investigations Division for the Fannin County Sheriff's Office, responded to a call at the Fannin Regional Hospital concerning a suspect who had tried to make ricin, gotten it on himself, and drove to the hospital. (Tr. 72-73, 122-23). Ricin is "a highly toxic and fatal substance."[6] (Tr. 143). Turner was accompanied by Investigator Scott Galloway. (Tr. 121-22). They had been informed that Defendant's white Lincoln Town Car was in the hospital parking lot, so when they arrived, Galloway remained in the parking lot to make sure no one approached the vehicle to avoid possible contamination by ricin, and Turner went inside the hospital . (Tr. 122). When Turner arrived in the emergency room, someone pointed to the room where Defendant was or gave him the room number. (Tr. 73-74, 86). Turner was also advised by emergency room personnel that Defendant reported that he had been trying to separate some castor beans and got some substance on him, so he came to the hospital because he was in fear for his safety, and that some of that substance was in his vehicle in the emergency room parking lot. (Tr. 86). Turner did not tell the hospital to delay discharging Defendant, and

---

[6] *See United States v. Levenderis*, 806 F.3d 390, 397-98 (6th Cir. 2015) ("Ricin is extremely deadly. There is no known antidote for ricin poisoning . . . . Ricin is designated as a 'select toxin' by the Secretary of Health and Human Services, which means it has 'the potential to pose a severe threat to public health and safety." (internal quotations omitted)); *United States v. Crooker*, 688 F.3d 1, 4 n.2 (1st Cir. 2012) ("Ricin is a deadly toxin derived from castor beans. A few grains, if injected, inhaled, or ingested, can kill an adult.").

to his knowledge no other law enforcement officers advised the hospital to do so. (Tr. 107-08).

When Turner arrived at Defendant's room, the only people present were Defendant, Turner, and Deputy Dustin Carder; Defendant was not being "guarded" by law enforcement officers, he was not handcuffed, he had not been arrested, and Turner did not tell him he was arrested. (Tr. 74-75, 81-82). Turner and Carder had their firearms, but they remained holstered; they did not threaten Defendant or tell him he could not leave the hospital. (Tr. 107). Turner questioned Defendant to determine "what type of alarm may or may not exist" for public safety because he did not "know a lot" about ricin and he wanted more information to be able to determine what response, i.e., fire response or EMA, was needed.[7] (Tr. 75-76). Turner asked Defendant "about his well-being, where he was at during the treatment process, exactly what he had done as far as this process with castor beans, and where some of those elements of that may be at as far as in his car or somewhere else." (Tr. 75; *see also* Doc. 28).

The recording reflects that Defendant said he "grabbed all the stuff and put it in a bag" in his car. (Doc. 28 at 2). Turner asked if it was "poisonous," and Defendant responded, "He said it's not unless it's inhaled or injected." (*Id.*).

---

[7] Their conversation was recorded, and a copy of the recording was admitted during the hearing (Def. Ex. 2), and Defendant also provided a transcript of the recording (Def. Ex. 2A (Doc. 28)).

Turner said, "we probably need to get your . . . car out of the hospital parking lot, right?" to which Defendant at first responded that "it's nothing to worry about" but admitted he had been "pretty concerned." (*Id.*). Defendant told Turner, "I got have my car." (*Id.*). Turner told Defendant he had "a substance in [his] car that may or may not be deadly at this time" and they "need[ed] to get it figured out" and then questioned Defendant about what he was doing with the castor beans. (*Id.* at 3-4). Defendant explained that he ground the castor beans and put them in a bottle of acetone (nail polish remover), and the bottle was in his car. (*Id.* at 4). Turner asked him, "Can we look at it?" (Doc. 28 at 4), and Defendant responded, "You gotta let me get my clothes on, yeah." (*Id.*). Turner replied, "All right, cool. We just want to make sure everything's all right then," and Defendant responded "Yeah. It's all good. I suppose. [inaudible]." (*Id.*). Turner asked, "So you're good?" and Defendant responded, "Yeah . . . I'm fine." (*Id.*). Turner asked him about his treatment at the hospital and anticipated release and told Defendant that he would see Defendant "in a minute." (*Id.* at 4-5). At the conclusion of their conversation Turner did not place Defendant in handcuffs or arrest him or tell him not to leave the room. (Tr. 76).

Captain Turner and Deputy Carder then went outside to the parking lot, leaving Defendant alone in the hospital room. (Tr. 76-77). The Fannin County Sheriff's Office contacted the Cherokee County Fire Department to request the

assistance of its hazardous material ("hazmat") unit to help with an unknown substance that was possibly ricin. (Tr. 137-38, 140). The fire department was briefed that there was a vehicle outside of the hospital, a white Lincoln, that had possible contaminates of ricin in it. (Tr. 141). Cherokee's hazmat unit serves Fannin County because Fannin County does not have a hazmat unit. (Tr. 109, 135-37, 140). The Cherokee Fire Department is not a law enforcement entity and does not have the authority to arrest. (Tr. 136). Cherokee Fire Department Chief Darrel Mitchell, who is over the Special Operations Division, and Cherokee County Fire and Emergency Services Sergeant Nicholas H. Durham accompanied the hazmat team to the hospital. (Tr. 137, 140). Meanwhile Turner directed that other vehicles were moved away from Defendant's vehicle "to isolate the vehicle with the unknown substance away from everybody else just for public safety," but they did not move Defendant's vehicle. (Tr. 77).

Approximately 10 to 15 minutes after Turner had left Defendant's room, Defendant walked out of the hospital; he was not accompanied by law enforcement officers. (Tr. 78). Defendant approached Turner and Turner gave him a cigarette. (Tr. 78). Turner did not then arrest Defendant, place him in custody, or tell him not to leave or that he could not leave. (Tr. 78, 107). Defendant was not in handcuffs, shackles, or restrained in any way. (Tr. 123). Turner did tell Defendant that the car could not leave until law enforcement made sure it was safe. (Tr. 79,

100).  At that point hazmat notifications had been made, but hazmat personnel had not arrived.  (Tr. 79).

When the hazmat team arrived it staged in front of the hospital until it was cleared to go back to the parking lot near the emergency room and briefed on the situation.  (Tr. 141-42).  Captain Turner asked Investigator Galloway to ask Defendant for consent to search his car for ricin, so Turner requested Defendant's consent, which he gave, and Defendant signed a Fannin County Sheriff's Department Waiver of Constitutional Rights to a Search Warrant form at 8:23 p.m.  (Tr. 79, 99, 109-10, 123-26, 130; Gov't Ex. 4 (Doc. 33-1)).  The form states that Defendant "having been informed of my constitutional right not to have a search made of the premises or vehicle hereinafter mentioned without a search warrant and of my right to refuse to consent to such a search, hereby authorizes Cherokee Co. Hazmat Team of the Fannin County Sheriff's Department, State of Georgia, to conduct a complete search of the below describe[d] premises or vehicle," i.e., his Lincoln Town Car located at the Fannin Regional Hospital.  (Doc. 33-1).  By signing the form Defendant acknowledged that "[t]his written permission is being given by me to the above name[d] persons voluntarily and without threats or promises of any kind.  I understand that any items found as a result of my consent to this search without a search warrant can and may be used as evidence against me

in a court of law." (*Id.*). Galloway and Deputy Ethan Martin also signed the consent form.[8] (Tr. 125-26; Doc. 33-1).

Deputies Galloway and Martin were the only law enforcement officers in close proximity to Defendant when they obtained Defendant's consent to search. (Tr. 127). They were wearing black polo shirts, green pants, and boots, and their firearms were visible but remained holstered. (Tr. 127). Defendant was not restrained during their conversation, and the deputies exerted no force on him or used their weapons, and did not threaten him, subject him to duress, raise their voices, or make any promises to him. (Tr. 127-28). Defendant did not appear to be under the influence of alcohol or narcotics, his speech was not slurred, he appeared coherent, and he did not appear sleepy or tired. (Tr. 128). Defendant never said that he did not want to sign the form or refuse to sign the form. (Tr. 128).

The hazmat team received instructions that they were clear to search the vehicle, and at approximately 8:36 p.m. (*see* Def. Ex. 4 (Doc. 34-1)) a team of three approached the vehicle, including Sgt. Durham, a crew member in charge of photography, and a crew member responsible for air monitoring. (Tr. 142-43). They wore full body splash-resistant protective suits, rubber boots, rubber gloves, rubber hoods, and full face and respiratory protection. (Tr. 143-44). As they

---

[8] Deputy Martin also recorded the conversation between Galloway and Defendant concerning Defendant's consent to search the car. (Tr. 124-25; Gov't Ex. 5).

approached the car they took air readings to make sure it was safe to proceed and were able to reach the car. (Tr. 143-44, 147-48). They had been briefed that the substance was in a bottle on the floorboard of the driver's side that was possibly in a bag, and when they looked inside the car they saw a bottle that fit that description on the driver's side front floorboard. (Tr. 144). They had been briefed by their incident commander to be aware of anything that could be used in the production of ricin, and they also found a grinder that had some type of residue, although they did not do any sampling of that at that time. (Tr. 145). They found these items in less than 20 minutes. (Tr. 145). They did not take anything from the vehicle or touch anything inside it because they were "strictly the reconnaissance team." (Tr. 151).

Because it was cold outside Captain Turner had one of the patrol cars opened with the heater on so Defendant could sit inside and stay warm, but he did not tell Defendant that he had to sit in the patrol car, no one had patted him down or taken his personal effects, he had his cell phone with him, and he was free to get in and out of the car. (Tr. 79-80, 94-95, 105-06). Defendant was close enough to his car to be able to see and hear what was going on and to communicate with officers (Tr. 101-02), but he never withdrew his consent to search (Tr. 110).

At approximately midnight, after the initial analysis indicated a positive test for the ricin antibody in substance found in Defendant's car, Defendant was taken

into custody, taken back inside the hospital for decontamination, and transported to the Fannin County Sheriff's Office. (Tr. 8, 18, 80-81, 96, 104-05). After Defendant was processed, FBI Special Agents Christopher John Bower and Bennie Johnson interviewed him in an interview room, beginning a few minutes after 1:00 a.m. on February 3rd.[9] (Tr. 9-10, 12, 19). The agents and Defendant were the only people in the room. (Tr. 11). The agents identified themselves as special agents with the FBI. (Tr. 11). They were dressed in civilian attire, and their firearms were not visible. (Tr. 11-12). Defendant wore scrubs and his hands were restrained with flex cuffs. (Tr. 12, 29-30, 38). Agent Johnson advised Defendant of his *Miranda* rights and explained the FBI advice of rights form, FD-395, to Defendant. (Tr. 10; Gov't Ex. 1 (Doc. 22-1)). Defendant initialed each right and signed the form, indicating that he understood his rights and agreed to waive them and talk to the agents without an attorney present, and the agents signed as witnesses. (Tr. 10-12; Doc. 22-1). The agents did not use any weapons or force on Defendant or threaten him, they made no promises to Defendant, they did not yell at him or raise their voices, and Defendant did not appear to be under duress and did not express any feelings of duress. (Tr. 12-13). Defendant did not appear to be under the influence of alcohol or drugs, his speech was not slurred, he appeared coherent, and his answers were responsive to the agents' questions. (Tr. 14).

---

[9] The interview was recorded. (Tr. 15-16; Gov't Ex. 2). A transcript of the interview is also in the record. (Doc. 27).

Although it was 1 a.m., Defendant did not appear "overly sleepy," he sat upright, he did not say that he was fatigued or sleepy or indicate that he wanted to stop the interview because he was tired, and he did not appear to be confused about what was happening. (Tr. 14, 34). Defendant "seemed agitated a little bit [and] was not happy about the situation he was in, but he was very forthcoming in speaking to [the agents]." (Tr. 13). During the interview he did not invoke his right to remain silent, and he did not invoke his right to an attorney, indicate that he wanted an attorney, or ask for an attorney. (Tr. 15). The agents provided him food and drink during the interview; he initially expressed reluctance to eat it because he thought it could be poisoned, but he eventually ate it. (Tr. 15, 24-25). The interview lasted approximately an hour and 15 to 20 minutes. (Tr. 15). Fannin County Sheriff's deputies took Defendant out of the room at the conclusion of the interview. (Tr. 28).

### B.      Motion To Suppress Evidence Obtained From Car (Doc. 26)

The Government asserts that the hazmat team's warrantless search of Defendant's car in the hospital parking lot was authorized by Defendant's voluntary consent to the search (Doc. 40 at 19-20), but Defendant argues that the Government has not met its burden of proving that he freely and voluntarily consented to that search (Doc. 36 at 12-13).

1.    **Consent Search**

The evidence presented at the hearing shows that after Defendant told Turner that there was a bottle of acetone with ground up castor beans in his car in the hospital parking lot, Turner asked Defendant "Can we look at it?" to which Defendant responded, "You gotta let me get my clothes on, yeah." (Doc. 28 at 4). Later Defendant signed a "Waiver of Constitutional Rights to a Search Warrant" form, which stated that Defendant "having been informed of my constitutional right not to have a search made of the premises or vehicle hereinafter mentioned without a search warrant and of my right to refuse to consent to such a search, hereby authorizes Cherokee Co. Hazmat Team of the Fannin County Sheriff's Department, State of Georgia, to conduct a complete search of the below describe[d] premises or vehicle," i.e., his Lincoln Town Car located at the Fannin Regional Hospital. (Doc. 33-1). By signing the form Defendant acknowledged that "[t]his written permission is being given by me to the above name[d] persons voluntarily and without threats or promises of any kind. I understand that any items found as a result of my consent to this search without a search warrant can and may be used as evidence against me in a court of law." (*Id.*).

Defendant nevertheless argues that his consent was not voluntarily given because:

> even if the Court finds that he was not in custody, it is clear that his movements had been restricted at least insofar that he was not being

allowed access to transportation that he already had stated that he would need.  He was given the impression that the car was going to be searched as a fete accompli.  Furthermore, he had been up for hours and had been forced to stand by for hours while police mobilized in response to the incident.

(Doc. 36 at 14).  The undersigned disagrees.  In the first place, while the evidence shows that Turner and other law enforcement were concerned about the safety risk posed by the possible ricin in Defendant's car and intent to secure the car until the substance could be investigated, the evidence does not show that Turner or others indicated that the car would be searched regardless of whether Defendant consented or a search warrant was obtained.  Having been informed that the substance in question was in Defendant's car, Turner indicated to Defendant that they "probably need to get your  . . . car out of the hospital parking lot" and when Defendant described the bottle with the acetone and ground castor beans, he asked Defendant "Can we look at it?"  (Doc. 28 at 2, 4).  Turner's question thus indicates a desire to obtain Defendant's permission to search the car.  Moreover, the form Defendant signed indicated that his consent was being provided as a "Waiver of Constitutional Rights to a Search Warrant," and the form advised Defendant of his "constitutional right not to have a search made of the [his] vehicle . . . without a search warrant and of my right to refuse to consent to such a search[.]"  (Gov't Ex. 4).  In addition, there is no evidence that hazmat or any member of law enforcement began searching the vehicle until after Defendant provided his written

consent. The evidence shows that hazmat did not begin approaching the car to search it until 8:36 (*see* Doc. 34-1), after Defendant signed the consent form at 8:23 p.m. (*see* Doc. 33-1).

Defendant contends that his movements were restricted during that time because he was not allowed access to his car to leave and he was "forced to stand by for hours while police mobilized" (Doc. 36 at 14), but there is no evidence that he was "forced" to remain in the parking lot, that his movements were restrained, or that he could not have obtained alternative transportation by requesting a friend or family member to pick him up, particularly since he had a cell phone. (*See* Tr. 79-80, 94-95, 105-06).

The uncontroverted evidence shows that law enforcement officers did not threaten Defendant, point their weapons at him, restrain him, or make any promises to him in exchange for his consent to search the car. The fact that he could not have access to his car due to reasonable concerns for public safety did not vitiate that consent. And the record is devoid of evidence that law enforcement officers told him that his car would be searched regardless of whether or not he consented. Instead, the evidence shows that he was asked for his consent, he was advised that he had a right not to have his car searched without a warrant (*see* Doc. 34-1), and there is no evidence that any one searched his car until after he gave his consent. These circumstances are certainly less coercive than those found in other cases

where the Eleventh Circuit held the consent to be voluntary. In *United States v. Hidalgo*, 7 F.3d 1566 (11th Cir. 1993), for example, the court found defendant's consent to be voluntary even though he had been "arrested by SWAT team members who broke into his home in the early morning, woke him, and forced him to the ground at gunpoint," and "he had invoked his right to remain silent before consenting to the search." *Id.* at 1571. In *United States v. Garcia*, 890 F.2d 355 (11th Cir. 1989), the court found the defendant's post-arrest consent to search his residence was voluntary, even though fourteen agents were present when the defendant was arrested in his front yard; agents conducted a security sweep of his house; agents arrested him and led back into the house in handcuffs; and agents refused the defendant's conditional consent and requested to search the whole house "or else they would have to secure the house and apply for a search warrant." *Id.* at 357-62 and n. 4.

Because Defendant voluntarily consented to the hazmat team's search of his car on February 2, 2017, its warrantless search of his car for items possibly containing or contaminated by ricin did not violate the Fourth Amendment. It is therefore **RECOMMENDED** that Defendant's motion to suppress evidence obtained from his car on February 2, 2017 (Doc. 26) be **DENIED**.[10]

_____

[10] The Government also contends that the search was authorized by the public safety exception to the warrant requirement (*see* Doc. 40 at 20-22), but because

### C.  Motion To Suppress Statements (Doc. 12)

Defendant argues that "[t]he Government has not carried its burden of showing that the statements made by [Defendant] at the hospital and later during post arrest interrogation were voluntary and in compliance with Miranda." (Doc. 36 at 10). The undersigned disagrees.

### 1.  Pre-Arrest Statements

The record shows that Captain Turner did not provide *Miranda* warnings to Defendant prior to talking to him in the emergency room on February 2, 2017 (*see* Doc. 28), and no evidence has been provided that any other law enforcement officer did so. Such warnings were not required, however, because Defendant was not in custody at the time. He was in a room in the emergency department of the hospital, he was not restrained, or under arrest, and Captain Turner and Deputy Carder did not threaten him, brandish their weapons, or indicate by action or words that Defendant was under arrest or that he could not leave. (Tr. 74-76, 81-82, 107). The undersigned finds that under the totality of the circumstances, Defendant was not in custody when questioned in the hospital on February 2, 2017 because there had been no "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest" *Street*, 472 F.3d at 1309, and therefore no *Miranda* warnings were required.

---

Defendant voluntarily consented to the search of his car, it is unnecessary to reach the Government's alternative basis for the search.

The undersigned also finds that Defendant's statements to Captain Turner were voluntarily made. Neither Turner nor Carder threatened Defendant, made any promises to him to obtain his statements, or coerced him into talking with them. (*See* Doc. 28). Defendant appeared willing to talk with Turner about the situation, never indicated that he did not want to talk with him, and he appeared to understand and respond appropriately to Turner, providing detailed information about what he had done with the castor beans and how he became contaminated. (*See id.*). Under these circumstances, the undersigned finds that the Government has met its burden of proving that Defendant's February 2, 2017 statements to Captain Turner were "the product of [Defendant's] free and rational choice," *Jones*, 32 F.3d at 1516, and were therefore made voluntarily.

Accordingly, it is **RECOMMENDED** that Defendant's motion to suppress his February 2, 2017 pre-arrest statements at the hospital be **DENIED**.

## 2. Post-Arrest Statements

After Defendant was arrested and transported to the Fannin County Sheriff's Office, he was clearly in custody. Prior to questioning him, FBI Agent Johnson advised Defendant of his *Miranda* rights; Defendant indicated that he already knew them; and Defendant initialed each of his rights on an FBI Advice of Rights form and signed the form, indicating that he had read and understood his rights and was "willing to answer questions without a lawyer present." (Tr. 10-12; Doc. 22-1). He

then answered the agents' questions and never indicated throughout the interview that he wanted to invoke his right to remain silent or to have an attorney present during questioning. (Tr. 15; *see also* Gov't Ex. 2; Doc. 27). The undersigned finds that the Government has met its burden of proving that Defendant was advised of his *Miranda* rights, that Defendant understood those rights, and that he voluntarily waived his rights and agreed to speak with the agents without an attorney present.

The undersigned also finds that Defendant's statements to the agents were made voluntarily. The agents spoke with him in a professional and courteous tone and manner; they gave him food and offered him coffee or water; and they did not threaten or yell at Defendant, use force against him, point their weapons at him, make any promises to him in exchange for his statements, or act in any way to coerce his statements. (*See* Tr. 12-13, 15, 24-25; *see also* Gov't Ex. 2; Doc. 27). Defendant did not appear to be confused or under the influence of alcohol or drugs; he appeared coherent and responded appropriately to the agents' questions. (Tr. 14, 34; *see also* Gov't Ex. 2; Doc. 27). At no point during his interview did Defendant indicate a reluctance to speak with the agents, that he wanted to terminate the interview, or that he wanted an attorney present. (Tr. 15).

Defendant contends that his statements were not made voluntarily because his car had been detained for hours and "no one indicated that [he] would have had

a way to get home without his car," "he was sleep deprived," having worked all night before the events leading to his arrest, "fearful for his health," "had gone without food," and was "a young man with a sub-high school education." (Doc. 36 at 11). Defendant argues that "[u]nder these circumstances, it is hard to see how the Government can prevail in showing on this record with unmistakable clarity that the statements were voluntary." (*Id*.). As to Defendant's contention that he "was sleep-deprived," his interview indicates that Defendant told the agents that he had worked from February 1st at 9:45 p.m. until 8 a.m. on February 2nd (Doc. 27 at 5), then spent the day with friends until approximately 4 p.m. when he went to the hospital after he had spilled the castor bean-acetone mixture on his hand around noon (*see* Doc. 27 at 5, 19-21, 26-29), and it is undisputed that once released from the hospital, he remained in the hospital parking lot until he was arrested around midnight. Defendant's lack of sleep does not appear to have interfered with his ability to understand and respond to the agents' questions, however, and he did not indicate that he was tired or sleepy or wanted to stop the interview because he had not had enough sleep. (Tr. 14, 34; Gov't Ex. 2; Doc. 27). Instead, he appeared coherent and was appropriately responsive to their questions. (*Id.*). He was also provided food and offered coffee and water (Gov't Ex. 2; Doc. 27 at 1-2), and although he initially indicated that he did not "trust nobody with my drinks or

anything like that" because of his membership in a white supremacist group (Doc. 27 at 2), he subsequently ate at least some of the food (*see id* at 14, 37-38).

It is undisputed that Defendant spent several hours in the hospital parking lot, but as discussed above, he was not restrained or involuntarily held there until he was arrested at approximately midnight. Although he could not take his car during period, there is no evidence that Defendant was required to remain on the premises or that he could not have obtained alternative transportation by calling a friend or family member, particularly since he had a cell phone. Moreover, while he waited for his car to be processed, the deputies allowed him to sit in the back of a patrol car with the heat on to stay warm, which also provided Defendant an opportunity to rest, and he was free to enter and leave the patrol car at will. And with respect to Defendant's fears about his health, while Defendant occasionally expressed his concern about the possible effects of his exposure (*see* Doc. 27 at 10, 25-27, 35-37), his demeanor and responses during the interview do not demonstrate that his health concerns predominated his statements or were of such magnitude they overbore his free will in responding to the agents' questions.[11] (*See* Gov't Ex. 2; Doc. 27).

---

[11] At one point Defendant made the remark, "I'm gonna die," but that appears to be in reference to his hunger and complaint that the fries he was offered were soggy. (Doc. 27 at 18).

Finally, while Defendant told the agents that he has an 8th or 9th grade education and had not obtained his GED (Doc. 27 at 15), the interview demonstrates his ability to read as he was asked to read aloud the statement, "I've read the statements and my rights and understand my rights, what my rights are at this time, and I'm willing to answer any questions without a lawyer present" (Doc. 27 at 4), and he stated during the interview that he "read[s] a whole lot" and "like[s] to know everything about everything," with science being his favorite field of study. (Doc. 27 at 11, 15). Furthermore, his responses indicate that he had sufficient intellectual ability to understand and respond to the agents' questions, regardless of his limited education.

The undersigned finds that Defendant understood his rights under *Miranda*, he voluntarily waived those rights and chose to speak with Agents Bower and Johnson without an attorney present, and that his statements to them were made voluntarily. Accordingly, it is **RECOMMENDED** that Defendant's motion to suppress his February 3, 2017 post-arrest statements be **DENIED**.

### Summary

For the reasons discussed above, it is **RECOMMENDED** that Defendant's motions to suppress evidence (Docs. 12, 13, 14, 26) be **DENIED**.

**IT IS ORDERED** that, subject to a ruling by the District Judge on any objections to orders or recommendations of the undersigned Magistrate Judge, this case is **certified ready for trial.**

**IT IS SO ORDERED, REPORTED AND RECOMMENDED** this <u>14th</u> day of <u>March</u>, 2018.

<u>/s/ J. Clay Fuller</u>
J. Clay Fuller
United States Magistrate Judge