```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF GEORGIA
 2                     GAINESVILLE DIVISION


 3

   UNITED STATES OF AMERICA,      )
 4          Plaintiff,            )
                                  )
 5   -vs-                         )   Indictment
                                  )   No. 2:17-CR-005-RWS
 6   WILLIAM CHRISTOPHER GIBBS,   )
            Defendant.            )
 7


 8


 9
       Transcript of the Daubert Motion and Pretrial Conference
10           Before the Honorable Richard W. Story,
               United States District Court Judge
11                    September 5, 2018
                     Gainesville, Georgia
12


13


14


15   APPEARANCES OF COUNSEL:


16   On behalf of
     the Government:            Ryan Karim Buchanan,
17                              Assistant United States Attorney


18


19   On behalf of
     the Defendant:             Mildred Geckler Dunn, Esq.
20                              V. Natasha Perdew Silas, Esq.


21


22
     Reported stenographically by:
23   Amanda Lohnaas, RMR, CRR
     Official Court Reporter
24   United States District Court
     Atlanta, Georgia
25   (404) 215-1546
```

1                              INDEX

2
Witnesses for the Government:
3
Neel Barnaby, Ph.D.
4          Direct Examination                 8
           Cross-Examination                 31
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Wednesday, September 5, 2018, 10:05 a.m.; Gainesville,

2     Georgia.)

3          THE COURTROOM DEPUTY:  The Court now calls for a

4     pretrial conference and hearing in Criminal Action

5     2:17-CR-05, United States of America versus William

6     Christopher Gibbs.

7          Counsel, please state your name for the record.

8          MR. BUCHANAN:  Good morning, Your Honor, Ryan Buchanan

9     on behalf of the United States.  I'm joined at counsel table

10    by FBI special agents Kim Spell-Fowler and Benni Jonsson.

11         THE COURT:  Good morning.

12         MS. SILAS:  Good morning, Judge.  For Mr. Gibbs, I am

13    Natasha Silas, and also co-counsel Millie Dunn is here at the

14    table, along with Mr. Gibbs.

15         THE COURT:  Good morning.

16         We are here on a couple of matters.  The first is there

17    was a request for a *Daubert* hearing concerning the expert

18    that the government wishes to produce at the trial based upon

19    some disclosures that have been made by the government to the

20    defense concerning that expert's qualifications and opinions.

21         Let me, I think the way I'd like to proceed is,

22    Mr. Buchanan, give you an opportunity to make a brief opening

23    statement and then, Ms. Silas, if you want to respond to

24    that, and then I'll hear the actual evidence just to help me

25    to, I think, bring into focus just what's at issue here.

1        MS. SILAS:  Okay, so are we jumping directly to the

2    *Daubert* hearing?  I do have at least one matter to bring up

3    that would be more classified as a pretrial conference type

4    matter.

5        THE COURT:  Okay.  What's that?

6        MS. SILAS:  Okay.  Judge, the government in its

7    investigation of the case noted and provided the documents

8    relating to a number of items that I think are irrelevant.

9        And so for Mr. Gibbs, he has a particular type of

10   religion and that religion involves a Bible called a *White*

11   *Man's Bible*.  There were some Facebook postings that have

12   sort of a version of a swastika but it's something kind of

13   modified.  There's also some things associated with his

14   church that I think some people might call white supremacist

15   and other type things.

16       I think they have nothing to do with the issues that the

17   jury's going to need to determine in this case.  I really

18   think that that could end up being a bit of a sideshow.

19   There's kind of like -- I don't even see any relevance at all

20   in it.  He's charged with possessing a substance that's

21   supposed to be on a certain prohibited list, so there's not

22   really a question of, you know, intent that would possibly

23   bring those type of things in issue other than intent to

24   possess a particular substance, and I think all of those type

25   matters ought to be kept out.

1        I do think that it could bleed into, so, how did your

2    investigation start, blah, blah, blah, blah, blah, we decided

3    to look into this.  But even though that might give the jury

4    a fuller picture of the course of the investigation, if that

5    is the case, and I hear some murmurings that maybe that's not

6    the case, whatever the case is, we shouldn't be hearing about

7    swastikas or white supremacy or any kind of religious views

8    or that Mr. Gibbs considers religious in front of this jury.

9        THE COURT:  Thank you.  I think we will pass on that

10    until we hear from the *Daubert* matter, only because I'm

11    assuming you've got a witness here on the *Daubert* matter?

12        MR. BUCHANAN:  I do, and he's from D.C.

13        THE COURT:  All right, why don't we get that so we can

14    get that taken care of and let him go on about his day and

15    then we'll come back to this on the pretrial matters.

16        MS. SILAS:  Okay.  And the Court did receive our motion

17    to dismiss, right?  Because we feel it's dispositive.

18        THE COURT:  Well, we'll take that up after the *Daubert*.

19        MS. SILAS:  Okay, great.

20        THE COURT:  Mr. Buchanan, let me hear from you, just a

21    brief opening if you would in terms of your position.  And

22    we'll limit ourselves to the *Daubert* issue at this time.

23        MR. BUCHANAN:  Absolutely, Your Honor.

24        Your Honor, this case, I don't know if the Court is

25    aware of -- just a brief issue of the facts.

1      Back in February of 2017, Mr. Gibbs showed up at the

2    hospital in Fannin County and reported to the hospital staff

3    he believed he'd spilled ricin on himself.  They inquired a

4    little bit about what he had done, type of castor beans, sort

5    of understood there was a potential hazardous material

6    situation.

7      So he was treated by the hospital staff and the hospital

8    staff alerted the local, the Fannin County HAZMAT, which

9    Fannin County actually does not have a HAZMAT team so they

10   came over from Cherokee County, I believe.  So they processed

11   the scene, they in turn called the FBI, and so then the FBI

12   processed this scene.

13     During that processing they pulled and recovered several

14   items.  They sent those items to the FBI lab and four of

15   those items tested positive for ricin.

16     Dr. Neel Barnaby from the -- I'm going to mess up the

17   name of it -- the Scientific Response and Analysis Unit,

18   SRAU, at the FBI lab in Quantico worked on these materials

19   and he concluded that four of those things, two substances,

20   two liquid substances tested positive for ricin and then two

21   physical items, a grinder, and then an acetone bottle.

22     So we have proffered Mr. -- Dr. Barnaby as an expert in

23   the detection of biological threat agents.

24     If Dr. Barnaby sounds familiar, he's testified before

25   Your Honor before in a previous ricin case, I believe in 2014

1  or 2015, so the Court should be familiar.  His testimony

2  would be substantively the same as that previous testimony a

3  few years ago.  I believe that there may be one test that has

4  been adapted or has changed, but in sum it will essentially

5  be the same.

6      So we've offered him as the expert and we plan to call

7  him this morning.  That's our only expert witness in this

8  matter.

9      THE COURT:  Very well.

10     Ms. Silas?

11     MS. SILAS:  And what's that, what was that middle word,

12 biological what agent?

13     MR. BUCHANAN:  Threat.

14     MS. SILAS:  Threat agent.

15     Judge, we don't -- well, first of all, Ms. Dunn is going

16 to handle the questioning.

17     THE COURT:  Okay.

18     MS. DUNN:  There are a couple of things I would like to

19 point out, Your Honor.

20     THE COURT:  Okay, come on up.

21     MS. DUNN:  This sort of dovetails -- well, it directly

22 dovetails with our motion to dismiss.

23     First, in order for the Court to make a finding that

24 under *Daubert* this man should testify you have to find that

25 it's relevant that ricin was possessed in the first place.

1   So from that standpoint we believe it's irrelevant and it's

2   not a select agent as defined in 18 U.S.C. 175b(a).  So

3   that's number one.

4        Number two --

5        THE COURT:  That part's of why I wanted to do this

6   first, because I think, I read your motion to dismiss, and to

7   suggest that I fully grasp where we are on that would be a

8   gross overstatement and so that's why I'm hoping some expert

9   testimony may help me to better understand the descriptors

10  that are in the statute and so forth.

11       MS. DUNN:  Well, that is really the most important point

12  from our perspective at this point, I think, so I'm going to

13  sit down and we can go ahead and get started and if I need to

14  say anything later I will.

15       THE COURT:  Very well, thank you.

16       All right, Mr. Buchanan, you may call your witness.

17       MR. BUCHANAN:  Your Honor, the United States calls Dr.

18  Neel G. Barnaby.

19       THE COURT:  Dr. Barnaby, you can come around and come

20  through.

21       MS. SILAS:  We'd invoke the rule if there are any other

22  witnesses.  It seems like there might not be.

23       THE COURT:  I understood there was only one witness.

24       MS. SILAS:  Okay.

25                    NEEL BARNABY, Ph.D.,

1    having been first duly sworn or affirmed, was examined and

2    testified as follows:

3         THE COURTROOM DEPUTY:  Thank you, please have a seat.

4                         DIRECT EXAMINATION

5    BY MR. BUCHANAN:

6    Q.   Dr. Barnaby, please state your name.

7    A.   Neel Barnaby.

8    Q.   And how are you employed?

9    A.   I am a forensic examiner with the FBI Laboratory.

10   Q.   And how long have you been employed with the FBI?

11   A.   I've been employed with the FBI since 2005.

12   Q.   Please pull that microphone a little closer to you.

13   A.   I'm sorry.

14   Q.   How long have you been with the FBI lab?

15   A.   With the FBI Laboratory I've been employed since 2005.

16   I switched to an examiner position at the end of 2009.

17   Q.   And is the FBI lab an accredited laboratory?

18   A.   The FBI Laboratory is accredited to the ISO17025

19   standard, even more so the unit I'm currently employed with,

20   the Scientific Response and Analysis Unit, has been

21   accredited to the ISO17020 standard.

22   Q.   And you mentioned a particular unit that you worked with

23   at the FBI lab.  What is that unit?

24   A.   The Scientific Response and Analysis Unit.  It's the

25   same lab I've been employed with since 2005; the name has

1    changed, though.

2    Q.    Do you remember that previous name?

3    A.    Yeah.  We, before we were called the Scientific Response

4    and Analysis Unit, it was the Chemical Biological

5    Radiological Nuclear Sciences Unit.  Prior to that it was the

6    Chemical Biological Sciences Unit.

7    Q.    And where is the SRAU located?

8    A.    Our unit is located within the FBI Laboratory in

9    Quantico, Virginia.

10   Q.    And before -- you mentioned you joined the FBI in 2005.

11   Prior to joining the FBI, did you have any biology research

12   experience?

13   A.    Yes.  Before joining the FBI, I was a postdoctoral

14   research associate at Duke University in the Developmental

15   Cell and Molecular Biology Group.  Prior to working at Duke,

16   I was a postdoctoral research associate at the UC Berkeley

17   Plant Gene Expression Center.

18   Q.    Dr. Barnaby, do you have any teaching experience?

19   A.    Yes, I do.  I have taught as a teaching assistant in

20   graduate school when I was getting my Ph.D.  Currently I have

21   a secondary duty as being the training program manager for

22   forensic examiners in my unit.  And as a forensics examiner

23   in the SRAU, we also train agents that come to Quantico or to

24   an offsite near Quantico regarding biological threat agents.

25   Q.    And do you belong to any professional organizations?

1  A.   Currently I'm out of scope on my American Phytopathology

2  Society; I haven't paid the dues this year.  But normally I

3  participate in some of the plant pathology societies.

4  Q.   And please describe your formal education.

5  A.   I have a Ph.D. in biology, specifically in plant

6  molecular biology and biochemistry.  I have a biology degree,

7  a bachelor's degree in biology and a bachelor's degree in

8  chemistry.

9  Q.   And have you published any scholarly works?

10  A.   Yes.  So I published research from my graduate studies,

11  as well as a position before graduate school at the U.S.

12  Department of Agriculture.  I've also had the opportunity to

13  publish or co-author book chapters in the area of microbial

14  forensics, specifically in plant pathology.

15  Q.   And have you given any professional presentations?

16  A.   I've given professional presentations.  Most of them

17  were done before becoming a forensic examiner.  The job duty

18  has changed and time commitments are now elsewhere, but I

19  have been requested or invited to speak, you know, on behalf

20  of the FBI Laboratory in the field of microbial forensics.

21  Q.   Dr. Barnaby, have you previously been qualified as an

22  expert in the detection of biological threat agents such as

23  ricin?

24  A.   Yes.

25  Q.   And have you testified in court before?

1   A.   Yes.

2   Q.   As an expert?

3   A.   Yes.

4   Q.   Approximately how many times?

5   A.   Three times.  One in state court and two in federal

6   court.

7   Q.   And have you actually testified here in the Gainesville

8   courthouse before?

9   A.   Yes.

10  Q.   In this courtroom?

11  A.   Yes.  In this witness box.

12  Q.   In this witness box.  Was the subject of your previous

13  testimony the detection of biological threat agents?

14  A.   Yes.  Specifically ricin.  All three cases I've

15  testified in have been for ricin.

16  Q.   And you mentioned another federal case.  Where was that

17  case located?

18  A.   That was in the Southern District of New York, also a

19  ricin case.

20  Q.   Has there been an instance where you were offered by the

21  government as an expert but not allowed by the court to

22  testify based on concerns that you do not qualify as an

23  expert?

24  A.   No.

25       MR. BUCHANAN:  May I approach the witness, Your Honor?

1          THE COURT:  You may.

2     Q.   (By Mr. Buchanan)  Dr. Barnaby, I've handed you what

3     I've marked as Government's Exhibit 1.  Please tell Judge

4     Story what that item is.

5     A.   This is a copy of my CV.

6     Q.   And does that, does Government's Exhibit 1 sort of

7     fairly and accurately capture your professional experience

8     and qualifications?

9     A.   Yes.  The one thing I would add is I've got a -- we're

10    updoing or redoing the book chapter.  I published -- the last

11    publication here was the second edition, we're currently

12    redoing it to the third edition.  So there will be another

13    publication coming up soon.

14         MR. BUCHANAN:  Your Honor, we move the admission of

15    Government's Exhibit 1 into evidence.

16         THE COURT:  Any objection?

17         MS. DUNN:  No, sir.

18         THE COURT:  It's admitted.

19    Q.   (By Mr. Buchanan)  Dr. Barnaby, let's talk about your

20    current work and the methodology you use at the SRAU.

21         Please tell the Court what a biological threat agent is.

22    A.   A biological threat agent could be a bacteria, a virus,

23    a fungal agent or a fungal toxin, as well as any toxin

24    derived from a biological entity that's taken outside of its

25    natural state and used as a weapon to commit a crime.

1   Q.   And specifically is ricin a biological threat agent?

2   A.   Yes.  Ricin would qualify as a biological threat agent.

3   Q.   And what is ricin?

4   A.   Ricin is a naturally occurring toxin found in the seed

5   of the castor plant.  It's categorized as a

6   ribosome-inhibiting protein, and basically when it gets into

7   a cell it prevents the cell from making new proteins and

8   therefore it kills the cell.

9   Q.   Is it dangerous?

10  A.   Yes.

11  Q.   What is sort of the bottom line as to what ricin does to

12  people?

13  A.   So as I mentioned, it prevents protein synthesis within

14  a cell.  Once ricin enters into a cell, it only takes one

15  molecule of ricin to go into one cell to stop it from making

16  proteins.  And when you prevent a cell from making new

17  proteins, once it runs out of the proteins it currently has

18  that cell dies.

19       And if an organism is exposed to enough ricin and it

20  gets into enough cells, you start killing tissue.  Once you

21  kill tissues, you can kill organs, and when you kill organs

22  you kill the organism.

23       If ricin was to get into your blood it would attack your

24  blood and your liver and you would most likely die of liver

25  failure, if you had a lethal dose, within three to five days.

1    Q.    And how does ricin get to the cells in that dangerous

2    way that you mentioned?

3    A.    You can be exposed to ricin in three basic ways.  You

4    can ingest it, which is the least toxic form of it, or you

5    can get it injected or inhaled.

6          Injected, inhaled gets it directly to organs.  So if

7    it's injected it's going to directly attack the blood and the

8    liver.  If it's inhaled it's going to start to kill your

9    lungs.

10         If you ingest it, again, that's the least toxic form,

11   still very toxic, but it takes a little bit more to get

12   through the gut and into the blood and then to go after the

13   organs.

14         All three mechanisms of exposure will cause organ

15   failure.

16   Q.    And does ricin pose a danger if it touches your skin?

17   A.    No.  Ricin is not a dermal hazard.  You can have a

18   hundred percent pure ricin and hold it in your hand; if you

19   have intact skin it won't get through the outer dermal layer.

20   Q.    Please tell the Court how you and the SRAU test for

21   ricin.

22   A.    We use a number of different tests.  And I think to

23   basically understand the tests, it's to understand what

24   question we're trying to answer with those specific tests.

25         There are three basic questions we're trying to answer.

1   What I failed to mention earlier about what ricin is, ricin

2   is actually a family of toxic proteins.  So it's not just one

3   protein in that plant cell.  There are approximately seven

4   what we refer to as isoforms.  They vary in the protein

5   sequence that are toxic to humans or animals.

6        Now, the most toxic form is a form called RCA60.  That's

7   commonly referred to in the literature as ricin D or ricin E.

8   So there are two isoforms that vary just slightly in the

9   amino acid sequence, but both of them are very toxic.  The

10  others ones, other family members are toxic, they're just not

11  as toxic as RCA60.

12       So with that in mind, the first question we're trying to

13  answer when we conduct ricin testing is are any members of

14  that ricin toxin family present.

15       MS. DUNN:  I'm sorry, I'm having a hard time

16  understanding what he's saying.

17       Can you just please speak a little slower?

18       THE WITNESS:  I'm sorry, I know I talk fast.  I got

19  admonished by the judge the last time I was here.  Okay, so

20  let me start over.

21       So the first question we're trying to ask when we're

22  testing for ricin is are any members of the ricin toxin

23  family present in the sample.

24       The second question, if we get a positive that we

25  detected a member of the ricin toxin family, would be is that

1    ricin toxin active.  In other words, can it inhibit protein

2    synthesis.

3         The third question is going to be is the most lethal or

4    most toxic form present.  So is RCA60 present in that sample.

5         Okay, so those are the three basic questions we're

6    trying to answer.

7         Now, to answer that first question, is any member of the

8    ricin toxin family present, we use an assay called

9    enzyme-linked immunosorbent assay.  It's referred to as

10   ELISA.

11   Q.   (By Mr. Buchanan)  What is an assay?

12   A.   An assay is a test.  It's just a different way of saying

13   a test.

14   Q.   Do your assays or do your tests require any equipment?

15   A.   Yes.  All of them have -- for the ELISA, the first two

16   tests we run it's run on the same piece of equipment.  It's a

17   piece of equipment called a plate reader.  As a general piece

18   of equipment I used it in graduate school.  Other

19   laboratories use it to determine whether RCA60 is present.

20        We use different mass spec instruments.  Those are used

21   in diagnostic communities, as well as research communities as

22   well.

23   Q.   Let's start with the ELISA test for the presence of

24   ricin.

25   A.   Okay.  The ELISA test -- and there are different types

1    of ELISA assays.  So if you were to pick up a biochemistry

2    textbook, they would list different forms of the ELISA assay.

3         The one we are running is referred to simply as a

4    sandwich ELISA.  And if you can envision a sandwich being

5    made, where you've got a slice of bread, a piece of cheese,

6    slice of bread, and a toothpick with an olive, you can

7    picture what's going on with the ELISA.

8         Now, obviously it's not bread.  But instead of that

9    first slice of bread, we have what is referred to as a

10   capture antibody.

11        Now, an antibody, you may be familiar with it, is part

12   of the animal's immune system, part of humans' immune system.

13   An antibody is something that's generated to a foreign

14   invader as part of the immune system, so it recognized what

15   we refer to as an antigen.

16        Now, our capture antibody that we're using for ricin is

17   made against -- it's made against ricin, so it recognizes

18   ricin and only ricin.

19        So we have this first piece of bread put down.  We put

20   our unknown sample over that capture antibody.  If ricin is

21   present in the unknown sample, that capture antibody will

22   grab the ricin out of that solution.  Okay.

23        The next step would then be to use another antibody --

24   excuse me, drink of water.

25        So if we've got ricin in our unknown solution, we've got

1  our capture antibody, the first piece of bread, the cheese

2  would be the ricin.

3      Now, the next antibody we would use is referred to as a

4  detection antibody.  It's a different antibody made against

5  ricin.  So now if ricin is present it will detect the ricin

6  that's been captured out of the solution.  So we've got

7  capture antibody, the ricin, and another ricin antibody.

8      All right.  That top, that detector antibody, the last

9  one that detected ricin, is made in goats.  So we inject

10  sublethal doses of ricin into a goat and then we extract the

11  blood and purify the antibody out.

12      The third tests which are represented by the toothpick

13  in the sandwich model is an antibody against goats.  It's a

14  mouse antibody where we inject goat serum in.  So that

15  antibody can detect anything from a goat.  We throw that on

16  there.

17      If that detector antibody is present being bound to

18  ricin, that goat -- that anti-goat mouse antibody will bind

19  to it.

20      But the mouse antibody has an enzyme linked to it.  It's

21  a protein that can change a substrate into a blue color.  So

22  if ricin is present, we've got the sandwich built, that's the

23  well that this reaction is taking place in, will turn blue or

24  bluish green, okay.  So you're looking for a color change.

25      If ricin is not present in that sample, the sandwich

1    won't get built, there will be no color change.  So it would

2    stay clear and you would have a result of ricin not detected.

3         So if we get that blue result that's going to tell us

4    that we have a member of the ricin toxin family present.  I

5    can't tell you which isoform is there from this test, we just

6    know that one of the toxin or multiple toxins are present in

7    the unknown sample.

8         THE COURT:  You said there are seven isoforms in the --

9         THE WITNESS:  Yeah.  Now the next question, next test --

10   Q.   (By Mr. Buchanan)  If after you've completed that first

11   test and you receive that blue or bluish-green positive

12   result, what to you do next?

13   A.   So if we've got a ricin detected result what we would go

14   on to do is answer the second question:  Is it active, right?

15   I mean, we want to know is it toxic.

16        The second assay would use we refer to as cell-free

17   translation assay.  We abbreviate it CFT, everything in

18   science is abbreviated.

19        With the CFT assay what we are doing is we are creating

20   the inside of the cell, a living cell.  We're actually taking

21   the lysate out of rabbit blood from -- yeah, a rabbit blood

22   cell, putting it in a tube.  And we're adding RNA that

23   encodes for the protein that makes the firefly glow.  If

24   you've ever seen fireflies, they glow bright light.  We're

25   going to create that protein in a tube and it will glow green

1   and our instrument can read that, whether it's glowing or

2   not.

3       Now, you recall earlier when I said ricin prevents

4   protein synthesis, so it prevents a cell from making

5   proteins.  So we've added our test mix in there.  If we allow

6   the test mix to sit on its own it will produce a glowing

7   green protein and you would see that.  If we add ricin to

8   that mix it's not going to glow green.

9       And this is a two-part test, so this is the first part

10   that we need to see.  We need to see that whatever is in our

11   sample that we're testing can turn off protein synthesis.

12   But turning off protein synthesis is not specific to ricin.

13       One of the other agents we tested for in this case was

14   abrin.  Abrin is a ribosome-inhibiting protein just like

15   ricin.  So just turning off protein synthesis is just the

16   first step.

17       I then have to have another result, it's a two-part

18   test, where I take the antibody against ricin, add it to the

19   unknown mix and then put that in my test mix.

20       The antibody will block ricin from turning off protein

21   synthesis.  So I've got to have the two results to say that I

22   have ricin-specific activity.  I've got to have it where

23   ricin turned off the protein synthesis and then I have to

24   show you where I turned off the ricin activity with the

25   antibody.

1       THE COURT:  That second test, you're not using as your

2   sample on that the result from the first assay?  You're using

3   a fresh sample there so you haven't already separated out the

4   ricin at that point?

5       THE WITNESS:  What we do is we make a mix, a dilution up

6   front, an aliquot of the sample, and then we just take

7   individual samples out of that aliquot for all our different

8   tests.

9       THE COURT:  That's why you have to do the second level

10  of test here, to be sure you're dealing with ricin?

11      THE WITNESS:  Yeah.  So the second level of test -- so

12  the first one we're just trying to look for any of the family

13  members.  The second one we take another aliquot out of our

14  diluted sample to see if it's active.  The reagents aren't

15  interchangeable, you have to do it separately.

16      So if I --

17  Q.   (By Mr. Buchanan)  Go ahead.

18  A.   Continue?  Okay, so now I've got a second result that

19  I've got an active toxin.  The third question, is RCA60

20  present.  So I want to know is the most toxic form of that

21  there, you know, whether it's ricin D or ricin E.

22      For that we go to two different mass spec methods.  You

23  could run just one; we run them both to try to get to the

24  same answer.

25      What we're doing with the mass spec method is sequencing

1    the protein.  So proteins, you can think of them as a strand

2    of pearls where each pearl is an amino acid, but the sequence

3    of that amino acid is specific to ricin.  So I can

4    distinguish that from other proteins based off of the

5    sequence.

6         Now, even though both methods were mass spec methods the

7    way we get -- the upfront parts of the two methods are

8    slightly different.

9         The first method that we do is called liquid

10   chromatography-high resolution tandem mass spec, or mass

11   spec/mass spec.

12        What we're doing -- and for both methods -- is the

13   protein by itself is too large to, you know, inject into a

14   mass spec and get a sequencing result.  So we break it into a

15   predictable fragment cleavage pattern.

16        We use an enzyme called trypsin, which cuts very

17   specifically behind lysine and arginine amino acids.  So if I

18   know the sequence of the protein, whether it's ricin or any

19   other protein, I can predict where trypsin will cut and I

20   will know what peptides are going to, you know, be derived

21   from that cleavage.

22        So with the LC method, we cleaned it with trypsin.  We

23   then subject it to the liquid chromatography, which separates

24   out the peptides and then it gets injected into the mass

25   spec.

1    Now, as I told you it was MS/MS.  That first round of

2    mass spec is going to select for peptides that would be of

3    the same molecular weight or the same size as ones we would

4    predict from ricin.

5    Once the instrument collects those peptides, it then

6    subjects it to another round of mass spec and starts to look

7    at the individual amino acid sequence.  So we're getting a

8    lot of information.  We know we've got peptides that match

9    ricin, but then we know specifically the peptides have

10   sequence of ricin.

11   Now, with the other mass spec method, it's referred to

12   as MALDI-TOF/TOF, stands for matrix assisted laser desorption

13   ionization-time of flight/time of flight mass spec, which is

14   another way to generate the protein sequencing but it's got a

15   little bit more upfront work.

16   So instead of going straight to the enzymatic cleavage

17   with trypsin, what we're doing is we'll take our sample and

18   run it on an acrylamide gel.  You can think of a gel as sort

19   of a thin layer Jell-O-like material, and this Jell-O-like

20   material has the ability to separate out the proteins of

21   different sizes.  So the smaller proteins will run very fast

22   and run to the bottom of the gel; the larger proteins will be

23   at the top of the gel.

24   Ricin in its intact form has two components, an A chain

25   and B chain, that are bound together by two sulfur molecules.

1    We'll load one lane that's in a, we refer to as a non-reduced

2    form, so it's the form that you would find in the seed, we'll

3    see a protein that should run at the same molecular weight as

4    ricin.  So refer to it as 60 kilodaltons or -- it will run

5    anywhere from 60 to 65 kilodaltons, depending on what

6    isoforms are present.

7         We then take the same lane on the same gel but we add a

8    chemical that breaks the A and B chain apart.  So when that

9    lane runs we're no longer going to see a protein at that 60

10   kilodalton; we're going to see smaller ones.

11        THE COURT:  What is that word, kilo- what?

12        THE WITNESS:  Kilodalton.  It's a measure.

13        THE COURT:  Spell it.

14        THE WITNESS:  Sure.  It's k-i-l-o-d-a-l-t-o-n.

15        A dalton, it's kind of hard to relate back to, it's

16   1/12th of a carbon atom's nucleus.  So it's kind of hard.

17   Just know that the higher the number of kilodaltons, the

18   larger the protein; the smaller, the smaller.

19        So once we add this chemical and we break those A and B

20   chains apart, we're going to see bands at the 30 and 35

21   kilodaltons range.  So we need to see that.

22        Once we see that, we actually take a razor, cut those

23   bands, which represent where the protein is at, out of the

24   gel.  That is subjected to the trypsin digest I spoke about

25   earlier and then those are loaded into the MALDI-TOF

1    instrument.

2        Now, MALDI-TOF is a little different than the other of

3    the LC method.  With the MALDI-TOF, you're mixing it with

4    what we refer to as a matrix and that's where the matrix

5    assisted gets its name from.

6        That matrix, once it's mixed with your sample, dries

7    down on a plate and then it's hit with a laser and then the

8    laser actually causes that matrix to go up into the

9    instrument, gets sucked into it, and then it sort of just

10   flies based on the mass to charge ratio.  It acts more like a

11   mass spec that we spoke of earlier.

12       So that first round of TOF is going to pick the peptides

13   of the correct molecular weight and then that second round is

14   going to start sequencing, breaking one amino acid off at a

15   time and you're going to see the actual sequence.

16       So at end of both methods what we require before we can

17   say that RCA60 is present is we need to see a minimum of four

18   peptides that will match ricin, we need to see at least one

19   from each chain, one from A, one from the B, and that we need

20   to have it specific to RCA60.

21       There are times when we can get peptides that are common

22   to all the isoforms in there, if we get those that are really

23   uninformative to say RCA60 is present.  So we report the

24   result out as ricin as protein detected but inconclusive for

25   RCA60.  It's a band that RCA60 has but we can't distinguish

1    that from any of the other ones.

2         And those are the three methods that we utilize to

3    detect ricin.  Or the four methods, I should say.

4    Q.    (By Mr. Buchanan)  Dr. Barnaby, this methodology that

5    you just described, is it used by other agencies?

6    A.    Yes.  The ELISA that I spoke of was developed by the

7    Navy Medical Research Center.  ELISAs are used throughout the

8    research and diagnostic community, so that's a common

9    technique.  But specifically the assay we're using to detect

10   ricin is used by the Department of Defense.

11        The activity assay that I spoke of was developed by the

12   United States Army Medical Research Institute of Infectious

13   Disease and it's used by other DoD labs.  The enzymatic tests

14   like this, not specifically the one we have, are used by

15   other, you know, agencies, research institutes.  I used an

16   enzyme test in my graduate work, not specific for ricin but

17   something similar.  So enzyme tests, activity tests are not

18   something that's uncommon.

19        The mass spec methods are definitely utilized by other

20   disciplines.

21        All the tests that we are running, you know, are

22   recognized as legitimate testing methods for other agents.

23   For this one we just discussed, ricin, we used the same

24   methodology to detect abrin.  We've shared our reagents with

25   the UK for SOP and the reagents.

1    Q.    So these methods, the ELISA, the CFT, and the two mass

2    spec tests, are they generally accepted in the scientific

3    community?

4    A.    Yes.  Specifically our tests for ricin, we have an

5    agreement with the Centers for Disease Control, if we have a

6    case that involves, you know, human exposure, and we don't

7    have enough sample to provide to the CDC, we have provided

8    them with our SOPs and our validation material and they're

9    willing to accept our results to make public health

10    decisions.

11    Q.    Let's talk about your work in this case.  Did you work

12    on some items in this matter on the case involving

13    Mr. William Christopher Gibbs?

14    A.    Yes.

15    Q.    And approximately how many items did the lab receive?

16    A.    We inventoried 45 items.

17    Q.    And of those 45 items, did you test all of them?

18    A.    No.  We tested 28 items.

19    Q.    And why did you not test all 45?

20    A.    When we approach a case like this, we triage what

21    samples we're going to test for ricin or abrin, and we tested

22    both in this case.

23          So one of the first things I do when we're inventorying

24    is look at materials, whether that would be something where I

25    would expect to find ricin, or ricin could be present.  So if

1    I received liquids or powders they're going to be a priority

2    for testing.

3         The next type of evidence I'm looking for is evidence

4    that could be used to extract ricin from the seed.  This

5    could be something as simple as a hammer, blender, solvents,

6    used coffee filters, items such as that, general laboratory

7    equipment, and so on.

8         Now, the third item would be items that were submitted

9    more for the traditional forensics, like fingerprints or

10   human DNA.  So we would categorize, look at those items and

11   swab them to clear them.

12        One of the things we would want to do is get it out of

13   the laboratory that we're doing the testing in back to the

14   lab at Quantico.  If we can show that ricin's not present on

15   those items it's easier to conduct the traditional forensics

16   in Quantico than it is in the containment lab.

17        And then the fourth thing would be if swabs were taken

18   during the time of collection, whether they're environmental

19   swabs, like a table top, or of items that were, you know, not

20   collected.

21   Q.   In this case did you receive a variety of types of

22   items?

23   A.   Yes.  We received multiple types of items.

24   Q.   And after you determined that you would test 28 items,

25   did you start with the ELISA test on those 28 items?

1    A.    That's correct.

2    Q.    And then after using the ELISA test, did you conduct the

3    CFT test on those 28 items?

4    A.    Yes.

5    Q.    And then after conducting the CFT, did you conduct the

6    mass spec test?

7    A.    Yes.

8    Q.    Dr. Barnaby, what were the results of your testing?

9    A.    Four of the 28 samples that were tested for the presence

10   of ricin we detected ricin in the four samples, specifically

11   the RCA60 toxin based off the mass spec testing.

12        Of the 28 items we tested for abrin, none of them --

13   abrin was not detected on any of the 28.

14   Q.    These four items were tested positive for the most toxic

15   form of ricin?

16   A.    Yes.

17        MR. BUCHANAN:  May I approach the witness, Your Honor?

18        THE COURT:  You may.

19   Q.    (By Mr. Buchanan)  Dr. Barnaby, I've handed you what

20   I've marked previously as Government's Exhibit 2.  Please

21   tell the Court what that item is.

22   A.    So this is a copy of my laboratory report with the

23   associated lab reports for the ricin and abrin testing, as

24   well as seed identification, it's one of the tests we didn't

25   discuss, but any time we get in seeds we would send that to

1    U.S. Department of Agriculture for identification.

2    Q.    And why do you need to test seeds?

3    A.    Seeds of ricin and abrin or any of the toxin that's in

4    their natural occurring state, it's in -- ricin is in a

5    castor seed.  I'm not going to test something that, you know,

6    it's there.

7    Q.    And your findings typically with -- after the

8    methodology has been conducted, are your findings peer

9    reviewed?

10    A.    Yes.  Our findings are reviewed on a number of different

11    levels.  They're certainly tech reviewed at NBFAC.  We peer

12    review the work at FBI Laboratory, as well as

13    administratively review it.

14    Q.    And does, Government's Exhibit 2, does it fairly and

15    accurately capture the results of your testing in this case?

16    A.    Yes.

17         MR. BUCHANAN:  Your Honor, we move for the admission of

18    Government's Exhibit 2 into evidence.

19         THE COURT:  Any objection?

20         MS. DUNN:  Not for the purposes of this hearing.

21         THE COURT:  It's admitted.

22         MR. BUCHANAN:  Nothing further, Your Honor.

23         THE COURT:  Ms. Dunn?

24         MS. DUNN:  Yes, sir.

25                              CROSS-EXAMINATION

1    BY MS. DUNN:

2    Q.    Good morning.

3    A.    Good morning.

4    Q.    I'd like to start by talking about the cases that you've

5    testified in before.  You said there were two federal cases

6    and one state case?

7    A.    That's correct.

8    Q.    Let's start with the state case.  What was the charge?

9    A.    The charge was murder for hire through use of ricin, and

10    I believe there was another charge of child molesting but I

11    wasn't quite aware of the full charges against the defendant.

12    Q.    Okay.  So you were tasked to find out whether or not

13    this was ricin and you testified about whether or not it was

14    ricin?

15    A.    No.  I was called in as an expert on ricin for that case

16    to explain what ricin was and how it could be administered to

17    someone.

18    Q.    So you did not actually test anything in that case?

19    A.    No, not for that case.

20    Q.    You generally were basically a professor talking about

21    ricin?

22    A.    Yeah.  I mean that would be a way to describe it.

23    Q.    Okay.  You said there were two federal cases.  One was

24    here in this courthouse?

25    A.    Uh-huh.

1  Q.   And that was a prosecution under 18 U.S.C. 175, correct?

2  A.   I believe so.  That's -- I'm a scientist.

3  Q.   You're a scientist, you're not a lawyer?

4  A.   Correct.

5  Q.   But one of the things you do in science is you decide

6  how to categorize things and what to call them, correct?

7  A.   Correct.

8  Q.   And if there's a legal definition of a substance, you

9  look and see whether or not the substance fits within the

10 legal definition?

11 A.   Yeah.  If I was provided a definition I could certainly

12 do that.

13 Q.   Okay.  So with respect to the case you testified in

14 court here, the terminology "select agent" was not ever an

15 issue?

16 A.   I don't recall if it was or not.  It's been four years

17 now.

18 Q.   It was a biological toxin issue, correct?

19 A.   Ricin, yeah, ricin is a biological toxin.

20 Q.   Okay.  And then tell me about the case you testified, I

21 think you said in New York District Court?

22 A.   In New York, that was an individual who was trying to

23 purchase ricin.  We had received in castor seeds but we did

24 not receive in actual ground-up material.

25 Q.   Okay.  So did you test that material?

1    A.    No.  We didn't receive the ground material; we received

2    seeds.  As I spoke earlier, seeds go to the U.S. Department

3    of Agriculture.

4    Q.    So you did not test any material in that case?

5    A.    No.

6    Q.    So we only have one case that you've testified in where

7    you've ever tested material?

8    A.    Correct.

9    Q.    And that was a case under 18 U.S.C. Section 175 and the

10   issue was whether or not there was a biological toxin?

11       MR. BUCHANAN:  Your Honor, I'd object.  I believe this

12   is going toward the motion to dismiss and not necessarily

13   Dr. Barnaby's qualifications or his methodology.

14       THE COURT:  I'll allow him, if he recalls, I'll allow

15   him to testify.  There's a record of what the charge was in

16   that case, but as we're going to move to that issue later,

17   while I've got him here I'm happy for you to ask him

18   questions.  So I'll overrule the objection.

19       MS. DUNN:  Thank you, Your Honor.

20       THE WITNESS:  Could you repeat the question?  I'm sorry.

21   Q.    (By Ms. Dunn)  Probably not, I can try.  That case was

22   whether or not ricin was found and the defendant was charged

23   with possession of a biological agent to use as a weapon of

24   mass destruction.

25   A.    Again, you know, I test for ricin.  If that's the

1   wording in the charge, you know --

2   Q.   You don't recall?

3   A.   Yeah.  It's not something that I would be able to speak

4   to as an expert.

5   Q.   Fair enough, that's fine.  Are you familiar with the

6   charge in this case?

7   A.   Vaguely.

8   Q.   Okay.  Tell me what you know about the charge in this

9   case.

10  A.   Someone is being charged with possession of ricin out of

11  its natural state.  I mean, the items we tested and that

12  tested positive are ricin that are not inside of the castor

13  seed.

14  Q.   Okay.  Have you been asked whether or not -- strike

15  that.  Let me do this a different way.

16       You're not a lawyer, correct?

17  A.   No.

18  Q.   But you are a scientist?

19  A.   Uh-huh.

20  Q.   And you know the names of biological toxins and

21  agricultural toxins and plant-based toxins and all of those

22  things?

23  A.   Yes.

24  Q.   Okay.  I'm going to hand you what's been marked as

25  Defendant's Exhibit 1.  Will you take a look at that?

1    A.    Yes.

2    Q.    Are you familiar with that listing of the Code of

3    Federal Regulations?

4    A.    Yes.

5    Q.    Can you tell the Court what that is?

6    A.    This is a listing of the overlap select agents of

7    toxins.  So select agents are biological agents, whether

8    they're a bacteria, viruses, fungi, or toxins that have been

9    deemed to potentially cause great harm to humans, which would

10   be regulated by the Centers for Disease Control, or the U.S.

11   Department of Agriculture, when they're potentially animal or

12   plant diseases.  This is a list of those agents that fall as

13   an overlap between those two lists.

14   Q.    And the code section at the top of that, could you read

15   it into the record?

16   A.    You're talking about in the box?

17   Q.    Yes.  Is it --

18   A.    It says Code of Federal Regulations, Title 42, Public

19   Health, Chapter 1, Public Health Service, Department of

20   Health and Human Services, in parentheses References and an

21   abbreviation of Annos, close parentheses, Subchapter F,

22   Quarantine, Inspection, Licensing, Part 73, Select Agents and

23   Toxins.

24   Q.    And is that in specific Section 73.4?

25   A.    Yes.

1    Q.    Okay.

2    A.    And that's titled Overlap Select Agents and Toxins.

3    Q.    There is a listing --

4         MS. DUNN:  First of all, Your Honor, I would move into

5    evidence Defendant's Exhibit 1.

6         THE COURT:  Any objection?

7         MR. BUCHANAN:  No, Your Honor.

8         THE COURT:  It's admitted.

9    Q.    (By Ms. Dunn)  There's a listing of items, things,

10   toxins under subsection 1.  Do you see that at the top?

11   A.    You're talking about listed under B?

12   Q.    Subsection B, okay.

13   A.    Yeah.

14   Q.    I'm sorry, I gave you my only copy.  Do you see that?

15   A.    Yes, the one titled Overlap Select Agents and Toxins.

16   Q.    Okay.  Do you see ricin on that list?

17   A.    No.  Ricin wouldn't be regulated on the overlapped

18   agents.  Ricin is regulated on the list put out by the

19   Centers for Disease Control.

20        This is a list that causes disease between animals and

21   people.  So it's the overlap agents.  Subsequently, there's

22   USDA list for animal and plant pathogens that don't cause

23   harm to humans.

24        So if we're looking at select agents there are three

25   lists.  Two of the main, I would call the parent lists, and

1    then there's the one, the overlap list, that would be agents

2    that both agencies find harmful.

3    Q.    In specific we'd like to look at 42 C.F.R. 73.4.  So

4    that's the one you have in front of you.  So just on that

5    list, and no other list are we talking about, do you see

6    ricin?

7    A.    No.

8    Q.    Okay.  Under subsection C where it says Genetic

9    Elements, Recombinant and/or Synthetic Nucleic Acids, and

10   Recombinant and/or Synthetic Organisms, do you see anything

11   there that describes ricin?

12   A.    No.

13   Q.    And if you would quickly read through the rest of it,

14   I'd like you to tell me if there is anything here that draws

15   your attention to ricin.

16   A.    No.  As I stated earlier, ricin falls on the human list.

17   Q.    We're talking about --

18   A.    It's not on this list.

19   Q.    -- this list.

20   A.    It's not on this list.

21   Q.    Not on this list.  Let's talk about Defendant's

22   Exhibit 2, which I am handing you now.

23   A.    Thank you.

24   Q.    And I will represent to you that that is 42 C.F.R. 73.5;

25   is that correct?

1  A.   Yes, it is.

2  Q.   Okay.  I'd like you to read through that and tell me if

3  you're familiar with that list or that section.

4       MR. BUCHANAN:  Your Honor, same objection as before.

5  Just having him read the statutes does not go towards his

6  qualification as an expert or the methodology used in this

7  case.

8       MS. DUNN:  It does go to the relevance under *Daubert*,

9  which is the whole issue.

10      THE COURT:  I'll overrule.

11      THE WITNESS:  Okay.

12 Q.   (By Ms. Dunn)  Are you familiar with that code section?

13 A.   I mean, yes, exemptions to Human Health and Services

14 select agents and toxins.

15      MS. DUNN:  I would move Defendant's Exhibit 2 into

16 evidence.

17      MR. BUCHANAN:  Same objection.

18      THE COURT:  It's admitted.

19 Q.   (By Ms. Dunn)  And is there -- this is basically

20 exemptions regarding select agents and toxins, right?

21 A.   Yes.

22 Q.   There's no list of select agents and toxins contained in

23 this --

24 A.   No.

25 Q.   -- C.F.R.?  Okay.  Now I'm going to hand you Defendant's

1    Exhibit 3, it's 42 C.F.R. 73.6, and ask if you recognize it

2    as well.

3    A.   Okay, it's exemptions for the overlaps, like the agents

4    and toxins.

5    Q.   And again, it does not --

6         MS. DUNN:  Well, first let me move it into evidence as

7    Exhibit 3.

8         MR. BUCHANAN:  No objection, Your Honor.

9         THE COURT:  It's admitted.

10   Q.   (By Ms. Dunn)  It too is exemptions and doesn't contain

11   a list of select agents, correct?

12   A.   Correct.

13   Q.   So of the three code sections I have given you, only

14   42 C.F.R. 73.4 contains a list of select agents?

15   A.   Of these three, that's correct.

16   Q.   Okay.  And ricin is not on that list?

17   A.   No.

18   Q.   And it's not on the other two lists I've given you?

19   A.   No.

20   Q.   Now, I do understand that ricin is on 42 C.F.R. 73.3,

21   correct?

22   A.   I don't know the actual number, but it is on one of the

23   lists that's overseen by the Centers for Disease Control.

24   Q.   So I'm going to hand you 42 C.F.R. 73.3, and tell me if

25   that refreshes your recollection that that is the list that

1   ricin is contained on.

2   A.    Yes.  Both ricin and the abrin are on this list.

3         MS. DUNN:  Your Honor, could I have just a moment?

4         THE COURT:  Yes.

5         (Pause in the proceedings.)

6   Q.    (By Ms. Dunn)  So let's talk about, moving to a

7   completely different subject matter, let's talk about the

8   testing that was done in this case.  I have some questions.

9   I am not a scientist in any respect and I'm going to say

10  stupid things, please feel free to correct me.

11        First of all, did you do the tests or did other people

12  do the tests?

13  A.    No.  The testing was done at my direction at the

14  National Bioforensic Analysis Center.

15  Q.    Were you physically present when it was done?

16  A.    Not during the testing.  One of my colleagues was

17  present during the inventory when it first arrived.  It was

18  on a weekend.  I went there the following, I think Monday or

19  Tuesday, to inventory the items again as they were being

20  processed, and then the testing would take place after I

21  left.

22  Q.    Who was the colleague that was there?

23  A.    Dr. Robert Bull.

24  Q.    So he did some of the inventory and you did some of the

25  inventory?

1    A.    He initially took the evidence in.  So when evidence

2    arrives at the lab we have to open it up to ensure the

3    integrity of the packaging.  He then did an initial look

4    through the evidence.  Then when I received it in the lab a

5    few days later, I was the one who actually put it in the

6    computer system for the FBI Laboratory.

7    Q.    Okay.  So basically what you did is you saw what came in

8    and you made a listing in the computer about what was there?

9    A.    No.  That would not be the full thing of what I did.

10   That's just one small aspect of it.

11        One, as an examiner, as we discussed earlier, I've got

12   to assess the items for testing and specifically how I want

13   them tested.

14        In working with the sample processor at the NBFAC I'm

15   going, reviewing the items of evidence, explaining to them

16   how I want them swabbed to pull a sample off of the item or

17   we're going to list saying I want you to pull X amount of

18   liquid out of the sample or weigh X amount of powder off of

19   certain samples.

20        The other part of the job is when I mentioned items that

21   may be of value for traditional forensics, I will explain to

22   them how, you know, handle it in a certain way, this is where

23   I want you to test this item to swab for further testing.

24        Once I have the sample processors on board with how

25   we're going to handle it, we type up a sample analysis plan.

1    I explain to them what assays I want them to conduct on those

2    items, and that document is referred to as a sample analysis

3    plan.  It's in essence a contract between myself and them and

4    they're not allowed to deviate other than the directions that

5    I provided them.

6         If something comes up during the process of testing, I

7    think during, I think the CFT assay, prior to the ricin or

8    abrin testing, there was a bubble in one of the wells, the

9    reaction wells.  That's a nonconformance, that would

10   interfere with the camera reading, whether the color changed.

11   They had to call me to get permission to retest that item.

12   So once we agree on the sample analysis plan, you know,

13   that's basically their marching orders and they're not

14   allowed to deviate.

15   Q.   Okay, so let's break that down a little bit.

16   A.   Okay.

17   Q.   You're not there when the testing occurs but you tell

18   them what you want them to do when they test?

19   A.   Yes.

20   Q.   Okay.  Do you do that verbally or in writing?

21   A.   Both.  So we're working with them at the laboratory,

22   explaining the item, explaining to them how I want them to

23   sample them, sample the items.

24        I'll then work with the NBFAC director to start

25   generating a sample analysis plan and then that can be

1  provided to me electronically or in person, if it's typed out

2  while I'm at the lab.  Then I'll approve that verbally and in

3  writing.

4  Q.   Okay, so there is a written sample analysis plan

5  regarding this case somewhere?

6  A.   Yes.

7  Q.   And you have access to that?

8  A.   Yes.

9       MS. DUNN:  Your Honor, I believe that we're entitled to

10  that in discovery and I would ask that the government produce

11  it to us.

12  Q.   (By Ms. Dunn)  Okay, so next, when you're telling them

13  how to swab the things you want swabbed, do they actually do

14  it in front of you or they do it later when you're not there?

15  A.   It depends on the case.

16  Q.   This case.  I only care about this case.

17  A.   I would have to go to my file to find out.

18  Q.   Do you have it with you?

19  A.   No.

20  Q.   Okay.  You knew you were testifying about this case

21  today?

22  A.   Not specifics of that.  I thought I was testifying

23  regarding the science today.

24  Q.   Okay.  So you don't know if you were there or not?

25  A.   No.  I was present the day we started the sample

1   processing.  I just don't recall if I was actually in the lab

2   when they actually started the testing.

3   Q.   Well, that's what I'm asking, were you in the lab?  Were

4   you physically present when any of the items were swabbed in

5   this case?

6   A.   And that's something, I don't recall that at the moment.

7   Q.   Were you physically present when any of the testing that

8   you've described was actually conducted?

9   A.   No.  The testing occurs over a couple of weeks,

10  actually.  The ELISA and the CFT, we usually have results for

11  the ELISA within about 48 hours of the samples arriving or

12  when we start testing.  The CFT will be about 24 to 36 hours

13  after that.  And then the mass spec testing takes a few

14  weeks.

15  Q.   And somebody else, not you, is doing that testing?

16  A.   Correct.  We have technicians in the lab that are

17  conducting the testing.

18  Q.   And they're the ones who review the results and tell you

19  the results?

20  A.   The results are reviewed by a number of folks.

21  Certainly the technician getting the results off the

22  instrument would review it.  The program manager for the

23  different testing components in the laboratory would review

24  those results.  The NBFAC director would review the results.

25  And then I would get the results.

1  Q.   And when you get them they're already signed off on by

2  the three other people you talked about?

3  A.   No, not at that point.  Sometimes we get the results in

4  before the final report is even written, but certainly the

5  final report doesn't go forward until I've had a chance to

6  look and ensure that everything that I requested to be done

7  was done the way I requested it.  So the final report doesn't

8  get finalized until I say it's good to be finalized.

9  Q.   Okay.  And how do you know that it's done the way you

10 requested?  Because they tell you?

11 A.   Yes and no.  I mean, we have a quality assurance system

12 at NBFAC.  The testing is accredited with outside agencies

13 with that program.  I have no reason to doubt that they

14 wouldn't be following the SOP.

15 Q.   So if you have no reason to doubt it, then every time

16 you get the results they should be exactly what you asked

17 for, right?

18 A.   They usually are.  Again, with the quality assurance

19 checks, you have to ensure that it's done correctly.

20 Q.   Again, other than read the report and see what the

21 results are, do you have any way independently, you

22 personally as a person with personal knowledge standing in a

23 lab, know what's being done?

24 A.   Know what's --

25 Q.   Other than relying on other people --

1        THE COURT:  Let me say, this is not a deposition.  This

2    is a *Daubert* hearing.

3        MS. DUNN:  Yes, sir.

4        THE COURT:  You're getting into weight of the testimony,

5    not his qualifications to do it.  We all know that experts

6    can rely on others to perform their functions and so forth.

7    So I don't want -- this isn't going to be his full-blown

8    testimony.  This is about *Daubert*.

9        MS. DUNN:  I understand.

10       THE COURT:  Okay.

11       THE WITNESS:  I'm sorry, can you repeat the question?

12   Q.   (By Ms. Dunn)  Personal knowledge --

13       THE COURT:  I think he's already answered he didn't do

14   the test, he's relying on what the others did.

15   Q.   (By Ms. Dunn)  With respect to you talked about three

16   different tests, one in two parts, can you tell me the

17   equipment that is used in each of those testings?

18   A.   We use four -- we have four different tests.  For the

19   ELISA and the CFT, it is a plate reader.  It's just a

20   machine, kind of describe it as looking like a toaster oven.

21   It has a little platform that will come out, you put the

22   plate on, goes in, and there's a camera that looks for light

23   when we excite the proteins that are going to either turn

24   colors or glow with the specific wavelength of light.  So

25   both the ELISA and CFT rely on a plate reader.

1          For the two other tests we rely on mass spec

2     instruments.  As I said earlier, one of them is referred to

3     as an LC, a high-resolution MS/MS instrument.  The other one

4     is a MALDI-TOF/TOF mass spec.

5     Q.   And with respect to the plate reader that's like a

6     toaster oven and then a camera looks for the light, is there

7     a particular brand that you use?

8     A.   I believe it's Thermo Fisher.  I'd have to rely on the

9     SOP to get the exact brand because the companies have sold

10    out, they changed ownership.  But I believe it's a Thermo

11    Fisher.

12    Q.   I was going to ask you that question with respect to all

13    of this equipment, would they all be in the SOP if I get a

14    copy of that?

15    A.   Yes.  It should be listed in the SOP as part of the

16    equipment.  In regards to the LC high-resolution MS/MS, that

17    is a Thermo Fisher product, with the MALDI-TOF/TOF

18    instruments, it's an AB SCIEX piece of equipment.

19    Q.   Okay.  And with respect to each of these, is there some

20    sort of scientific algorithm that is used to determine the

21    end result?

22    A.   With the plate reader it's just an Excel spreadsheet.

23    You're just doing calculations based off the amount of light

24    compared to a standard curve of actual positive ricin.  With

25    the mass spec instruments, there are software specific to

1   those model instruments.

2   Q.   So it's something that comes with the equipment; it's

3   not something that is a software that's loaded on afterwards?

4   A.   For the mass spec methods it is equipment that would run

5   the instrument, yes.

6   Q.   One of the --

7   A.   Actually, let me clarify.  So you've got the software

8   that runs the instrument.  Some of the analysis of when it's

9   comparing it to the database, that could be another software

10  package called Mascot.  So that's outside of -- it doesn't

11  actually run the instrument but that is another piece of

12  software.  And the vendor that sells the equipment does sell

13  that, so there is a little bit of a distinction with the

14  MALDI.

15  Q.   And all of those would be in the SOP?

16  A.   Yes.

17  Q.   Okay.  And so I understand, when data comes out of a

18  mass spec, as I understand it, it comes out like as

19  mountains?

20  A.   Peaks, yes.

21  Q.   Peaks, okay.  And when you say compare them with

22  known -- what did you say, known --

23  A.   They call them spectra.

24  Q.   So what you do is you have a list of things, certain

25  peaks, and you compare what came out of the mass spec with

1   the list of things you have, and if the peaks match you say

2   it's a match?

3   A.    That's one way to do data analysis.  But with mass spec

4   technology you typically want to run a positive control.  In

5   this case would be ricin, actually commercial purchased

6   ricin.  Just because there are calibration, it's one of the

7   quality control measures when running a mass spec, you run a

8   calibration mix but you also want to make sure that you

9   understand how ricin, peptides and, you know, the subsequent

10  sequencing are working on your instrument.  So you would have

11  a positive control of ricin so you could compare it to the

12  database or the expected spectra, plus what the actual

13  positive control looks like.

14  Q.    And that would be in the SOP?

15  A.    Yes.

16  Q.    And the results of that would be in the SOP?

17  A.    The results of the work?

18  Q.    The results, would that be in the SOP or no?

19  A.    No, the results of the analysis won't be in the SOP.

20  The SOP is a standard operating procedure that's applied to

21  different cases.  The results are not, for any given case,

22  are not going to be an in an SOP.

23  Q.    I understand.  And the report that the government put

24  into evidence, that's the final report, correct?

25  A.    That's correct.

1    Q.    Do you get other documentation?  Do you actually get the

2    printout of the peaks?

3    A.    That comes in the discovery, the disk we provided from

4    NBFAC for discovery.  So you will get the raw data as well.

5    Q.    Okay, and you've provided that to the government?

6    A.    I believe we have, yes.

7    Q.    Okay.

8          MS. DUNN:  Your Honor, I would ask that we be provided

9    with the raw data too, I don't think we have that.

10         MR. BUCHANAN:  My records show that we sent it December

11   6th, 2017.  It's a disk, looks like this.

12         THE COURT:  If it's been sent it's not necessary,

13   obviously, but --

14         MS. DUNN:  We'll double-check and if not will you make

15   it available again?

16         MR. BUCHANAN:  Absolutely.

17         MS. DUNN:  Thank you, then I won't waste any more time

18   on that.

19   Q.    (By Ms. Dunn)  When you do the testing where the light

20   turns blue, is that videotaped or is there any kind of photo

21   documentation of that?

22   A.    Of the testing?

23   Q.    Of the turning blue.

24   A.    No.  So what it's doing is it's calculating the degree

25   of how blue it is.  So if you have very small amounts of

1    ricin present it will be a faint blue versus a darker blue.

2        The output of that we refer to as the optical density,

3    abbreviated OD.  You will get an output of that and that will

4    go into an Excel spreadsheet.  That should have been provided

5    as well.

6    Q.   Okay, so that's in the data that we were just talking

7    about?

8    A.   Yes.

9    Q.   All right.  One of the things you said is when you get

10   the material you prepare the substance for testing and you

11   talked about a solution.  So tell me how that works.

12   A.   So one of the methods, if you have a powder, all of our

13   assays are done in liquid form, so if we get a powder I've

14   got to dissolve an amount of that powder into a buffer.  The

15   dilution buffer is going to be what we refer to as PBS, it's

16   phosphate buffered saline.  It's commonly used throughout

17   other, you know, diagnostic research communities or just

18   university research.  It's just diluted in the PBS.

19   Q.   Okay, so it's basically a way to liquify the material?

20   A.   Yeah, dissolve the powder.  If we've got liquid we don't

21   have to, obviously, dissolve it.  If I've got enough there --

22   you know, if I only had a drop I might bring it up to a

23   certain amount.

24   Q.   What if it's not a powder but it's a chunky, solid

25   substance?

1  A.    Chunky, solid substance, we do encounter those every

2  once in a while.  And even with some of the powdered mixtures

3  they don't readily go into solution.  We have tubes that have

4  a little plastic, it's sort of like a mortar and pestle.  If

5  you've ever seen in a pharmacy where they've got the white

6  thing where they grind, we have small Eppendorf tubes that

7  have a plastic tip that will go down and we can grind the

8  chunky material and try to liberate any, if there's ricin

9  present, into solution.  Ricin is referred to as a soluble

10  protein, so it readily goes into solution.  So it doesn't

11  take much grinding of a chunky particle.

12  Q.    Okay, so let me ask you this.  If you had some chunked

13  up castor beans and you took your little mortar and pestle

14  and you ground it up and put it in the phosphate buffered

15  saline, the saline would pull out the ricin?

16  A.    Yes.  Ricin would dissolve in the solution, an aqueous

17  solution.

18  Q.    Okay.  And then you would use the entire material,

19  including any of the undissolved solids, or you would just

20  use the liquid that's dissolved?

21  A.    We'd just use the liquid that's dissolved.  We don't use

22  it in its entirety.  So as I mentioned earlier, we'll make up

23  an aliquot and use it for all the different testing methods

24  that we discussed.  We would also save approximately a mil as

25  well.

1  Q.    So if I took a castor bean and I chopped it up into

2  pieces and it came to your lab for testing, you wouldn't test

3  the entire thing; you would try to draw out ricin but you

4  wouldn't know what else was in there?

5  A.    So we wouldn't test an entire -- we wouldn't consume

6  evidence in its entirety, anyway.  We would take out a small

7  amount of it.  Probably if I had one castor seed worth, it

8  would be anywhere from 10 to 30 milligrams' worth, very small

9  amount.  From that we would grind it up into the liquid and

10 test.

11       Now, with all biological exams, it's agent specific.  So

12 we're asking the question is this agent present.  So when I

13 talked about the ELISA, I talked about antibodies that were

14 specific to ricin.  We're only looking for ricin in that

15 test.

16       When I ran the same test for abrin, I'm only looking for

17 abrin.  And the same when we got to mass spec, we're

18 selecting for peptides of ricin or abrin.  In this case it

19 was just ricin.

20 Q.    Okay.  So basically you know what you're looking for and

21 you look for those peptides to see if it's present?

22 A.    Yeah.  We know an agent that we're saying we want to

23 test this stuff for the presence of X agent, so in this case

24 ricin.

25 Q.    But you don't test for everything that's contained in

1    the sample that you take?

2    A.    No.

3    Q.    Okay.  So, for instance, if it's a castor bean and it's

4    just one slice of a castor bean, say I've sliced it into

5    pieces and you just get the one slice, you would just take a

6    portion of that slice because you don't want to use all the

7    evidence, right, but you would take a portion of it, you

8    would put in your -- you would chop it up with your little

9    mortar and pestle, right?

10   A.    Yes.

11   Q.    Put in your phosphate buffered saline that would draw

12   the protein out, especially ricin because ricin is

13   particularly protein soluble in water, right?

14   A.    Uh-huh.

15   Q.    But it wouldn't draw out all the other stuff that's in

16   ricin, a ricin bean?  A castor bean, pardon me.

17   A.    No.  Anything that is soluble will dissolve in that

18   solution.  Anything that would, again, dissolve in water will

19   dissolve in the phosphate buffered saline.

20         Something like the oil, which we refer to as

21   hydrophobic, you know, oil and water don't mix, so oil is not

22   going to dissolve in the phosphate buffered saline.  So

23   things like carbohydrates, sugars, other proteins,

24   potentially the nucleic acids, DNA and RNA, would dissolve in

25   that phosphate buffered saline.

1   Q.   Okay, so you went exactly where I was going next.   So if

2   it's part of a castor bean, that's about 60 percent oil,

3   right?

4   A.   40 to 60 percent depending on the cultivar.

5   Q.   And some of a castor bean is -- well, they're proteins,

6   there are about 50 or more different proteins in a castor

7   bean?

8   A.   There are a number of different proteins in there.

9   Ricin or the family of ricin represents 1 to 5 percent of the

10  weight of the seed.   RCA60, the more toxic form, and another

11  member of the RCA120 represent the bulk of that 1 to

12  5 percent.

13  Q.   Okay.   Other than that 1 to 5 percent, there are a ton

14  of other proteins in the castor bean?

15  A.   Yeah, there are other proteins present.

16  Q.   Okay.   Are they all equally soluble in water?

17  A.   Proteins are going to depend on the amino acid sequence.

18  I couldn't say that all of them would be soluble in water.

19  It's going to depend on how hydrophobic they are.

20       When you're extracting proteins out of a plant you've

21  got some that are very soluble that readily go into water,

22  some are mildly soluble and you can add chemicals to help get

23  them in the solution to dissolve, and there are other ones

24  that are very hydrophobic and will just repel water, they

25  will not dissolve.

1   Q.   So some of the proteins are water soluble and some are

2   not?

3   A.   Yes.

4   Q.   None of the oil, 40 to 60 percent, is water soluble?

5   A.   Correct.

6   Q.   So by running this test you're actually pulling ricin

7   out of something that used to just be a castor bean?

8   A.   Ricin by its very nature is out of a castor seed.  It

9   doesn't matter, you know, in what form it is.  Ricin is

10  ricin.

11  Q.   Well, it's not illegal to possess a castor bean?

12       MR. BUCHANAN:  Objection, Your Honor; calls for a legal

13  conclusion.

14       THE COURT:  Sustained.

15  Q.   (By Ms. Dunn)  Is a castor bean considered a biological

16  toxin?

17  A.   I would not consider a castor bean a biological threat

18  agent.  It does contain a biological toxin.

19  Q.   And when we looked at the C.F.R. list, the 73.3, it does

20  not contain castor beans; it only contains ricin, correct?

21  A.   That's correct.

22  Q.   And you know that castor beans are not illegal to

23  possess?

24  A.   That's correct.

25  Q.   So by taking the slice of castor bean, which was my

1    hypothetical, and taking a mortar and pestle and breaking it

2    up and putting your solution on it that draws out

3    specifically water-soluble proteins, which includes ricin

4    because it's extremely water soluble, you're testing

5    basically for ricin, but you're not testing what was actually

6    possessed by the person that that slice of castor bean came

7    from, just from one aspect of what was in that material?

8    A.   I'm testing for the presence of ricin outside of its

9    natural state, which is in an intact castor seed.  So I would

10   not be slicing an intact castor seed.  If I get an intact

11   castor seed, I'm sending the seed to the U.S. Department of

12   Agriculture.

13       So if I've got parts of the seed where I couldn't -- you

14   know, it's not an intact seed.  We would take a part of

15   whatever material came in, whether it's a chunk, a powder, or

16   a liquid, and we would test for the presence of ricin.

17   Q.   Okay, fair enough.  And with all of these testings that

18   you've done and in your report, you cannot tell the Court

19   what else was in those substances that you received?

20   A.   No.  Specifically we were testing for the presence or

21   absence of ricin.

22   Q.   One test that you talked about, was it the ELISA test

23   where you talked about using a mouse antibody and an

24   anti-goat something?

25   A.   Yes.  We use -- to what you're referring to was the

1    detection antibody, was a goat antiricin antibody and then

2    the conjugant antibody is a mouse anti-goat antibody.

3    Q.    Tell me what that means.

4    A.    Okay.  So the detection antibody, the goat antiricin is

5    an antibody produced by goats who have been inoculated with

6    ricin.  The antibodies are purified away from all the other

7    antibodies that the goat may be producing and then that's

8    utilized in our test.

9         The mouse anti-goat antibody is a mouse that's been

10   injected with goat serum, so it's producing antibodies

11   against goat material.  It's purified in the same way as the

12   ricin antibody would be.

13   Q.    And what they do is they somehow let you know if ricin

14   is present?

15   A.    Yeah, they're specifically -- the capture and the

16   detection antibodies have been validated to detect ricin.

17   Q.    Is ricin a toxin to things like rodents, mice, or rats?

18   A.    Yes.  Ricin is toxic to all mammals.

19   Q.    You said that quality control measures were done in

20   order to reduce the error rate, I think you said that earlier

21   when you were testifying.  What is the error rate --

22   A.    I don't recall mentioning error rate.

23   Q.    You don't recall --

24   A.    I don't recall talking about that.

25   Q.    Okay.  Well, do you do quality control measures?

1    A.    That's correct.

2    Q.    And do you do that to reduce the error rate?

3    A.    We do that to ensure that we're not getting errors and

4    ensure that our assay is working as it's designed to do.

5    Q.    Do you consider -- okay, so I'm used to doing this

6    mostly with things like cocaine and methamphetamine and we're

7    always given an error rate, plus or minus 4.3.  Are you

8    familiar with that?

9    A.    I think you're speaking of standard deviations and not

10   necessarily an error rate.  An error rate says you've got

11   something that's occurring that's producing a false result.

12       Our assays, we don't accept an error rate.  So if we --

13   it's not to say that we don't have error, you know, we have a

14   nonzero error rate, but the error rate would be something

15   like a human error.  That's not something that's going to

16   occur on a regular basis.  So we can't establish a rate, but

17   we monitor that through having controls with our assays.

18   Q.    So you're saying the testing itself doesn't have an

19   error rate but you realize that human error could sometimes

20   occur?

21   A.    Yeah.  I would say it's a non-calculable error rate and

22   that's why we monitor with controls.

23       MS. DUNN:  Can we have just a moment, Your Honor?

24       THE COURT:  Yes.

25       (Pause in the proceedings.)

1    Q.    (By Ms. Dunn)  So let me just make sure that I'm clear.

2    I understand that if you get a whole intact castor bean that

3    you will not do a test on it because it's a whole intact

4    castor bean?

5    A.    Normally.  There's been cases where something -- there

6    was information that they requested the whole, but in general

7    we do not test an intact seed.

8    Q.    But it's fair to say that if you did a test like these

9    few times on a whole intact castor bean, that you would find

10   ricin?

11   A.    Correct.

12   Q.    Because ricin is always in a castor bean?

13   A.    Ricin is a naturally occurring toxin found in the castor

14   seed.

15   Q.    Is ricin something that dissipates over time?

16   A.    Dissipates in which --

17   Q.    For instance, if it's exposed to environmental forces,

18   could it go away or degrade?

19   A.    Yes.  So with ricin in a powdered or dry form, it's very

20   stable protein.  In liquid form, especially if it's not a

21   very pure mixture in that liquid, things can start to break

22   it down.  Certainly heat above 80 degrees Celsius, which is

23   approximately 176 degrees Fahrenheit, heat will what's

24   referred to as denature it and that may cause it to unfold

25   and becomes nontoxic.

1    Q.    Okay, unfold.  So what you're talking about is the

2    proteins and the way that they're ordered together in a

3    structure and if heat is applied it unfolds, it opens up its

4    structure and it's no longer toxic?

5    A.    Correct, generally speaking.  I mean, it can sometimes

6    refold in something that's less toxic, but in general I would

7    say if it's denatured, when it cools down, if it was through

8    heat, it's not going to form ricin, the toxic form, the

9    active form again.

10        The easiest way to think of it is you crack open a raw

11   egg, it's runny.  You heat up the proteins, you denature

12   them.  When you cool the egg off, it doesn't go back into a

13   runny state, it stays in whatever form, you know, it twisted

14   into.

15   Q.    What are other ways that you can denature ricin besides

16   heat?

17   A.    Extreme pHs.

18   Q.    Such as?  How would you do that?

19   A.    You could use strong acids, strong bases would do it.

20   Certainly cleaving it with another enzyme, like we do in our

21   testing.  Breaking it into pieces would do it.  I had

22   mentioned also a chemical that we add to it when we're

23   running the gels, that's denaturing it.

24   Q.    So are there chemicals that are sold in grocery

25   stores or --

1        THE COURT:  I'm just struggling with the relevance of

2    this.

3        MS. DUNN:  Okay.

4    Q.   (By Ms. Dunn)  Specifically how does the adding an

5    acetate change a castor bean and make it more or less ricin?

6    A.   So it's not going to make it more or less ricin.  When

7    we're talking about adding a strong acid to that amino acid,

8    it's going to potentially cleave parts of it off, the amino

9    acid.

10       So when I said you have a -- think of it as a chain of

11   pearls, think if I took a pearl off but the string was still

12   there, you could take chips at it and it would denature it.

13       So when you look at proteins, and that's not just ricin,

14   any protein, they have what we call structure, okay.  It's a

15   macromolecule, not just a small chemical.  The primary

16   structure is that amino acid sequence, so that's what makes

17   it that protein.

18       So with ricin we have a known amino acid sequence.  So

19   whether it's in its native form, the active form, or

20   denatured form, it's still ricin, it's just active or not

21   active.

22       The easiest way to think of it is if right now you see

23   me talking, you know, it's a live version of me.  If I have a

24   heart attack and die, it's still me, it's just a dead version

25   of me.

1          Ricin is the same.  Proteins are the same way, or

2     enzymes -- proteins that are enzymes are the same way, you

3     could have the active form and the inactive form.

4          Now, the other structures that are protein, or we

5     mentioned folding, you have secondary structure, and these

6     are repeatable structures that are found in all different

7     types of proteins.  So we'll have an alpha helix.  And if

8     you're old enough to remember a telephone cord, when they're

9     hanging and you have that curl thing, it's a structure that

10    the protein will form that looks like the old telephone

11    cords.

12         You also have a structure called a beta sheet, which

13    looks like a folded ribbon.  Proteins will form these when

14    they're folding and being developed inside of a cell and

15    under specific conditions.  So when you change the

16    environment and relax those structures they don't typically

17    go back to that structure.

18         Third structure to think about when you're looking at

19    these are once I get these alpha helix and beta sheets

20    formed, I wrap them all together into a glob, almost like a

21    ball of string.  So if I took my string of pearls and just

22    knotted it up, that's specific to the active -- or protein,

23    right, in its native form.  If I relax that structure I'll

24    inactivate the protein.

25         The fourth structure is referred to -- it's basically

1    when I take two separate domains and attach them together.

2    So when I mentioned earlier that A chain and that B chain

3    binded by a disulfide bond or a sulfur bond, that's a fourth

4    structure.  So you could chemically cleave that and turn this

5    into a non, you know, functioning protein.

6         But at the end of the day as long as you haven't altered

7    that primary structure and that amino acid sequence is there

8    it's still that protein.

9    Q.   Okay.  So let me see if I understand what you're saying.

10   It's still a ricin protein but if you add acetone to it you

11   can make it less toxic.

12   A.   Okay.  So acetone is an organic solvent and not to be

13   confused with acid.  Acid is different.  Think of acid as

14   sort of like what's in your battery or muriatic acid you buy

15   and put in your pool, very --

16   Q.   I don't mean to interrupt, but small brain, blond hair.

17   I'm talking about acetone in particular.  How does that

18   affect?

19   A.   Acetone, you can use acetone to purify ricin.  Normally

20   it's called organics -- it's the equivalent to adding a salt,

21   we call it salting out.  You can do an organic extraction

22   where you add it and get a protein to purify out.

23        Now, with ricin typically you would use an organic

24   solvent like acetone, which is the equivalent of fingernail

25   polish remover, to remove the oil.  So you're not using it to

1    precipitate out the protein, more so you're trying to get rid

2    of the castor oil.

3    Q.    Okay.  And if you were doing that would you use a large

4    quantity, like a gallon-size jug for a dozen castor beans, or

5    would you use a very small quantity?

6    A.    You're asking what I would use?

7    Q.    I'm asking -- I'm assuming you have read treatises on

8    these sorts of things and you understand how it's done.  If

9    not, that's fine, you can just tell us you don't understand.

10   A.    No, I understand where you're going, but having purified

11   proteins that would take a different track on doing that and

12   I would have -- you know, I understand more scientific

13   methods that I would go down the road of doing that.

14        The protocols I think you're referring to are some of

15   the online protocols and some of the anarchist cookbook-type

16   methods where they'll first soak the beans, castor seeds, in

17   lye to soften the woody seed coat, pop the pulp out, grind

18   that material up, and then extract it with acetone to get rid

19   of the oil.

20        The procedure is varied with the amounts and volumes.

21   Some of them don't even have the volumes written down.  So

22   what somebody would use to do that, I would be guessing

23   trying to figure out what they would use.

24   Q.    Fair enough.

25        (Pause in the proceedings.)

1          MS. DUNN:  That's all I have, Your Honor.

2          THE COURT:  All right.

3          MS. DUNN:  Thank you very much.

4          THE COURT:  I find that the witness is qualified to

5     offer opinions in the field in which he's been identified.  I

6     find that he has -- there is a valid basis for the opinions

7     that he's offered, that they are consistent with the science,

8     with the peer-reviewed information concerning these

9     particular tests and the results, and therefore I find that

10    the government has proved by a preponderance of the evidence

11    the elements necessary for the witness to testify concerning

12    the opinions that he's set out in his expert witness report.

13         Thank you, you may step down.

14         We'll take a brief recess and then we'll come back and

15    deal with the issues on the motion to dismiss, as well as the

16    issues for the pretrial hearing purposes.

17         Just in case, do you mind asking the doctor, if he's not

18    catching a flight in 15 minutes, if he could hang around for

19    a while in case we get into some matters where he might help

20    us out a little later?

21         MR. BUCHANAN:  Sure, I believe he has a 5:00 flight,

22    it's around 5:00 or 6:00, we have some time.

23         THE COURT:  Okay, great.  Let's take a ten-minute recess

24    and we'll come back.

25         (Recess, 11:40 a.m. to 11:50 a.m.)

1          THE COURT:  Not that we will resolve the issue today,

2     but a motion for leave to file a motion to dismiss has been

3     filed by the defense.  It's not yet ripe for the Court's

4     consideration but I want to give the government an

5     opportunity to respond to that, as it may help bring into

6     focus what we have there and assist me in moving the case

7     along.

8          So, Mr. Buchanan, if you would like to be heard on that,

9     and this is not necessarily in lieu of being able to file a

10     written response, but just if you could address it for me.

11          MR. BUCHANAN:  I would appreciate it, constitutional

12     issues, I appreciate being able to respond in writing.

13          I told the Court, I believe just as a quick review, and

14     Ms. Dunn and I spoke about the motion briefly, I think it was

15     last week, and I have done a quick review, I believe in the

16     Second Circuit in the case that Dr. Barnaby talked about has

17     addressed at least some of these constitutional issues with

18     respect to the constitutionality of 175.  I'm not certain of

19     that as of now.  I have not conducted extensive Eleventh

20     Circuit research as to what the law is here.  But I do know

21     that I believe a challenges to 175 have occurred in a couple

22     of jurisdictions across the country and I would appreciate an

23     opportunity to respond in writing and sort of to formalize

24     what I believe is the case, at least from the Second Circuit,

25     and that is that 175 -- I do know they upheld a conviction

1    for 175 so that sort of tells me that they found it

2    constitutional.  But I'll review it more thoroughly and

3    closely and see the specifics of that case and I'd like an

4    opportunity to find similar cases, if they exist, in the

5    Eleventh Circuit.

6        THE COURT:  Let me ask you this.  Much of what I see is

7    the challenge here is whether the offense as charged in the

8    indictment is found within 175b.  That's kind of what I see

9    is more that than a constitutional challenge, but rather

10   whether -- and I know Ms. Dunn was questioning this last

11   witness about some of the federal regulations, 73.4 and 5 and

12   6 in particular, which are found in subsection (a)(1).

13       As I understand the indictment, it's brought under (c),

14   subsection (c), which doesn't refer to those sections of the

15   Code of Federal Regulations but actually refer to other

16   matters, but I don't know that ricin is found in those.  And

17   that's what I understand the challenge to be more about, that

18   is, does this statute, this particular statute direct itself

19   to accession of ricin.

20       Again, I'm not trying to put you on the spot to answer

21   that question now but I think in terms of looking at that and

22   preparing a written response, I think that's where the focus,

23   from my perspective, is greatest.  So I would encourage you

24   to look at it from that perspective.

25       I think that obviously if the statute doesn't address

1    the conduct as alleged in the indictment it's defective and

2    so to that extent I'm going to allow the motion to proceed

3    but give you an opportunity to address the motion.  And,

4    quite honestly, I think our trial is set October 1, I know

5    that's somewhat of a tight frame but I plan to keep it on the

6    calendar.  So I'm going ask you to expedite your response to

7    the motion so I can rule on it promptly and give everyone

8    notice as quickly as possible as to that.

9        So we'll move on from that.  I will grant the motion of

10   leave to file your motion and just ask the government to as

11   promptly as possible file a response.  And again, I think the

12   focus of this is does this particular statute encompass the

13   conduct as alleged in the indictment.

14       While I've got you here, Ms. Silas raised an issue about

15   certain evidence.  I don't know if it's your intent to offer

16   that evidence at trial or not.  If so, let me hear from you

17   about that.

18       MR. BUCHANAN:  It's not my intent to offer -- to make

19   that the focus of this case, Your Honor.  What I need to

20   check is, I do remember that when Mr. Gibbs reported to the

21   hospital there were items that prompted, that raised concern.

22   One of those items was a knife; I don't believe the FBI

23   recovered that knife.  But I believe he may have been wearing

24   a jacket, a vest that referenced that entity, that church of

25   whatever it is, and so I believe that that was something that

1  was noted by hospital staff and might have factored into the

2  urgency with which they reported to the police.

3       Now, I don't plan on offering someone to say he had this

4  jacket on and now I went to the Internet and I found all

5  these things related to this entity, but I don't want to

6  preclude the witnesses from testifying about their

7  observations of him, their interaction with him.

8       He spoke about having possibly spilled ricin to hospital

9  staff.  And then, as the Court is aware, he gave a

10  post-arrest Mirandized statement that talked about ricin as

11  well.  And I can't remember whether or not in that statement

12  he talks about that church but I can look and see whether or

13  not that's the case.

14       But I don't anticipate making this case about any

15  affiliations of defendant or about any potential plans for

16  the ricin.  There's no evidence of what he planned to do with

17  it and I don't plan on speculating on that or eliciting any

18  of that type of evidence from the witnesses.

19       THE COURT:  Let's do this.  I will grant the motion that

20  we not go into that with your right to alert the Court if

21  there are matters that you feel fall within this range of

22  evidence that you feel you should be permitted to offer at

23  trial, and that way we can then address those outside the

24  presence of the jury and decide if, while it may have some

25  probative value, if 403 causes it to go out because of its

1    prejudicial effect.  I'm guessing that's the kind of balance

2    that we'll have to strike.  But I want to give you a chance

3    to look at the evidence and make a decision.  If there are

4    matters you think you need to present your case-in-chief,

5    alert me to those and when you have been able to evaluate

6    your need for them I can then evaluate that probative value

7    versus any prejudicial effect.

8         So at this point the directive would be not to introduce

9    that but you have the right to raise it with the Court and

10   we'll address it should there be items that fall within that

11   category that you feel you need to present.

12        MR. BUCHANAN:  Yes, Your Honor.

13        THE COURT:  All right.

14        Yes, Ms. Silas?

15        MS. SILAS:  Were you about to adjourn?

16        THE COURT:  No.  I was about to see what else you wanted

17   to talk about.

18        MS. SILAS:  Oh, okay.  I was just trying to catch you.

19        While we're just talking about Mr. Barnaby, Ms. Dunn

20   asked some questions about whether he was present for the

21   testing, and the Court made a ruling that that only goes to

22   the weight.

23        And we actually think otherwise and we think that

24   there's a good confrontation clause challenge there.  Now, I

25   know that, you know, it oversimplifies it to just say

1    *Crawford*, *Crawford*, because there's difference between an

2    expert context and not an expert context, but I'm not sure

3    that if he did none of the testing and he actually -- like

4    there's a difference between relying on other people's

5    reports in the process of what you're testing and what you're

6    doing and just not doing any of it.

7        So we would -- we are going to -- we think now that we

8    ought to object to that and so maybe we would submit

9    something to you.  I don't know that you've given

10   Mr. Buchanan a deadline on his response, nor am I suggesting

11   that you should, although we do think that our argument

12   prevails.  You know, it's not on the list, the one that he

13   cites, points to A, A points to the list, it's not on the

14   list.  And then --

15       THE COURT:  On that, here's the burden you've got, to

16   me, it seems, is we allow experts -- experts are allowed to

17   rely on data generated by others without the necessity of

18   bringing in every one of those persons who was engaged in the

19   process.

20       Physicians, we don't require the x-ray tech to come in

21   who actually shot the film of the chest so that the physician

22   could rely on the film which showed that there was an

23   abnormality.  We don't require that.

24       And as I understood his testimony, and perhaps I didn't

25   understand it, these were tests that generated reports, that,

1   you know, you get the spectrograph, you get the other

2   matters, and there's a reading of that, which while the folks

3   conducting the test may have done a reading, he had to also

4   do a reading, he had to approve it, he had to look at the

5   results.

6        That's my concern in terms of rolling in here, spending

7   two days putting -- I mean, quite honestly, take this

8   witness's testimony and multiple it times four, and if you

9   want to do that to the jury, then we've got them off into the

10  chemistry labs instead of deciding the guilt or innocence of

11  this accused.

12       It's what do we allow the trial to turn into, is it

13  going to be one on chemistry or is it going to be about the

14  guilt or innocence of the accused.  And that's my only

15  concern, that while certainly you've got a right under

16  Crawford to confront the evidence against you, and I will

17  protect that right, I struggle a little bit in this context

18  with that.  And I understand, I think I understand your

19  theory about the beans and all that, but I also look at the

20  samples that were tested that served as the basis for his

21  findings.

22       And I can understand wanting to plow deeper into that,

23  which is a fact issue that could be addressed at trial, but I

24  struggle a bit.  I say that only to say that's the hurdle in

25  my view you need to overcome, is the need to require that all

1   the lab techs who did the different tests would be required

2   to travel here to present testimony, especially in the

3   absence of some indication that there's some probative value

4   there.

5       MS. SILAS:  And I'm not sure I'm actually saying that.

6   I don't think it would be all that great to have four or five

7   different people.  But it seems like more like someone did

8   the test and then we're calling sort of the head of the lab,

9   almost, and I'm not meaning that title, but just somebody

10  else, some supervisor who really doesn't -- he really didn't

11  describe really much involvement at all other than this is

12  the way you do a test.  Maybe it's just in the SOP, I don't

13  even know, but he really didn't describe having been

14  involved.

15      THE COURT:  I'm not sure the SOP is going to help you.

16  I think it is the directives on the testing that he said he

17  would have decided these would be the tests to be run and he

18  would have given directives of that.

19      My guess is when the government provides you the details

20  on the actual underlying tests you will then see whether

21  one -- and I don't know this, but I can guess that perhaps a

22  different person does each of the tests and that's why I said

23  four people.  I don't know that one person takes a sample and

24  runs it through all the test protocols or not.  But I'm

25  guessing that when you get this additional underlying

1    information you would have that made available to you.

2        You would also see what type of results you'd get from

3    each of the assays and then the spectrograms and all the rest

4    and that may give you a better position from which to analyze

5    what you need by way of underlying participants.

6        MS. SILAS:  Okay.

7        THE COURT:  Let the government produce those matters to

8    you, if you think you've got something there, bring it to me

9    and we'll take a look at it.

10       MS. SILAS:  Okay.  And Mr. Buchanan has alerted me to a

11   production that I may have overlooked, I'd like to let you

12   know that.

13       If we're describing issues here, with respect to the

14   instructions in this case, I'm not sure that there is one so

15   I'll just be looking around for whether there's a pattern on

16   this one.

17       THE COURT:  And I don't have specific recollection of

18   the witness -- I don't recall what statute the earlier ricin

19   case was brought under.

20       MS. SILAS:  It was under 175, this is 175b, which is not

21   (b) subsection of 175 but 175b and then -- okay.

22       THE COURT:  So that's probably not a good guide for you

23   for purposes of the charge.

24       MS. DUNN:  No, sir.

25       MS. SILAS:  And then just flagging issues for the Court,

1    I just wanted the Court to know that I'm on trial supposedly

2    with Judge Ross, the "supposedly" part being I don't know

3    what's going to happen with the client decision process, but

4    on September 24th.  I expect that to be a very short trial,

5    it's an illegal reentry case, but I want the Court to be

6    aware of it in case you all are looking for me and off I'm

7    doing that.

8        And then if the government did end up saying that

9    something was necessary about this religion or, for instance,

10   a picture of him with the jacket, then that would be

11   something we would want to deal with in voir dire and so I

12   just want to keep the Court -- I think it all needs to be

13   kept out.

14       THE COURT:  Yes, and for that reason, Mr. Buchanan, I

15   would want you to let me know in advance of trial so that we

16   would have those issues addressed so they could be addressed

17   in opening statement if there were such matters that were

18   going to be introduced at trial.

19       MR. BUCHANAN:  Absolutely, Your Honor.

20       THE COURT:  Any other matters from the government that

21   you feel we need to address this morning in terms of

22   preparation for trial?

23       MR. BUCHANAN:  I don't believe so, Your Honor.

24       THE COURT:  Thank you.

25       All right, let me get from you, by the Monday before

1    trial if I could have your voir dire questions that will

2    allow me to do the questionnaire and get that copied to you

3    before the end of the week.  And, of course, requests to

4    charge I would like to have by the Monday morning the trial

5    starts.

6        And you folks, this is not your first rodeo with me, you

7    know all the scoop.

8        Mr. Buchanan, I don't know if your colleagues have told

9    you how we do it but I'm happy to go through the drill with

10   you if you would like for me to in terms of our process.

11       MR. BUCHANAN:  One question.  Ms. Silas earlier

12   mentioned the possibility of a bench trial.  So I didn't know

13   whether or not the defendant, what the thought process is or

14   whether or not that would sort of obviate the need to have

15   that discussion of how we would do that.

16       THE COURT:  That's the first I heard of this.

17       MS. SILAS:  Right.  I thought about the possibility of

18   recommending that.  However, once we filed our motion to

19   dismiss we kind of have been all focused on that.  We really

20   think there's a lot of merit there so we haven't pursued that

21   further.

22       THE COURT:  Let me just say this.  If a decision were

23   made for a bench trial by consent of all parties, I would

24   want to know that at the earliest possible date because we

25   have now summoned jurors for this case.  And in Gainesville,

1    unlike Atlanta, when we summon jurors it is for a case, so

2    this is the only reason we have them coming and we want to

3    release them in ample time if we not going to need them.

4        MS. SILAS:  We will let you know.

5        THE COURT:  All right.  Mr. Buchanan, are you

6    comfortable with the process or do you want me to go through

7    that?

8        MR. BUCHANAN:  If the Court wouldn't mind.

9        THE COURT:  Yes.  As I mentioned, I need to get your

10   voir dire questions from you because I will prepare a written

11   questionnaire, I use one in every case.  It is not sent to

12   the jurors in advance but is rather given to them the morning

13   they report.

14       When they're brought into the courtroom, each juror, I

15   will do qualifying questions, and then each juror will stand

16   and state where they live, what type work they do, if they

17   have children, if they have a significant other where that

18   person works as well, where adult children work, if they've

19   ever been on the jury before, if so what type and whether

20   they reached a verdict, whether they've been on a grand jury,

21   whether they've had military service.

22       That little litany of questions can be found at the

23   Court's website under, I think, trial instructions for

24   lawyers under Judge Story's tab, you can find those.

25       After they do that, we go through and each juror gives

1   you that information and then each side has up to 30 minutes

2   to ask questions but you must ask them from your list of

3   proposed questions that you submitted to me in advance.

4         When you come in that morning I will have lined through

5   a lot of your questions because if I'm doing it in qualifying

6   or I put it in the written questionnaire, then I will strike

7   it so you've got a handy list of really what's left on your

8   list.

9         I think two times a lawyer has not gotten through all of

10  his or her questions.  So it sounds oppressive to say you get

11  30 minutes, but the truth is the matter of things that are

12  left to ask about can generally be handled in 30 minutes.

13        After you each do your 30 minutes of questions we then

14  follow up on the written questionnaire.  So during that 30

15  minutes you should not touch on subjects that are in the

16  written questionnaire.

17        The way I decide what to put on the written

18  questionnaire are typically things that I think a juror may

19  not want to talk about in open court where there may be other

20  people in the courtroom that they know in the community and

21  so forth.  So for that reason we like to honor their privacy

22  and so we follow up on those questions in private.  We do it

23  sequestered individual, we bring them in one at a time.  I do

24  those follow-up questions but with input from attorneys on

25  what you want me to cover.

1        After we do the individual questions then we strike the

2    jury.  It is done by passing a list.  The jury is not present

3    in the courtroom when we do that.  So I'm just saying that to

4    you because if you're remembering the person wearing the red

5    shirt is a person you don't want, you need to write down who

6    that is on your list because the red shirt won't be in the

7    room when you're striking the jury.

8        After striking the jury we proceed -- usually we get the

9    jury struck by lunch.  For that reason you don't have to have

10   any witnesses here Monday morning but you should be ready to

11   start your evidence Monday afternoon.

12       Thirty minutes per side for opening statements and we

13   will begin each morning at 9:30, we try to recess as close to

14   5:00 as possible.  Of course, we take a lunch recess and

15   typically a mid morning and mid afternoon recess.

16       Closing arguments, 30 minutes per side.  I do not give

17   the charge until after the arguments, and I read the charge

18   to the jury but I also send out with the jury the complete

19   charge in writing, a copy for each juror.

20       For that reason, the charge conference, which is held

21   typically, obviously before the closing arguments, hopefully

22   the day before the closing arguments, is an opportunity to --

23   I will give you the night before your closing the draft of

24   the charge so you can see how it looks and at the charge

25   conference I'll hear from you as to any additions or

1   deletions you want me to make and even editing in terms of if

2   you would like me to move something around or whatever.

3   That's why I give it to you in written form, so you can see

4   the way they're going to get it.  So that's your chance to

5   help edit the charge the jury is going to get.  As I said, I

6   try to get that to you the night before your closings so

7   you've got it as you prepare your closing and have some sense

8   of where we're headed.

9        During the trial you don't have to ask my permission to

10  approach a witness.

11       That's all I can think of in terms of housekeeping.  Any

12  questions that you have?

13       MR. BUCHANAN:  I don't think so, Your Honor.

14       THE COURT:  All right.  Thanks, folks, we will see

15  you -- yes?

16       MS. DUNN:  Not a question on what we just talked about,

17  but you said the government's response to the motion to

18  dismiss, you wanted it expedited but you didn't give a due

19  date or me a reply date.

20       THE COURT:  What time frame to you think you need,

21  Mr. Buchanan, to get that?  Realizing we're working against

22  an October 1.

23       MR. BUCHANAN:  Can I have a week?

24       THE COURT:  Yes.

25       MR. BUCHANAN:  Next Thursday?

1          THE COURT:  Thursday is perfect, next Thursday.  And if

2     you could reply by the following Wednesday, maybe?

3          MS. DUNN:  (Nods head.)

4          THE COURT:  So next Thursday for the government,

5     Wednesday for the reply.  And we will make it a priority in

6     chambers, we will get on it as quickly as we possibly can as

7     soon as we get the reply.

8          All right, thanks, folks.  Unless I hear something

9     different from you, we'll plan to be moving forward on the

10    1st, and obviously subject to the ruling on the motion as

11    well.  Thank you.  We're adjourned.

12          (Proceedings concluded, 12:15 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4    UNITED STATES DISTRICT COURT:

5    NORTHERN DISTRICT OF GEORGIA:

6

7            I hereby certify that the foregoing pages, 1

8    through 83, are a true and correct copy of the proceedings in

9    the case aforesaid.

10            This the 19th day of September, 2018.

11

12

                         /s/ *Amanda Lohnaas*
13            _____

14            Amanda Lohnaas, CCR-B-580, RMR, CRR
              Official Court Reporter
15            United States District Court

16

17

18

19

20

21

22

23

24

25